Exhibit 2

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALT Hotel, LLC, | ) | Case No. 11-19401 (ABG) |
| | ) | |
| Debtor. | ) | **Hearing Date: March 5, 2012 at 10:00 a.m.** |
| | ) | **Objection Due: February 23, 2012 at 5:00 p.m.** |

**DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR**

THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT AND HAS FOUND THAT IT CONTAINS INFORMATION THAT IS ADEQUATE TO ENABLE A CREDITOR OF THE DEBTOR OR A HOLDER OF AN EQUITY INTEREST IN THE DEBTOR TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. THE DEBTOR HAS PROVIDED THE INFORMATION THAT IS SET FORTH HEREIN TO ENABLE ITS CREDITORS AND INTEREST HOLDERS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY UPON THE DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN THE PURPOSE OF MAKING AN INFORMED JUDGMENT ABOUT THE PLAN AND DECIDING HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONTAIN ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY PERSON THAT FEELS THAT HE, SHE, OR IT MUST HAVE SUCH ADVICE IN ORDER TO MAKE A JUDGMENT ABOUT THE PLAN SHOULD CONSULT HIS, HER, OR ITS OWN ATTORNEYS, ACCOUNTANTS, AND/OR ADVISORS.

THE MANAGEMENT OF THE DEBTOR AND EXPERT CONSULTANTS THAT HAVE BEEN EMPLOYED BY THE DEBTOR HAVE PROVIDED ALL OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, WITH THE EXCEPTION OF INFORMATION FOR WHICH MANAGEMENT HAS IDENTIFIED ANOTHER SOURCE. THE DEBTOR HAS NOT AUTHORIZED ANY PARTY TO MAKE ANY REPRESENTATIONS ABOUT THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS AND/OR ITS PLAN OF REORGANIZATION OTHER THAN THOSE REPRESENTATIONS THAT ARE MADE IN THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING DOCUMENTS AND EXHIBITS.

IN DETERMINING HOW TO VOTE UPON THE PLAN OF REORGANIZATION, HOLDERS OF CLAIMS AND/OR INTERESTS SHOULD NOT

RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS OTHER THAN THOSE
CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTOR HAS BEEN CAREFUL TO MAKE ACCURATE STATEMENTS
IN THIS DISCLOSURE STATEMENT WITH RESPECT TO ALL MATERIAL
MATTERS. THE DEBTOR BELIEVES THAT THE CONTENTS OF THIS
DISCLOSURE STATEMENT ARE COMPLETE AND ACCURATE IN ALL
MATERIAL RESPECTS. HOWEVER, THE DEBTOR CANNOT AND DOES NOT
WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS
WITHOUT INACCURACY. IT IS ESPECIALLY IMPORTANT THAT ALL HOLDERS
OF CLAIMS AND/OR INTERESTS UNDERSTAND THAT EVENTS AND
CIRCUMSTANCES THAT THE DEBTOR DOES NOT CURRENTLY FORESEE MAY
MATERIALLY ALTER THE FINANCIAL PERFORMANCE OF THE DEBTOR.

TO ALL PARTIES IN INTEREST:

On May 5, 2011 ("Petition Date"), ALT Hotel, LLC (the "Debtor") filed a voluntary
petition under Chapter 11 of the Bankruptcy Code. The Debtor is presently acting as a debtor in
possession. The Debtor's case is pending in the above-captioned court (the "Bankruptcy
Court").

This Disclosure Statement is submitted by the Debtor and contains information with
respect to the Debtor's proposed Plan of Reorganization (the "Plan"), which is attached hereto as
Exhibit A.[1] Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being
distributed to you together with a copy of the proposed Plan to allow you to make an informed
decision in exercising your right to accept or reject the proposed Plan. In the event that there are
any inconsistencies between the Plan and the Disclosure Statement, the terms of the Plan shall
control. The Court's approval of this Disclosure Statement does not constitute an endorsement
by the Court of the proposed Plan.

The Debtor urges you to vote to accept the proposed Plan and to promptly return your
completed ballot in order to assure that your vote will be counted.

## ARTICLE I

## DEFINITIONS

Terms that are employed in this Disclosure Statement and that are not specifically
defined herein or in the Bankruptcy Code shall be defined in accordance with the Plan of
Reorganization that accompanies this Disclosure Statement. In some instances, capitalized terms
that are used in the Plan are included herein in the lower case, such as the term "Claim". Use of
the lower case is not intended to alter the definition of the subject term.

---

[1]    The Plan attached hereto as Exhibit A is identical in all respects to the *Plan of Reorganization Under
Chapter 11 of the Bankruptcy Code* filed by the Debtor on December 16, 2011 at Docket No. 154.

## ARTICLE II

## BACKGROUND INFORMATION

### A.    <u>The Debtor</u>.

The Debtor is a limited liability company.  The Debtor's sole asset is an operating hotel that is located in Chicago, Illinois and that is named The Allerton Hotel (the "Hotel" or the "Property").  The Hotel is located on what is often referred to as Chicago's "Magnificent Mile," at the intersection of North Michigan Avenue and East Huron Street.  It has 443 guest rooms, a building area of approximately 243,200 square feet, a restaurant and lounge, and meeting and banquet facilities.

The Hotel is an iconic and historic fixture in Chicago.  It has been in operation for nearly 90 years, having first opened its doors in 1924, during the "Roaring Twenties."  One of the first high-rises to be located on Michigan Avenue, its beautiful Northern Italian Renaissance architecture initially stood in stark contrast to the then-prevalent Georgian and Tudor revival cityscape.  By the 1940s, when the Hotel's famous (and still extant) "Tip Top Tap" sign was first illuminated, the Hotel had achieved recognition as a social and political "in spot."

The Hotel gained nationwide attention during the 1950s when radio personality Don McNeil broadcast his popular daily radio program, "Don McNeil's Breakfast Club," from the Tip Top Tap.  Such Hollywood legends as Bob Hope, Marilyn Monroe, Danny Kaye, Frank Sinatra, Lucille Ball, Jerry Lewis, Ginger Rogers, and James Stewart were featured guests on the show.

The Allerton is today included on the National Register of Historic Places.    In June of 1998, the City of Chicago designated the Hotel as an historic landmark.

In 1998, the Hotel launched a $60 million renovation program.  A subsequent renovation, at a cost of in excess of $10 million, was completed in July of 2008.  The renovations were well received.  The Hotel was awarded the "Best Guestroom Design" by *Hotel World Magazine* and was a finalist in the ratings for best restaurant, lounge and public space design.

Unfortunately, however, the newly-refurbished Hotel reopened at the onset of the 2008 recession and Chicago's worst hotel market downturn ever recorded.  Revenue per available room (or RevPar) dropped by approximately twenty-nine percent (29%) in the year after the Debtor completed the renovations.  Occupancy rates fluctuated during the recession but increased for the 2011 calendar year.  Average daily rates, however, have remained low, peaking in 2008 but declining since that time.

### B.    <u>Ownership of the Debtor and Secured Indebtedness</u>.

On November 9, 2006, the Debtor entered into that certain Loan Agreement (the "Senior Loan Agreement") with Column Financial, Inc. ("Column") in the original principal amount of $79 million, containing Tranche A and B portions.  The Senior Loan Agreement was secured by a Mortgage and Security Agreement (the "Mortgage"), which purportedly created a senior lien position on substantially all of the Debtor's property, including a mortgage on the Hotel property

and a security interest in a lockbox account into which all revenues associated with the operation of the Hotel are deposited. Column, based on a series of transactions beginning in March 2007, indirectly assigned the Tranche A portion of the senior loan to U.S. Bank National Association (as successor-in-interest) to Wells Fargo Bank, N.A. ("Wells Fargo"), as Trustee for the Beneficial Holders of the Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-TLF1 (the "Wells Fargo Securitization Trust"). The remaining portion of the senior loan (Tranche B) was assigned to Wells Fargo.

On May 24, 2010, subsequent to the commencement of a foreclosure lawsuit that is discussed below, the Wells Fargo Securitization Trust and Wells Fargo assigned their respective interests under the Senior Loan Agreement, the Mortgage and related documents to DiamondRock Allerton Owner LLC ("Secured Lender"), an affiliate of DiamondRock Hospitality Company ("DRH" and together with Secured Lender, "DiamondRock"), a publicly held real estate investment trust. As of the Petition Date, the principal balance that was nominally due and owing under the Senior Loan Agreement was $69 million, subject to the Claim Objection and Equitable Subordination Litigation brought by the Debtor and Mezz Lender, as defined in section II.B below.

On March 21, 2007, the parent company of the Debtor, Alt Hotel Mezz, LLC ("Mezz Borrower") entered into a mezzanine loan agreement in the principal amount of $10 million (the "Mezz Loan") with Column pursuant to a Mezzanine Loan Agreement. Column and the Debtor entered into the Mezz Loan Agreement to allow the Debtor to pay down the Tranche A portion of the senior loan by $10 million. The Mezz Loan was secured by a Pledge and Security Agreement also dated March 21, 2007 (the "Pledge Agreement"), whereby Mezz Borrower, a bankruptcy remote, special purpose entity, pledged one hundred percent (100%) of the membership interests in the Debtor to Column as security for the Mezz Loan. The Mezz Loan was subsequently assigned to Hotel Allerton Mezz, LLC ("Mezz Lender").

In June 2010, after Wells Fargo refused to extend the maturity of the Senior Loan and declared under the Senior Loan Agreement, Mezz Lender, as a means of protecting its interests in the Hotel, foreclosed on the membership interests in the Debtor through a credit bid by the Mezz Lender in the amount of $8.4 million. The credit bid was made at a publicly noticed sale pursuant to Article 9 of the Uniform Commercial Code in effect in the State of New York as of the date of the sale (the "UCC Sale"). As a result of the UCC Sale, Mezz Lender succeeded to the ownership of the membership interests in the Debtor.

## C.   **Events Leading to Bankruptcy**.

During the fall of 2009, the Debtor sought to extend the maturity date of the Senior Loan Agreement which was otherwise due to mature on January 9, 2010. However, notwithstanding the fact that the Debtor was contractually entitled to the requested extension, Wells Fargo refused to approve the extension. Wells Fargo had approved a similar extension in the previous year and had provided the Debtor with good reason to believe that yet another one-year extension would be approved. However, based on an improper calculation of the Debt Service Coverage Ratio performed by Wells Fargo (or Key Bank, N.A., as servicer of the Wells Fargo Securitization Trust), Wells Fargo denied the extension.

On April 21, 2010, Wells Fargo, in its dual capacities as special servicer under the Wells Fargo Securitization Trust and holder of the Tranche B debt, declared a default under the Senior Loan Agreement.  On April 30, 2010,Wells Fargo initiated a foreclosure lawsuit in the Circuit Court of Cook County, Illinois, which was captioned *Wells Fargo, et al. v. ALT Hotel LLC*, and designated Case No. 10-CH-18859 (the "Foreclosure Case").  The Debtor and Mezz Lender strongly dispute the claims that any default occurred under the Senior Loan Agreement and that the Senior Lender is entitled to foreclose its mortgage on the Property.

In an effort to protect the Debtor's substantial equity in the Hotel, the Debtor initiated the above-captioned bankruptcy case (the "Case") on May 5, 2011, the Petition Date.

**D.    Significant Events in Bankruptcy Case.**

1.    Employment of Debtor's Bankruptcy Counsel.  On June 1, 2011, the Bankruptcy Court entered an order authorizing the Debtor to employ Neal Wolf & Associates, LLC ("NW&A") as counsel to the Debtor, effective as of the Petition Date.  NW&A files monthly invoices and quarterly applications for allowance of attorneys' fees and reimbursement of expenses in this Case.  On November 2, 2011, the Bankruptcy Court entered an order granting, in part, NW&A's first interim application for allowance of its compensation and reimbursement of its expenses.

2.    Schedules and Statement of Financial Affairs.  On June 11, 2011, the Debtor filed its Statement of Financial Affairs and Schedules.  Electronic copies of these documents, which list and categorize the assets and liabilities of the Debtor as well as a considerable amount of additional current and historical information about the Debtor, and which are voluminous, will be provided to parties in interest by NW&A upon written request.

3.    Retention of FTI as Debtor's Financial Advisors.  On January, 10, 2012, the Debtor filed its application to employ FTI Consulting, Inc., as Financial Advisors to the Debtor *nunc pro tunc* to June 21, 2011 (the "FTI Application").  The FTI Application is scheduled to be heard on January 30, 2012.

4.    Claims Bar Date Established.  On November 16, 2011, the Bankruptcy Court entered an order establishing December 16, 2011 (the "Bar Date") as the deadline by which holders of unsecured prepetition claims were required to submit proofs of claim.[2]

5.    Cash Collateral/Post-Petition Financing.  On May 9, 2011, the Bankruptcy Court authorized the Debtor to use the cash collateral of the Secured Lender on an interim basis.  The Bankruptcy Court extended the Debtor's use of cash collateral in orders entered on May 18, 2011, May 23, 2011, June 27, 2011, October 5, 2011 and December 21, 2011 (the December 21, 2011 order being hereinafter referred to as the "Sixth Interim Order").  The Debtor's use of cash collateral is currently approved through March 11, 2012.  The specific limitations on, and terms related to, the Debtor's use of cash collateral are more specifically set forth in the Sixth Interim

---

[2]    Creditors holding claims based on the rejection of their executory contracts or unexpired leases, or claims added by the Debtor through subsequent amendment to the Debtor's schedules, are provided with additional time to file a proof of claim.

Order. The next hearing on the Debtor's use of cash collateral is scheduled to take place on March 5, 2012.

The Debtor has filed a motion that seeks, in part, entry of an order approving proposed postpetition financing to be provided by the Secured Lender (the "DIP Financing Motion").[3] A hearing on the DIP Financing Motion is currently scheduled to occur on January 25, 2012. The DIP Motion, in part, proposes a borrowing by the Debtor of as much as $800,000, to cover the Debtor's liquidity needs during the "slower," winter season.

6.    Valuation Motion. On May 27, 2011, the Debtor filed a motion (the "Valuation Motion") seeking entry of an order establishing pre-hearing procedures and deadlines, and scheduling a hearing, for the purpose of determining the value of the Hotel. Upon stipulation of the Debtor and Secured Lender, and pursuant to an order entered by the Bankruptcy Court on November 14, 2011, the hearing on the Valuation Motion has been continued so that it can be conducted concurrently with the hearing on confirmation of the Plan. A status hearing on the Valuation Motion is currently scheduled to occur on March 5, 2012.

7.    Claim Objection and Equitable Subordination Litigation. On July 8, 2011, the Debtor and Mezz Lender filed an adversary proceeding in the Bankruptcy Court against the Secured Lender, captioned *ALT Hotel, LLC and Hotel Allerton Mezz, LLC v. DiamondRock Allerton Owner, LLC,* and designated Adv. No. 11-01469-ABG (the "Claim Objection and Equitable Subordination Litigation"). In the Claim Objection and Equitable Subordination Litigation, the Debtor and Mezz Lender seek, among other things, entry of an order disallowing that portion of the Secured Lender's claim consisting of default interest and subordination of a portion of the Secured Lender's claim. The Debtor and Mezz Lender have amended their complaint three times in the Claim Objection and Equitable Subordination Litigation, most recently on November 14, 2011. On a number of occasions, the Secured Lender has filed a motion seeking entry of an order dismissing the Claim Objection and Equitable Subordination Litigation. A hearing on Senior Lender's most recent motion to dismiss the Claim Objection and Equitable Subordination Litigation is scheduled to take place on March 7, 2012.

8.    Removed Litigation. On August 3, 2011, Mezz Lender filed a notice removing to the Bankruptcy Court certain claims against DiamondRock and Wells Fargo that were brought by the Mezz Lender in the Foreclosure Case. The removal notice created new Adv. No. 11-01651-ABG (the "Removed Litigation"). The Debtor is not a party to the Removed Litigation. Mezz Lender has sought to consolidate the Removed Litigation and the Equitable Subordination Litigation. The Bankruptcy Court has raised issues with respect to the proposed consolidation and has also questioned whether the Bankruptcy Court has subject matter jurisdiction over the Removed Litigation. The Bankruptcy Court has indicated that it will decide these issues on March 7, 2012.

9.    Guaranty Litigation. PS CDO Manager, LLC, an affiliate of the Debtor and Mezz Lender, is guarantor under a Guaranty, dated as of October 1, 2010 (the "Guaranty"). On July 12, 2011, the Secured Lender made a demand for payment under the Guaranty. On August 9,

---

[3]    Debtor's Motion for Order Authorizing Debtor to (A) Use Cash Collateral; (B) Obtain Post-Petition Financing from Senior Lender and (C) Grant Adequate Protection and Provide Security to Senior Lender, filed on December 14, 2011 at Docket No. 152.

2011, the Secured Lender filed a lawsuit in the Supreme Court of the State of New York, County of New York, against PS CDO Manager, LLC, that is captioned *DiamondRock Allerton Owner, LLC v. PS CDO Manager, LLC*, and designated as Index No. 652224/2011 (the "Guaranty Litigation"). The Guaranty Litigation remains pending in the Supreme Court of the State of New York.

## ARTICLE III

## ASSETS AND LIABILITIES OF DEBTOR

A.  <u>Assets</u>.

On August 19, 2011, the New York City, New York-based firm of LW Hospitality Advisors LLC, in an engagement commissioned by the Debtor, issued an opinion that the market value of the fee simple interest in the Debtor's property, in its "as-is condition," as of August 1, 2011, was $94,000,000. The opinion was set forth in a detailed report that was entitled *"Self-Contained Appraisal of the Allerton Hotel Chicago on Magnificent Mile"* by LW Hospitality Advisors, LLC, dated August 19, 2011 (the "Appraisal"). The Debtor believes that the fair market value of the Hotel is equal to or greater than that set forth in the Appraisal.

The Secured Lender disputes the Debtor's asserted valuation of the Hotel, claiming that the value of the Hotel is less than the amount of the Secured Indebtedness.

In addition to the fee simple interest that was valued in the Appraisal, the Debtor owns [i] accounts receivables totaling approximately $734,650, [ii] inventory (linens, food, beverages, glassware, silver and related inventory) totaling approximately $123,362, [iii] potential claims against the Secured Lender and Wells Fargo and [iv] cash reserves at Property level.

B.  <u>Liabilities</u>.

1.  <u>Asserted Secured Claim of Secured Lender</u>. The Secured Lender has filed a proof of claim in this Case asserting a secured Claim of not less than $73,049,185.77 (the "Secured Lender Claim"). The Debtor and Mezz Lender dispute both the amount and priority of the Secured Lender Claim, and have filed an adversary proceeding, the Claim Objection and Equitable Subordination Litigation, seeking the partial disallowance and subordination of the Secured Lender Claim.

2.  <u>Other Asserted Secured Claims</u>. No other Secured Claims were scheduled in the Debtor's bankruptcy schedules. As of the date hereof, three creditors have filed proofs of claim alleging Secured Claims against the Debtor, totaling $701,219.48. The Debtor disputes the assertion that any of these Claims is secured and also disputes the amounts of these Claims. The Debtor is in the process of further reviewing these Claims and may file and prosecute claim objections with respect to the three proofs of claim. The Debtor believes at this time that the amount of these disputed Other Secured Claims is minimal.

3.  <u>Priority Claims</u>. Scheduled and asserted Priority Claims, to date, total $355,314.13. Such Claims are held by Taxing Agencies or are Claims asserting priority under sections 503(b)(9), 507(a)(2), 507(a)(4) and/or 507(a)(5) of the Bankruptcy Code. However,

certain proofs of claim of such asserted Priority Claims may be subject to valid Claim objections, which the Debtor will be filing and prosecuting to settlement or adjudication. Further, the Debtor may revise its bankruptcy schedules to reduce certain scheduled Priority Claims. The Debtor believes that actual allowed Priority Claims will equal not more than approximately $331,687.78. The only anticipated Priority Claims that will be Allowed Claims are Claims arising under sections 507(a)(2), 507(a)(3) or 507(a)(8) of the Bankruptcy Code. Such Claims are not required to be classified and are therefore not separately classified in the Plan.

4.      General Unsecured Claims. Scheduled and asserted General Unsecured Claims, to date, total approximately $5,535,819.54. In arriving at this aggregate amount, for purposes of the Disclosure Statement, the Debtor has used the greater of the scheduled or claimed amount, where a creditor's Claim was scheduled and such creditor also filed a proof of claim. However, by far the largest of such Claims, in the amount of $4,902,820 (the "Unite Here Claim"), was filed by Unite Here National Retirement Fund, The Unite Here Claim is a contingent Claim which would arise only in the event that the Hotel were to cease operations, permanently close its doors, and cease making contributions to the relevant union pension funds. Such a scenario is so unlikely that the Debtor believes the only reasonable approach is to estimate the Unite Here Claim at zero for purpose of voting on the Plan. Further, a number of the remaining General Unsecured Claims are subject to valid Claim objections, which the Debtor intends to file and prosecute to settlement or adjudication. Furthermore, certain scheduled General Unsecured Claims may be subject to amendment. Consequently, the Debtor anticipates that actual allowed General Unsecured Claims will aggregate not more than approximately $484,725.

5.      Equity Holder's Deficiency Claim. The Equity Holder has filed a proof of claim asserting a Secured Claim of not less than $3,503,633.90. The Debtor disputes the Equity Holder's Deficiency Claim as to both amount and priority. Based on discussions with the Equity Holder, designation of the Equity Holder's Claim as a secured claim is a scrivener's error.

## ARTICLE IV

## SUMMARY OF PROPOSED PLAN OF REORGANIZATION

**A.      Explanation of Impaired and Unimpaired Claims and Interests.**

A claim or interest is "impaired" under a plan of reorganization if the legal, equitable, or contractual rights of the holder of such claim or interest is altered under the plan. Any and all Allowed Claims in Classes 1, 3 and 4 are impaired under the Plan. Because of this impairment, the holders of Claims in Classes 1, 3 and 4 are entitled to vote to accept or reject the Plan.

The term "unimpaired" refers to classes of creditors or interest holders whose legal, equitable, and contractual rights remain unaltered by the Plan. Because of the treatment afforded to such classes, they are deemed to have accepted the Plan. It is not necessary to solicit acceptances from the holders of Claims or Interests in unimpaired Classes. Allowed Claims in Class 2 are unimpaired under the Plan. The Allowed Interest of the Equity Interest Holder in Class 5 is unimpaired under the Plan

**B.      Classification of Claims and Interests.**

All Claims, as defined in section 101(5) of the Bankruptcy Code, against the Debtor are classified as set forth herein. A Claim is in a particular Class only to the extent it qualifies within the definition of such Class and is in a different Class to the extent it qualifies within the definition of such different Class.

     1.     <u>Unclassified Claims:</u> Claims arising under sections 507(a)(2), 507(a)(3) and 507(a)(8) of the Bankruptcy Code.

     2.     <u>Class 1:</u> Secured Claim of Secured Lender, the amount and priority of which is in dispute.

     3.     <u>Class 2:</u> Other Secured Claims, if any.

     4.     <u>Class 3:</u> General Unsecured Claims.

     5.     <u>Class 4:</u> Equity Holder's Deficiency Claim, the amount and priority of which is in dispute.

     6.     <u>Class 5:</u> Interest of Equity Holder.

### ARTICLE V

### PROVISIONS FOR SATISFYING CLAIMS AND SPECIFYING TREATMENT OF EACH CLASS UNDER THE PLAN

The treatment of all Allowed Claims and Interests shall be as follows:

**A.**     **<u>Unclassified Claims.</u>**

     1.     <u>Administrative Expense Claims.</u> Pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, each allowed Administrative Expense Claim shall be paid in full on or before the Effective Date, or as otherwise agreed by the holder of such Claim.

     2.     <u>Priority Claims.</u> Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Allowed Claim of a government unit for real property taxes, soft drink taxes, city telecom taxes, movie taxes, hotel accommodation and restaurant taxes, amusement taxes, sales and use taxes, MPEA taxes, hotel room taxes, state telecommunication and state telecom infrastructure taxes, and other taxes held by a government unit that remain due and unpaid as of the Effective Date, shall be paid in full on or before the Effective Date, or as otherwise agreed to by the governmental unit holding such Priority Tax and Duty Claim. To the extent other Claims of governmental units become Priority Tax and Duty Claims, such Priority Tax and Duty Claims will be paid in full on the later of the Effective Date or on the date such claims of any such governmental units become a Priority Tax and Duty Claim.

**B.**    **Treatment of Classified Claims and Interests.**

1.    Unclassified Claims: Each holder of a Priority Tax and Duty Claim shall be paid in full, or as otherwise agreed by the holder of such Claim, on or before the Effective Date or upon entry of a Final Order allowing such Claim, whichever shall occur later.

2.    Class 1: Secured Claim of Secured Lender.

The Class 1 Secured Claim of the Secured Lender, which is impaired under the Plan, shall be treated as follows:

(a)    The Secured Lender will retain all of its liens and security interests in property of the Debtor, which liens and security interests will have the same priority and validity as the Pre-Petition liens and security interests of the Secured Lender, unless the validity and priority of such liens and security interests have been altered by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

(b)    If, as, and when it is allowed, but in no event earlier than the Effective Date, the amount of the Allowed Secured Claim of the Secured Lender will be increased by all principal and interest due under the DIP Loan (the "DIP Loan Balance").

(c)    The sum of the amount of the Allowed Secured Claim of the Secured Lender and the DIP Loan Balance, which sum the Debtor currently estimates to be $66,800,000, will constitute the new principal balance of the Secured Claim of the Secured Lender (the "New Principal Balance").

(d)    The New Principal Balance will bear interest at the rate of 4.625 percent per annum, which interest will be payable to the Secured Lender monthly, for a period of sixty (60) months, commencing upon the first Business Day of the calendar month following the later to occur of (i) the Effective Date or (ii) the date upon which a Final Order is entered allowing the Secured Claim of the Secured Lender (the "Secured Loan Payment Commencement Date").

(e)    The New Principal Balance, together with any accrued and unpaid interest, from and after the Secured Loan Payment Commencement Date, will be repaid in full upon the date of payment of the final installment of interest provided for immediately above (the "Maturity Date").

(f)    The New Principal Balance, together with any accrued and unpaid interest, may be prepaid at any time prior to the Maturity Date, without penalty.

(g)    The Foreclosure Case will be dismissed with prejudice.

(h)    The Guaranty Litigation will be dismissed with prejudice, the claims asserted in the Guaranty Litigation will be released, and the Guaranty will be replaced and superseded by the Amended and Restated Guaranty, which will contain the same substantive terms as the Guaranty.

(i)      Amended and Restated Loan Documents will be executed, delivered, and (where appropriate) recorded in order to memorialize and give effect to the provisions of the Plan insofar as such provisions relate to the treatment of the Secured Lender under the Plan.

3.      <u>Class 2</u>: Other Secured Claims.

These Claims, if any, are unimpaired under the Plan. The holders of the Allowed Other Secured Claims, if any, shall retain, unaltered, the legal, equitable and contractual rights (including any liens that secure such Claim) to which the holders of such claims are entitled, and such Allowed Claims shall be reinstated as of the Effective Date.

4.      <u>Class 3</u>: General Unsecured Claims.

These Claims are impaired under the Plan. Each holder of an General Unsecured Claim that is an Allowed Claim shall receive fifty percent (50%) of the amount of such holder's Allowed Claim on the Effective Date and fifty percent (50%) of the balance of such holder's Allowed Claim, together with interest computed at the rate of five percent (5%) per annum, one hundred eighty (180) days after the Effective Date. If a holder of such an Allowed Claim also holds other Claims separately classified, those Claims will be treated as set forth with respect to the applicable Class or Classes.

5.      <u>Class 4</u>: Equity Holder's Deficiency Claim.

This Claim is impaired under the Plan. The Equity Holder's Deficiency Claim shall accrue interest at the rate of seven percent (7%) per annum commencing upon the Effective Date. Each month, commencing upon the first Business Day of the month following the month in which the Effective Date occurred, the holder of the Equity Holder's Deficiency Claim, to the extent the Equity Holder's Deficiency Claim is an Allowed Claim, shall receive a payment equal to the amount of Excess Cash Flow, if any, which shall be applied first to accrued and unpaid interest and second to principal, until the Equity Holder's Deficiency Claim, to the extent it is an Allowed Claim, together with all interest that has accrued thereon, has been paid in full.

6.      <u>Class 5</u>: Interest of Equity Holder.

The Interest of the Equity Holder is unimpaired under the Plan.

## ARTICLE VI

## MEANS FOR EXECUTION OF THE PLAN

A.      <u>**Comments on Financial Projections.**</u>

As set forth in the Monthly Cash Flow Projections (the "CF Projections"), attached hereto as <u>Exhibit B</u>, the Debtor has the means to execute the Plan. Such projections reflect anticipated cash flows for the first approximately five (5) years after the Effective Date, and indicate that the Debtor reasonably anticipates the receipt of revenue sufficient to meet all of its expenses and debt service obligations under the Amended and Restated Loan Agreement, New Promissory

Note and related documents. The CF Projections herein are derived from the forecasts set forth in the Appraisal.

The Appraisal contained cash flow forecasts based upon projections of future revenues and expenses, relying on historical performance, analysis of the Chicago market, and benchmarking of competitive properties and asset classes. A more specific explanation of the various aspects of the projections is set forth below.

## B.    Revenues.

The future occupancy of the Hotel has been forecasted based on its relative competitiveness with other hotels in the market and its respective "penetration rate" among the market supply. That is, how much of its "fair share" of market occupancy does the Property achieve given its number of rooms, amenities, and the supply and demand in the market.

The Hotel accounts for 19.9% of the 2,230 total rooms within the competitive set identified in the Appraisal.[4] Historically, the Property has achieved just over 100% penetration of its fair share of occupied room nights. Due to its strategic location in the center of Michigan Avenue and virtually across the street from the luxury Peninsula and Ritz Carlton hotels and its proximity to demand generators and nearby amenities, the property is expected to maintain its historical penetration rates. Despite projected increases in demand which would increase occupancy to over 80% during the projection period by holding penetration rates constant, the projections forecast stabilized occupancy of 75% beginning in the second year of the projections.[5] According to the appraiser's projections, penetration levels for the subject property are estimated at around 100% as of the stabilized year of 2012.

Based on supply and demand relationships projected for the market, inflationary pressures and other factors, the projections anticipate rising ADR levels continuing through the end of 2011 and into 2012 and following years, followed by a period of stabilization in the long term. ADR for the property is forecasted to be $138.60 in year 1 of the projections.

Other departmental revenues (i.e. food & beverage, minibar, telephone and other) are derived from a combination of data from the "HOST Report" (a respected industry study of the consolidated results of all US hotels produced by Smith Travel Research), the Hotel's historical performance, and overall industry averages.

## C.    Expenses.

Expenses were forecasted by the appraiser using a computer model based on the theory that each expense item has an independent fixed component and a variable component that fluctuates based on occupancy of the Property. The fixed portion is then increased at the assumed inflation rate, and the variable portion fluctuates based on both inflation and occupancy.

---

[4]    The competitive set consists of the 277 room Ambassador East, 222 room Whitehall Hotel, 417 room Wyndham Chicago Downtown, the 215 room Affina Chicago, the 305 room Millennium Knickerbocker and the 351 room Crowne Plaza Hotel

[5]    The projections are based on a year ending July 31. Year one commences on August 1, 2011.

Based on this assumption, the forecast for rooms expense is 32.7% of rooms revenue in year one of the projections, decreasing to 26.6% of rooms revenue in the stabilized year. These results were then benchmarked against industry averages and historical performance of the Hotel to ensure that they are within a reasonable range. An identical methodology was used for the remaining departmental expenses, with food & beverage, telecommunications and other departmental expenses 90.3%, 64.3% and 27.2% in year one, and 89.3%, 63.5% and 27.0% in the stabilized year, respectively.

Undistributed operating expenses, including administrative & general, sales & marketing, energy costs, operating & maintenance, property taxes and insurance were estimated in a similar manner, based on the historical performance of the Property and benchmarking to the industry averages provided by the HOST report.

| | Actual | Forecast | | Benchmarking | | | | |
|---|---|---|---|---|---|---|---|---|
| | Allerton 2010 | Allerton Year One | Allerton Stabilized Year (Deflated) | Independent | East North Central Chicago | Urban | Upscale | 300 to 500 Rooms |
| Rooms (% of Revenue) | 40.1% | 32.7% | 26.6% | 29.6% | 29.6% | 28.8% | 28.0% | 28.1% |
| Food & Beverage (% of Revenue) | 92.2% | 90.3% | 89.3% | 78.4% | 73.2% | 79.2% | 78.8% | 75.6% |
| Telecommunications (% of Revenue) | 65.7% | 64.3% | 63.6% | 174.5% | 115.8% | 124.4% | 169.4% | 152.4% |
| Other Deparmental (% of Revenue) | 27.5% | 27.2% | 27.0% | n/a | n/a | n/a | n/a | n/a |
| Administrative & General ($ per available room) | $ 4,180 | $ 4,370 | $ 4,579 | $ 6,658 | $ 4,140 | $ 5,638 | $ 4,103 | $ 5,381 |
| Sales & Marketing ($ per available room) | $ 2,762 | $ 2,971 | $ 3,145 | $ 4,005 | $ 3,568 | $ 4,492 | $ 3,338 | $ 4,427 |
| Energy ($ per available room) | $ 1,238 | $ 1,309 | $ 1,330 | $ 2,780 | $ 1,952 | $ 2,605 | $ 2,246 | $ 2,587 |
| Operations & Maintenance ($ per available room) | $ 2,425 | $ 2,619 | $ 2,799 | $ 3,487 | $ 2,535 | $ 3,038 | $ 2,386 | $ 2,980 |
| Property Taxes ($ per available room) | $ 2,086 | $ 2,133 | $ 2,115 | n/a | n/a | n/a | n/a | n/a |
| Insurance ($ per available room) | $ 410 | $ 430 | $ 427 | $ 984 | $ 334 | $ 642 | $ 522 | $ 675 |

The projections incorporate a forecast of general price inflation equal to 3% per year over the projection period. This assumption is indented to reflect an average long-term trend rather than an inflation forecast for a specific period of time.

**D.    Extrapolation of Annual Forecast into Monthly Results.**

The Appraisal provides estimated *annual* cash flows for the Property beginning August 1, 2011. However, to demonstrate the Property's ability to service debt on a monthly basis, these cash flows have been converted to monthly cash flows beginning with the date at which we expect the Debtor's emergence from bankruptcy, April 1, 2012.

The historical seasonality of the Property from August 2009 through July 2011 (i.e. the two-year period immediately preceding the start of the Appraisal's projections) was analyzed in order to create detailed monthly projections from the annual figures contained in the Appraisal. The Chicago lodging market is somewhat seasonal, with higher occupancies and average daily rates achieved during the spring, summer and fall seasons, and with weaker occupancies and average daily rates in the winter season.

By analyzing the historical seasonality trends, the expected percentage of each line item that could be expected to occur in each month was calculated (e.g. over the prior two years, approximately 8.8% of total rooms revenue for the year was generated in August of each respective year. Therefore, to estimate August rooms revenue for year one of the projections, the

forecasted year one rooms revenue is multiplied by 8.8%. An identical methodology was followed for each line item in the Appraisal's projections).

This extrapolation into monthly results allows one to estimate the amount that will be added to the current debt balance to fund operating shortfalls in the winter of 2012, up to a maximum of $0.8 million, as agreed to by the Debtor and Senior Lender, and allows for a start date at the beginning in any month in 2012.

The Hotel is managed by Kokua Hospitality, LLC ("Kokua") pursuant to a Hotel Management Agreement, dated November 9, 2006, between the Debtor and Kokua. Kokua has provided a monthly budget for 2012 (the "Budget"), and we are therefore able to compare the results under the extrapolation methodology to the Budget created by the party with the most intimate knowledge of day to day operations, booking pace and market trends. However, the property manager has not produced any forward looking projections subsequent to the 2012 budget year, so the Appraisal's forecasts have been utilized.

|  | Budget | Appraisal |
|---|---|---|
| Revenues | $ 23.8 | $ 21.7 |
| Expenses | $ 18.7 | $ 17.0 |
| NOI after FF&E | $ 5.1 | $ 4.7 |

As illustrated, the property manager has forecasted higher revenues and higher overall net operating income ("NOI") after reserves for furniture, fixtures and equipment ("FF&E") in 2012 than the figures derived from our extrapolation of the Appraisal, which only lends further support for the feasibility of this plan and the reasonableness of the approach.

## E.    Temporary Cash Flow Shortfall.

Finally, the CF Projections reflect a negative forecast in April 2012 of approximately $147,970. The Debtor expects this projected cash flow deficiency to be funded by Mezz Lender or by a debtor in possession loan.

## ARTICLE VII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except for any unexpired lease or executory contract that the Debtor rejects or designates as being subject to rejection on or before the Effective Date, all executory contracts and unexpired leases not previously assumed by the Debtor pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtor and the Plan shall constitute a motion to assume such executory contracts and unexpired leases to which the Debtor is a party. Subject to occurrence of the Effective Date, entry of a Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption of unexpired leases and/or executory contracts pursuant to section 365(a) of the Bankruptcy Code and finding by the

Bankruptcy Court that each such assumption(s) is/are in the best interests of the Debtor, the Estate and all parties in interest in the Reorganization Case. With respect to each such executory contract and/or unexpired lease assumed by the Debtor, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order, or agreed to by the parties on or before the Effective Date, any default by the Debtor with respect to any such assumed executory contract or unexpired lease existing as of the Effective Date, shall be cured in the ordinary course of the business of the Reorganized Debtor promptly after any such default becomes known to the Debtor or Reorganized Debtor and, if disputed, established pursuant to applicable law by the Bankruptcy Court, and the assumed executory contracts and/or unexpired leases shall be binding and enforceable upon the parties thereto, subject to the rights and defenses existing under each such executory contract and/or unexpired lease.

Notwithstanding the foregoing, the Debtor reserves the right to reject any executory contract or unexpired lease listed on an exhibit to be provided to the Bankruptcy Court and served on all creditors and other parties in interest no later than five (5) Business Days prior to the Confirmation Hearing. Any such exercise of the right to reject an unexpired lease of real property under which the Reorganized Debtor is a lessor shall entitle the lessee to all rights under section 365(h) of the Bankruptcy Code, unless otherwise agreed to in writing by the Reorganized Debtor and the particular lessee.

## ARTICLE VIII

## LIQUIDATION ANALYSIS

The Bankruptcy Code requires that a creditor with a right to vote either accept the Plan or that such creditor receive under the Plan at least as much as it would receive if the Debtor's assets were liquidated in, and the proceeds distributed under, a Chapter 7 liquidation case. This is generally known as the "best interest of creditors" test. To apply the test, one must value the Debtor's assets at the dollar amount that would be generated from their liquidation in the context of a Chapter 7 case. Based in part upon the Appraisal, it is the opinion of the Debtor that, under the Plan, the holders of allowed claims and interest will receive payment in full and will receive not less than they would receive in a Chapter 7 case. The Plan thus complies with the "best interest of creditors" test.

## ARTICLE IX

## RISK FACTORS

By far the most significant risk factor for the Debtor and its holders of claims and interests is the risk that, for any reason (including but not limited to reasons outside the control of the Debtor), the Debtor will not meet or exceed its financial projections.

## ARTICLE X

## TAX CONSEQUENCES

EVERY PARTY POTENTIALLY AFFECTED BY THE PLAN IS STRONGLY ADVISED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

The confirmation and execution of the Plan will have no material impact upon the Debtor. The Debtor does not express an opinion regarding any impact it will have upon creditors or the Equity Holder.

## ARTICLE XI

## CONFIRMATION OF THE PLAN

A.   **Voting Procedures.**

A ballot to be used for voting your acceptance or rejection of the Plan is being mailed to you together with this Disclosure Statement and the Plan. Holders of claims should read the instructions carefully, complete, date and sign the ballot, and transmit it in the envelope enclosed. IN ORDER TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE INDICATED ADDRESS NOT LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON _____, 2012. FAILURE TO VOTE OR A VOTE TO REJECT THE PLAN WILL NOT AFFECT THE TREATMENT TO BE ACCORDED A CLAIM OR INTEREST IF THE PLAN NEVERTHELESS IS CONFIRMED.

If more than one-half in number of claimants voting and at least two-thirds in amount of the Allowed Claims of such claimants in each Class of Claims vote to accept the Plan, such Classes will be deemed to have accepted the Plan. If at least two-thirds in amount of the membership interests voted in a Class of Interests are voted to accept the Plan, such Class will be deemed to have accepted the Plan. For purposes of determining whether a Class of Claims or Interests has accepted or rejected the Plan, only the votes of those who have timely returned their ballots will be considered.

B.   **Hearing on Confirmation of Plan.**

The hearing on confirmation of the Plan has been set for _____, 2012 at __:__ a.m. before the Honorable A. Benjamin Goldgar, United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. The Bankruptcy Court shall confirm the Plan at that hearing only if certain requirements, as set forth in section 1129 and other sections of the Bankruptcy Code, are satisfied.

C.   **Feasibility.**

The Debtor must also establish that confirmation of the Plan is not likely to be followed by the Reorganized Debtor's liquidation, or the need for further financial reorganization. To the

extent necessary, the Debtor will present testimony and other evidence with respect to feasibility at the hearing on confirmation of the Plan. The Debtor strongly believes that the Plan is feasible (regardless of the ultimate allowed amount of the claim of the Secured Lender) and that the Bankruptcy Court will so find. A Bankruptcy Court finding of feasibility does not, however, guarantee that the Debtor will fully meet or comply with all of its obligations under the Plan.

**D.    Treatment of Dissenting Classes of Creditors.**

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims that is impaired under, and has not accepted, the Plan. Upon such a finding, the Bankruptcy Court may confirm the Plan despite the rejection of a dissenting Class. The Debtor has requested that the Court confirm the Plan even if creditors holding Claims in impaired Classes do not accept the Plan.

**E.    Effect of Confirmation.**

Confirmation of the Plan shall operate on the Effective Date as a discharge of the Debtor from all claims and indebtedness that arose before the Effective Date, except for those unclassified claims that the Reorganized Debtor agrees to pay as a continuing obligation. All such discharged claims and indebtedness shall be satisfied by the cash payment or other consideration provided under the Plan. Upon Confirmation, all property of the Estate shall be free and clear of all claims and interests of creditors, except as otherwise provided in the Plan or the order of the Bankruptcy Court confirming the Plan. On the Effective Date, the Reorganized Debtor shall be vested with all assets of the Estate. The provisions of the Plan shall bind the Debtor, the Reorganized Debtor, and all other parties in interest, including any creditor or Interest holder of the Debtor, whether or not such creditor or Interest holder is impaired under the Plan and whether or not such creditor has accepted the Plan.

**F.    Consequences of the Failure to Confirm the Plan.**

In the event the Court declines to confirm the Plan, for any reason, the Debtor may propose a new or revised plan of reorganization, the case may be dismissed, or the case may be converted to a Chapter 7 case.

## ARTICLE XIII

### SATISFACTION OF INDEBTEDNESS, DISCHARGE OF CLAIMS AND RELATED PROVISIONS

**A.    Satisfaction of Indebtedness and Discharge of Claims.**

The distribution made to the various Classes of creditors as provided for in this Plan shall be in full and complete satisfaction of their Allowed Claims. Except to the extent provided for in this Plan, Confirmation shall operate, upon the Effective Date, as a discharge of any and all debts and claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtor, or the Debtor in its capacity as Debtor in Possession, that arose at any time prior to Confirmation. The discharge of the Debtor and the discharge of claims against the Debtor, whether asserted against

the Debtor or the Debtor in Possession, shall be effective as to each Claim, regardless of whether or not (a) the Claim was scheduled, (b) a proof of claim was filed, (c) the Claim is an Allowed Claim or (d) the holder thereof voted to accept the Plan.

**B.**     **Release of Liabilities under Limited Guaranty and Related Injunction.**

**AS OF THE EFFECTIVE DATE, AND IN CONSIDERATION FOR PS CDO MANAGER, LLC'S AGREEMENT TO ACT AS GUARANTOR UNDER THE NEW LIMITED GUARANTY, THE SECURED LENDER SHALL BE DEEMED TO HAVE FOREVER RELEASED, WAIVED AND DISCHARGED ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DEMANDS, DEBTS, CAUSES OF ACTION AND LIABILITIES SECURED LENDER MAY HAVE AGAINST PS CDO MANAGER, LLC WITH RESPECT TO THE LIMITED GUARANTY AND SHALL BE PERMANENTLY ENJOINED FROM ANY ACTION TO ENFORCE THE LIMITED GUARANTY.**

**C.**     **Exculpation.**

As of the Effective Date, the Debtor and the Equity Holder, and each of their respective present or former officers, members, employees, accountants, advisors, attorneys, consultants, experts or other agents, shall not have or incur any liability to any entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan or other related document, the pursuit of Confirmation, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan.  The Debtor and the Equity Holder shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and any related document.  In no event shall any party exculpated from liability under this section be exculpated from liability in the case of gross negligence, fraud or willful misconduct.

**D.**     **No Liability for Solicitation or Participation.**

Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the persons who have solicited acceptances or rejections of the Plan (including the Debtor and the Equity Holder, and each of their respective present or former officers, members, employees, accountants, advisors, attorneys, consultants, experts or other agents) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation or for violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan.

*[Remainder of Page Left Intentionally Blank]*

RESPECTFULLY SUBMITTED this 25th day of January 2012.

ALT Hotel, LLC

By:  Hotel Allerton Mezz, LLC, Sole Member of ALT Hotel, LLC

By:  /s/ Neal L. Wolf
          One of its attorneys

Neal L. Wolf (ARDC 6186361)
Dean C. Gramlich (ARDC 6191587)
NEAL WOLF & ASSOCIATES, LLC
155 N. Wacker Drive, Suite 1910
Chicago, IL 60606
Main: (312) 228-4990
Fax:  (312) 228-4988
Email: nwolf@nealwolflaw.com

*Attorneys for the Debtor and Debtor-in-Possession*

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALT Hotel, LLC, | ) Case No. 11-19401 (ABG) |
| | ) |
| Debtor. | ) **Hearing Date:** _____, 2012 |
| | ) **Hearing Time:** __:__ a.m. |

### PLAN OF REORGANIZATION UNDER CHAPTER 11
### OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR

ALT HOTEL, LLC ("Debtor"), the debtor and debtor in possession in the above-captioned Chapter 11 case, files the following Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code:

### ARTICLE I

### DISCLOSURE STATEMENT

The Debtor has filed a Disclosure Statement pursuant to 11 U.S.C. § 1125 and Bankruptcy Rule 3016(c) (the "Disclosure Statement"). The Disclosure Statement was approved by the Bankruptcy Court on _____, 2012. The Disclosure Statement provides information that the Bankruptcy Court has determined to be adequate to enable holders of claims and interests to make informed judgments about the Plan. PLEASE READ THE DISCLOSURE STATEMENT WITH CARE.

### ARTICLE II

### DEFINITION OF TERMS

**A. Definitions**

A term or word that is used in this Plan and that is not defined below, but that is defined in the Bankruptcy Code, shall have the meaning that is ascribed to it in the Bankruptcy Code and shall be construed in accordance with section 102 of the Bankruptcy Code. When used in this Plan, the following terms, when they are capitalized as set forth below, shall have the meanings that are specified below, unless the Plan otherwise indicates or unless the context otherwise requires:

1. <u>Administrative Expense Claim</u>: a Claim that, if allowed, would be entitled to priority under section 503(b) of the Bankruptcy Code, including (a) a claim that is incurred by the Debtor on or after the Petition Date; (b) a Claim of a Professional Person under sections 330

and 331 of the Bankruptcy Code and Bankruptcy Rule 2016; and (c) any and all fees and charges that are assessed against the Estate under 28 U.S.C. § 1930.

2.    Affiliate Claim: a claim held or asserted by an affiliate of the Debtor, as "affiliate" is defined in section 101(2) of the Bankruptcy Code.

3.    Allowed Claim: any Claim that

   (a)    has been listed in the Schedules and is not described as disputed, contingent, or unliquidated;

   (b)    has been listed and described in the Schedules as a disputed, contingent, or unliquidated Claim, but only to the extent that the validity and amount of the Claim has been approved by Final Order of the Bankruptcy Court; or

   (c)    is presently or later becomes subject to an objection, and is subsequently allowed, but only in such amount as is allowed by a Final Order of the Bankruptcy Court.

4.    Amended and Restated Guaranty: that certain Amended and Restated Guaranty which shall be filed and served upon the Secured Lender not later than five (5) Business Days prior to the hearing on the adequacy of the Disclosure Statement, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

5.    Amended and Restated Loan Agreement: that certain Amended and Restated Loan Agreement which shall be filed and served upon the Secured Lender not later than five (5) Business Days prior to the hearing on the adequacy of the Disclosure Statement, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

6.    Amended and Restated Loan Documents: the Amended and Restated Guaranty, Amended and Restated Loan Agreement, Amended and Restated Mortgage, Amended and Restated Promissory Note, Amended and Restated Security Agreement, and any other agreement or instrument that must reasonably be drafted and executed to memorialize and give effect to the provisions of the Plan insofar as such provisions relate to the treatment of the Secured Lender under the Plan.

7.    Amended and Restated Mortgage: that certain Amended and Restated Mortgage which shall be filed and served upon the Secured Lender not later than five (5) Business Days prior to the hearing on the adequacy of the Disclosure Statement, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

8.    Amended and Restated Promissory Note: that certain Amended and Restated Promissory Note which shall be filed and served upon the Secured Lender not later than five (5) Business Days prior to the hearing on the adequacy of the Disclosure Statement, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

9.     Amended and Restated Security Agreement: that certain Amended and Restated Security Agreement which shall be filed and served upon the Secured Lender not later than five (5) Business Days prior to the hearing on the adequacy of the Disclosure Statement, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

10.    Bankruptcy Code: Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as it is in effect upon the Petition Date, together with all amendments thereto that are applicable to this Chapter 11 Case.

11.    Bankruptcy Court or Court: the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) or, if either the reference of this Chapter 11 Case is withdrawn by the United States District Court or venue of this Chapter 11 Case is transferred, the United States District Court for the Northern District of Illinois or such other court of competent jurisdiction that exercises jurisdiction over the Chapter 11 Case.

12.    Bankruptcy Rules: the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court that are in effect on the Petition Date, together with all amendments thereto that are applicable to the Chapter 11 Case.

13.    Business Day: any day, except a Saturday, a Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

14.    Chapter 11 Case: the Chapter 11 case pending before the Bankruptcy Court that was commenced by the Debtor on the Petition Date and is designated Case No. 11-19401.

15.    Claim: a claim, as defined in section 101(5) of the Bankruptcy Code.

16.    Claims Bar Date: December 16, 2011.

17.    Class: a class of Claims or Interests, as defined in Article III of this Plan.

18.    Confirmation: the entry of the Confirmation Order by the Bankruptcy Court.

19.    Confirmation Order: the order that is entered by the Bankruptcy Court confirming the Plan.

20.    Debtor: ALT Hotel, LLC, whether acting as the debtor in possession or as the Reorganized Debtor.

21.    DIP Loan: the Post-Petition loan that is made by the Secured Lender to the Debtor pursuant to section 364 of the Bankruptcy Code.

22.    Disputed Claim: a Claim that is represented by a Proof of Claim as to which an objection has been filed by any party in interest, or a Claim that is described in the Debtor's schedules as disputed, unliquidated, or contingent.

23. <u>Effective Date</u>: the first Business Day that is at least fourteen (14) calendar days following the day upon which the Confirmation Order becomes a Final Order.

24. <u>Equity Holder</u>: Hotel Allerton Mezz, LLC, the sole member of, and sole holder of an Interest in, the Debtor.

25. <u>Equity Holder's Deficiency Claim</u>: the Claim represented by the Proof of Claim that has been filed by the Equity Holder.

26. <u>Estate</u>: the estate that was created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

27. <u>Equitable Subordination Litigation</u>: The adversary proceeding that is captioned *ALT Hotel, LLC, et al. v. DiamondRock Allerton Owner, LLC*, is designated Adv. No. 11-01469, and is currently pending in the Bankruptcy Court.

28. <u>Excess Cash Flow</u>: such cash as is generated by the Hotel from its operations and from any other source after payment of, or reasonably adequate reserve for, operating expenses, applicable taxes, reasonable capital expenditures, payments required under the Plan and Confirmation Order, and reasonably anticipated seasonal liquidity needs, as determined by the Reorganized Debtor, in the exercise of its reasonable business judgment.

29. <u>Final Order</u>: an order or judgment of the Bankruptcy Court (or any alteration, modification or amendment thereto), the implementation, operation, or effect of which has not been stayed and as to which the time to appeal or seek review, rehearing or issuance of a *writ of certiorari* has expired, and as to which no appeal or petition for review, reconsideration, rehearing or issuance of *writ of certiorari* has been taken or is still pending.

30. <u>Foreclosure Proceeding</u>: the foreclosure lawsuit that is captioned *DiamondRock Allerton Owner, LLC v. Alt Hotel, LLC*, is designated Case No. 10 CH 18859 (Atkins, J.), and is currently pending (although stayed under section 362 of the Bankruptcy Code) in the Circuit Court of Cook County, Illinois, Chancery Division, but not the Removed Litigation, as defined below.

31. <u>General Unsecured Claims</u>: all Unsecured Claims, other than any Unclassified Claims, any Administrative Expense Claims, any Priority Tax Claims, the Equity Holder's Deficiency Claim, or any claims other than Administrative Expense Claims that are otherwise entitled to priority under section 507 of the Bankruptcy Code.

32. <u>Guaranty</u>: that certain Guaranty Agreement that was dated as of October 1, 2010, executed by PS CDO Manager, LLC, and given to the Secured Lender.

33. <u>Guaranty Litigation</u>: the lawsuit that is captioned *DiamondRock Allerton Owner, LLC v. PS CDO Manager, LLC*, is designated Index No. 652224/2011, and is currently pending in the Supreme Court of the State of New York, County of New York.

34. <u>Hotel</u>: the Allerton Hotel, an operating hotel that is owned by the Debtor and located at 701 North Michigan Avenue, Chicago, Illinois.

35. <u>Interest</u>: the membership interest of the Equity Holder in the Debtor, which constitutes the sole membership interest in the Debtor.

36. <u>Manager</u>: Kokua Hospitality, LLC, the manager of the Hotel.

37. <u>Net Sale Proceeds</u>: the proceeds from the sale of any property of the Estate, or any portion thereof, less costs of sale for which the Debtor or Reorganized Debtor is liable.

38. <u>Notice and Hearing</u>: legal proceedings in the Bankruptcy Court as described in section 102(1) of the Bankruptcy Code.

39. <u>Petition Date</u>: May 5, 2011, the date upon which the Debtor commenced this Chapter 11 Case.

40. <u>Plan</u>: this Plan of Reorganization, as it may be amended or modified from time to time either by the filing of an amended Plan by the Debtor or pursuant to an order of the Bankruptcy Court.

41. <u>Post-Petition</u>: occurring after the Petition Date.

42. <u>Priority Tax and Duty Claims</u>: Allowed unsecured claims of governmental units which are entitled to priority under section 507(a)(8) of the Bankruptcy Code.

43. <u>Professional Persons</u>: any and all Persons that have been employed and/or that are to be compensated or reimbursed pursuant to any of sections 326, 327, 328, 330 or 1103 of the Bankruptcy Code.

44. <u>Pro Rata</u>: proportionally, so that the ratio of the amount that is distributed on account of a particular Allowed Claim to the amount of such Allowed Claim is the same as the ratio of the amount distributed on account of all Allowed Claims in the Class of which such particular Allowed Claim is a member to the aggregate amount of all Allowed Claims in such Class.

45. <u>Removed Litigation</u>: the portion of the Foreclosure Proceeding that was removed to the Bankruptcy Court, captioned *Hotel Allerton Mezz, LLC v. Wells Fargo Bank, N.A., et al.,* and designated Adv. No. 11-01651, and that is currently pending in the Bankruptcy Court.

46. <u>Reorganized Debtor</u>: following the Effective Date, the Debtor as reorganized pursuant to the Plan.

47. <u>Schedules</u>: the schedules, statement of financial affairs, and lists filed by the Debtor on and after the Petition Date pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended.

48. <u>Secured Claim</u>: a Claim that is a secured by a duly-perfected mortgage, security interest, or lien against property of the Debtor and that is quantified in accordance with section 506(a) of the Bankruptcy Code.

49.     Secured Lender: DiamondRock Allerton Owner, LLC.

50.     Governmental Unit: any governmental unit, agency, or entity that is the holder a
Claim that is not a Secured Claim and that is otherwise entitled to treatment as a Priority Claim
pursuant to section 507(a)(8) of the Bankruptcy Code.

B.     Rules of Interpretation.

The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to
the Plan.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

1.     Unclassified Claims: Administrative Expense Claims and Priority Tax and Duty
Claims.

2.     Class 1: the Secured Claim of the Secured Lender, the amount of which is in
dispute.

3.     Class 2: any Secured Claim other than the Class 1 Claim of the Secured Lender
including, but not limited to, the claim of any "lessor" under a "financing lease" or "capital
lease."

4.     Class 3: General Unsecured Claims.

5.     Class 4: the Equity Holder's Deficiency Claim.

6.     Class 5: the Interest of the Equity Holder.

## ARTICLE IV

## TREATMENT OF UNCLASSIFIED CLAIMS AND CLASSES OF CLAIMS AND INTERESTS UNDER THE PLAN

### A.     Unclassified Claims

1.     Administrative Expense Claims. Pursuant to section 1129(a)(9)(A) of the
Bankruptcy Code, each Allowed Administrative Expense Claim, with the exception of each
Administrative Expense Claim of a Professional Person, shall be paid in full on or before the
Effective Date or pursuant to terms that are otherwise agreed to by the Debtor and the holder of
such claim. Each Administrative Expense Claim of a Professional Person shall be paid in full
within fourteen (14) days after the entry of a Final Order by the Bankruptcy Court allowing the
application for compensation and reimbursement of such Professional Person.

2.     Priority Tax and Duty Claims. Pursuant to section 1129(a)(9)(C) of the
Bankruptcy Code, each Allowed Priority Tax and Duty Claim shall be paid in full on or before

the Effective Date or pursuant to terms that are otherwise agreed to by the Debtor and the holder of such Claim.

**B.    Classified Claims and Interests**

    1.    Class 1:  Secured Claim of Secured Lender.

The Class 1 Secured Claim of the Secured Lender, which is impaired under the Plan, shall be treated as follows:

    (a)    The Secured Lender will retain all of its liens and security interests in property of the Debtor, which liens and security interests will have the same priority and validity as the Pre-Petition liens and security interests of the Secured Lender, unless the validity and priority of such liens and security interests have been altered by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

    (b)    If, as, and when it is allowed, but in no event earlier than the Effective Date, the amount of the Allowed Secured Claim of the Secured Lender will be increased by all principal and interest due under the DIP Loan ("DIP Loan Balance").

    (c)    The sum of the amount of the Allowed Secured Claim of the Secured Lender and the DIP Loan Balance, which the Debtor currently estimates to be $66,800,000 (after adding the expected amount of the Allowed Secured Claim to the expected amount of the DIP Loan Balance), will constitute the new principal balance of the Secured Claim of the Secured Lender ("New Principal Balance").

    (d)    The New Principal Balance will bear interest at the rate of 4.625 percent per annum, which interest will be payable to the Secured Lender monthly, for a period of sixty (60) months, commencing upon the first Business Day of the calendar month following the later to occur of [i] the Effective Date or [ii] the date upon which a Final Order is entered allowing the Secured Claim of the Secured Lender ("Secured Loan Payment Commencement Date").

    (e)    The New Principal Balance, together with any accrued and unpaid interest, from and after the Secured Loan Payment Commencement Date, will be repaid in full upon the date of payment of the final installment of interest provided for immediately above ("Maturity Date").

    (f)    The New Principal Balance, together with any accrued and unpaid interest, may be prepaid at any time prior to the Maturity Date, without penalty.

    (g)    The Foreclosure Proceeding will be dismissed with prejudice.

    (h)    The Guaranty Litigation will be dismissed with prejudice, the claims asserted in the Guaranty Litigation will be released, and the Guaranty will be replaced and superseded by the Amended and Restated Guaranty, which will contain the same substantive terms as the Guaranty.

    (i)    Amended and Restated Loan Documents will be executed, delivered, and (where appropriate) recorded in order to memorialize and give effect to the provisions of the Plan insofar as such provisions relate to the treatment of the Secured Lender under the Plan.

2.    <u>Class 2</u>: Other Secured Claims

These Claims, if any, are unimpaired under the Plan. Each holder of an Allowed Other Secured Claim, if any, shall retain, unaltered, the legal, equitable and contractual rights (including any liens that secure such Claim) to which such Claim entitles each such holder and such Allowed Other Secured Claim, if any, shall be reinstated as of the Effective Date.

3.    <u>Class 3</u>: General Unsecured Claims.

These Claims are impaired under the Plan. Each holder of an Allowed General Unsecured Claim shall receive fifty percent (50%) of the amount of such holder's Allowed General Unsecured Claim on the Effective Date and fifty percent (50%) of the balance of such holder's Allowed General Unsecured Claim, together with interest computed at the rate of five percent (5%) per annum, one hundred eighty (180) days after the Effective Date.

4.    <u>Class 4</u>: Equity Holder's Deficiency Claim.

This Claim is impaired under the Plan. The Equity Holder's Deficiency Claim shall accrue interest at the rate of seven percent (7%) per annum commencing upon the Effective Date. Each month, commencing upon the first Business Day of the month following the month in which the Effective Date occurred, the holder of the allowed Equity Holder's Deficiency Claim shall receive a payment equal to the amount of Excess Cash, if any, which shall be applied first to accrued and unpaid interest and second to principal, until the allowed Equity Holder's Deficiency Claim, together with all interest that has accrued thereon, has been paid in full.

5.    <u>Class 5</u>: Interest of Equity Holder.

The Interest of the Equity Holder is unimpaired.

C.    **Impairment of Classes and Interest.**

The Claims and/or Interests comprising Classes 1, 3 and 4 are impaired under the Plan (each, an "Impaired Class"). Pursuant to the provisions of section 1129(b) of the Bankruptcy Code, in the event an Impaired Class does not accept the Plan, the Debtor requests that the Court

enter an order confirming the Plan without the acceptance of such Impaired Class pursuant to section 1129(b) of the Bankruptcy Code. All holders of Claims in Class 2, if any, and the holder of the Class 5 Interest, are deemed to have accepted the Plan.

## ARTICLE V

## CLAIMS OBJECTIONS AND TREATMENT OF DISPUTED CLAIMS

### A.    Administration of Claims

Each Claim shall be allowed or disallowed, as the case may be, in such amount as the Court shall determine, whether prior to or following Confirmation, and whether pursuant to this Plan or otherwise, upon such notice as the Bankruptcy Court or Bankruptcy Rules shall permit, except that (i) after the Effective Date, the Reorganized Debtor may settle or compromise any controversies regarding Claims without notice or further order of the Court and (ii) pursuant to section 502(d) of the Bankruptcy Code, any Claims held by any entities from which property is recoverable under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that are transferees of transfers that are avoidable under sections 544, 545, 547, 548 or 549 of the Bankruptcy Code, are deemed disallowed and the holders thereof may not vote to accept or to reject the Plan unless such entities or transferees have paid the amount, or turned over any such property, for which such entities or transferees are liable under section 542, 550 or 553 of the Bankruptcy Code.

### B.    Claims Assigned to Reorganized Debtor.

On the Effective Date, the Debtor shall be deemed to have assigned to the Reorganized Debtor, and the Reorganized Debtor shall be deemed to have acquired and become the successor to, all causes of action, claims, lawsuits, defenses, counterclaims and setoffs, whether equitable or legal, available to the Debtor as of the Effective Date, including all claims of the Debtor for relief against any other person existing as of the Effective Date. Any objection to Claims must be filed and served in accordance with Bankruptcy Rule 3007; provided, however, that the foregoing limitations do not apply to any Claims filed subsequent to Confirmation.

### C.    No Distribution on Disputed Claims.

Notwithstanding any provision of the Plan specifying the time for payment of distributions to holders of claims, no payment, dividend, or distribution shall be made to the holder of any Disputed Claim until the time such Claim has been determined to be an Allowed Claim. Notwithstanding the existence of a Disputed Claim in a Class to which a distribution under this Plan is due, such distribution to other creditors shall not be affected by any delay in the resolution of the Disputed Claim. Upon the allowance of any Disputed Claim, the holder shall be paid the amount that such holder would have received had its Claim been an Allowed Claim on the Effective Date.

## ARTICLE VI

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### A.    Assumption of Executory Contracts and Unexpired Leases.

Except for any unexpired lease or executory contract that the Debtor rejects or designates as being subject to rejection on or before the Effective Date, all executory contracts and unexpired leases not previously assumed by the Debtor pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtor and the Plan shall constitute a motion to assume such executory contracts and unexpired leases to which the Debtor is a party. Subject to occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtor, the Estate and all parties in interest in the Reorganization Case. With respect to each such executory contract or unexpired lease assumed by the Debtor, unless otherwise determined by the Bankruptcy Court pursuant to Final Order or agreed to by the parties on or before the Effective Date, any defaults of the Debtor with respect to such assumed executory contracts or unexpired leases existing as of the Effective Date shall be cured in the ordinary course of the business of the Reorganized Debtor promptly after any such default becomes known to the Debtor and, if disputed, established pursuant to applicable law by the Bankruptcy Court, and the assumed executory contracts and unexpired leases shall be binding and enforceable upon the parties thereto, subject to the rights and defenses existing under each such executory contract and unexpired lease.

#### B.    Reservation of Rejection Rights.

Notwithstanding subpart A of this Article VI, the Debtor may reject any executory contract or unexpired lease listed on an exhibit to be provided to the Bankruptcy Court and served on all creditors and other parties in interest no later than five (5) business days prior to the Confirmation Hearing. Any such exercise of the right to reject an unexpired lease of real property under which the Reorganized Debtor is a lessor shall entitle the lessee to all rights under section 365(h) of the Bankruptcy Code, unless otherwise agreed to in writing by the Reorganized Debtor and the particular lessee.

## ARTICLE VII

### MEANS FOR EXECUTION OF THE PLAN

On the Effective Date, or as soon thereafter as reasonably possible, the Guaranty Litigation will be dismissed without prejudice. On or before the Effective Date, the Debtor and the Secured Lender shall have executed the Amended and Restated Loan Documents and such other agreements, instruments and other documents as shall give effect to the Plan and Confirmation Order. Notwithstanding any other provision of this Plan or any related agreement, instrument or document, the Debtor and the Secured Lender may amend the foregoing loan documents and all related agreement, instruments and other documents and enter into supplemental and ancillary documents without any additional approval of the Bankruptcy Court.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

### A.    Vesting of Assets.

Upon the Effective Date, all assets of the Estate shall be vested in the Reorganized
Debtor in accordance with section 1141 of the Bankruptcy Code, and no further order of the
Court shall be necessary for the Reorganized Debtor to perform such acts as are within the
ordinary scope of its business and/or necessary to carry out the purposes or intent of this Plan.

### B.    Unmarked Ballots.

Executed ballots respecting the Plan returned by Creditors to the Debtor that do not
indicate acceptance or rejection of the Plan shall be deemed and counted as acceptance of the
Plan.

### C.    Negotiated Distribution Checks.

Pursuant to section 347 of the Bankruptcy Code, ninety (90) days after any distribution to
any creditor by the Reorganized Debtor provided for herein, the Reorganized Debtor shall stop
payment on any check on such distribution remaining unpaid to a holder of an Allowed claim
and funds shall be returned to the Reorganized Debtor. From and after the date the Reorganized
Debtor stops payment on any distribution check pursuant to this paragraph, the holder of the
Allowed claim on account of which such check was issued shall be entitled to receive no further
distributions on account of his/her/its claim and such holder's Allowed claim shall thereupon be
deemed satisfied in full.

### D.    Mailing List; Returned Distribution Checks.

The official listing of creditor identities and mailing addresses is maintained by the Clerk
of the Bankruptcy Court, United States Bankruptcy Court for the Northern District of Illinois
(the "Official Mailing List"). It shall be the obligation of each creditor and/or party in interest to
assure that the Official Mailing List is current and accurate as to each such person or entity. In
the event that a distribution check, that has been properly posted to the creditor's address as set
forth in the Official Mailing List, is returned as undeliverable by the United States Postal
Service, the Reorganized Debtor shall be authorized, but not required, to avoid such check with
the applicable funds becoming subject to further distribution pursuant to this Plan, and the Claim
of such creditor being deemed satisfied in full.

### E.    Administrative Claims Bar Date.

The deadline for submission of all Claims entitled to administrative priority, with the
exception of fees and costs of Professional Persons shall be thirty (30) days following
Confirmation. Failure to file a Claim by this date shall conclusively bar the claimant from
asserting his Claim, which Claim shall be forever discharged.

F. **Employment of Professional Persons.**

The Reorganized Debtor shall be authorized to employ and compensate Professional Persons following Confirmation upon such terms as the Reorganized Debtor deems reasonable and appropriate without further notice or order of the Court. All final applications for compensation for legal services rendered prior to the Effective Date and reimbursement of actual and necessary expenses shall be filed and served on the Reorganized Debtor and Office of the United States Trustee within forty-five (45) days following the Effective Date.

G. **Treatment of Negotiable Instruments.**

Any negotiable instrument held by the holder of an Allowed Claim shall be deemed exchanged, canceled, or satisfied, as the case may be, on the Effective Date.

H. **Timely Payments.**

The Reorganized Debtor shall make all payments required under the Plan and applicable law on a timely basis

I. **Stay of Confirmation Order Shall Not Apply.**

The stay of enforceability of Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall not apply, and the order of Confirmation shall be enforceable according to its terms absent further order of the Court.

J. **Event of Default; Consequences of Default.**

An event of default shall occur if the Reorganized Debtor shall fail to comply with a material provision of this Plan. In such an event, the party alleging such default shall provide written notice of the alleged default to the Reorganized Debtor and the attorneys for the Reorganized Debtor, at the following addresses:

> Joseph Iacono
> c/o Hotel Allerton Mezz, LLC
> 1370 Avenue of the Americas, 23rd Floor
> New York, NY 10019

> With a copy to:

> Neal L. Wolf
> Neal Wolf & Associates, LLC
> 155 North Wacker Drive, Suite 1910
> Chicago, IL 60606

If, after thirty (30) days following the Reorganized Debtor's and its counsel's receipt of the notice of default, the Reorganized Debtor and such party have been unable to resolve, or the Reorganized Debtor has been unable to cure, the asserted default, such party may proceed with any remedies available to it under applicable law, provided that nothing herein shall limit or

12

affect the Reorganized Debtor's right to seek appropriate relief from any court of competent jurisdiction, including the Bankruptcy Court.

## ARTICLE IX

## SATISFACTION OF INDEBTEDNESS, DISCHARGE OF CLAIMS AND RELATED PROVISIONS

### A.    Satisfaction of Indebtedness and Discharge of Claims.

The distribution made to the various classes of creditors as provided for in this Plan shall be in full and complete satisfaction of their Allowed Claims. Except to the extent provided for in this Plan, Confirmation shall operate, upon the Effective Date, as a discharge of any and all debts and claims as defined in section 101(5) of the Bankruptcy Code against the Debtor or Debtor in Possession that arose at any time prior to Confirmation. The discharge of the Debtor and the discharge of claims against the Debtor, whether asserted against the Debtor or the Debtor in Possession, shall be effective as to each claim, regardless of whether or not (a) the claim was scheduled, (b) a proof of claim was filed, (c) the claim is an Allowed Claim or (d) the holder thereof voted to accept the Plan.

### B.    Exculpation.

As of the Effective Date, the Debtor, the Equity Holder, and their affiliates, and each of their respective present or former officers, members, employees, accountants, advisors, attorneys, consultants, experts or other agents, shall not have or incur any liability to any entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan or other related document, the pursuit of Confirmation, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan. The Debtor and Equity Holder shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and any related document. In no event shall any party exculpated from liability under this section be exculpated from liability in the case of gross negligence, fraud or willful misconduct.

### C.    No Liability for Solicitation or Participation

Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the persons who have solicited acceptances or rejections of the Plan (including the Debtor and Equity Holder, and each of their respective present or former officers, members, employees, accountants, advisors, attorneys, consultants, experts or other agents) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation or for violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan.

## ARTICLE X

### MODIFICATON OF THE PLAN

Pursuant to the provisions of section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor and Reorganized Debtor reserve the right to modify or alter the provisions of the Plan at any time prior to or subsequent to Confirmation, subject to the provisions of Bankruptcy Code and the Bankruptcy Rules.

### ARTICLE XI

### RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Notwithstanding Confirmation, until entry of a final decree, the Bankruptcy Court shall retain jurisdiction to ensure that the purposes and intent of the Plan are carried out. Without limiting the generality of the foregoing, the Court shall retain jurisdiction for the following purposes:

1. Fixing and allowing any Claim as a cost and expense of the administration of the Chapter 11 Case.

2. Reconsidering the allowance of any Claim that has been allowed.

3. Hearing and determining any objection to a Claim. The failure of the Debtor to object to, or to examine any claim for the purpose of voting, shall not be deemed to be a waiver of the Debtor's right to object to any claim in whole or in part.

4. Hearing and determining any action brought by the Debtor seeking to avoid any transfer of an interest of the Debtor in property, or any obligation incurred by Debtor, that is avoidable pursuant to applicable law.

5. With the exception of any applicable, remaining claims in the Foreclosure Proceeding, which shall be resolved in the Circuit Court of Cook County (or other applicable court), hearing and determining all causes of action, controversies, disputed, or conflicts between or among the Debtor and any other party, including those that were pending prior to Confirmation.

6. With the exception of any applicable, remaining claims in the Foreclosure Proceeding, which shall be resolved in the Circuit Court of Cook County (or other applicable court), hearing and determining all questions and disputes regarding title to the property of the Debtor or the Estate.

7. Correcting any defect, curing any omission, or reconciling any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan.

8. With the exception of any applicable, remaining claims in the Foreclosure Proceeding, which shall be resolved in the Circuit Court of Cook County (or other applicable

court), hearing and determining any action brought by the Debtor to protect the Debtor and the Estate from actions of creditors, or other parties-in-interest.

      9.     Issuing any order that may be necessary to implement the Plan or Order of Confirmation, including without limitation, such declaratory judgments and injunctive orders as are appropriate to protect the Debtor, the Estate and the Reorganized Debtor from actions of creditors, or other parties in interest.

      10.    Hearing and determining any dispute relating to the terms or implementation of the Plan or Confirmation Order, or the rights and obligations of any parties in interest with respect thereto.

      11.    The modification of the Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code in accordance with Article XI above.

## ARTICLE XII

### ENTRY OF CLOSING ORDER BY THE BANKRUPTCY COURT

      The Bankruptcy Court shall enter an order concluding and terminating the Reorganization Case upon application of the Reorganized Debtor.

*[Remainder of Page Left Intentionally Blank]*

Dated this 16th day of December, 2011.

ALT Hotel, LLC

By    Hotel Allerton Mezz, LLC, Sole Member of ALT Hotel, LLC

By:    _____

Joseph Iacono, Authorized Signatory,
Hotel Allerton Mezz, LLC, Sole Member

**Exhibit B**

EXHIBIT B

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Available Rooms | 161,695 | 161,695 | 161,695 | 162,138 | 161,695 |
| Occupied Rooms | 120,150 | 121,271 | 121,271 | 121,475 | 121,399 |
| Occupancy | 74.3% | 75.0% | 75.0% | 74.9% | 75.1% |
| ADR | $ 145.74 | $ 159.80 | $ 177.03 | $ 187.55 | $ 193.08 |
| RevPAR | $ 108.30 | $ 119.85 | $ 132.77 | $ 140.52 | $ 144.96 |
| **Revenue** | | | | | |
| Rooms Revenue | 17,511,181 | 19,378,837 | 21,468,658 | 22,783,305 | 23,440,087 |
| Food & Beverage Revenue | 3,831,291 | 3,983,909 | 4,109,230 | 4,231,244 | 4,353,011 |
| Minibar Revenue | 127,575 | 132,384 | 136,979 | 140,788 | 144,979 |
| Other Departmental Revenue | 186,149 | 193,689 | 200,304 | 206,074 | 211,689 |
| Rentals and Other Income | 333,557 | 344,827 | 356,192 | 366,827 | 377,509 |
| **Total Departmental Revenue** | $ 21,989,753 | $ 24,033,646 | $ 26,271,364 | $ 27,728,238 | $ 28,527,276 |
| **Departmental Expenses** | | | | | |
| Rooms Expense | 5,509,930 | 5,709,535 | 5,890,727 | 6,062,766 | 6,238,586 |
| Food & Beverage Expense | 3,560,778 | 3,680,943 | 3,798,241 | 3,909,464 | 4,022,761 |
| Other Departmental Expense | 119,197 | 123,558 | 127,558 | 130,918 | 134,558 |
| Other Expense | 90,015 | 93,015 | 96,015 | 99,015 | 102,015 |
| **Total Departmental Expense** | $ 9,279,921 | $ 9,607,051 | $ 9,912,541 | $ 10,202,163 | $ 10,497,920 |
| **Gross Operating Profit** | $ 12,709,832 | $ 14,426,595 | $ 16,358,823 | $ 17,526,075 | $ 18,029,356 |
| **Unallocated Expenses:** | | | | | |
| General & Administrative | 1,998,420 | 2,092,846 | 2,196,785 | 2,275,254 | 2,340,758 |
| Sales & Marketing | 1,361,681 | 1,430,751 | 1,506,471 | 1,562,022 | 1,607,239 |
| Repairs & Maintenance | 1,203,078 | 1,267,911 | 1,339,146 | 1,390,440 | 1,430,607 |
| Utilities | 595,394 | 617,394 | 641,493 | 661,595 | 680,994 |
| Property Taxes & Insurance | 1,157,667 | 1,193,000 | 1,229,667 | 1,266,000 | 1,304,000 |
| Management Fee | 659,024 | 720,991 | 788,057 | 831,675 | 855,979 |
| Lease Expense | 45,349 | 47,349 | 48,675 | 50,349 | 51,675 |
| **Total Unallocated Expenses** | $ 7,020,613 | $ 7,370,242 | $ 7,750,294 | $ 8,037,335 | $ 8,271,253 |
| **Net Operating Income** | $ 5,689,219 | $ 7,056,353 | $ 8,608,529 | $ 9,488,741 | $ 9,758,103 |
| FF&E | 876,205 | 959,275 | 1,048,135 | 1,108,434 | 1,140,077 |
| **Cash Flow Before Debt Service** | $ 4,813,014 | $ 6,097,078 | $ 7,560,394 | $ 8,380,307 | $ 8,618,026 |

EXHIBIT B

| | Month 1 Apr-12 | Month 2 May-12 | Month 3 Jun-12 | Month 4 Jul-12 | Month 5 Aug-12 | Month 6 Sep-12 | Month 7 Oct-12 | Month 8 Nov-12 | Month 9 Dec-12 | Month 10 Jan-13 | Month 11 Feb-13 | Month 12 Mar-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Available Rooms | 13,290 | 13,733 | 13,290 | 13,733 | 13,733 | 13,290 | 13,733 | 13,290 | 13,733 | 13,733 | 12,404 | 13,733 |
| Occupied Rooms | 9,587 | 11,321 | 12,107 | 12,587 | 11,463 | 11,288 | 12,573 | 10,885 | 8,399 | 5,426 | 5,956 | 8,578 |
| Occupancy | 72.1% | 82.4% | 91.1% | 91.7% | 83.5% | 84.8% | 91.6% | 81.9% | 61.2% | 39.5% | 48.0% | 62.5% |
| ADR | $ 118.95 | $ 155.63 | $ 187.19 | $ 139.95 | $ 140.41 | $ 152.46 | $ 159.48 | $ 159.46 | $ 119.71 | $ 92.62 | $ 106.25 | $ 121.53 |
| RevPAR | $ 85.81 | $ 128.30 | $ 170.53 | $ 128.28 | $ 117.20 | $ 129.26 | $ 146.12 | $ 130.62 | $ 73.21 | $ 36.60 | $ 51.01 | $ 75.91 |
| **Revenue** | | | | | | | | | | | | |
| Rooms Revenue | 1,140,409 | 1,761,912 | 2,266,283 | 1,761,611 | 1,609,443 | 1,717,865 | 2,334,376 | 1,735,970 | 1,005,410 | 502,579 | 632,787 | 1,042,536 |
| Food & Beverage Revenue | 295,928 | 484,020 | 462,414 | 414,765 | 302,550 | 367,145 | 540,621 | 300,857 | 219,196 | 111,246 | 151,030 | 181,518 |
| Minibar Revenue | 10,205 | 12,131 | 15,750 | 12,022 | 8,758 | 9,086 | 12,615 | 12,455 | 11,021 | 5,237 | 8,149 | 10,145 |
| Other Departmental Revenue | 15,674 | 15,307 | 20,980 | 17,360 | 13,805 | 15,946 | 25,321 | 20,412 | 11,411 | 8,593 | 9,424 | 11,915 |
| Rentals and Other Income | 7,747 | 20,665 | 40,604 | 33,798 | 33,778 | 22,528 | 91,431 | 15,935 | 7,574 | 16,806 | 13,073 | 29,618 |
| **Total Departmental Revenue** | $ 1,469,964 | $ 2,294,034 | $ 2,806,031 | $ 2,239,557 | $ 1,968,335 | $ 2,132,570 | $ 3,004,363 | $ 2,085,630 | $ 1,254,612 | $ 644,461 | $ 814,463 | $ 1,275,734 |
| **Departmental Expenses** | | | | | | | | | | | | |
| Rooms Expense | 424,607 | 476,529 | 529,954 | 558,501 | 484,879 | 464,331 | 523,558 | 536,068 | 441,723 | 332,640 | 324,010 | 423,131 |
| Food & Beverage Expense | 281,459 | 361,762 | 327,616 | 349,829 | 286,935 | 297,716 | 333,528 | 324,837 | 392,293 | 211,461 | 215,104 | 238,299 |
| Other Departmental Expense | 9,945 | 11,330 | 12,925 | 7,626 | 5,778 | 5,575 | 11,538 | 7,732 | 10,526 | 9,988 | 14,337 | 11,898 |
| Other Expense | 6,471 | 7,096 | 7,661 | 7,653 | 8,165 | 7,743 | 9,900 | 10,061 | 9,066 | 5,694 | 4,616 | 5,891 |
| **Total Departmental Expense** | $ 722,482 | $ 856,717 | $ 878,155 | $ 923,608 | $ 785,757 | $ 775,365 | $ 878,524 | $ 868,697 | $ 793,547 | $ 559,783 | $ 558,067 | $ 679,219 |
| **Gross Operating Profit** | $ 747,482 | $ 1,437,317 | $ 1,927,876 | $ 1,315,949 | $ 1,182,578 | $ 1,357,205 | $ 2,125,840 | $ 1,216,933 | $ 461,065 | $ 84,677 | $ 256,396 | $ 596,514 |
| **Unallocated Expenses:** | | | | | | | | | | | | |
| General & Administrative | 164,926 | 170,557 | 184,777 | 169,920 | 151,946 | 145,764 | 157,984 | 163,392 | 242,493 | 148,640 | 133,025 | 164,996 |
| Sales & Marketing | 110,489 | 127,483 | 116,931 | 114,393 | 111,650 | 78,837 | 101,840 | 122,817 | 121,633 | 116,118 | 110,828 | 128,660 |
| Repairs & Maintenance | 110,642 | 111,819 | 97,568 | 105,105 | 68,275 | 103,641 | 85,541 | 101,798 | 120,731 | 101,139 | 94,237 | 102,602 |
| Utilities | 48,521 | 44,674 | 42,194 | 38,775 | 43,388 | 26,571 | 43,967 | 56,586 | 61,054 | 71,594 | 60,636 | 57,434 |
| Property Taxes & Insurance | 94,583 | 94,583 | 94,583 | 94,583 | 97,417 | 97,417 | 97,417 | 97,417 | 97,417 | 97,417 | 97,417 | 97,417 |
| Management Fee | 43,840 | 68,536 | 83,813 | 67,037 | 58,929 | 63,773 | 91,184 | 62,144 | 37,647 | 19,385 | 24,469 | 38,268 |
| Lease Expense | 2,860 | 2,841 | 4,356 | 4,263 | 2,765 | 7,879 | 2,152 | 4,417 | 1,572 | 4,635 | 2,801 | 4,810 |
| **Total Unallocated Expenses** | $ 575,861 | $ 620,492 | $ 624,223 | $ 594,076 | $ 534,371 | $ 523,882 | $ 580,084 | $ 608,571 | $ 682,547 | $ 558,907 | $ 523,413 | $ 594,186 |
| **Net Operating Income** | $ 171,621 | $ 816,825 | $ 1,303,654 | $ 721,873 | $ 648,207 | $ 833,323 | $ 1,545,755 | $ 608,361 | $ (221,482) | $ (474,230) | $ (267,016) | $ 2,329 |
| FF&E | 62,133 | 97,267 | 119,380 | 95,652 | 72,751 | 78,665 | 111,162 | 77,101 | 46,186 | 27,435 | 34,783 | 53,692 |
| **Cash Flow Before Debt Service** | $ 109,489 | $ 719,558 | $ 1,184,274 | $ 626,221 | $ 575,456 | $ 754,659 | $ 1,434,593 | $ 531,260 | $ (267,668) | $ (501,655) | $ (301,799) | $ (51,363) |