EXHIBIT 1

Amended and Restated Loan Agreement

## AMENDED AND RESTATED LOAN AGREEMENT

**By and between**

**ALT HOTEL, LLC,**
**as Borrower,**

**and**

**DIAMONDROCK ALLERTON OWNER, LLC,**
**as Lender**

**Dated as of [_____], 2012**

# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...................................2

    Section 1.1    Definitions....................................................................................2
    Section 1.2    Principles of Construction..........................................................27

ARTICLE 2        GENERAL TERMS.....................................................................27

    Section 2.1    Loan Commitment; Disbursement to Borrower ...............................27
    Section 2.2    Interest Rate .............................................................................28
    Section 2.3    Loan Payment ...........................................................................29
    Section 2.4    Prepayments..............................................................................30
    Section 2.5    Release of Property ....................................................................31
    Section 2.6    Cash Management ......................................................................31
    Section 2.7    Extension of the Initial Maturity Date .........................................35

ARTICLE 3        CONDITIONS PRECEDENT ........................................................36

    Section 3.1    Conditions Precedent to Closing..................................................36

ARTICLE 4        REPRESENTATIONS AND WARRANTIES..................................38

    Section 4.1    Borrower Representations............................................................38
    Section 4.2    Survival of Representations ........................................................46
    Section 4.3    Approval of Bankruptcy Court ....................................................46

ARTICLE 5        BORROWER COVENANTS.........................................................46

    Section 5.1    Affirmative Covenants................................................................46
    Section 5.2    Negative Covenants ...................................................................60
    Section 5.3    Hotel........................................................................................65

ARTICLE 6        INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS ................................................................................65

    Section 6.1    Insurance .................................................................................65
    Section 6.2    Intentionally Omitted ................................................................68
    Section 6.3    Miscellaneous ..........................................................................68
    Section 6.4    Casualty...................................................................................70
    Section 6.5    Condemnation ...........................................................................70
    Section 6.6    Restoration ...............................................................................70

ARTICLE 7        RESERVE FUNDS ................................................................................75

    Section 7.1    Intentionally Omitted ................................................................75
    Section 7.2    Escrow Funds ..........................................................................75
    Section 7.3    FF&E Reserve Funds ................................................................76
    Section 7.4    Intentionally Omitted ................................................................77
    Section 7.5    Seasonality Reserve Funds .......................................................77
    Section 7.6    Operating Expense Account .....................................................78
    Section 7.7    Excess Cash Flow Account ......................................................78
    Section 7.8    Reserve Funds, Generally .........................................................78
    Section 7.9    Letters of Credit ......................................................................80

ARTICLE 8        DEFAULTS .........................................................................................81

    Section 8.1    Event of Default .......................................................................81
    Section 8.2    Remedies ..................................................................................83

ARTICLE 9        SPECIAL PROVISIONS .....................................................................85

    Section 9.1    Sale of Note .............................................................................85
    Section 9.2    Intentionally Omitted ................................................................85
    Section 9.3    Intentionally Omitted ................................................................85
    Section 9.4    Exculpation ..............................................................................85
    Section 9.5    Matters Concerning Manager and Franchisor .............................87
    Section 9.6    Servicer ....................................................................................87
    Section 9.7    Intentionally Omitted ................................................................88
    Section 9.8    Intentionally Omitted ................................................................88

ARTICLE 10       MISCELLANEOUS .............................................................................88

    Section 10.1    Survival ...................................................................................88
    Section 10.2    Lender's Discretion ..................................................................88
    Section 10.3    Governing Law ........................................................................88
    Section 10.4    Modification, Waiver in Writing ...............................................90
    Section 10.5    Delay Not a Waiver .................................................................90
    Section 10.6    Notices .....................................................................................90
    Section 10.7    Trial by Jury ............................................................................91
    Section 10.8    Headings ..................................................................................91
    Section 10.9    Severability ..............................................................................91
    Section 10.10   Preferences ..............................................................................92
    Section 10.11   Waiver of Notice .....................................................................92
    Section 10.12   Intentionally Omitted ...............................................................92
    Section 10.13   Expenses; Indemnity ................................................................92
    Section 10.14   Schedules Incorporated ............................................................93
    Section 10.15   Offsets, Counterclaims and Defenses ........................................93
    Section 10.16   No Joint Venture or Partnership; No Third Party Beneficiaries ....93

Section 10.17 Publicity ...................................................................................................94
Section 10.18 Waiver of Marshalling of Assets ...................................................................94
Section 10.19 Waiver of Offsets/Defenses/Counterclaims....................................................94
Section 10.20 Conflict; Construction of Documents; Reliance ..............................................94
Section 10.21 Brokers and Financial Advisors....................................................................95
Section 10.22 Prior Agreements .......................................................................................95
Section 10.23 Duplicate Originals, Counterparts .................................................................95

**SCHEDULES AND EXHIBITS**

Schedule I          Leases
Schedule II         Intentionally Omitted
Schedule III        Organizational Structure
Schedule IV         Intentionally Omitted
Schedule V          Intentionally Omitted
Schedule VI         List of Approved Managers, Approved Cash Management Managers and
                    Hotel Companies
Schedule VII        Intentionally Omitted
Schedule VIII       Intentionally Omitted
Schedule IX         Intentionally Omitted
Schedule X          Union Contracts

Exhibit A           Legal Description
Exhibit B           Form of Replacement Guaranty

## AMENDED AND RESTATED LOAN AGREEMENT

THIS AMENDED AND RESTATED LOAN AGREEMENT, dated as of [_____], 2012 (as amended, restated, replaced, supplemented or otherwise Modified from time to time, this "**Agreement**"), is entered into by and among **DIAMONDROCK ALLERTON OWNER, LLC**, a Delaware limited liability company, having its principal place of business at 6903 Rockledge Drive, Suite 800, Bethesda, Maryland 20817 (together with its successors and assigns, "**Lender**") and **ALT HOTEL, LLC**, a Delaware limited liability company, having its principal place of business at c/o Petra Capital Management LLC, 1370 Avenue of the Americas, 23rd Floor, New York, New York 10019 ("**Borrower**").

### W I T N E S S E T H :

WHEREAS, Lender, as successor-in-interest to U.S. Bank National Association (successor-in-interest to Wells Fargo Bank, N.A.), as trustee for the beneficial holders of the Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-TLF1 ("**Second Original Lender**"), as successor-in-interest to Column Financial, Inc., as Tranche A Lender, and Column Financial, Inc., as Tranche B Lender (collectively, "**Original Lender**") made a loan to Borrower in the original principal amount of up to $79,000,000 (the "**Original Loan**"), pursuant to that certain Loan Agreement, dated as of November 9, 2006 (the "**Original Closing Date**"), by and between Original Lender and Borrower, as amended pursuant to that certain First Amendment to Loan Agreement, dated as of March 21, 2007, by and between Original Lender and Borrower, that certain Second Amendment to Loan Agreement, dated as of November 6, 2009, by and between Second Original Lender and Borrower (collectively, the "**Original Loan Agreement**");

WHEREAS, Borrower initiated a chapter 11 proceeding entitled In re: ALT Hotel LLC (Case No. 11-19401) (the "**Bankruptcy Proceeding**") in the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) (the "**Bankruptcy Court**");

WHEREAS, the Bankruptcy Proceeding was resolved through an amended plan of reorganization (the "**Plan of Reorganization**") filed in the Bankruptcy Proceeding on October [__], 2012 and confirmed on October [__], 2012 by an order entered by the Bankruptcy Court (the "**Confirmation Order**");

WHEREAS, Lender initiated proceedings captioned DiamondRock Allerton Owner, LLC v PS CDO Manager, LLC, designated as Index No. 652224/2011 before the Supreme Court of the State of New York, County of New York (the "**New York Proceeding**");

WHEREAS, Borrower initiated proceedings captioned ALT Hotel, LLC, et al v. DiamondRock Allerton Owner, LLC, designated as Adv. No. 11-01469 filed before the Bankruptcy Court (the "**Equitable Subordination Litigation**");

WHEREAS, simultaneously with the execution of this Agreement, the Bankruptcy Proceeding, the New York Proceeding and the Equitable Subordination Litigation will be dismissed with prejudice;

WHEREAS, simultaneously with the execution of this Agreement, and as a condition to the effectiveness of this Agreement and the Plan of Reorganization, Borrower is making a payment to Lender in the amount of Five Million Dollars ($5,000,000) under the Original Loan (the "**Original Loan Paydown**"), reducing the Outstanding Principal Balance of the Loan to Sixty-Six Million Dollars ($66,000,000);

WHEREAS, simultaneously with the execution of this Agreement, Borrower is making a deposit into the Seasonality Reserve the amount of One Million Five Hundred Thousand Dollars ($1,500,000) pursuant to Section 7.5.1 hereof;

WHEREAS, Lender and Borrower are willing to amend and restate the terms of the Original Agreement in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the covenants, agreements, representations and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE 1

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions.    For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with, such Person.

"**Affiliated Manager**" shall mean any Manager in which Borrower, Principal or any Sponsor has, directly or indirectly, any legal, beneficial or economic interest.

"**Aggregate Outstanding Principal Balance**" shall mean, as of any date, the Outstanding Principal Balance.

"**ALTA**" shall mean the American Land Title Association, or any successor thereto.

"**Alterations**" shall mean physical alterations to the Property but shall exclude the addition, replacement and/or upgrading of FF&E.

"**Amortization Payment**" shall mean an amount equal to (A) prior to the first Permitted Transfer, one hundred percent (100%) of all funds on deposit in the Cash Management Account as of the applicable Payment Date after payment of items (i) through (v) of Section 2.6.3(a), provided, however, in no event shall the total Amortization Payment in any Fiscal Year under this subsection (A) exceed the principal payments that would be paid during such Fiscal Year if the Outstanding Principal Balance was repaid at the Applicable Interest Rate on a thirty (30) year amortization schedule and (B) after a Permitted Transfer, twenty-five percent (25%) of all funds on deposit in the Cash Management Account as of the applicable Payment Date after payment of

items (i) through (v) of Section 2.6.3(a), provided, however, in no event shall the total Amortization Payment in any Fiscal Year under this subsection (B) exceed the principal payments that would be paid during such Fiscal Year if the Outstanding Principal Balance was repaid at the Applicable Interest Rate on a thirty (30) year amortization schedule.

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures as well as costs of preparing the financial reports required under Section 5.1.11 hereof, for the Property prepared by Borrower or the Manager, as applicable, for the applicable Fiscal Year or other period.

"**Applicable Interest Rate**" shall mean a fixed rate of five and one-half percent (5.5%).

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.11(d) hereof.

"**Approved Cash Management Manager**" shall mean each of the Persons designated as an Approved Cash Management Manager on Schedule VI hereto as long as at the time of such Person's appointment there has been no material adverse change in the business or condition, financial or otherwise, of such Person.

"**Approved Extraordinary Expense**" shall mean an Extraordinary Expense reasonably approved by Lender in writing after the occurrence and continuance of an Event of Default as provided in Section 5.1.11(e).

"**Approved Franchise Agreement**" shall mean a Franchise Agreement with an Approved Franchisor which is on arm's length, market terms, and reasonably approved by Lender.

"**Approved Franchisor**" shall mean any franchisor, licensor or similar Person owned or controlled by any Approved Manager, and reasonably approved by Lender.

"**Approved Institutional Investor**" shall mean an Institutional Investor reasonably acceptable to Lender (as confirmed in writing by Lender).

"**Approved Manager**" shall mean each of the Persons designated as an Approved Manager on Schedule VI hereto as long as at the time of such Person's appointment there has been no material adverse change in the business or condition, financial or otherwise, of such Person.

"**Approved Operating Expense**" shall mean an operating expense of the Property (which shall include, without limitation, all fees required to be paid to a manager pursuant to the Management Agreement) which is either (i) set forth on the Approved Annual Budget or (ii) if such operating expense is not included on the Approved Annual Budget, otherwise approved in writing by Lender (with such approval not to be unreasonably withheld, conditioned or delayed).

"**Approved Op Ex Disbursements**" shall have the meaning set forth in Section 7.6 hereof.

"**Approved Projections**" shall mean, for any applicable period, such projections of Net Cash Flow approved by Lender in writing (which such approval shall not be unreasonably withheld, conditioned or delayed).

"**Approved Replacement Reservation System**" shall mean any of (i) Pegasus (including Unirez, UTELL and Travel Click), (ii) Lexington, (iii) SRZ, or (iv) SynXis.

"**Approved Reservation Contract**" shall mean, collectively, (a) a contract with an Approved Replacement Reservation System for reservation services for the Property, which contract shall be in form and substance reasonably acceptable to Lender and (b) a recognition agreement and comfort letter in form and substance reasonably satisfactory to Lender, executed and delivered to Lender by Borrower and such Approved Replacement Reservation System.

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents (as the same has been amended, modified or assigned), dated as of the Original Closing Date, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Amended and Restated Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Lender, Borrower, and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assumption Transfer**" shall have the meaning set forth in Section 5.2.10(e) hereof.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited, petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee or examiner for such Person or any portion of the Property; or (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Code**" shall mean 11 U.S.C. §101 *et seq*., as the same may be amended from time to time.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals to this Agreement.

"**Bankruptcy Proceeding**" shall have the meaning set forth in the Recitals to this Agreement.

"**Base Management Fee**" shall mean a per annum fee payable to Manager pursuant to the Management Agreement equal to 3% of Gross Receipts (as defined in the Management Agreement).

"**Basic Carrying Costs**" shall mean, for any period, the sum of the following costs: (a)Taxes, (b) Other Charges and (c) Insurance Premiums.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its permitted successors and assigns.

"**Borrower Recourse Liabilities**" shall have the meaning set forth in Section 9.4 hereto.

"**Breakage Costs**" shall have the meaning set forth in Section 2.2.3(h) hereof.

"**Building**" shall mean the building located upon the Land.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Calculation Date**" shall mean the first Payment Date occurring in each calendar quarter.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP and the Uniform System of Accounts (including expenditures for building improvements or major repairs).

"**Cash Management Account**" shall have the meaning set forth in Section 2.6.2(a) hereof.

"**Cash Management Agreement**" shall mean that certain Amended and Restated Cash Management Agreement, dated as of the date hereof, by and among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Casualty**" shall have the meaning set forth in Section 6.4 hereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 6.6 hereof

"**Casualty Retainage**" shall have the meaning set forth in Section 6.6 hereof

"**Certified Amount**" shall have the meaning set forth in Section 2.6.2(b) hereof

"**Change of Control Transfer**" shall have the meaning set forth in Section 5.2.10(d) hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade materially and adversely affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in <u>Section 6.6(b)</u> hereof.

"**Confirmation Order**" shall have the meaning set forth in the Recitals to this Agreement.

"**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage and the other Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled interest payments and principal payments (if any) due under this Agreement and the Note.

"**Debt Service Coverage Ratio**" shall mean a ratio for the applicable period in which:

(a)     the numerator is the Net Cash Flow for such period as set forth in the financial statements required hereunder; and

(b)     the denominator is the aggregate amount of interest due and payable on the Note for such period.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default and of which Borrower has actual notice.

"**Default Rate**" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) five percent (5%) above the Applicable Interest Rate.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in

the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's or "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch or S&P or "Aa2" by Moody's).

"**Embargoed Person**" shall have the meaning set forth in <u>Section 4.1.35</u> hereof.

"**Environmental Indemnity**" shall mean that certain Amended and Restated Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Equipment**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Equitable Subordination Litigation**" shall have the meaning set forth in the Recitals to this Agreement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in <u>Section 8.1(a)</u> hereof.

"**Excess Cash Flow**" shall have the meaning set forth in <u>Section 2.6.3(a)(vii)</u> hereof.

"**Excess Cash Flow Account**" shall mean a sub-account of the Cash Management Account established to hold Excess Cash Flow.

"**Excess Cash Flow Funds**" shall mean such amounts as are held in the Excess Cash Flow Account.

"**Excusable Delay**" shall have the meaning set forth in <u>Section 6.6(b)(i)(D)</u> hereof.

"**Extended Maturity Date**" shall have the meaning set forth in <u>Section 2.7</u> hereof.

"**Extension Fee**" shall mean one percent (1.0%) of the Outstanding Principal Balance.

"**Extension Option**" shall have the meaning set forth in <u>Section 2.7</u> hereof.

"**Extension Term**" shall have the meaning set forth in <u>Section 2.7</u> hereof.

7

"**Extraordinary Expense**" shall have the meaning set forth in <u>Section 5.1.11(e)</u> hereof

"**FF&E**" shall have the meaning set forth in <u>Section 7.3.1</u> hereof.

"**FF&E Reserve Funds**" shall have the meaning set forth in <u>Section 7.3.1</u> hereof.

"**FF&E Monthly Deposit**" shall have the meaning set forth in <u>Section 7.3.1</u> hereof.

"**FF&E Reserve Account**" shall mean a sub-account of the Cash Management Account established to hold FF&E Reserve Funds.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Fixed Maturity Date**" shall mean either (a) the Initial Maturity Date, or (b) if Borrower shall have properly exercised the Extension Option, the Extended Maturity Date, as applicable.

"**Foreclosure Proceeding**" shall mean the foreclosure lawsuit that is captioned DiamondRock Allerton Owner, LLC v. Alt Hotel, LLC, designated as Case No. 10 CH 18859 (Atkins, J.), before the Circuit Court of Cook County, Illinois, Chancery Division, other than as removed to the Bankruptcy Court.

"**Franchise Agreement**" shall mean (i) any Approved Franchise Agreement or (ii) to the extent Lender has granted its prior written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed, any franchise, license or similar agreement entered into after the date hereof by Borrower or any of its respective Affiliates with respect to all or any portion of the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, in each case subject to the terms and conditions set forth herein.

"**Franchisor**" shall mean (i) any Approved Franchisor or (ii) to the extent Lender has granted its prior written consent thereto, such consent not to be unreasonably withheld, or as otherwise permitted hereunder any franchisor, licensor or similar Person under any Franchise Agreement entered into after the date hereof with respect to all or any portion of the Property, together with their respective successors and assigns in such capacity, in each case subject to the terms and conditions set forth herein.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean, for any period, all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source during such period, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-through or reimbursements paid by tenants under the Leases of any nature, but excluding Rents from month-to-month tenants or tenants that are the subject of any Bankruptcy Action (with the exception of any Rents paid until such time as (i) any such tenant or tenants file a motion to assume or reject the relevant Lease(s), (ii) the deadline under the Bankruptcy Code by which such tenant or tenants must assume or reject the relevant Lease(s) expires, or (iii) any such tenant or tenants fail to pay Rents with respect to such Lease(s) on a timely basis) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, proceeds from the sale of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income insurance) and Condemnation Proceeds, any disbursements to Borrower from any of the Reserve Funds, any proceeds resulting from the sale, exchange, transfer, financing or refinancing of all or part of the Property and any investment income on funds not related to the normal operation of the Property.

"**Guarantors**" shall mean the guarantor under the Guaranty, and its successors and permitted assigns and the term "**Guarantor**" shall mean each of such guarantors.

"**Guaranty**" shall mean that certain Amended and Restated Guaranty Agreement made by PS CDO Manager, LLC for the benefit of Lender and dated as of the date hereof, which supersedes and replaces that certain Guaranty Agreement, dated as of October 1, 2010, made by PS CDO Manager, LLC for the benefit of Lender, which is deemed null and void and of no further force and effect.

"**Historic District Regulations**" shall mean, collectively, (i) that certain Ordinance passed by the City Council of the City of Chicago at the regular meeting held on the 29th day of April, 1998, as recorded on June 18, 1998 as document number 98517095 by the County Recorder of Cook County, Illinois, (ii) that certain Certification of the Rehabilitation of the Allerton Hotel, 701 North Michigan Avenue, For the Class-L Real Estate Tax Reduction, executed on December 1, 1999, by David Mosena, Chairman, on behalf of the City of Chicago Commission on Chicago Landmarks and (iii) any amendment, restatement, supplement or other modification of any of the foregoing.

"**Hotel Company**" shall mean each of the Persons designated as a Hotel Company on Schedule VI hereto as long as at the time of such Person's appointment there has been no material adverse change in the business or condition, financial or otherwise, of such Person.

"**Hotel License**" shall mean, collectively, each license and/or permit required under applicable Legal Requirements for the operation of the Property as it is required to be operated pursuant to the terms hereof, including, without limitation, any required hotel operators license, food and beverage license and liquor license.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, on a particular date, the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations for which such Person is liable); (d) obligations under reimbursement agreements in connection with letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Liabilities**" shall have the meaning set forth in <u>Section 10.13(b)</u> hereof.

"**Indemnifying Person**" shall mean Borrower.

"**Independent Director**" or "**Independent Manager**" shall mean a Person selected by Borrower who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years: (a) a stockholder, director (with the exception of serving as the Independent Director or Independent Manager), officer, employee, partner, member, attorney or counsel of Principal, Borrower or any Affiliate of either of them; (b) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Principal, Borrower or any Affiliate of either of them; (c) a Person controlling or under common control with any such stockholder, director, officer, partner, member, customer, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, partner, member, customer, supplier or other Person. Notwithstanding anything to the contrary contained herein, a natural Person who satisfies the foregoing definition other than <u>subparagraph (b)</u> shall not be disqualified from serving as an Independent Director of the applicable Person if such natural Person is an independent director provided by a nationally recognized company that provides professional independent directors in the ordinary course of its business. A natural Person who otherwise satisfies the foregoing definition except for being the independent director of a special purpose entity affiliated with the Borrower or Special Purpose Entity shall not be disqualified from serving as an Independent Director of the Special Purpose Entity if such special purpose entity does not own a direct or indirect interest in the Borrower or Special Purpose Entity and such person is an independent director provided by a nationally-recognized company that provides professional independent directors in the ordinary course of its business.

"**Initial Maturity Date**" shall mean the date that is 48 months from date hereof.

"**Initial Seasonality Deposit**" shall have the meaning set forth in <u>Section 7.5.1</u>.

"**Institutional Investor**" shall mean shall mean any one of the following Persons:

(i)       a pension fund, pension trust or pension account that (a) has total real estate assets of at least $1,000,000,000 and (b) is managed by a Person that controls at least $1,000,000,000 of real estate equity assets;

(ii)      a pension fund advisor who (a) immediately prior to such transfer, controls directly and/or indirectly at least $1,000,000,000 of real estate equity assets and (b) is acting on behalf of one or more pension funds that, in the aggregate, satisfy the requirements of clause (i) of this definition;

(iii)     an insurance company that is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia), which (a) has a net worth, as of a date no more than six (6) months prior to the date of the transfer, of at least $500,000,000 and (b) immediately prior to such transfer, controls real estate equity assets of at least $1,000,000,000;

(iv)     an insurance company which is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia) (a) with a net worth, as of a date no more than six (6) months prior to the date of the transfer, of at least $500,000,000 and (b) who, immediately prior to such transfer, controls directly and/or indirectly real estate equity assets of at least $1,000,000,000; or;

(v)      a corporation organized under the banking laws of the United States or any state or territory of the United States (including the District of Columbia) (a) with a combined capital and surplus of at least $500,000,000 and (b) who, immediately prior to such transfer, controls directly and/or indirectly real estate equity assets of at least $1,000,000,000;

(vi)     any Person with a long-term unsecured debt rating from the Rating Agencies of at least investment grade; or

(vi)     any Person which is 51% owned (directly or indirectly) and controlled by any of the Persons listed in clauses (i) through (vi) above.

Notwithstanding the foregoing, no Person shall be deemed to be an Institutional Investor if (y) such Person (or any other Person owned or controlled by such Person or affiliated with such Person) has been, within the last ten (10) years, (I) subject to any material, uncured event of default in connection with a loan financing which resulted in litigation or an acceleration of an indebtedness held by Lender or any other secondary market or institutional lender or (II) the subject of any Bankruptcy Action; or (z) any of the principals or Persons which control such Person or own a material direct or indirect equity interest in such Person have ever been convicted of a felony.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.3 hereof.

"**Insurance Proceeds**" shall have the meaning set forth in Section 6.6(b) hereof.

"**Interest Period**" shall mean, with respect to any Payment Date, the period commencing on and including the ninth (9th) day of the preceding calendar month and terminating on and including the eighth (8th) day of the calendar month in which such Payment Date occurs; provided, however, that no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate), and the initial Interest Period shall begin on and include the Closing Date and shall end on and include the immediately following eighth (8th) day of the calendar month.

"**Land**" shall mean the land more particularly described on Exhibit A attached hereto and all rights appurtenant thereto, including, without limitation, all air and development rights, if any, acquired by Borrower.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of any space in the Property, and (a) every modification, amendment or other agreement relating to such lease, sublease, subsublease or other agreement entered into in connection with such lease, sublease, subsublease or other agreement, and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean all Federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Prescribed Laws, the Americans with Disabilities Act of 1990, as amended, the Historic District Regulations and all permits, licenses and authorizations and regulations relating to each of the foregoing, and all covenants, agreements, restrictions and encumbrances contained in any instruments recorded against the Property in the real estate records (other than the Leases) at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Lender Controlled Funds**" shall have the meaning set forth in Section 2.6.1(d) hereof.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without payment of fee by Lender), clean sight draft letter of credit acceptable to Lender and the Rating Agencies (either an evergreen letter of credit or one which does not expire until at least thirty (30) Business Days after the Maturity Date) in favor of Lender and entitling Lender to draw thereon in New York, New York without payment of a fee, issued by a domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution.

"**Letter of Credit Amount**" shall mean ten percent (10%) of the then outstanding balance of the Loan.

"**Licenses**" shall have the meaning set forth in Section 4.1.22 hereof.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create, any of the foregoing, on or affecting Borrower, the Property or any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the original principal amount of Sixty Six Million Dollars ($66,000,000) made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Environmental Indemnity, the Guaranty, the Manager Recognition Agreement, the Cash Management Agreement, Lockbox Account Agreement and all other documents executed and/or delivered in connection with the Loan.

"**Lockbox Account**" shall have the meaning set forth in Section 2.6.1(a) hereof.

"**Lockbox Account Agreement**" shall have the meaning set forth in Section 2.6.1(a) hereof.

"**Lockbox Bank**" shall have the meaning set forth in Section 2.6.1 hereof.

"**Management Agreement**" shall mean (i) the Hotel Management Agreement entered into by and between Manager and Borrower, as same may be amended, modified or supplemented from time to time, pursuant to which Manager is to provide management and other services with respect to the Property or (ii) if the context requires, a Replacement Management Agreement.

"**Manager**" shall mean Kokua Hospitality, LLC, a Delaware limited liability company, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"**Manager Controlled Funds**" shall have the meaning set forth in Section 2.6.1(d) hereof.

"**Manager Recognition Agreement**" shall mean that certain Amended and Restated Subordination, Nondisturbance and Attornment Agreement made by and among Borrower, Lender and Manager as of the date hereof and any replacements thereof.

"**Management Termination Period**" shall mean a period commencing upon the earliest of (i) the occurrence of a default by Manager under the Management Agreement beyond any

applicable grace and cure periods which has a Material Adverse Effect, (ii) the failure of the income and revenue generated from the Property to be applied in accordance with the terms of the Management Agreement and the Loan Documents, or (iii) the expiration, cancellation or other termination of the Management Agreement, which such Management Termination Period shall expire upon the earlier of (y) Borrower entering into a Replacement Management Agreement in accordance with the applicable terms and conditions hereof or (z) the satisfaction and discharge of the Debt.

"**Manager Termination Condition**" shall have the meaning set forth in <u>Section 9.5(a)</u> hereof.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the Property, (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of Borrower or the Property, (iii) the enforceability, validity, perfection or priority of the lien of the Security Instrument or the other Loan Documents, or (iv) the ability of Borrower to perform its obligations under the Loan Documents.

"**Material Contract**" shall mean any of the following: (a) all material covenants, agreements, restrictions and encumbrances contained in any instruments, either recorded or otherwise a matter of public record, affecting the Property or any part thereof which if violated will result in a material adverse effect on the ownership or operation or materially diminish the value of the Property, (b) any lease or sublease that is entered into after the date hereof for greater than 2,500 rentable square feet at the Property, (c) the union contracts and employment agreements, together with all settlement agreements related thereto affecting the Property (collectively, the "**Union Contracts**") described on <u>Schedule X</u>, including, without limitation any existing or future settlement agreements pertaining to any disputes arising out of such Union Contract, (d) the Franchise Agreement, if any, and (e) any contract, license or other agreement pursuant to which goods or services are provided to, or in respect of, Borrower or the Property and which (i) is not terminable upon sixty (60) days notice or less or requires payment of a termination fee in excess of $25,000, (ii) requires the payment of an amount per year in excess of $250,000 or (iii) is with an Affiliate of Borrower, as any of the foregoing described in clauses (a) through (d) may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement; <u>provided</u>, that (A) advance booking arrangements and negotiated rate agreements entered into in the ordinary course of the management and operation of the Property, (B) the mere purchase of goods on a non-forward commitment basis (e.g., purchase of a good for cash) in the ordinary course of the management and operation of the Property and (C) any other agreement entered into with a Person that is not an Affiliate of Borrower pursuant to which good or services are provided to, or in respect of, the Property entered into in the ordinary course of the management and operation of the Property, as the same is managed and operated on the date hereof, and which requires the payment of an amount per year that is less than $500,000, shall not constitute a Material Contract. Notwithstanding the foregoing, so long as an Event of Default exists, all contracts, licenses and other agreements whether or not oral or in writing pursuant to which any goods or services are provided to or in respect of Borrower or the Property (other than advance booking arrangements and negotiated rate agreements entered into in the ordinary course of the management an operation of the Property) shall be deemed to be Material Contracts.

14

"**Maturity Date**" shall mean either (a) the Fixed Maturity Date, or (b) if applicable, the Extended Maturity Date or (c) such other date on which the final payment of principal of the Note becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Monthly Interest Payment**" shall have the meaning set forth in Section 2.3.1.

"**Monthly Payment Notification**" shall have the meaning set forth in Section 2.6.1(d) hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean that certain first priority Mortgage and Security Agreement, dated the Original Closing Date, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Net Cash Flow**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period (as reasonably determined by Lender using underwriting standards that are consistent with the standards used at the initial underwriting and closing of the Loan, which are normal and customary in the securitized loan industry for loans of a similar size as the Loan on properties of the same type as the Property in the same general geographic area as the Property); provided, that for purposes of calculating Net Cash Flow, the following shall be deducted from Gross Income from Operations for such period (but without duplication for amounts already deducted as Operating Expenses or as part of the FF&E Reserve Funds): (a) the management fees, sales and marketing fees and other fees and expenses payable to Manager under the Management Agreement, (b) minimum assumed FF&E Monthly Deposit contributions equal to four percent (4%) of Gross Income from Operations, and (c) the franchise fees, sales and marketing expenses and other fees and expenses payable to Franchisor under any Franchise Agreement.

"**Net Operating Income**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.

"**Net Proceeds**" shall have the meaning set forth in Section 6.6(b) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 6.6(b)(vi) hereof.

"**New York Proceeding**" shall have the meaning set forth in the Recitals to this Agreement.

"**Original Loan**" shall have the meaning set forth in the Recitals to this Agreement.

"**Original Loan Paydown**" shall have the meaning set forth in the Recitals to this Agreement.

"**Note**" shall mean that certain Amended and Restated Promissory Note, dated as of the date hereof and in the original principal amount of Sixty Six Million Dollars ($66,000,000), evidencing the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Notice**" shall have the meaning set forth in <u>Section 10.6</u> hereof.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized officer of the general partner or managing member of Borrower, as applicable.

"**Operating Company**" shall mean a Person which, as of the date of the applicable transfer, is not a "shell" or "pass through" entity and which has material assets other than its direct and/or indirect equity ownership interest in Borrower. Notwithstanding the foregoing, a Person may still be considered an "Operating Company" for the purposes hereof if it is a "series" limited liability company and the aforesaid "material assets" are held in other series which are legally separate for liability purposes but legal title to such material assets remains held by such "series" limited liability company.

"**Operating Expenses**" shall mean, for any period, the total of all operating expenses, computed in accordance with GAAP, of whatever kind relating to the Property, which expenditures are incurred on a regular monthly or recurring or other periodic basis, including without limitation, utilities, cleaning, maintenance, ordinary repairs and maintenance, insurance, permits, license fees, franchise fees, royalties, property taxes and assessments, advertising and marketing expenses, management fees, payroll and related taxes, security systems, transportation, legal and accounting, computer processing charges, tenant improvements and leasing commissions (to the extent the same are not capitalized under GAAP), operational equipment or other lease payments as reasonably approved by Lender, and other similar costs, but excluding depreciation or amortization, income or estate taxes or other impositions in the nature of income or estate taxes, any expense (including legal, accounting and other professional fees, expenses and disbursements) incurred in connection with the making of the Loan or the sale, exchange, transfer, financing or refinancing of all or any portion of the Property or in connection with the recovery of proceeds which are applied to prepay the Note, any expenses which in accordance with GAAP should be capitalized, any item of expense which would otherwise be considered within Operating Expenses pursuant to the provisions above but is paid directly by any tenant or reimbursed by the tenant to Borrower, Debt Service and contributions to the FF&E Reserve Funds, the Tax and Insurance Escrow Funds, the Seasonality Funds, and any other reserves required under the Loan Documents.

"**Operating Expense Account**" shall mean a sub-account of the Cash Management Account established to hold Operating Expense Funds.

"**Operating Expense Funds**" shall have the meaning set forth in <u>Section 7.6</u> hereof.

"**Original Closing Date**" shall have the meaning set forth in the Recitals to this Agreement.

"**Original Lender**" shall have the meaning set forth in the Recitals to this Agreement.

"**Original Loan Agreement**" shall have the meaning set forth in the Recitals to this Agreement.

"**Other Charges**" shall mean all ground rents, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof and which if not timely paid will result in a Lien on the Property.

"**Other Obligations**" shall mean (a) all obligations of Borrower contained herein; (b) each obligation of Borrower contained in any other Loan Document; and (c) each obligation of Borrower contained in any renewal, extension, amendment, modification, change of, or substitution or replacement for, all or any part of this Agreement, the Note or any other Loan Document.

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**Payment Date**" shall mean the ninth (9th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"**Payment Notice**" shall have the meaning set forth in Section 5.1.24 hereof.

"**Payment Shortfall**" shall have the meaning set forth in <u>Section 7.5.2</u> hereof.

"**Permitted Encumbrances**" shall mean, collectively (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy or on the Survey or otherwise approved or created pursuant to the Bankruptcy Proceeding or approved by the Original Lender with respect to the Original Loan, (c) Liens, if any, for Taxes imposed by any Governmental Authority that are not yet due or delinquent or are being contested in accordance with <u>Section 5.1.2</u> hereof, (d) statutory liens for labor or materials that (i) secure sums not yet due and payable, (ii) secure sums for which Borrower is not indebted, (iii) secure sums not in excess of $500,000.00 in the aggregate, or (iv) are bonded or insured over to Lender's reasonable satisfaction; <u>provided</u>, <u>however</u>, that with respect to the foregoing <u>subclauses (ii)</u> and <u>(iii)</u>, such sums shall be deemed "Permitted Encumbrances" for purposes of this definition only if, after written notice to Lender, Borrower, at its own expense, is contesting the amount or validity of same by appropriate legal proceeding

17

in accordance with the Loan Documents, promptly initiated and conducted in good faith and with due diligence; and provided further that the conditions set forth in clauses (a) through (f) of Section 5.1.2 and/or Section 3.6(b) of the Mortgage, as applicable, shall also be satisfied in respect of such contest, (e) any attachment or judgment lien; provided that the judgment it secures shall have been discharged or execution thereof stayed pending appeal within the earlier of sixty (60) days after the entry thereof and the date that is ten (10) days prior to the earlier to occur of the Maturity Date or the date on which the Property is scheduled to be sold for non-payment, or shall have been discharged within the earlier of sixty (60) days after the expiration of any such stay and the date that is ten (10) days prior to the earlier to occur of the Maturity Date or the date on which the Property is scheduled to be sold for non-payment, (f) easements, rights-of-way, restrictions (including zoning restrictions), defects or irregularities in title to which like properties are commonly subject which have not been granted or created by Borrower in violation of any term of this Agreement prohibiting such grant or creation and which do not (i) interfere with the benefits to be provided by the Mortgage, (ii) adversely affect the operation, use, value, enjoyment or marketability of the Property in any material respect, or (iii) adversely affect Borrower's ability to repay the Loan in full, and (g) such other Liens as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Transfer**" shall have the meaning set forth in Section 5.2.10(e) hereof.

"**Permitted Transferee**" shall mean a corporation, partnership or limited liability company that (i) (A) has (or its affiliated entities have) total assets (in name or under management) in excess of $100,000,000 not including the Property and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $15,000,000, and (B) is (x) an entity that is (or is controlled and 15% (directly or indirectly) owned by) an experienced operator and/or owner regularly engaged in the business of owning or operating, full-service hotel properties in urban locations (as its main business or as part of a broader business of owing or operating commercial properties) and that engages an Approved Property Manager or (y) is an Approved Institutional Investor or (iii) is Sponsor or any entity controlled by Sponsor; provided, however, notwithstanding the foregoing in no event shall any Prohibited Transferee be a Permitted Transferee under this definition, even if such Prohibited Transferee otherwise satisfies the conditions set forth in subsections (i), (ii) or (iii) of this definition

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Plan of Reorganization**" shall have the meaning set forth in the Recitals to this Agreement.

"**Policies**" shall have the meaning specified in Section 6.3(a) hereof.

"**Prescribed Laws**" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. § 1701 *et seq.* and (d) all other Legal Requirements relating to money laundering or terrorism.

"**Principal**" shall mean any constituent owner of Borrower which, by the terms hereof, is required to be a Special Purpose Entity.

"**Proforma Net Cash Flow**" shall mean the Net Cash Flow that would be generated by the Property upon completion of a Restoration, as reasonably determined by Lender based upon the Net Cash Flow as of the date immediately prior to the occurrence of the Casualty or Condemnation and taking into account any reduction in the revenue-generating capacity of the Property due to reduced room count, size of Improvements, etc. that will exist following the Restoration.

"**Prohibited Transferee**" means (i) any person, or any entity which has a chief executive officer, president, chief financial officer, general counsel, chief operating officer or person holding an equivalent position to the foregoing (but with a different title) (each a "**Senior Executive**") who has been convicted of a felony involving theft, fraud, extortion, embezzlement or other similar criminal acts involving dishonesty (a "**Dishonest Convict**") or (ii) any entity that is controlled by a person, or an entity which has a Senior Executive, who is a Dishonest Convict; provided, however, that no such entity shall constitute a "Prohibited Transferee" if it is diligently taking commercially reasonable actions in furtherance of removing such Senior Executive from his or her capacity as such or (iii) any person or entity (or any Affiliate thereof) that would jeopardize the Property's liquor license if to be held by such transferee or (iv) any person or entity who is an Embargoed Person.

"**Property**" shall mean the Land, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property, Land, and Improvements, as more particularly described in the granting clause of the Mortgage and referred to therein as the "Property".

"**Provided Information**" shall mean any and all financial and other information provided at any time by, or on behalf of, any Indemnifying Person with respect to the Property, Borrower, Principal and/or Manager in connection with the Loan.

"**Qualified Manager**" shall mean any of (a) Manager, (b) any Approved Manager (including without limitation, any Hotel Company) or (c) in the reasonable judgment of Lender,

a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Property.

"**Rating Agencies**" shall mean each of S&P, Moody's and Fitch, or any other nationally recognized statistical rating agency which has been approved by Lender.

"**Removed Litigation**" shall mean the lawsuit captioned Hotel Allerton Mezz, LLC v. Wells Fargo Bank, N.A., *et al.*, designated as Adv. No. 11-01651, filed in the Bankruptcy Court.

"**Rents**" shall mean all rents (including, without limitation, percentage rents), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payments and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower from any and all sources arising from or attributable to the Property and the Improvements, including, without limitation, all revenues from telephone services, laundry, vending, television, and all hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, and all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager, or any of their respective agents or employees, and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance (it being understood and agreed that the management fee for such replacement manager shall not exceed then prevailing market rates); and (b) an agreement in substantially the same form as the Manager Recognition Agreement (or such other agreement in form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense; provided, however, if the Qualified Manager is a Hotel Company, then (i) such Hotel Company's standard form of management agreement shall constitute a Replacement Management Agreement which shall be deemed acceptable to Lender under this definition and (ii) the manager recognition agreement shall provide that Lender may not terminate such Qualified Manager as the manager unless such Qualified Manager has defaulted under such Replacement Management Agreement beyond all applicable notice and grace periods.

"**Reserve Funds**" shall mean, collectively, the Tax and Insurance Escrow Funds, the FF&E Reserve Funds, the Seasonality Funds, the Operating Expense Funds, the Excess Cash Flow Funds and any other escrow fund established pursuant to the Loan Documents.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation; provided, however, that Borrower may make other alterations in connection with such repair or restoration as may be reasonably approved by Lender.

"**Restoration Debt Service Coverage Ratio**" shall mean a ratio for the applicable period in which:

(a)    the numerator is the Proforma Net Cash Flow as of the date of determination; and

(b)    the denominator is the product obtained by multiplying the (x) Outstanding Principal Balance as of such date of determination by (y) a constant equal to the Applicable Interest Rate.

"**Restricted Party**" shall mean, collectively (a) Borrower, Principal and any Affiliated Manager, (b) any shareholder, partner, member, non-member manager or direct legal or beneficial owner of Borrower, and (c) Persons which hold indirect legal or beneficial interests in Borrower.

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies, Inc.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance or pledge of a legal or beneficial interest.

"**Seasonality Reserve Account**" shall mean a sub-account of the Cash Management Account established to hold Seasonality Reserve Funds.

"**Seasonality Reserve Amount**" shall mean the greater of (i) One Million Five Hundred Thousand Dollars ($1,500,000) and (ii) the Seasonality Shortfall Amount.

"**Seasonality Reserve Funds**" shall have the meaning set forth in Section 7.5.1 hereof.

"**Seasonality Shortfall Amount**" shall mean the greater of (i) One Million Five Hundred Thousand Dollars ($1,500,000) and (ii) if there shall be insufficient Gross Income From Operations to pay in full (a) all deposits into the Tax and Insurance Account for the payment of Taxes and Insurance Premiums, (b) Approved Operating Expenses and Approved Extraordinary Expenses for the Property and/or (c) all Monthly Interest Payments, each as due in the then preceding calendar months of December, January, February, March and April (collectively, the "**Seasonality Months**" and individually, a "**Seasonality Month**") and without reduction for any surplus funds in any such month.  For the avoidance of doubt, the Seasonality Shortfall Amount shall in no event be reduced by the amount of any excess Gross Income From Operations available in any Seasonality Month after payments for deposits for the payment of Taxes and Insurance Premiums and payments of all Approved Operating Expenses, Approved Extraordinary Expenses and Monthly Interest Payments and without taking into account amounts utilized from the Seasonality Reserve Account.

21

"**Second Original Lender**" shall have the meaning set forth in the Recitals to this Agreement.

"**Security Documents**" shall have the meaning set forth in <u>Section 2.5.1</u> hereof

"**Servicer**" shall have the meaning set forth in <u>Section 9.6</u> hereof.

"**Servicing Agreement**" shall have the meaning set forth in <u>Section 9.6</u> hereof

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company which at all times prior to, on and after the date hereof:

(a)      was, is and will be organized solely for the purpose of (i) acquiring, financing, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; or (ii) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

(b)      has not been, is not, and will not be engaged in any business unrelated to (i) the acquisition, financing, development, ownership, management or operation of the Property, (ii) acting as general partner of the limited partnership that owns the Property, or (iii) acting as a member of the limited liability company that owns the Property, as applicable;

(c)      has not had, does not have, and will not have, any assets other than those related to the Property or its partnership interest in the limited partnership or the membership interest in the limited liability company that owns the Property or acts as the general partner or a member thereof, as applicable;

(d)      except as expressly permitted by this Agreement, the Bankruptcy Proceeding or the other Loan Documents or in connection with a repayment of the Debt or as required by law, has not engaged, sought or consented to, and will not engage in, seek or consent to, any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

(e)      if such entity is a limited partnership, has had, now has, and will have as its only general partners, Special Purpose Entities that are corporations, limited partnerships or limited liability companies;

(f)      if such entity is a corporation, has had, now has, and will have at least one (1) Independent Director, and has not caused or allowed, and will not cause or allow, the board of directors of such entity to take any action requiring the unanimous affirmative vote of one

hundred percent (100%) of the members of its board of directors unless one (1) Independent Director shall have participated in such vote;

(g)    if such entity is a limited liability company with more than one (1) economic member, has had, now has and will have at least one (1) member that is a Special Purpose Entity that is a corporation that has at least one (1) Independent Director and that owns at least one percent (1.0%) of the equity of the limited liability company;

(h)    if such entity is a limited liability company with only one (1) economic member, has been, now is, and will be a limited liability company organized in the State of Delaware or State of Maryland that (i) has at least one Independent Manager and has not caused or allowed, and will not cause or allow, the board of managers or managing member of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the managers, including, without limitation, filing a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, unless one Independent Manager shall have participated in such vote and (ii) has at least one springing member that will become the member of such entity upon the dissolution of the existing member;

(i)    if such entity is (i) a limited liability company, has had, now has, and will have articles of organization, a certificate of formation and/or an operating agreement, as applicable, (ii) a limited partnership, has had, now has, and will have a limited partnership agreement, or (iii) a corporation, has had, now has, and will have a certificate of incorporation that, in each of the foregoing cases, provides that such entity will not: (A) dissolve, merge, liquidate or consolidate other than as permitted by the Bankruptcy Proceeding; (B) sell all or substantially all of its assets or the assets of Borrower (as applicable); (C) engage in any other business activity or amend its organizational documents with respect to the matters set forth in this definition without the consent of Lender; or (D) without the affirmative vote of one (1) Independent Director and of all other directors of the corporation (that is such entity or the general partner or managing or co-managing member of such entity), file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest;

(j)    has been, is and intends to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same have or shall become due, and has maintained, is maintaining and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(k)    has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

(1)    has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own tax returns, except to the extent that it is a disregarded entity for tax purposes or has been or is required to file consolidated tax returns by law, provided, however, that any entity may file tax returns consolidated with those of another

23

Person as long as such consolidated tax return shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(m)    has maintained and will maintain its own records, books, resolutions and agreements;

(n)    (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) other than as provided in the Cash Management Agreement, has not participated, and will not participate, in any cash management system with any other Person;

(o)    has held and will hold its assets in its own name;

(p)    has conducted and will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (dd) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(q)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person; provided, however, that any entity may have financial statements consolidated with those of another Person as long as such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(r)    has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets and has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations;

(s)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(t)    (i) if such entity owns the Property, it has had no and will have no Indebtedness other than (1) the Loan, (2) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed one percent (1%) of the original principal amount of the Loan, in the aggregate, which liabilities are not more than ninety (90) days past the date incurred and are not evidenced by a note, and (3) such other debt as may be specifically approved by Lender in its sole discretion; or (ii) if such entity acts as the general partner of a limited partnership that owns the Property or as the sole member or managing member of a limited liability company which owns the Property or of a limited liability company that is the sole equity member of such limited liability company, has and will have no Indebtedness other than (x) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of such entity or the Borrower, in amounts not to exceed one percent (1%) of the original principal amount of the

24

Loan, in the aggregate, which liabilities are not more than ninety (90) days past the date incurred and are not evidenced by a note, or (y) such other liabilities that are permitted pursuant to this Agreement;

(u)    has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Agreement;

(v)    has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate other than, with respect to Special Purpose Entities other than Borrower, the ownership of 100% of the outstanding equity ownership interests of another Special Purpose Entity;

(w)    has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(x)    has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name. The stationery, invoices, and checks utilized by the Special Purpose Entity or utilized to collect its funds or pay its expenses have borne and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(y)    except to Lender in connection with the Loan has not pledged and will not pledge its assets for the benefit of any other Person;

(z)    has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (dd) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(aa)    has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(bb)    has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(cc)    has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

25

(dd)    has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or other Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party, and (ii) in connection with this Agreement;

(ee)    has not had and will not have any obligation to indemnify, and has not indemnified and will not indemnify, its partners, officers, directors or members, as the case may be, unless such an obligation was and is fully subordinated to the Obligations and will not constitute a claim against the Obligations in the event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation;

(ff)    if such entity is a corporation, to the extent such entity has become insolvent, it has considered and shall consider the interests of its creditors in connection with all corporate actions;

(gg)    except as expressly contemplated by the Loan Documents, does not and will not have any of its obligations guaranteed by any Affiliate; and

(hh)    has complied and will comply with all of the terms and provisions contained in its organizational documents.  The statement of facts contained in its organizational documents are true and correct and will remain true and correct.

"**Sponsor**" shall mean Petra Capital Management LLC and its Affiliates and related entities.

"**Sponsor Entities**" shall mean any one or more of Sponsor and any Approved Institutional Investor, in each case and as of the date of determination, owning all or any portion of the equity ownership interests described in Section 5.2.10(d)(ii)(A).

"**Springing Recourse Events**" shall have the meaning set forth in Section 9.4 hereto.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Substitute Guarantor**" shall mean a Person with total assets in excess of $50,000,000 (in name or under management) and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $10,000,000.

"**Survey**" shall mean a survey of the Property prepared pursuant to the requirements contained in Section 4.1.27 hereof.

"**Tax and Insurance Escrow Funds**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or any part thereof, together with all interest and penalties thereon, if any.

"**Threshold Amount**" shall have the meaning set forth in <u>Section 5.1.21</u> hereof.

"**Title Company**" shall mean Lawyers Title Insurance Corporation, or any successor title companies acceptable to Lender and licensed to issue title insurance in the State in which the Property is located.

"**Title Insurance Policy**" shall mean the ALTA mortgagee title insurance policy provided to Original Lender (or, if the Property is in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the Lien of the Mortgage (as defined in the Original Loan Agreement) encumbering the Property.

"**Transfer**" shall have the meaning set forth in <u>Section 5.2.10(b)</u> hereof.

"**UCC**" or "**Uniform Commercial** Code" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"**Uniform System of Accounts**" shall mean the most recent edition of the Uniform System of Accounts for Hotels as adopted by the American Hotel and Motel Association.

"**U.S. Obligations**" shall mean non-redeemable securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged.

Section 1.2    <u>Principles of Construction</u>.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE 2

## <u>GENERAL TERMS</u>

Section 2.1    <u>Loan Commitment; Disbursement to Borrower</u>.

2.1.1    <u>Agreement to Lend and Borrow</u>.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to continue, and Borrower hereby agrees to borrow, the Loan on the Closing Date. Each of the parties hereto acknowledges and agrees that, as of the date hereof, the Loan is outstanding from Lender to Borrower in the outstanding

principal amount of Sixty-Six Million Dollars ($66,000,000). Borrower acknowledges and agrees that all of such funds were advanced to, and received by, Borrower.

        2.1.2    <u>Amounts Repaid May Not Be Re-borrowed</u>. Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

        2.1.3    <u>The Note, Mortgage and Loan Documents</u>. The Loan shall be evidenced by the Note and secured by the Mortgage, the Assignment of Leases and the other Loan Documents.

        2.1.4    <u>Intentionally Omitted</u>.

    Section 2.2    <u>Interest Rate</u>.

        2.2.1    <u>Interest Generally</u>. Interest on the Outstanding Principal Balance shall accrue from the Closing Date to but excluding the Maturity Date at the Applicable Interest Rate.

        2.2.2    <u>Interest Calculation</u>. Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate based on a three hundred sixty (360) day year by (c) the Outstanding Principal Balance.

        2.2.3    <u>Intentionally Omitted</u>.

        2.2.4    <u>Intentionally Omitted</u>.

        2.2.5    <u>Default Rate</u>. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

        2.2.6    <u>Usury Savings</u>. This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Outstanding Principal Balance at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Outstanding Principal Balance at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.7        Intentionally Omitted.

Section 2.3        Loan Payment.

2.3.1        Interest Payments.  Borrower shall pay to Lender on each Payment Date the interest accrued on the Outstanding Principal Balance for the preceding Interest Period (the "**Monthly Interest Payment**"). The first Interest Period hereunder shall commence on and include the Closing Date and end on and include the eighth (8th) day of the next occurring calendar month. Each Interest Period thereafter shall commence on and include the ninth (9th) day of each calendar month during the term of the Loan and shall end on and include the eighth (8th) day of the next occurring calendar month. For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods, if the day on which such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day. With respect to payments of principal due on the Maturity Date, interest shall be payable at the Applicable Interest Rate or the Default Rate, as the case may be, through and including the day immediately preceding such Maturity Date. All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

2.3.2        Principal Payments. In addition to the Monthly Interest Payment, Borrower shall pay to Lender principal payments in accordance with the terms of this Agreement, including, without limitation, the Amortization Payment and all amounts to be paid to Lender from Seasonality Reserve Funds**.**

2.3.3        Payment on Maturity Date. Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

2.3.4        Late Payment Charge.  If any principal, interest or any other sums due under the Loan Documents, excluding the payment of principal due on the Maturity Date, is not paid by Borrower by the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5.0%) of such unpaid sum, and (b) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.

2.3.5        Method and Place of Payment.   Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

29

Section 2.4     Prepayments.

2.4.1     Voluntary Prepayments.  On any Payment Date and so long as no Event of Default has occurred and is continuing, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Outstanding Principal Balance, in whole or in part; provided that such prepayment is accompanied all accrued and unpaid interest on the portion of the Outstanding Principal Balance then being prepaid.  Any partial prepayment shall be applied to the Loan in such order and priority as may be determined by Lender in its sole discretion.

2.4.2     Mandatory Prepayments.     On the next occurring Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender is not obligated or does not elect to make such Net Proceeds available to Borrower for Restoration, Borrower authorizes Lender to apply Net Proceeds as a prepayment of the Debt, in an amount equal to one hundred percent (100%) of such Net Proceeds.  Any prepayments under this Section 2.4.2 shall be applied as provided in Section 2.4.3.  Any Net Proceeds remaining after the prepayment of the Debt in full shall be transferred by Lender to Borrower. If the Lender does not make available to Borrower the Net Proceeds for Restoration as provided in this Section 2.4.2, then notwithstanding anything to the contrary herein, Borrower shall be permitted to repay the remaining Debt in whole.

2.4.3     Application of Payments of Principal.  Notwithstanding anything to the contrary contained in this Agreement, the following principal payments shall be allocated among the Loan, as follows:

(a)     any voluntary prepayment of the Loan shall be fully allocated only to the Loan;

(b)     all Net Proceeds not required to be made available for Restoration shall be applied first to the Debt, in any order, priority and proportions as Lender shall elect in its sole discretion from time to time, until the Debt is paid in full, and then the balance disbursed to Borrower;

(c)     subject to Lender's obligation to make the Approved Op Ex Disbursements (to the extent applicable), any Reserve Funds, Excess Cash Flow or other cash collateral held by or on behalf of Lender, whether in the Cash Management Account, the Tax and Insurance Escrow Account, the FF&E Reserve Account, or otherwise, including, without limitation, any Net Proceeds then being held by Lender, shall, upon the occurrence and during the continuance of an Event of Default, be applied by Lender as follows or may continue to be held by Lender as additional collateral for the Loan, all in Lender's sole discretion: first, to the Debt, in any order, priority and proportions as Lender shall elect in its sole discretion from time to time, until the Debt is paid in full, and then the balance disbursed to Borrower;

(d)     Intentionally Omitted; and

(e)     subject to Lender's obligation to make the Approved Op Ex Disbursements (to the extent applicable), all Rents received by Lender upon the occurrence and

30

during the continuance of an Event of Default pursuant to Section 3.1 of the Assignment of Leases shall be applied by Lender as follows or may continue to be held by Lender as additional collateral for the Loan, all in Lender's sole discretion: first, (i) to the expenses of managing and securing any of the Property, as contemplated by clause (a) of said Section 3.1 of the Assignment of Leases, and/or (ii) to the Debt, in any order, priority and proportions as Lender shall elect in its sole discretion from time to time, until the Debt is paid in full, and then the balance disbursed to Borrower.

2.4.4    Intentionally Omitted.

Section 2.5    Release of Property.  Except as set forth in this Section 2.5, no repayment or prepayment of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Mortgage.

2.5.1    Release on Payment in Full.  Lender shall, upon the written request and at the expense of Borrower, (a) upon payment in full of all principal and interest due on the Loan and all of the other Debt due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Agreement, release (or reconvey) the Lien of the Mortgage and of this Agreement upon the Lockbox Account, the Cash Management Account, all Reserve Funds and all other security interests granted herein and under the Loan Documents (collectively, the "**Security Documents**"), or (b) in lieu of applying monies as a full repayment of the Debt, along with a release of the Lien of the Mortgage and the other Security Documents, Lender agrees that it shall, in consideration of an amount equal to that necessary for a full repayment of the Debt in accordance with the terms of the Security Documents, endorse the Note, and assign the Mortgage and the other Security Documents to a lender designated by Borrower, and Lender shall execute and deliver to Borrower or such lender such instruments and other documents as shall be necessary or appropriate in compliance with all applicable laws to evidence any such assignment of the Mortgage and the Loan, and Borrower shall reimburse Lender for all of its reasonable out-of-pocket costs, including, but not limited to, legal costs and expenses incurred in connection therewith.

Section 2.6    Cash Management.

2.6.1    Lockbox Account.

(a)    Borrower shall establish and maintain a  segregated Eligible Account (the "**Lockbox Account**") with an Eligible Institution (the "**Lockbox Bank**") in trust for the benefit of Lender, which Lockbox Account is under the sole dominion and control of Lender in accordance with the terms of the Lockbox Account Agreement entered into on the Original Closing Date among such Eligible Institution, Borrower and Lender (as the same may be amended and restated on the date hereof, the "**Lockbox Account Agreement**").  The Lockbox Account shall be entitled "DiamondRock Allerton Owner, LLC, as Lender to ALT Hotel, LLC-Lockbox Account."  Borrower hereby grants to Lender a first priority security interest in the Lockbox Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Lockbox Account, including, without limitation, filing UCC-1 Financing

Statements and continuations thereof. Borrower will not in any way alter or modify the Lockbox
Account and will notify Lender of the account number thereof. Lender (and its agents, including
Servicer) shall have the sole right to make withdrawals from the Lockbox Account and all costs
and expenses for establishing and maintaining the Lockbox Account shall be paid by Borrower.

(b)    Borrower shall, or shall cause Manager to, deliver irrevocable written
instructions to all tenants under Leases to deliver all Rents payable thereunder directly to the
Lockbox Account. Borrower shall, and shall cause Manager to, deposit all amounts received by
Borrower or Manager constituting Rents within two (2) Business Days after receipt by Borrower
and Manager shall use reasonable efforts to deposit same within one (1) Business Day after
receipt thereof; provided, however, notwithstanding anything to the contrary contained herein, in
the event the Property is being managed by an Approved Cash Management Manager pursuant to
a Replacement Management Agreement, all Rents from all sources including, without limitation,
the American Express Card, Mastercard and Visa Card will be received and held by such
Approved Cash Management Manager prior to and during the continuance of an Event of
Default and such Approved Cash Management Manager shall have the sole right to pay the
expenses of the Property pursuant to and in accordance with the terms of the applicable
Replacement Management Agreement, and the parties hereto shall enter into such modifications
to the Lockbox Agreement and Cash Management Agreement as such Approved Cash
Management Manager reasonably requests and that are reasonably acceptable to the parties in
order to effectuate the foregoing.

(c)    Borrower shall obtain from Lockbox Bank its agreement, in form and
substance reasonably satisfactory to Lender to transfer to the Cash Management Account in
immediately available funds by federal wire transfer all amounts of the opening available
balance on deposit in the Lockbox Account once every Business Day throughout the term of the
Loan.

(d)    Each of Borrower and Lender acknowledge that, as of the date hereof, all
receipts payable with respect to the Property paid by (i) the American Express Card (with respect
to receipts other than from Property's restaurant), together with all cash, wire transfer and check
payments made with respect to the Property, are delivered directly to Manager (the "**Manager
Controlled Funds**") and (ii) the Visa Card, Diner's Card, Discover Card, American Express
(with respect to receipts from the Property's restaurant only), the Mastercard and all other credit
cards are delivered directly to the Lockbox Account (the "**Lender Controlled Funds**").  On or
prior to the fifth (5th) day of each month, Borrower shall cause Manager to notify Lender as to
(A) the aggregate amount of Manager Controlled Funds actually received by Manager during the
immediately preceding calendar month and (B) the amount of Approved Operating Expenses
required for such month pursuant to the Approved Annual Budget and Approved Extraordinary
Expenses (such notification, the "**Monthly Payment Notification**").  If the Monthly Payment
Notification shall indicate that the amount of Approved Operating Expenses and Approved
Extraordinary Expenses for such month (x) exceeds the amount of Manager Controlled Funds
actually received by Manager during the immediately preceding month, then Lender shall
promptly pay to Manager from the amount of Lender Controlled Funds actually received by
Lender in such month, funds equal to the amount of such shortfall and (y) is less than the amount
of Manager Controlled Funds actually received by Manager during the immediately preceding

month, then Borrower shall cause Manager to promptly deposit the excess amount of such Manager Controlled Funds into the Lockbox Account. During the continuance of an Event of Default, at Lender's direction Borrower shall cause Manager to direct all Manager Controlled Funds into the Lockbox Account.

(e)     Borrower shall, and shall cause Manager to, instruct all Persons that maintain open accounts with Borrower or Manager with respect to the Property or with whom Borrower or Manager does business on an "accounts receivable" basis with respect to the Property to, deliver all payments due under such accounts in accordance with Section 2.6.1(d), and neither Borrower nor Manager shall direct any such Person to make payments due under such accounts in any other manner.

(f)     Without the prior written consent of Lender, so long as any portion of the Debt remains outstanding, neither Borrower nor Manager shall direct or cause any Person to pay any amount in any manner other than as provided in this Agreement.

(g)     Neither Borrower, Manager nor any other Person shall open or maintain any accounts other than the Lockbox Account into which Rents from the ownership and operation of the Property are deposited (provided, that the foregoing shall not prohibit Borrower from utilizing one or more separate accounts for the disbursement or retention of funds that have been transferred to Borrower pursuant to the express terms of this Agreement).

(h)     If the Lockbox Bank fails to be an Eligible Institution, Lender may replace the Lockbox Bank with a substitute Lockbox Bank upon five (5) days' notice to Borrower. Borrower hereby agrees that it shall take all reasonable action necessary to facilitate the transfer of the respective obligations, duties and rights of the Lockbox Bank to the successor thereof selected by Lender in its sole discretion.

2.6.2     Cash Management Account. (a) Lender or Servicer has established and maintains a segregated Eligible Account, held by Lender or Servicer in trust for the benefit of Lender, which is under the sole dominion and control of Lender (the "**Cash Management Account**").  The Cash Management Account is currently held at KeyBank, N.A. (the "**Cash Management Bank**") and is entitled "Alt Hotel LLC Cash Management Account," account number 329681092568.  Borrower hereby grants to Lender a first priority security interest in the Cash Management Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Cash Management Account, including, without limitation, filing UCC-1 Financing Statements and continuations thereof.  Borrower will not in any way alter or modify the Cash Management Account and will notify Lender of the account number thereof.  Lender and Servicer shall have the sole right to make withdrawals from the Cash Management Account and all costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Borrower. Lender shall have the right, from time to time, to replace the Cash Management Bank with another Eligible Institution.

(b)     Intentionally Omitted.

(c)    Lender shall establish the following sub-accounts (which may be ledger-entry sub-accounts) of the Cash Management Account, each in the name of Lender, into which funds on deposit in, or other financial assets credited to, the Cash Management Account shall be deposited, credited or otherwise allocated in accordance with the provisions of Section 2.6.3:

(i)    the Tax and Insurance Escrow Account into which Tax and Insurance Escrow Funds shall be deposited under Section 7.2;

(ii)    the Seasonality Reserve Account into which Seasonality Reserve Funds shall be deposited under Section 7.5;

(iii)    the FF&E Reserve Account in which the FF&E Reserve Funds will be deposited under Section 7.3;

(iv)    Intentionally Omitted;

(v)    the Operating Expense Account into which Operating Expense Funds shall be deposited under Section 7.6; and

(vi)    the Excess Cash Flow Account into which Excess Cash Flow shall be deposited under Section 7.7.

2.6.3    Application of Funds in the Cash Management Account.

(a)    On each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day) all funds on deposit in the Cash Management Account shall be applied by Lender to the payment of the following items in the following order of priority:

(i)    First, payment to the Tax and Insurance Escrow Account in accordance with the terms and conditions of Section 7.1;

(ii)    Next, payments to the Operating Expense Account in accordance with the terms and conditions of Section 7.6 hereof;

(iii)    Next, payment to Lender of the Monthly Interest Payment due on such Payment Date;

(iv)    Next, payments to the FF&E Reserve Account in accordance with the terms and conditions of Section 7.3 hereof;

(v)    Next, payment to the Seasonality Reserve Account in accordance with the terms and conditions of Section 7.5 hereof;

(vi)    Next, payment to Lender of the Amortization Payment, if any, and any other amounts then due and payable to Lender under the Loan Documents; and

(vii)    Next, all remaining funds ("**Excess Cash Flow**") shall be paid to Borrower, unless an Event of Default exists, in which case all Excess Cash Flow shall be deposited in the Excess Cash Flow Account.

(b)    The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever. Notwithstanding the foregoing, upon the termination of an Event of Default, any amounts in the Excess Cash Flow Account shall be released to Borrower.

(c)    Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, subject to Lender's obligation to make the Approved Op Ex Disbursements and to make funds available for the payment of Taxes and Insurance Premiums (which Lender hereby agrees to do solely to the extent of receipts from the Property and funds in the Seasonality Reserve), all funds on deposit in the Cash Management Account following the occurrence of an Event of Default and its continuance may be applied by Lender in such order and priority as Lender shall determine in its sole discretion until the Debt is paid in full, and then the balance disbursed to Borrower. Borrower hereby agrees and acknowledges that if (x) all of the Obligations have been satisfied and (y) there are funds remaining in the Reserve Funds, Lender shall deliver any balance to Borrower.

Section 2.7    <u>Reconciliations</u>.  Upon a request by Borrower, Lender shall cooperate (at no out of pocket cost to Lender) with Borrower to cause Cash Management Bank, Lockbox Bank or Manager to prepare and deliver to Borrower monthly reconciliations of the funds contained in the Cash Management Account and bank account statements for the Cash Management Account and the Lockbox Account.

Section 2.8    <u>Extension of the Initial Maturity Date</u>.  Borrower shall have the option to extend the term of the Loan beyond the Initial Maturity Date for one (1) year each (the "**Extension Term**", and the Maturity Date following the exercise of the Extension Option is hereinafter the "**Extended Maturity Date**") upon satisfaction of the following terms and conditions:

(a)    no monetary Default under the Loan or Event of Default shall have occurred and be continuing at the time the Extension Option is exercised and on the date that the Extension Term commences;

(b)    Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than six (6) months, and no later than one (1) month, prior to the Initial Maturity Date;

(c)    the Debt Service Coverage Ratio, at the time election was made pursuant to <u>Section 2.7(b)</u> above and at the Initial Maturity Date, based on the trailing 12 months, shall be equal to or greater than 1.20:1.00;

35

(d)     Intentionally Omitted;

(e)     Intentionally Omitted;

(f)     Intentionally Omitted; and

(g)     In connection with the Extension Option, Borrower shall have delivered to Lender, together with its notice pursuant to underline subsection (b) of this Section 2.7, the non-refundable Extension Fee based on the Outstanding Principal Balance on the date of such notice.

## ARTICLE 3

## CONDITIONS PRECEDENT

Section 3.1     Conditions Precedent to Closing.  The obligation of Lender to make the Loan hereunder is subject to the fulfillment by Borrower, or waiver by Lender, of the following conditions precedent no later than the Closing Date provided, however, that by entering into this Agreement, Lender shall be deemed to have waived any such condition not therefore fulfilled or satisfied (subject to any post-closing letter executed by Borrower contrary to such waiver).

3.1.1     Representations and Warranties; Compliance with Conditions.  The representations and warranties of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Default shall have occurred and be continuing; and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

3.1.2     Loan Documents.  Lender shall have received originals of this Agreement, the Note and all of the other Loan Documents, in each case, duly executed and delivered on behalf of Borrower.

3.1.3     Insurance; Encumbrances.

(a)     Intentionally Omitted.

(b)     Intentionally Omitted.

(c)     Intentionally Omitted.

(d)     Insurance.  Lender shall have received valid certificates of insurance for the Policies required hereunder, satisfactory to Lender in its sole discretion, and evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)     Intentionally Omitted.

36

    (f)    <u>Encumbrances</u>.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first priority Lien as of the Closing Date with respect to the Mortgage, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents and the Bankruptcy Proceeding, and Lender shall have received satisfactory evidence thereof.

    3.1.4    <u>Related Documents</u>.  Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance reasonably satisfactory to Lender, and shall have been duly authorized, executed and delivered by all parties thereto and Lender shall have received and approved certified copies thereof.

    3.1.5    <u>Delivery of Organizational Documents</u>.  (a)  Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Borrower and/or its formation, structure, existence, good standing and/or qualification to do business, as Lender may reasonably request in its sole discretion, including, without limitation, good standing certificates, qualification to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender.

    (b)    Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Principal, Guarantors, and other members and/or partners of Borrower, and/or the formation, structure, existence, good standing and/or qualification to do business of any of the foregoing, as Lender may request in its sole discretion, including, without limitation, good standing certificates, qualification to do business in the appropriate jurisdictions, authorizing resolutions and incumbency certificates as may be requested by Lender.

    3.1.6    <u>Opinions of Borrower's Counsel</u>.  Lender shall have received opinions from Borrower's counsel with respect to the due execution, authority, enforceability under New York law of the Loan Documents (it being understood that such opinions shall not include enforceability of the Mortgage and Assignment of Leases or any other opinions under Illinois law), all such opinions in the form of the opinions delivered to Lender on the date hereof.

    3.1.7    <u>Intentionally Omitted.</u>

    3.1.8    <u>Basic Carrying Costs</u>.  Borrower shall have paid or cause to have been paid, or there shall be sufficient funds in the Lockbox Account to pay, all Basic Carrying Costs relating to the Property which are in arrears, including without limitation, (a) accrued but unpaid Insurance Premiums, (b) currently due Taxes (including any in arrears) and (c) currently due Other Charges, which amounts shall be funded with proceeds of the Loan.

    3.1.9    <u>Intentionally Omitted</u>.

    3.1.10    <u>Payments</u>.  All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or

before the Closing Date shall have been paid, including, without limitation, the Original Loan Paydown and the Initial Seasonality Deposit.

3.1.11    <u>Intentionally Omitted.</u>

3.1.12    <u>Intentionally Omitted.</u>

3.1.13    <u>Intentionally Omitted.</u>

3.1.14    <u>Pending Suits</u>.  The Bankruptcy Proceeding, the New York Proceeding and the New York Proceeding will be dismissed with prejudice prior to or simultaneously with the execution of this Agreement.

3.1.15    <u>Intentionally Omitted</u>.

3.1.16    <u>Intentionally Omitted</u>.

3.1.17    <u>Management Agreement</u>.  Lender hereby approves the Management Agreement. The base management fee payable to the Manager shall not exceed three percent (3.0%) of Gross Receipts (as defined in the Management Agreement) per annum.

3.1.18    <u>Intentionally Omitted</u>.

3.1.19    <u>Intentionally Omitted</u>

3.1.20    <u>Intentionally Omitted</u>.

3.1.21    <u>Intentionally Omitted</u>.

## ARTICLE 4

## <u>REPRESENTATIONS AND WARRANTIES</u>

Section 4.1    <u>Borrower Representations</u>.  Borrower represents and warrants as of the Closing Date that:

4.1.1    <u>Organization</u>.  Borrower has been duly organized and is validly existing and in good standing pursuant to the laws of the State of Delaware and is in good standing as a authorized foreign entity pursuant to the laws of the State of Illinois, with all requisite power and authority to own its properties and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower will consist only of the ownership, management and operation of the Property. Immediately following the funding of the Loan, the ownership interests of Borrower will be as set forth on the organizational chart attached hereto as <u>Schedule III</u>.

4.1.2    <u>Proceedings</u>.    Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party.  This Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by or on behalf of Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.1.3    <u>No Conflicts</u>.    The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower, Principal and/or Guarantors, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any such Governmental Authority required for the execution, delivery and performance by Borrower, Principal and/or Guarantors, as applicable, of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

4.1.4    <u>Litigation</u>.    There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened (a) in writing against Borrower, Principal or the Property, which actions, suits or proceedings, if determined against Borrower, Principal or the Property, are reasonably likely to materially adversely affect the condition (financial or otherwise) or business of Borrower, Principal or the condition or ownership of the Property, or (b) that are not adequately covered by insurance, other than the Bankruptcy Proceeding, the Equitable Subordination Litigation, the Foreclosure Proceeding, the New York Proceeding, the Removed Litigation, any other action, suit or proceeding of which Lender is aware, any other advisory proceedings initiated in connection with the Bankruptcy Proceeding, the New York Litigation and other actions initiated by Lender, all of which Lender acknowledges.

4.1.5    <u>Agreements</u>.    Borrower is not a party to any agreement or instrument which is reasonably likely to materially and adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise (other than the Bankruptcy Proceeding). Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property are bound which is reasonably likely to have a material adverse effect on Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which

Borrower or the Property is otherwise bound, other than (a) any obligations incurred in the ordinary course of the operation of the Property as permitted pursuant to clause (t) of the definition of "Special Purpose Entity" set forth in Section 1.1 hereof, and (b) the obligations under the Loan Documents.

      4.1.6    Title.  Borrower has good, marketable and as to the items other than personality, insurable fee simple title to the Property, free and clear of all Liens whatsoever, except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. Borrower is the sole owner of the portion of the Property constituting personalty, holding same free and clear of all Liens whatsoever, except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. The Permitted Encumbrances in the aggregate do not materially and adversely affect the value, operation or use of the Property (as currently used) or Borrower's ability to repay the Loan. The Mortgage and the Assignment of Leases, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, create (a) a valid, perfected first priority lien in and to Borrower's right, title and interest to the Property, subject only to Permitted Encumbrances and the Liens created by the Loan Documents, and (b) perfected first priority security interests in and to, and perfected collateral assignments of, Borrower's right, title and interest in and to all personalty (including the Leases) constituting any part of the Property, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. To Borrower's knowledge, there are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.

      4.1.7    Solvency.  Borrower has (a) not entered into the transaction contemplated by this Agreement or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under such Loan Documents. The fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's probable liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower). Other than the Bankruptcy Proceeding, no petition in bankruptcy has been filed against Borrower or any of its constituent Persons, and neither Borrower nor any of its constituent Persons has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under any state or

federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or any of its constituent Persons.

4.1.8    Full and Accurate Disclosure.  To Borrower's knowledge, no statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains (or in the case of written material, at the time supplied contained) any untrue statement of a material fact or omits (or in the case of such written material, at the time supplied omitted) to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.

4.1.9    No Plan Assets.

(a)    Borrower does not sponsor, is not obligated to contribute to, and is not itself an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (1) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (2) transactions by or with Borrower are not subject to any state or other statute, regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Loan Agreement including, but not limited to, the exercise by Lender of any of its rights under the Loan Documents.

(b)    Borrower further represents and warrants that one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

4.1.10    Compliance.  To Borrower's knowledge, Borrower and the Property (including the use thereof) comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes necessary to operate the Property and carry on its business. To Borrower's knowledge, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental

41

Authority. To Borrower's knowledge, there has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

       4.1.11   <u>Financial Information</u>.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in connection with the Loan (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of the Property as of the date of such reports, and (iii) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any material contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof as a hotel, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no material adverse change in the financial condition, operation or business of Borrower from that set forth in said financial statements.

       4.1.12   <u>Condemnation</u>.  To Borrower's knowledge, no Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of any roadway providing access to the Property.

       4.1.13   <u>Federal Reserve Regulations</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

       4.1.14   <u>Utilities and Public Access</u>.  To Borrower's knowledge, the Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

       4.1.15   <u>Not a Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.