federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or any of its constituent Persons.

4.1.8    <u>Full and Accurate Disclosure</u>.  To Borrower's knowledge, no statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains (or in the case of written material, at the time supplied contained) any untrue statement of a material fact or omits (or in the case of such written material, at the time supplied omitted) to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.

4.1.9    <u>No Plan Assets</u>.

(a)    Borrower does not sponsor, is not obligated to contribute to, and is not itself an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (1) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (2) transactions by or with Borrower are not subject to any state or other statute, regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Loan Agreement including, but not limited to, the exercise by Lender of any of its rights under the Loan Documents.

(b)    Borrower further represents and warrants that one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

4.1.10    <u>Compliance</u>.  To Borrower's knowledge, Borrower and the Property (including the use thereof) comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes necessary to operate the Property and carry on its business. To Borrower's knowledge, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental

Authority. To Borrower's knowledge, there has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

      4.1.11   <u>Financial Information</u>.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in connection with the Loan (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of the Property as of the date of such reports, and (iii) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any material contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof as a hotel, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no material adverse change in the financial condition, operation or business of Borrower from that set forth in said financial statements.

      4.1.12   <u>Condemnation</u>.  To Borrower's knowledge, no Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of any roadway providing access to the Property.

      4.1.13   <u>Federal Reserve Regulations</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

      4.1.14   <u>Utilities and Public Access</u>.  To Borrower's knowledge, the Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

      4.1.15   <u>Not a Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.

4.1.16    Separate Lots.  To Borrower's knowledge, the Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

4.1.17    Assessments.  To Borrower's knowledge, there are no pending or, to Borrower's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

4.1.18    Enforceability.  The Loan Documents are not currently subject to any right of rescission, set-off, counterclaim or defense by Borrower, Principal or any Guarantor, including the defense of usury, and Borrower, Principal and Guarantors have not asserted any right of rescission, set-off, counterclaim or defense with respect thereto except pursuant to the Equitable Subordination Litigation.

4.1.19    No Prior Assignment.  To Borrower's knowledge, there are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

4.1.20    Insurance.  Borrower has obtained and has delivered to Lender certificates of insurance (on ACORD Form 25), together with proof that all premiums have been paid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any such Policies, and Borrower has not done, by act or omission, anything which would impair the coverage of any such Policies.

4.1.21    Use of Property.  The Property is used exclusively for retail, restaurant and hotel purposes and other appurtenant and related uses.

4.1.22    Certificate of Occupancy; Licenses.  To Borrower's knowledge, all material certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits, if any, and any applicable liquor license required for the legal use, occupancy and/or operation of the Property for retail and hotel purposes (collectively, the "**Licenses**"), have been obtained and are in full force and effect. The use being made of the Property is in conformity with all zoning laws applicable to the Property.

4.1.23    Flood Zone.  To Borrower's knowledge, except as set forth on the Survey, none of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, the flood insurance required pursuant to Section 6.1(i) hereof is in full force and effect with respect to the Property.

4.1.24    Intentionally Omitted.

4.1.25    Boundaries.  To Borrower's knowledge except as set forth on the Survey, all of the Improvements, which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other

encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by the Title Insurance Policy or are Permitted Encumbrances.

4.1.26    <u>Leases</u>.    To Borrower's knowledge, the Property is not subject to any Leases other than (i) hotel guest occupancy agreements and (ii) the Leases described in <u>Schedule I</u> attached hereto and made a part hereof. Borrower is the owner and lessor of landlord's interest in the Leases. No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases and any subleases, licenses, assignments or occupancy agreements thereunder. The current Leases are in full force and effect and, to Borrower's knowledge, there are no monetary or other material defaults thereunder by either party and to Borrower's knowledge, there are no conditions that, with the passage of time or the giving of notice, or both, would constitute monetary or other material defaults thereunder. The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto. No Rent (including security deposits) has been paid more than one (1) month in advance of its due date. All work to be performed by Borrower prior to the date hereof under each Lease has been performed as required in such Lease and has been accepted by the applicable tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements, except as expressly set forth in such Leases, required to be given by Borrower to any tenant prior to the date hereof has already been received by such tenant. To Borrower's knowledge, no tenant listed on <u>Schedule I</u> has assigned its Lease or sublet all or any portion of the premises demised thereby. No tenant holds its leased premises under assignment, nor, to Borrower's knowledge, does anyone except such tenant and its employees occupy such leased premises. No tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the Property of which the leased premises are a part. No tenant under any Lease has any right or option for additional space in the Improvements.

4.1.27    <u>Survey</u>.    To Borrower's knowledge, to the knowledge of Borrower, the Survey for the Property delivered to Lender in connection with this Original Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

4.1.28    <u>Principal Place of Business; State of Organization</u>.    The Borrower is organized under the laws of the State of Delaware and has its principal place of business in the State of New York.

4.1.29    <u>Filing and Recording Taxes</u>.    All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid, and, under current legal requirements, the Mortgage is enforceable in accordance with its terms by Lender (or any subsequent holder thereof), subject to principles of equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations.

4.1.30    Special Purpose Entity/Separateness.

(a)    Borrower hereby represents, warrants and covenants that from and after the respective date of its formation through the date on which the Debt has been paid in full Borrower has been, is, shall be and shall continue to be a Special Purpose Entity.

(b)    The representations, warranties and covenants set forth in Section 4.1.30(a) shall survive for so long as any amount remains payable to Lender under this Agreement or any other Loan Document.

(c)    Intentionally Omitted.

4.1.31    Management Agreement.    As of the date hereof, the Management Agreement is in full force and effect and, to Borrower's knowledge, there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default by Borrower thereunder that is reasonably likely to have a material adverse effect on Borrower or the Property.

4.1.32    Illegal Activity.    No portion of the Property has been or will be purchased by Borrower with proceeds of any illegal activity.

4.1.33    Franchise Agreement.    As of the date hereof, there is no Franchise Agreement in effect.

4.1.34    Investment Company Act.    Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

4.1.35    Embargoed Person.    At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower or Principal shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under the Prescribed Laws (each such Person, an "**Embargoed Person**") with the result that the Loan made by Lender is or would be in violation of law; (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower or Principal, as applicable, with the result that the Loan is or would be in violation of law; and (c) none of the funds of Borrower or Principal, as applicable, shall be derived from any unlawful activity with the result that the Loan is or would be in violation of law.

4.1.36    Cash Management Account.

(a)    This Agreement, together with the other Loan Documents, creates a valid and continuing security interest (as defined in the Uniform Commercial Code of the State of Illinois) in the Lockbox Account and Cash Management Account in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is

enforceable as such against creditors of and purchasers from Borrower. Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold or otherwise conveyed the Lockbox Account or the Cash Management Account;

(b)     Each of the Lockbox Account and Cash Management Account constitute "deposit accounts" within the meaning of the Uniform Commercial Code of the State of Illinois;

(c)     Pursuant and subject to the terms hereof, the Lockbox Bank has agreed to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Lockbox Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities; and

(d)     The Lockbox Account and Cash Management Account are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee.

Section 4.2     <u>Survival of Representations</u>.     Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> hereof and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

Section 4.3     <u>Approval of Bankruptcy Court</u>.   The transactions contemplated by this Agreement and the other Loan Documents are part of the Reorganization Plan.

## ARTICLE 5

## BORROWER COVENANTS

Section 5.1     <u>Affirmative Covenants</u>.   From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

5.1.1     <u>Existence; Compliance with Legal Requirements</u>.   (a) To the extent necessary to avoid a material adverse change in the financial condition, business condition, legal existence or qualification to do business of Borrower, Borrower shall do or cause to be done with reasonable promptness all things necessary to preserve, renew and keep in full force and effect Borrower's existence, rights, licenses, permits and franchises and comply with all material Legal Requirements applicable to Borrower and the Property, including, without limitation, the Franchise Agreement, if any. Borrower shall keep and maintain or cause Manager to keep and maintain all Licenses necessary for the operation of the Property as a hotel (with appurtenant

46

retail uses). There shall never be committed by Borrower, and Borrower shall use commercially reasonable efforts not to permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording the federal government or any state or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower shall at all times maintain, preserve and protect all franchises and trade names, preserve all the remainder of its property used in the conduct of its business, and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Mortgage. Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, <u>provided</u> that (a) no Event of Default has occurred and remains uncured; (b) Borrower is permitted to do so under the provisions of any mortgage or deed of trust superior in lien to the Mortgage; (c) such proceeding shall not result in a default under any material agreement to which Borrower is subject and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Borrower shall, upon final determination thereof, promptly comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (f) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower and the Property; and (g) Borrower shall furnish such security as may be required in the proceeding (or, if none required, as may be reasonably requested by Lender), to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

(b)    <u>Intentionally Omitted</u>.

5.1.2    <u>Taxes and Other Charges</u>.  Borrower shall pay or cause to be paid all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, or any part thereof, as the same become due and payable; <u>provided</u>, <u>however</u>, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of <u>Section 7.2</u> hereof. Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges no later than ten (10) days prior to the date the same shall become delinquent <u>provided</u>, <u>however</u>, Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to <u>Section 7.2</u>  hereof. Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property and that is prohibited in accordance with <u>Section 5.2.2</u> hereof, and shall promptly pay for all utility services provided to the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other

47

Charges, provided that (a) no Default or Event of Default has occurred and remains uncured; (b) Borrower is permitted to contest same under the provisions of any mortgage or deed of trust superior in lien to the Mortgage; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (f) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (g) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien.

5.1.3    Litigation.  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower or Principal which are reasonably likely to materially adversely affect Borrower's or Principal's condition (financial or otherwise) or business or the Property.

5.1.4    Access to Property.  Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice (which may be given verbally); provided such inspections do not materially interfere with the use and operation of the Property.

5.1.5    Notice of Default.  Borrower shall promptly advise Lender of any material adverse change in Borrower's or Principal's condition, financial or otherwise, or of the occurrence of any Event of Default of which Borrower has actual knowledge.

5.1.6    Cooperate in Legal Proceedings.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way materially and adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

5.1.7    Perform Loan Documents.  Borrower shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower. Payment of the costs and expenses associated with any of the foregoing shall be in accordance with the terms and provisions of this Agreement, including, without limitation, the provisions of Section 10.13 hereof.

5.1.8    Award and Insurance Benefits.  Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably

payable in connection with the Property to the extent Lender is entitled to same under the terms of this Agreement or the Mortgage, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

5.1.9    Further Assurances.    Borrower shall, at Borrower's sole cost and expense:

(a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

(b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts reasonably necessary, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require, including, without limitation, the execution and delivery of all documents necessary to transfer any liquor licenses with respect to the Property; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

5.1.10    Mortgage Taxes.    Borrower represents that it has paid all state, county and municipal recording and all other taxes imposed upon the execution and recordation of the Mortgage.

5.1.11    Financial Reporting.

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis reasonably acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property. Lender shall have the right from time to time at reasonable times during normal business hours upon reasonable prior notice (which may be verbal) to examine such books, records and accounts where same are ordinarily maintained, which shall be at the office of Borrower or any other Person maintaining such books, records and accounts or its managing agent, and to make such copies or extracts thereof as Lender may reasonably require. After the occurrence and during the continuance of an Event of Default, Borrower shall pay any out-of-pocket costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)     Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements audited by an independent certified public accountant acceptable to Lender (which shall be deemed to include Price Waterhouse) in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year. Borrower's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses and the actual income and expenses for the prior Fiscal Year, (ii) occupancy statistics for the Property and (iii) an Officer's Certificate or an officer's certificate delivered by Manager certifying that, to such Person's knowledge, each annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and that such financial statements have been prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP or such other accounting basis as Lender shall reasonably accept and as of the date thereof whether, to such Person's knowledge, there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower or Guarantors, and if such Default or an Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)     Borrower will furnish, or cause to be furnished, to Lender on or before twenty five (25) days after the end of each calendar month during the first year of the term of the Loan and on or before forty five (45) days after the end of each calendar quarter thereafter, the following items, accompanied (with respect to quarterly reports only) by an Officer's Certificate or an officer's certificate delivered by Manager stating that, to such Person's knowledge, such items are true, correct, accurate in all material respects and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) a rent roll for the subject month (or quarter, as applicable); (ii) monthly (or quarterly, as applicable) and year-to-date operating statements (including Capital Expenditures) prepared for each calendar month (or quarter, as applicable), noting Net Operating Income, Gross Income from Operations, and Operating Expenses (not including any contributions to the FF&E Reserve Funds), and, upon Lender's reasonable request, other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such period, and containing a comparison of budgeted income and expenses and the actual income and expenses, all in form satisfactory to Lender; (iii) a reasonably detailed explanation of any material expenses incurred which were not provided in the applicable Annual Budget. On or before twenty five (25) calendar days after the end of each calendar month during the first year of the term of the Loan and on or before forty-five (45) calendar days after the end of each calendar quarter thereafter (or as soon after such 45th day as such reports become available to Borrower) Borrower also will furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

(d)     Each Fiscal Year, Borrower shall submit or shall cause Manager to submit to Lender an Annual Budget not later than thirty (30) days prior to the commencement of such

period or Fiscal Year in substantially the form delivered to Lender in connection with the closing of the Loan (or such other form as may be reasonably acceptable to Lender), except that the Annual Budget for the current Fiscal Year shall be delivered on or prior to the Closing Date. At all times, the Annual Budget shall be subject to Lender's approval, which shall not be unreasonably withheld, conditioned or delayed (each such Annual Budget, an "**Approved Annual Budget**"). Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's proposed Annual Budget. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request for approval of such Annual Budget containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST FOR APPROVAL OF ANNUAL BUDGET PURSUANT TO SECTION 5.1.11(d) OF THE LOAN AGREEMENT THIS REQUEST SHALL BE DEEMED APPROVED IF NOT OBJECTED TO WITHIN 5 BUSINESS DAYS**", Lender's approval shall be deemed given if no objection is made by Lender within five (5) Business Days after receipt thereof. In the event that Lender objects to a proposed Annual Budget submitted by Borrower which requires the approval of Lender hereunder, Lender shall advise Borrower of such objections within five (5) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within five (5) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves or is deemed to have approved the Annual Budget. Until such time that Lender approves or is deemed to have approved a proposed Annual Budget which requires the approval of Lender hereunder, the most recently Approved Annual Budget shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums, utilities expenses, union labor and fixed increases under previously executed agreements; provided, further, that the Approved Annual Budget shall be adjusted to reflect increased variable expenses as a result of increased occupancy levels from the prior year.

(e)    In the event that Borrower must incur an extraordinary Operating Expense or Capital Expenditure not set forth in the Approved Annual Budget (each, an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for approval, which approval shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything to the contrary contained herein, no approval from Lender shall be required if (i) a single Extraordinary Expense is equal to or less than five percent (5%) of the amount set forth in the Approved Annual Budget for such expense, or (ii) if no sum was budgeted for such expense in the Approved Annual Budget and the Extraordinary Expense is less than or equal to five percent (5%) of the Approved Annual Budget; provided that all Extraordinary Expenses in any Fiscal Year do not exceed five percent (5%) of the Approved Annual Budget, (iii) an emergency exists which require the immediate expenditure of an Extraordinary Expense to preserve the value of the Property or to protect the health and safety of Persons located on the Property or adjacent to the Property or (iv) such expense is an expense required to be made to cause the Property to comply with the terms of this Agreement or the other Loan Documents.

(f)      Any reports, statements or other information required to be delivered under this Agreement shall be delivered in paper form.

5.1.12   <u>Business and Operations</u>.  Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same as necessary for the ownership, maintenance, management and operation of the Property. Borrower will qualify to do business and will remain in good standing under the laws of Illinois as and to the extent the same are required for the ownership, maintenance, management and operation of the Property. Borrower shall keep and maintain all Licenses necessary for the operation of the Property for hotel and retail purposes, except to the extent that the failure to do so would not have a material adverse effect on Borrower or the Property.

5.1.13   <u>Title to the Property</u>.  Borrower will warrant and defend (a) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), and (b) the validity and priority of the Lien of the Mortgage and the Assignment of Leases, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

5.1.14   <u>Costs of Enforcement</u>.  In the event (a) that the Mortgage is foreclosed in whole or in part or that the Mortgage is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, or (c) of any future bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors (other than the Bankruptcy Proceeding), Borrower, on behalf of itself and its successors and assigns, agrees that it/they shall be chargeable with and shall pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

5.1.15   <u>Estoppel Statement</u>.

(a)      Lender and Borrower each shall, within thirty (30) days of written request from the other or a third party, furnish such other party or such third party with a statement, duly acknowledged and certified, setting forth (i) the Outstanding Principal Balance, (ii) the Applicable Interest Rate, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the performance of the Obligations, if any, and (v) that the Note, this Agreement, the Mortgage and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

(b)      At Lender's request (which may be made no more than one (1) time in any calendar year), Borrower shall request tenant estoppel certificates from each commercial tenant

leasing space at the Property in the form required by such tenant's lease or, at Borrower's election, in the form previously accepted by Lender.

5.1.16    <u>Intentionally Omitted</u>.

5.1.17    <u>Performance by Borrower</u>.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, subject to all applicable notice, grace and cure periods therein.

5.1.18    <u>Intentionally Omitted</u>.

5.1.19    <u>No Joint Assessment</u>.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

5.1.20    <u>Leasing Matters</u>.

(a)    Any Leases with respect to the Property executed after the date hereof which Leases both (x) cover more than 2,500 square feet and (y) are for a term of greater than a one year shall be submitted to Lender for approval, which approval shall not be unreasonably withheld, conditioned or delayed. Upon request, Borrower shall furnish Lender with executed copies of all Leases. Any Leases for which Lender's approval is not required in accordance with the preceding sentences of this <u>Section 5.1.20(a)</u> and all renewals of Leases (except for renewals of Leases pursuant to renewal rights in existence as of the date hereof) shall provide for rental rates comparable to existing market rates for comparable space in comparable buildings in Chicago, Illinois and shall otherwise contain commercially reasonable terms. Any Leases for which Lender's approval is not required in accordance with the preceding sentences of this <u>Section 5.1.20(a)</u> shall not contain any terms which would materially and adversely affect Lender's rights under the Loan Documents. All proposed Leases executed after the date hereof shall provide that they are subordinate to the Mortgage and that the lessee agrees to attorn to Lender or any purchaser at a sale by foreclosure or power of sale. Lender shall enter into a subordination, non-disturbance and attornment agreement on Lender's then-current standard form with any tenant subject to modifications requested by tenants, provided such modifications are reasonably acceptable to Lender (other than an Affiliate of Borrower) entering into a new lease for which Lender's approval is required by this <u>Section 5.1.20</u> and has been obtained, within ten (10) Business Days after written request therefore by Borrower. Borrower (i) shall use commercially reasonable efforts to observe and perform, or cause to be performed in all material respects, the obligations imposed upon the lessor under the Leases; (ii) shall use commercially reasonable efforts to enforce and may, in a commercially reasonable manner and in a manner not to impair the value of the Property involved, amend the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, or terminate or accept a surrender of such Lease, except that no termination or acceptance of

53

surrender of any Leases shall be permitted unless by reason of a tenant default and except as expressly provided in the Leases; provided, however, that no such acceptance of surrender of any Lease covering more than 2,500 square feet will be permitted without the consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, provided a new Lease for the applicable portion of the Property is entered into contemporaneously with such cancellation on substantially the same (or more favorable) terms as the cancelled lease with a tenant of substantially similar quality; (iii) shall not collect any of the rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change the terms of the Leases in a manner inconsistent with the provisions of the Loan Documents; and (vi) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require. Notwithstanding anything to the contrary contained herein, Borrower shall not enter into a lease of all or substantially all of the Property, without Lender's prior consent.

(b)      Notwithstanding anything to the contrary contained in this Section 5.1.20:

(i)      whenever Lender's approval or consent is required pursuant to the provisions of this Section 5.1.20, Borrower shall have the right to submit a term sheet of such transaction to Lender for Lender's approval, such approval not to be unreasonably withheld, conditioned or delayed. Any such term sheet submitted to Lender shall set forth all material terms of the proposed transaction, including identity of tenant, square footage, term, rent, rent credits, abatements, work allowances and tenant improvements to be constructed by Borrower. Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's written request for approval or consent of such term sheet. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST FOR APPROVAL OF LEASING TERM SHEET - REQUEST WILL BE DEEMED APPROVED PURSUANT TO SECTION 5.1.20 OF THE LOAN AGREEMENT IF NO OBJECTION IS MADE WITHIN 5 BUSINESS DAYS**", Lender shall be deemed to have approved or consented to such term sheet if Lender fails to respond to such second written request before the expiration of such five (5) Business Day period;

(ii)      whenever Lender's approval or consent is required pursuant to the provisions of this Section 5.1.20 for any matter with respect to which Lender has not previously approved a term sheet pursuant to Section 5.1.20(b)(i) above, Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's written request for such approval or consent. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST FOR APPROVAL OF LEASING MATTER - REQUEST WILL BE DEEMED APPROVED PURSUANT TO SECTION 5.1.20 OF THE LOAN AGREEMENT IF NO OBJECTION IS MADE**

**WITHIN 5 BUSINESS DAYS**", Lender shall be deemed to have approved or consented to such matter if Lender fails to respond to such second written request before the expiration of such five (5) Business Day period;

(iii)    whenever Lender's approval or consent is required pursuant to the provisions of this <u>Section 5.1.20</u> for any matter that Lender has previously approved or is deemed to have approved a term sheet pursuant to <u>Section 5.1.20(b)(i)</u> above, Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's written request for such approval or consent. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST FOR APPROVAL OF LEASING MATTER FOR WHICH TERM SHEET HAS BEEN APPROVED - REQUEST WILL BE DEEMED APPROVED PURSUANT TO SECTION 5.1.20 OF THE LOAN AGREEMENT IF NO OBJECTION IS MADE WITHIN 5 BUSINESS DAYS**", Lender shall be deemed to have approved or consented to such matter if Lender fails to respond to such second written request before the expiration of such five (5) Business Day period; <u>provided</u> that there have been no material deviations from the term sheet and that the aggregate economics of the transaction are no less favorable to Borrower than as set forth in the term sheet; and

(iv)    in the event that Lender shall have approved (or be deemed to have approved) a term sheet submitted by Borrower with respect to a certain Lease, Lender shall not withhold its approval or consent with respect to such Lease on the basis of any provisions of such Lease dealing with the items contained in the approved term sheet.

5.1.21    <u>Alterations</u>.  Except for the addition, upgrade or replacement of FF&E (which shall not be deemed Alterations), <u>provided</u>, <u>however</u>, FF&E shall in all events be subject to the terms and conditions of <u>Section 7.3</u> herein, and reimbursable pursuant to the terms and conditions of Section 7.3; Lender's prior written approval shall be required in connection with any Alterations to any Improvements, not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Lender's consent shall not be required in connection with any Alterations that will not have a material adverse effect on Borrower's financial condition or the value of the Property, <u>provided</u> that such Alterations are either (a) performed in connection with Restoration after the occurrence of a Casualty in accordance with the terms and provisions of this Agreement or (b) do not materially adversely affect any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements, and do not have an aggregate cost in excess of $1,000,000 (the "**Threshold Amount**"). If the total unpaid amounts due and payable with respect to the Alterations (other than such amounts to be paid or reimbursed by tenants under the Leases), after deducting any Reserve Funds which may be utilized for such Alterations in accordance with the terms of this Loan Agreement which amounts are not the subject of an unrelated request for disbursement from such Reserve Funds, (excluding alterations described in the first sentence of this <u>Section 5.1.21</u> above) shall at any time exceed the Threshold Amount, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:

(i) cash, (ii) U.S. Obligations, (iii) Intentionally Omitted, (iv) a completion and performance bond or an irrevocable letter of credit (payable on sight draft only) issued by a financial institution (A) having a rating by S&P of not less than "A-1+" if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is reasonably acceptable to Lender, (B) Intentionally Omitted and (C) in form reasonably acceptable to Lender, or (v) such other security reasonably satisfactory to Lender. Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to Alterations to the Improvements on the Property (other than such amounts to be paid or reimbursed by tenants under the Leases) over the Threshold Amount and Lender may apply such security from time to time at the option of Lender to pay for such Alterations.

5.1.22    Operation of Property.

(a)    Borrower shall cause the Property to be operated, in all material respects, in accordance with the Management Agreement or Replacement Management Agreement, as applicable; provided, however, that Borrower shall not be deemed to be in default hereunder if Manager, and not Borrower, is in default under the terms of the Management or Replacement Management Agreement and Borrower is otherwise complying with the provisions of this Section 5.1.22. In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly, after obtaining Lender's consent, if Lenders consent is expressly required in accordance with the terms of this Agreement, which consent should not be unreasonably withheld, conditioned or delayed, enter into a Replacement Management Agreement with Manager or another Qualified Manager, as applicable and in accordance with the terms of this Agreement. Any breach of the covenants contained in this Section 5.1.22(a) with respect to the Management Agreement shall not result in an Event of Default as long as Borrower is actively seeking Lender's consent, if Lenders consent is expressly required in accordance with the terms of this Agreement, to enter into a Replacement Management Agreement with Manager or another Qualified Manager or, in the case of a termination, the Manager is replaced within thirty (30) days by a Qualified Manager pursuant to Section 9.5.

(b)    Borrower shall: (i) use commercially reasonable efforts to perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Management Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, material report and estimate required to be delivered to Borrower under the Management Agreement; and (iv) use commercially reasonable efforts to enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner.

5.1.23    Performance of Material Contracts.  Borrower shall observe and perform in all material respects, the terms of all Material Contracts to be observed and performed by

56

Borrower pursuant to the terms of such Material Contracts, and Borrower shall exercise all commercially reasonable efforts to preserve and enforce all of Borrower's rights and remedies under such Material Contracts.

      5.1.24   <u>Franchise Agreement</u>.  Solely if a Franchise Agreement shall be in place with respect to the Property:

      (a)    Borrower shall cause Manager to operate the Property pursuant to, and in accordance with, the terms of the Franchise Agreement and the Management Agreement in all material respects.

      (b)    Subject to the terms and conditions of <u>Section 5.1.25</u>, Borrower shall (or shall cause.  Manager to) do the following:

      (i)    obtain, keep and maintain all certifications, permits, licenses, authorizations and approvals required for the continued legal use and operation of the Property as a hotel in the manner operated on the date hereof in all material respects;

      (ii)    promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under the Franchise Agreement in all material respects and use commercially reasonable efforts to preserve and to keep unimpaired its material rights thereunder,

      (iii)    promptly notify Lender of any (A) material default under the Franchise Agreement (or any successor franchise agreement or membership agreement), or (B) event or condition which, with the giving of notice or the passage of time, or both, would be a material default by Manager under the Franchise.  Agreement (or any successor franchise agreement or membership agreement), or (C) notice or information received which indicates that Franchisor is terminating the Franchise Agreement or otherwise terminating any license or other right of Borrower or Manager under the Franchise Agreement, in each case promptly after Borrower or Manager receives such notice or otherwise is aware of such default, event or condition, which notice to Lender shall be accompanied by a written statement of the actions Borrower intends to take to cure such default or remedy such event, condition or circumstance, and, thereafter, keep Lender fully informed on a regular basis as to the progress of such actions; and, in the event that such actions have not successfully cured such default or remedied such event, condition or circumstance within thirty (30) days of the date of the original notice to Lender or if at any time before or after such thirty (30) day period Lender determines, in its reasonable discretion, that Borrower or Manager will not be reasonably able to complete the required cure within the time period for such cure in the Franchise Agreement or the notice sent pursuant thereto, then Lender shall immediately, without the requirement of notice to Borrower or Manager but subject to the terms of the Franchise Agreement, be entitled to take such action as it deems necessary, as Borrower's sole cost and expense, in order to effect a cure of such default (including all rights and remedies Lender may have under this Agreement).  Borrower shall, and shall cause

Manager to, cooperate fully with Lender if Lender determines, in its reasonable discretion, to take any action it reasonably deems necessary in order to cure such default and Borrower shall immediately reimburse Lender for any and all reasonable costs and expenses resulting, either directly or indirectly, from such action;

(iv)    deliver copies to Lender of all notices of default which Borrower or Manager shall receive under the Franchise Agreement within ten (10) days after receipt thereof;

(v)    promptly deliver to Lender a copy of any financial statements, material business plan or capital expenditures plan, received by it under the Franchise Agreement;

(vi)    to the extent entitled to so request under the Franchise Agreement and not more frequently than one (1) time per calendar year, request from Franchisor an estoppel certificate from the Franchisor in form and substance satisfactory to Lender in its reasonable discretion and Borrower shall use its commercially reasonable efforts to obtain such estoppel certificate from Franchisor;

(vii)    to the extent not prohibited under the Franchise Agreement and to the extent available to Borrower, provide to Lender any additional information with respect to the Franchise Agreement which may be reasonably required by Lender and its successor and/or assigns in connection with a Secondary Market Transaction, and Borrower shall, and shall cause Manager to, reasonably cooperate with Lender and its successors and/or assigns in connection with any such Secondary Market Transaction; and

(viii)    within fifteen (15) days after request by Lender (but not more frequently than twice in any calendar year), furnish Lender with a statement, duly acknowledged and certified, setting forth (A) the amounts then payable under the Franchise Agreement; (B) the date payments were last made under the Franchise Agreement (including annual dues and all monthly fees); (C) any offsets or defenses to the payment of amounts due under the Franchise Agreement known to Borrower; and (D) a statement that the Franchise Agreement is a valid, legal and binding obligation of Borrower and has not been modified or if modified, giving particulars of such modification.

(ix)    (A) Borrower shall deliver to Lender copies of schedules of annual dues and any amendment or revision to the Franchise Agreement and evidence reasonably satisfactory to Lender that all annual membership dues and fees have been paid no later than fifteen (15) days prior to the due date (the "**Payment Notice**") in accordance with the Franchise Agreement for each year during the term of the Loan and Extension Term, (B) Borrower acknowledges and agrees that in the event that Lender shall fail to receive the Payment Notice as provided herein, Lender shall have the right, without obligation to inquire or notify Borrower, to pay such amounts then due and owing to Franchisor, and Borrower shall be required to reimburse Lender within two (2)

58

Business Days after receipt of request thereof.  Borrower further acknowledges and agrees that if it shall fail to deliver the Payment Notice to Lender in accordance with this Section 5.1.24(b)(ix), it shall be required to reimburse Lender for any amounts paid regardless of whether Borrower has already made such payment to Franchisor.

        (c)     Without Lender's prior written consent, not to be unreasonably withheld and subject to the terms and conditions of Section 5.1.25 herein Borrower shall not, nor shall Borrower permit Manager to:

        (i)     surrender, terminate or cancel the Franchise Agreement;

        (ii)     reduce or consent to the reduction of the term of the Franchise Agreement;

        (iii)     increase or consent to the increase of the amount of any charges under the Franchise Agreement (other than any increase provided for in the Franchise Agreement or any increase with respect to which Borrower's consent or approval is not required under the Franchise Agreement or any system-wide modification under the Franchise Agreement); or

        (iv)     otherwise materially modify, change, supplement, alter or amend, or, except to the extent consistent with commercially sound business practices, waive or release any of its rights and remedies under, the Franchise Agreement in any material respect.

        5.1.25  Termination of Franchise Agreement.  Notwithstanding anything contained herein to the contrary, if a Franchise Agreement shall be in place with respect to the Property, Borrower shall be permitted to terminate the Franchise Agreement and all of its obligations thereunder, subject to Borrower satisfying (and, to the extent applicable, continuing to satisfy) the following conditions:

        (a)     Borrower delivers a written notice to Lender at least thirty (30) days prior to the proposed termination date;

        (b)     Borrower shall provide Lender evidence that all amounts due and owing under the Franchise Agreement have been paid in full and will be paid in full as of the date of termination (including, without limitation, any termination or similar fees payable under the Franchise Agreement);

        (c)     From and after such termination, Borrower shall maintain the Property in the quality and condition which is equal to or better than the standard required under the Franchise Agreement (as if it were still in effect) or the standard required under any Approved Reservation Contract, whichever is higher);

        (d)     Prior to such termination, Borrower shall enter into an Approved Reservation Contract and deliver the same to Lender;

(e)       Following such termination, (1) Borrower shall (i) comply with the terms and conditions of the Approved Reservation Contract, (ii) not, without Lender's prior written consent (which such consent shall not be unreasonably withheld, conditioned or delayed), amend, supplement, restate, replace or otherwise modify the Approved Reservation Contract, (iii) cause the Property to be operated at all times under an Approved Reservation Contract and (iv) not enter into a replacement Approved Reservation Contract except in accordance with the applicable terms and conditions hereof and (2) the terms and conditions contained herein relating to the Franchise Agreement shall be deemed to relate and apply to the Approved Reservation Contract;

(f)       No Event of Default for which Lender has elected to accelerate the Loan shall have occurred and be continuing as of the date of the termination of the Franchise Agreement; and

(g)       Borrower shall pay all of Lender's out of pocket expenses in connection with this Section 5.1.25, including the reasonable legal fees and expenses of Lender; provided, that, such expenses to be borne by Borrower shall be capped at $10,000;

provided, however, that if Manager is replaced by an Approved Manager, then Borrower shall be entitled to terminate the Franchise Agreement and replace it with a Management Agreement (that may include concepts that generally appear in a franchise agreement) with such Approved Manager and/or a Franchise Agreement with such Approved Manager or an Affiliate of such Approved Manager.

5.1.26    Compliance with Plan of Reorganization.    Lender and Borrower each shall comply with all of the provisions of the Plan of Reorganization that relate to this Agreement and the Loan.

Section 5.2    Negative Covenants.    From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not, without Lender's prior written consent, do, directly or indirectly, any of the following:

5.2.1    Operation of Property.    Borrower shall not, without Lender's prior consent (which consent shall not be unreasonably withheld, conditioned or delayed): (i) subject to Section 9.5 hereof, surrender, terminate or cancel the Management Agreement; provided, that Borrower may, without Lender's consent, replace the Manager so long as the replacement manager is a Qualified Manager pursuant to a Replacement Management Agreement; (ii) reduce or consent to the reduction of the term of the Management Agreement other than as a result of a termination permitted hereunder or consented to by Lender; (iii) increase or consent to the increase of the amount of any charges or fees under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.

5.2.2   <u>Liens</u>.   Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except:

(i)   Permitted Encumbrances;

(ii)   Liens created by or permitted pursuant to the Loan Documents; and

(iii)   Liens for Taxes or Other Charges not yet due.

5.2.3   <u>Dissolution</u>.   Other than as permitted by the Plan of Reorganization, Borrower shall not (a) engage in any dissolution, liquidation, consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership and operation of the Property, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower except to the extent permitted by the Loan Documents, (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction where such qualification is required for Borrower to own its assets or conduct its business or enforce its contracts or agreements, or (e) cause Principal to (i) dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which Principal would be dissolved, wound up or liquidated in whole or in part, or (ii) amend, modify, waive or terminate the certificate of incorporation or bylaws of Principal, in each case, without obtaining the prior consent of Lender, other than in connection with any Transfer permitted pursuant to <u>Section 5.2.10</u> hereof.

5.2.4   <u>Change in Business</u>.   Borrower shall not enter into any line of business other than the ownership and operation of the Property as a hotel.

5.2.5   <u>Debt Cancellation</u>.   Borrower shall not cancel or otherwise forgive or release any claim or debt (other than in connection with termination of Leases in accordance herewith or with Transfers permitted hereunder) owed to Borrower by any Person, except in the ordinary course of Borrower's business.

5.2.6   <u>Zoning</u>.   Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case, without the prior consent of Lender.

5.2.7   <u>No Joint Assessment</u>.   Borrower shall not suffer, permit or initiate the joint assessment of all or any portion of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

5.2.8   <u>Principal Place of Business and Organization</u>.   Borrower shall not change its principal place of business set forth in the introductory paragraph of this Agreement without first giving Lender at least thirty (30) days prior notice. Borrower shall not change the

place of its organization as set forth in <u>Section 4.1.28</u> without the consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

5.2.9    <u>ERISA</u>.

(a)    Borrower shall not engage in any transaction which would cause any obligation or action to be taken hereunder or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

5.2.10    <u>Transfers</u>.

(a)    Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members and (if Borrower is a trust) beneficial owners, as applicable, in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

(b)    Without the prior consent of Lender and except to the extent otherwise set forth in this <u>Section 5.2.10</u>, Borrower shall not, and shall not permit any Restricted Party to, (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or

otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein, or (ii) permit a Sale or Pledge of an interest in the Property or in any Restricted Party (collectively, a "**Transfer**"), other than (1) pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of <u>Section 5.1.20</u> hereof, (2) the disposition of Equipment and other Personal Property pursuant to the replacement thereof or otherwise in the ordinary course of the operation of the Property and (3) as permitted in the Plan of Reorganization.

(c)     A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property, or any part thereof, for a price to be paid in installments; (ii) an agreement by Borrower leasing or subleasing all or substantially all of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; or (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests.

(d)     Notwithstanding the provisions of this <u>Section 5.2.10</u>, any equity ownership transfer (but not any pledge) of a direct and/or indirect interest in Borrower shall be permitted without Lender's consent provided, that, if any such transfer of a direct and/or indirect interest in Borrower is in excess of fifty percent (50%) or would result in a change of control of Borrower (a "**Change of Control Transfer**"), then (i)  Lender shall receive thirty (30) days prior written notice of such Transfer; (ii) the Transfer shall be to a Permitted Transferee, (iii) after giving effect to such Transfer, the Property shall continue to be managed by an Approved Manager, (iv) Borrower shall continue to be a Special Purpose Entity and shall continue to comply with the covenants contained herein related to ERISA matters, (v) a Substitute Guarantor shall have executed and delivered to Lender a replacement guaranty substantially in the form attached hereto as <u>Exhibit B</u> (and upon such execution and delivery, Lender shall release Guarantor under the then-existing Guaranty or any Substitute Guarantor under any prior replacement guaranty) and    (vi) Lender shall have received a payment (the "**Transfer Payment**") equal to (i) with respect to the first Permitted Transfer, Six Million Dollars ($6,000,000) less the Amortization Payments paid to Lender since the Effective Date, and (ii)

with respect to the second Permitted Transfer, Three Million Dollars ($3,000,000), such amounts to be applied to the Outstanding Principal Balance.

(e)     Lender shall not withhold its consent to up to two (2) Transfers of the Property in its entirety, directly or indirectly, to a Permitted Transferee (including, without limitation, an Affiliate of Borrower that is a Permitted Transferee) (an "**Assumption Transfer**" and together with a "**Change of Control Transfer**", a "**Permitted Transfer**"); provided that (i) no Event of Default shall have occurred and remain uncured; (ii) the Permitted Transferee shall have executed and delivered to Lender a modification of the terms hereof, the Note, the Mortgage or the other Loan Documents in form and substance reasonably acceptable to Lender; (iii) the Permitted Transferee shall have executed and delivered to Lender an assumption of this Agreement, the Note, the Mortgage and the other Loan Documents as so modified by the Permitted Transferee in form and substance reasonably acceptable to Lender, evidencing such Permitted Transferee's agreement to abide and be bound by the terms of the Note, this Agreement and the other Loan Documents, subject to the provisions of Section 10.4 hereof; (iv) Lender shall have received payment of all of fees and expenses incurred in connection with such Transfer including, without limitation, all of Lender's out-of-pocket expenses in connection with the approval of such Transfer, the cost of any third party reports, reasonable legal fees and expenses; (v) Lender shall have received payment of a non-refundable $5,000 application fee; (vi) Intentionally Omitted; (vii) Lender shall have received reasonably satisfactory evidence of the Permitted Transferee's continued compliance with the representations and covenants set forth in Section 4.1.30 and Section 5.2.9 hereof; (viii) Lender shall have received satisfactory evidence that the single purpose nature and bankruptcy remoteness of Borrower, its shareholders, partners or members, as the case may be, following such transfers are in accordance with the then current standards of Lender; (ix) a Substitute Guarantor shall have executed and delivered to Lender a replacement guaranty substantially in the form attached hereto as Exhibit B (and upon such execution and delivery, Lender shall release Guarantor under the then-existing Guaranty or any Substitute Guarantor under any prior replacement guaranty); (x) Lender shall have received the applicable Transfer Payment; and (xi) such other conditions as Lender shall determine in its reasonable discretion to be in the interest of Lender with respect to the Loan and the Property.

(f)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Obligations immediately due and payable upon a Transfer not in accordance with this Agreement. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer of the Property.

5.2.11     Distributions to Affiliates.  Borrower shall not make any distributions to, or otherwise pay any dividends or make any payments to, any Restricted Party or any Guarantor, including, without limitation, any Principal, during any month while the Obligations are outstanding unless and until the payments specified in Section 2.6.3(a)(i)-(vi) with respect to such month (whether due or payable in the ordinary course of business during such month) have been made with sufficient funds on deposit in the Cash Management Account.

5.2.12     No Amendments.  Borrower shall not, without Lender's prior written consent (which consent Lender shall not unreasonably withhold, delay or condition), materially

amend, modify or terminate, or permit the amendment, modification or termination of (i) the organizational, governing or other corporate documents of Borrower in violation of the terms of this Agreement and the other Loan Documents or (ii) any Material Contracts.

Section 5.3    Hotel.    Without limiting the provisions of Section 5.1.22 and/or 5.2.1 above, Borrower hereby makes the following affirmative and negative covenants and Borrower hereby makes the following representations and warranties as if same were contained in Section 4.1 hereof (and such representations and warranties are hereby incorporated into Section 4.1):

(a)    Borrower shall promptly provide Lender with full and complete copies of all notices of default received by Borrower pursuant to the Management Agreement. In addition to the foregoing, Borrower shall (i) promptly deliver to Lender a copy of an annual business plan, if any, and annual capital expenditures budget received by it under the Management Agreement and not otherwise delivered to Lender, and (ii) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the Manager under the Management Agreement and the Manager Recognition Agreement.

(b)    As of the Closing Date, to the best of Borrower's knowledge (1) the Management Agreement is in full force and effect, (2) all sums currently due and payable under the Management Agreement have been paid, (3) Borrower is not in default under the Management Agreement beyond any applicable notice and/or cure periods and (4) Manager is not in default under the Management Agreement beyond any applicable notice and/or cure periods.

## ARTICLE 6

## INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS

Section 6.1    Insurance.    Borrower shall or shall cause Manager to obtain and maintain insurance for Borrower and the Property providing at least the following coverages:

(i)    Special Form Perils insurance including ordinance and law coverage as required in this paragraph on the Improvements and the Personal Property located therein, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case, (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) without deduction for depreciation, but the amount shall in no event be less than the Aggregate Outstanding Principal Balance; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property located therein waiving all co-insurance provisions; (C) providing for no deductible in excess of the lesser of (1) five percent (5%) of the "Full Replacement Cost" (as such term is defined in clause (A) above), (2) five percent (5%) of the Net Operating Income for the calendar year in which such insurance is

65

obtained, or (3) Fifty Thousand and No/Dollars ($50,000.00) for all such insurance coverage; and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use thereof shall at any time constitute legal non-conforming structures or uses due to a loss by a covered peril which coverage shall comprise three types: (1) Coverage A – the value of the undamaged portion of the Improvements, which shall be included in the building limit; (2) Coverage B – the cost of demolition/debris removal in an amount equal to ten percent (10%) of the value of the Improvements; and (3) Coverage C – the increased costs of construction to restore the Improvements in an amount equal to ten percent (10%) of the value of the Improvements. In addition, Borrower shall obtain or cause to be obtained: (x) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the lesser of (1) the Aggregate Outstanding Principal Balance or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall reasonably require; and (y) coastal windstorm insurance in amounts and in form and substance satisfactory to Lender in the event the Building is located in any coastal region, provided that the insurance pursuant to clauses (x), and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i);

(ii)    commercial general liability insurance, including an endorsement and coverages against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than Two Million and No/Dollars ($2,000,000) in the aggregate and One Million and No/Dollars ($1,000,000) per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Article 8 of the Mortgage to the extent the same is available;

(iii)    rental loss and/or business income interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property have been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Improvements are repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected Gross Income from Operations for a period of not less than

twelve (12) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire prior to the end of such period. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the Gross Income from Operations for the succeeding twelve (12) month period. Notwithstanding anything to the contrary in Section 2.6 hereof, all proceeds payable jointly to Borrower and Lender pursuant to this subsection shall be held by Lender and shall be applied by Lender (I) first, to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note and (II) second, provided no Event of Default has occurred and is continuing, Operating Expenses approved by Lender in its sole discretion; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Improvements coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Improvements, and (4) with an agreed amount endorsement or confirmation that coinsurance does not apply to this coverage;

(v)     if the Improvements includes commercial property, worker's compensation insurance with respect to any employees of Borrower, as required by any Governmental Authority or Legal Requirement;

(vi)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)     umbrella liability insurance in an amount not less than Twenty Five Million and No/Dollars ($25,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(viii)     motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing minimum limits per occurrence of One Million and No/Dollars ($1,000,000.00);

(ix)     if the Building is or becomes a legal "non-conforming" use by a covered peril, ordinance or law coverage and insurance coverage to compensate for the cost of demolition and/or rebuilding of the undamaged portion of the Building along with

67

any reduced value and the increased cost of construction in amounts as requested by Lender;

(x)    the commercial property and business income insurance required under Sections 6.1(i) and (iii) above shall cover perils of terrorism and acts of terrorism (whether caused by a foreign or domestic source) and Borrower shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism (whether caused by a foreign or domestic source) on terms (including amounts) consistent with those required under Sections 6.1(i) and (iii) above at all times during the term of the Loan; provided, however, that coverage purchased by Borrower of the types provided for under the Terrorism Risk Insurance Act of 2002 ("**TRIA**") as of the date hereof (even if TRIA is modified, repealed or expires after the date hereof) shall satisfy Borrower's obligations under this subsection (x); provided, further, that Borrower shall not be required to incur a cost for terrorism insurance that is in excess of $226,000 per year (the "**Terrorism Coverage Cost Cap**") and in the event the annual premium for terrorism coverage satisfying the requirements of this Section 6.1(a) shall exceed the Terrorism Coverage Cost Cap, Borrower shall only be required to obtain and maintain terrorism coverage for as much of the coverage as is available for a premium equal to the Terrorism Coverage Cost Cap;

(xi)    the Required Environmental Insurance Policy; and

(xii)    upon not less than sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Building located in or around the region in which the Building is located.

Section 6.2    Intentionally Omitted.

Section 6.3    Miscellaneous.  All insurance provided for in Section 6.1 shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies may be issued by a syndicate of not less than five (5) financially sound and responsible insurance companies authorized to do business in the State, of which either (i) one hundred percent (100%) shall have a claims paying ability rating of "A" or better (and the equivalent thereof) by at least two (2) Rating Agencies, or (ii) sixty percent (60%) shall have a claims paying ability rating of "A" or better (and the equivalent thereof) by at least two (2) Rating Agencies and the first layers of the coverages required hereunder shall be provided by such companies, and the remaining forty percent (40%) of which shall have a claims paying ability rating of "BBB-" or better (and the equivalent thereof) by at least two (2) of the Rating Agencies, or (iii) the claims paying ability rating by at least two (2) Rating Agencies rating the Securities, shall be equivalent to or better than the claims paying ability rating of such insurance companies on the Closing Date. The Policies described in Section 6.1 (other than those strictly limited to liability protection) shall designate Lender as mortgagee and loss payee. Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to

Lender (each such date, as applicable, the "**Policy Expiration Date**"), Borrower will make its best efforts to provide (each of the following, collectively, the "**Renewal Evidence**") certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**").  In all events, Borrower shall (i) until delivery of the Renewal Evidence, keep Lender appraised during said fifteen (15) day period of its efforts to furnish to Lender the Renewal Evidence and (ii) by no later than two (2) Business Days prior to the Policy Expiration Date (such date, the "**Policy Renewal Deadline**"), furnish to Lender the Renewal Evidence.   Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of <u>Section 6.1</u>.

(a)      All Policies provided for or contemplated by <u>Sections 6.1(ii)</u> and <u>(vii)</u> shall name Borrower as the insured and Lender (and its affiliates) as the additional insured, as its interests may appear, and in the case of the Policies required under <u>Section 6.1</u> relating to property damage, boiler and machinery and flood insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(b)      All Policies provided for in <u>Section 6.1</u> shall contain clauses or endorsements to the effect that:

(i)      no act or negligence of Borrower, or anyone acting for Borrower, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)      the Policies shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' notice to Lender and any other party named therein as an additional insured;

(iii)      the issuers thereof shall give notice to Lender if the Policies have not been renewed at least fifteen (15) days prior to its expiration; and

(iv)      Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(c)      If, as of any Policy Renewal Deadline, Lender is not in receipt of written evidence that all Policies are in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate. All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the Default Rate.

(d)    Section 16.9 of the Mortgage is hereby incorporated by reference as if fully set forth herein.

Section 6.4    <u>Casualty</u>.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender, and shall, at Borrower's option, either (a) promptly commence and diligently prosecute the completion of the Restoration so that the Property resembles, as nearly as possible, the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with <u>Section 6.6</u>, or (b) prepay the Loan in whole. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In addition, Lender may participate in any settlement discussions with any insurance companies with respect to any Casualty in which the Net Proceeds or the costs of completing the Restoration are equal to or greater than One Million and No/Dollars ($1,000,000) and Borrower shall deliver to Lender all instruments required by Lender to permit such participation.

Section 6.5    <u>Condemnation</u>.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding in respect of Condemnation and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by Lender to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to perform the Obligations at the time and in the manner provided in this Agreement and the other Loan Documents and the Outstanding Principal Balance shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Obligations. Lender shall not be limited to the interest paid on the Award by the applicable Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a Governmental Authority, Borrower shall promptly commence and diligently prosecute Restoration and otherwise comply with the provisions of <u>Section 6.6</u>. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 6.6    <u>Restoration</u>.  The following provisions shall apply in connection with the Restoration:

(a)    If the Net Proceeds shall be less than One Million and No/Dollars ($1,000,000.00) and the costs of completing the Restoration shall be less than One Million and No/Dollars ($1,000,000.00), the Net Proceeds will be disbursed by Lender to Borrower upon receipt; <u>provided</u> that all of the conditions set forth in <u>Section 6.6(b)(i)</u> are met and Borrower

delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than One Million and No/Dollars ($1,000,000.00) or the costs of completing the Restoration is equal to or greater than One Million and No/Dollars ($1,000,000.00), the Net Proceeds will be held by Lender and Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this <u>Section 6.6</u>. The term "**Net Proceeds**" for purposes of this <u>Section 6.6</u> shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to <u>Section 6.1(i)</u>, <u>(iv)</u>, <u>(vi)</u>, <u>(ix)</u>, <u>(x)</u>, <u>(xi)</u> and, to the extent applicable, <u>(xii)</u> as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel costs and fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)    The Net Proceeds shall be made available to Borrower for Restoration upon the approval of Lender in its reasonable discretion that the following conditions are met:

(A)    no Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty, or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no material portion of the Improvements is located on such land;

(C)    the Management Agreement and Franchise Agreement, if any, will remain in full force and effect following completion of the Restoration or a Replacement Management Agreement or a replacement Franchise Agreement (entered into in accordance with the terms and conditions hereof) shall be executed and set to be in full force and effect following completion of the Restoration;

(D)    subject to delays due to acts of god, governmental restrictions, stays, judgments, orders, decrees, enemy actions, civil commotion, fire, casualty, strikes, work stoppages, shortages of labor or materials or other cases beyond the reasonable control of Borrower (each, an "**Excusable Delay**"), Borrower shall commence Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

71

(E)     any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1, if applicable, or (3) by other funds of Borrower;

(F)     Lender shall be satisfied that Restoration will be completed on or before the earliest to occur of (1) the Maturity Date, (2) such time as may be required under applicable Legal Requirements, or (3) the expiration of the insurance coverage referred to in Section 6.1(iii);

(G)     the Property and the use thereof after Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(H)     Restoration shall be done and completed by Borrower in a diligent manner and in material compliance with all applicable Legal Requirements;

(I)     such Casualty or Condemnation, as applicable, does not result in the permanent loss of access to the Property or the related Improvements;

(J)     after giving effect to Restoration, the Restoration Debt Service Coverage Ratio shall be at least equal to the Debt Service Coverage Ratio for the twelve (12) month period immediately prior to the Casualty which gave rise to such Restoration;

(K)     Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire estimated cost of completing the Restoration, which budget shall be subject to Lender's reasonable approval;

(L)     to the extent that any Licenses are affected by the applicable Casualty or Condemnation, Lender shall have received reasonably satisfactory evidence that all licenses and permits necessary for the operation of the hotel and any restaurant functions on the Property and any liquor license shall be in full force and effect upon completion of the Restoration; and

(M)     the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are in an amount sufficient in Lender's reasonable discretion to cover the estimated cost of Restoration, taking into account the budget delivered to Lender in accordance with clause (K) above.

(ii)     The Net Proceeds shall be paid directly to Lender for deposit in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 6.6(b), shall constitute additional security for the Debt and the Other Obligations. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time

to time during the course of Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with Restoration have been paid for in full or for deposits for FF&E ordered and placed or to be placed in storage or delivered to the Property, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Company which shall cause such liens to be omitted.

(iii)     In the event that the estimated cost of Restoration exceeds One Million and No/Dollars ($1,000,000.00), all plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**").  Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which shall not be unreasonably withheld, conditioned or delayed. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, including amounts for FF&E ordered and placed or to be placed in storage or delivered to the property, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "**Casualty Retainage**" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.6(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that Restoration has been completed substantially in accordance with the provisions of this Section 6.6(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has

73

satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the Title Company, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the Lien of the related Mortgage and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this <u>Section 6.6(b)</u> shall constitute additional security for the Debt and the Other Obligations.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that Restoration has been completed substantially in accordance with the provisions of this <u>Section 6.6(b)</u>, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower; <u>provided</u> no Event of Default shall have occurred and shall be continuing.

(c)     All Net Proceeds not required (i) to be made available for Restoration, or (ii) to be returned to Borrower as excess Net Proceeds pursuant to <u>Section 6.6(b)(vii)</u> may be retained and applied by Lender in accordance with <u>Section 2.4.2</u> hereof toward the payment of the Outstanding Principal Balance whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, in the sole discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its sole discretion, so long as Lender either commences to apply such Net Proceeds to Restoration in accordance with the terms and conditions of this Agreement or applies such Net Proceeds toward the payment of the Outstanding Principal Balance, in each case within thirty (30) days of receipt thereof.

(d)     In the event of foreclosure of the Mortgage, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of

Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

## ARTICLE 7

## <u>RESERVE FUNDS</u>

Section 7.1    <u>Intentionally Omitted</u>.

Section 7.2    <u>Escrow Funds</u>. Borrower shall pay to Lender on the Payment Date occurring in May 2013 and each Payment Date thereafter (a) one-twelfth of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates (such deposits, the "**Tax Deposits**"), and (b) one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (the foregoing amounts required to be so deposited pursuant to this <u>Section 7.2</u>, are hereinafter called the "**Tax and Insurance Escrow Funds**").  The Tax and Insurance Escrow Funds and the payment of the monthly Debt Service, shall be added together and shall be paid as an aggregate sum by Borrower to Lender.  Lender will promptly and timely apply the Tax and Insurance Escrow Funds to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to <u>Section 5.1.2</u> hereof and under the Mortgage, subject to Borrower's right to contest Taxes in accordance with <u>Section 5.1.2</u> hereof. In making any payment relating to the Tax and Insurance Escrow Funds, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Escrow Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to <u>Section 5.1.2</u> hereof, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Funds. Any amount remaining in the Tax and Insurance Escrow Funds after the Debt has been paid in full shall be returned to Borrower. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. If at any time Lender reasonably determines that the Tax and Insurance Escrow Funds are not or will not be sufficient to pay Taxes and Insurance Premiums by the dates set forth in (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be. Upon payment of the Taxes and Insurance Premiums, Lender shall reassess the amount necessary to be deposited in the Tax and Insurance Escrow Funds for the succeeding period, which calculation shall take into account any excess amounts remaining in the Tax and Insurance Escrow Funds.

Section 7.3     FF&E Reserve Funds.

      7.3.1     Deposit to FF&E Reserve Account.   Borrower shall deposit with Lender on each Payment Date an amount equal to four percent (4%) of the Gross Income from Operations for the prior calendar month (the "**FF&E Monthly Deposit**"), which is the amount reasonably estimated by Lender in its sole discretion to be due for replacements and repairs of the furniture, fixtures and equipment used in connection with the Property (collectively, the "**FF&E**"). Amounts so deposited shall hereinafter be referred to as Borrower's "**FF&E Reserve Funds**".

      7.3.2     Disbursements from FF&E Reserve Account.   Lender shall make disbursements from the FF&E Reserve Account as requested by Borrower, no more frequently than once in any thirty (30) day period and of no less than $5,000.00 per disbursement, within ten (10) days after satisfaction by Borrower of each of the following conditions with respect to each such disbursement: (i) Borrower shall submit Lender's standard form of draw request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made, which request shall specify the expense for FF&E to be paid and shall be accompanied by copies of paid invoices for the amounts requested; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; and (iii) Lender shall have received (1) an Officer's Certificate from Borrower (A) stating a description of the FF&E for which the disbursement is being requested, (B) stating that all FF&E to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements or is necessary as a deposit for the ordering of FF&E, (C) identifying each Person that supplied materials or labor or deposits for goods and materials in connection with the FF&E to be funded by the requested disbursement, (D) stating that each such Person has been paid in full or will be paid in full (including amounts paid for deposits made for such FF&E items) upon such disbursement, (E) stating that the FF&E to be funded have not been the subject of a previous disbursement, and (F) stating that all previous disbursements of FF&E Reserve Funds have been used to pay the previously identified expenses for FF&E, (2) a copy of any license, permit or other approval by any Governmental Authority required in connection with the FF&E and not previously delivered to Lender, (3) if required by Lender for requests in excess $50,000.00 for a single item, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment (which lien waivers may be conditioned solely upon receipt of payment) or other evidence of payment satisfactory to Lender, and (4) such other evidence as Lender shall reasonably request to demonstrate that the expenses for FF&E to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender may require an inspection of the Property at Borrower's expense prior to making a monthly disbursement in order to verify completion of replacements and/or repairs of FF&E in excess of $250,000.00 for which reimbursement is sought, provided that such inspection shall not extend the time within which Lender must disburse the funds from the FF&E Reserve Account as provided above.

      7.3.3     Balance in the FF&E Reserve Account.   The insufficiency of any balance in the FF&E Reserve Account shall not relieve Borrower from its obligation to fulfill all preservation and maintenance covenants in the Loan Documents.

7.3.4    <u>Intentionally Omitted</u>.

Section 7.4    <u>Intentionally Omitted</u>.

Section 7.5    <u>Seasonality Reserve Funds</u>.

7.5.1    <u>Deposits to Seasonality Reserve Account</u>.   On the Closing Date (i) Borrower shall deposit into the Seasonality Reserve Account the amount of One Million Five Hundred Thousand Dollars ($1,500,000) to be held by Lender as additional collateral for the Loan, and (ii) Lender and Borrower will instruct Lockbox Bank and Cash Management Bank (and Lender will instruct Servicer to instruct Lockbox Bank and Cash Management Bank) to deposit into the Seasonality Reserve Account all amounts currently held by Lockbox Bank and/or Cash Management Bank in the Lockbox Account and/or Cash Management Account (or any sub-accounts thereof) (collectively, the "**Initial Seasonality Deposit**") to be held by Lender as additional collateral for the Loan.   Commencing on the Payment Date in June, 2013 and continuing for each Payment Date thereafter, one hundred percent (100%) of all funds on deposit in the Cash Management Account (after the payments pursuant to <u>Sections 2.6.3(i)-(iv)</u> of this Agreement) shall be deposited into the Seasonality Reserve Account until the total amount on deposit in the Seasonality Reserve Account is equal to Seasonality Reserve Amount.   Amounts so deposited shall hereinafter be referred to as Borrower's "**Seasonality Reserve Funds**".

7.5.2    <u>Withdrawal from Seasonality Reserve Account</u>.   If, on any Payment Date, there are insufficient funds (a) in the Tax and Insurance Escrow Account for payment of Taxes and Insurance Premiums, (b) in the Operating Expense Account for payment of Approved Operating Expenses and Approved Extraordinary Expenses (and for purposes of this subsection (b), any Manager Held Funds shall be deemed to be funds in the Operating Expense Account) and/or (c) in the Cash Management Account for payment of the Monthly Interest Payment due on such Payment Date (any such shortfall the "**Payment Shortfall**"), provided that no Event of Default shall exist and remain uncured, Lender shall apply Seasonality Reserve Funds then on deposit to the payment of such Payment Shortfall (first to payment of Taxes and Insurance Premium, then to payment of Approved Operating Expenses and Approved Extraordinary Expenses and then to payment of the Monthly Interest Payment, but in no event to exceed the Payment Shortfall) and in each case the Seasonality Reserve Funds shall be reduced by an equal amount.   Notwithstanding the foregoing, Borrower expressly acknowledges and agrees that in the event that on any day on which the Payment Shortfall is due and payable the amount of such Payment Shortfall exceeds the Seasonality Reserve Funds then on deposit, Borrower shall remain liable for the difference between such Payment Shortfall and the Seasonality Funds then on deposit, such difference to be due and payable at the time the Payment Shortfall is due and payable. Lender acknowledges that if Lender is obligated to apply Seasonality Reserve Funds to the payment of any Payment Shortfall pursuant to this <u>Section 7.5.2</u>, then the failure of Borrower to pay such Payment Shortfall in the amount of such Seasonality Reserve Funds so applied shall not be deemed an Event of Default.   Notwithstanding anything to the contrary contained herein, following an Event of Default, Lender agrees to apply amounts in the Seasonality Reserve  to Payment Shortfalls solely with respect to the payment of Taxes and Insurance Premiums and payment of Approved Operating Expenses and Approved Extraordinary Expenses (it being

understood that Lender shall have no obligation to deposit funds into the Seasonality Reserve other than in accordance with Section 2.6.3).

    7.5.3  Distribution of Proceeds from Seasonality Reserve Account. On the Payment Date occurring in May 2013, after taking into account all payments required to be made pursuant to Sections 2.6.3(i)-(iv) of this Agreement on or before that Payment Date, the lesser amount of (i) One Million Five Hundred Thousand Dollars ($1,500,000) and (ii) the sum of (a) total amount then on deposit  in the Seasonality Reserve Account plus (b) any Manager Controlled Funds actually received by Manager that were required to have been deposited by Manager in the Lockbox Account in accordance with the terms of Section 2.6.1(d) on or before such Payment Date (after taking into account all payments that would have been made with such Manager Controlled Funds pursuant to Sections 2.6.3(i)-(iv) of this Agreement) but which were not timely deposited in accordance with such Section 2.6.1(d), shall be paid to Lender to reduce the Outstanding Principal Balance.

    Section 7.6  Operating Expense Account. On each Payment Date, Borrower shall deposit (or shall cause there to be deposited) into the Operating Expense Account (or  Lender shall cause to be deposited from the Cash Management Account in accordance with Section 2.6.3 herein) an amount equal to the aggregate amount of Approved Operating Expenses and Approved Extraordinary Expenses to be incurred by Borrower for the next succeeding Interest Period. Amounts deposited pursuant to this Section 7.6 are referred to herein as the "**Operating Expense Funds**". Lender shall disburse available Operating Expense Funds to Borrower to pay Approved Operating Expenses and/or Approved Extraordinary Expenses upon Borrower's request (which such disbursement shall include, to the extent of available Operating Expense Funds, the portion of the Base Management Fee then due and payable provided a Management Termination Period does not exist) (any such disbursement, an "**Approved Op Ex Disbursement**"). The foregoing request shall be accompanied by an Officer's Certificate detailing the applicable expenses to which the requested disbursement relates and attesting that such expense shall be paid with the requested disbursement.

    Section 7.7  Excess Cash Flow Account. In the event that a sweep of Excess Cash Flow is instituted during the continuance of an Event of Default, all Excess Cash Flow shall be deposited into the Excess Cash Flow Account. All such deposit amounts in the Excess Cash Flow Account shall be treated as a "Reserve Fund" for purposes of Section 7.8. All additional amounts deposited under this section shall be additional security for the repayment of the Debt and may be withdrawn by Lender upon the occurrence and continuance of an Event of Default and applied by Lender in such order and priority as Lender may determine. All calculations of the Debt Service Coverage Ratio shall be subject to verification by Lender.

    Section 7.8  Reserve Funds, Generally.

    (a)  Borrower grants to Lender a first-priority perfected security interest in all of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for the Obligations. Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for payment of the Obligations. Upon the occurrence and during the continuance of an Event of Default, subject to Lender's obligation to

make any available Approved Op Ex Disbursements (but only from available receipts from the Property, in the Operating Expense Account or the Seasonality Reserve) and payments of Tax and Insurance Premiums (but only from available receipts from the Property, in the Tax and Insurance Escrow Account or the Seasonality Reserve Account) Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the reduction of the Debt (in such order, proportion and priority as Lender may determine in its sole discretion), until the Debt is paid in full. Borrower and Lender hereby agree and acknowledge that if all of the Obligations have been satisfied and there is any amount remaining in the Reserve Funds, the balance shall be disbursed to Borrower.

(b)     Borrower shall not, without obtaining the prior consent of Lender, pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(c)     The Reserve Funds shall be held in an Eligible Account and shall be invested in Permitted Investments pursuant to the Cash Management Agreement. Provided that no Event of Default has occurred and is continuing, all interest or other earnings on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund, except that all interest or other earnings on the portions of the Tax and Insurance Escrow Funds representing Tax Deposits shall be retained by Lender. Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest or income earned on the Reserve Funds, except for any such taxes applicable to the interest or income earned on the portions of the Tax and Insurance Escrow Funds representing Tax Deposits which is retained by Lender. No other investments of the sums on deposit in the Reserve Funds shall be permitted except as set forth in this Section 7.8. Borrower shall bear all reasonable costs associated with the investment of the sums in the account in Permitted Investments. Such costs shall be deducted from the income or earnings on such investment, if any, and to the extent such income or earnings shall not be sufficient to pay such costs, such costs shall be paid by Borrower promptly on demand by Lender. Lender shall have no liability for the rate of return earned or losses incurred on the investment of the sums in Permitted Investments.

(d)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established. Borrower shall, effective upon an Event of Default, assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

        (e)        Upon request by Borrower, Lender agrees to use reasonable efforts to provide Borrower access to or copies of statements reflecting the current balance of the Reserve Funds.

        Section 7.9      <u>Letters of Credit</u>.

        7.9.1      <u>Delivery of Letters of Credit</u>.  With respect to any Letter of Credit which Borrower may furnish or cause to be furnished to Lender for any purpose hereunder or under any of the other Loan Documents, Lender will be entitled, among other things, to make one or more draws by presentment thereof to the issuing bank accompanied only by Lender's draft and a certification acceptable to Lender and required to be given under said Letter of Credit, it being intended that the issuing bank shall have no right to inquire as to Lender's right to draw upon said Letter of Credit. Lender shall be the beneficiary of any Letter of Credit delivered to it pursuant to the terms of the Loan Documents and none of Borrower, Principal nor Guarantor shall be entitled to draw down any such Letter of Credit for any reason whatsoever. Notwithstanding the foregoing, Borrower shall not deliver to Lender a Letter of Credit, or Letters of Credit which, in the aggregate, would exceed the Letter of Credit Amount.

        7.9.2      <u>Security for Debt</u>.  Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine.

        7.9.3      <u>Additional Rights of Lender</u>.  In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit: (a) with respect to any evergreen Letter of Credit, if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date (other than the Additional Collateral Letter of Credit), if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (c) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); (d) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution and Borrower has not substituted a Letter of Credit from an Eligible Institution within ten (10) Business Days after notice or (e) if the bank issuing the Letter of Credit shall not consent to the assignment of the Letter of Credit to such party as Lender shall request and Borrower has not substituted a Letter of Credit from an Eligible Institution within ten (10) Business Days after receiving notice from Lender of such failure to consent by the issuing bank. If Lender draws upon a Letter of Credit pursuant to the terms and conditions of this Agreement, provided no Event of Default exists, Lender shall apply all or any

part thereof for the purposes for which such Letter of Credit was established. Notwithstanding anything to the contrary contained in the above, Lender is not obligated to draw any Letter of Credit upon the happening of an event specified in (a), (b), (c), (d) or (e) above and shall not be liable for any losses sustained by Borrower due to the insolvency of the bank issuing the Letter of Credit if Lender has not drawn the Letter of Credit.

## ARTICLE 8

## DEFAULTS

Section 8.1   Event of Default.

(a)   Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)   if any portion of the Debt is not paid when due;

(ii)   Intentionally Omitted;

(iii)   subject to Borrower's right to contest as set forth in Section 5.1.2, if any of the Taxes or Other Charges are not paid when the same would be considered delinquent (provided that it shall not be an Event of Default if there are sufficient Tax and Insurance Escrow Funds on deposit with Lender to pay such amounts when due, no other Event of Default is then continuing and Servicer fails to make such payment in violation of this Agreement);

(iv)   if the Policies are not kept in full force and effect or if a default shall occur under Section 6.2 hereof;

(v)   if a Transfer in violation of this Agreement occurs or Borrower otherwise encumbers any portion of the Property without Lender's prior consent in violation of the provisions of this Agreement or Article 6 of the Mortgage;

(vi)   if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false in any material respect as of the date the representation or warranty was made; provided, however, that if (1) such misrepresentation was not intentional, and (2) the condition causing the representation or warranty to be false is susceptible of being cured, the same shall be an Event of Default hereunder only if the same is not cured within thirty (30) days after written notice to Borrower from Lender; and provided, further, if the condition causing the representation or warranty to be false is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such condition within such thirty (30) day period and thereafter diligently proceeds to cure the same, then such thirty (30) day period shall be extended for such an additional period of time as is reasonably necessary for Borrower in the

81

exercise of due diligence to cure such condition, such additional period not to exceed one hundred fifty (150) days;

(vii)    if Borrower or Principal shall make an assignment for the benefit of creditors in contravention of the Loan Documents;

(viii)    if a receiver, liquidator or trustee shall be appointed for Borrower or Principal, or if Borrower or Principal shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Principal (other than the Bankruptcy Proceeding), or if any proceeding for the dissolution or liquidation of Borrower or Principal shall be instituted (other than the Bankruptcy Proceeding); provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Principal, upon the same not being discharged, stayed or dismissed within sixty (60) days;

(ix)    Intentionally Omitted;

(x)    subject to *force majeure*, if Borrower ceases to do business as a hotel at the Property or terminates such business for any reason whatsoever (other than temporary cessation in connection with any continuous and diligent renovation or restoration of the Property following a Casualty or Condemnation);

(xi)    if Borrower breaches any of its respective negative covenants contained in Section 5.2 or any covenant contained in Section 4.1.30 or Section 5.1.11 hereof, and any such breach is not cured within fifteen (15) Business Days after written notice to Borrower from Lender;

(xii)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xiii)    Intentionally Omitted;

(xiv)    if a monetary default by Borrower under the Management Agreement has occurred and continues beyond the date that is three (3) Business Days prior to the expiration of the applicable cure period under the Management Agreement;

(xv)    if a non-monetary default by Borrower under the Management Agreement has occurred and continues beyond the date that is five (5) days prior to the expiration of the applicable cure period under the Management Agreement;

(xvi)    if Borrower commences a cure of a non-monetary default by Borrower under the Management Agreement and then abandons such cure or fails to diligently prosecute such cure for a period of ten (10) consecutive days;

(xvii)  if the Management Agreement is terminated and a Qualified Manager is not in place under a Replacement Management Agreement within forty five (45) days after such termination;

(xviii)  if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(xix)  Intentionally Omitted;

(xx)  Intentionally Omitted;

(xxi)  Intentionally Omitted; or

(xxii)  if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xxi) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default involving a payment by Borrower to Lender, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed one hundred fifty (150) days.

(b)  Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vii) or (viii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Obligations to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vii) or (viii) above, the Debt and all Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2   Remedies.

(a)  Unless waived by Lender in writing (Lender being under no obligation to do so), upon the occurrence of an Event of Default, all or any one or more of the rights, powers,

privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Obligations have been paid in full.

(b)     <u>Intentionally Omitted</u>.

(c)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose the Mortgage to recover so much of the Debt as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(d)     Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

(e)     <u>Remedies Cumulative; Waivers</u>.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of

84

Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

# ARTICLE 9

## SPECIAL PROVISIONS

Section 9.1    <u>Sale of Note</u>.  Borrower acknowledges and agrees that Lender may, at no cost to Borrower, sell all or any portion of the Loan and the Loan Documents and the Note. At the request of Lender, and to the extent not already required to be provided by Borrower under this Agreement, Borrower shall, at no cost to Borrower, use reasonable efforts to provide information not in the possession of Lender or which may be reasonably required by Lender in order to satisfy market standards or which may be reasonably required by prospective investors.

All reasonable third party costs and expenses (other than legal expenses) incurred by Borrower or Lender in connection with Borrower's complying with requests made under this <u>Section 9.1</u> shall be paid by Lender.

Section 9.2    <u>Intentionally Omitted</u>.

Section 9.3    <u>Intentionally Omitted</u>.

Section 9.4    <u>Exculpation</u>.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees for itself and its successors and assigns that it and its successors and assigns shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under, or by reason of, or in connection with, the Note, this Agreement, the Mortgage or the other Loan Documents. The provisions of this Section shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of or any of the Guaranties made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against

the Property; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower under the terms of this Agreement, by money judgment or otherwise, to the extent of any actual out of pocket loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

> (i)    fraud or intentional misrepresentation by Borrower, Guarantor or any of their respective principals, officers, agents or employees in connection with the Loan;

> (ii)    the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity Agreement or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

> (iii)    the wrongful removal or destruction of any material portion of the Property after an Event of Default; provided that Borrower has received notice of such wrongful removal or destruction;

> (iv)    the knowing misapplication or conversion by or on behalf of Borrower of (A) any Insurance Proceeds paid by reason of any Casualty, (B) any Awards received in connection with a Condemnation or (C) any Rents paid more than one (1) month in advance, in each case only to the extent of the amounts received by Borrower;

> (v)    any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to such foreclosure or action in lieu thereof;

> (vi)    Rents received or applicable to a period during the existence of any Event of Default which are not either (x) applied to the ordinary and necessary expenses of owning and operating the Property or (y) paid to Lender;

> (vii)    Borrower filing a voluntary petition under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law (other than the Bankruptcy Proceeding);

> (viii)    the filing of an involuntary petition against Borrower under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law if and only if (x) such filing was by an Affiliate of Borrower or (y) such filing was not by an Affiliate, but Borrower has acted in concert with, colluded or conspired with the petitioning creditors in connection with such involuntary petition;

> (ix)    Borrower filing an answer consenting to, or otherwise acquiescing or joining in any involuntary petition filed by any Person against Borrower under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law;

(x)    Borrower consenting to or otherwise acquiescing or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property (other than as requested by Lender);

(xi)    Borrower making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due;

(xii)    Borrower failing to maintain its status as a Special Purpose Entity in compliance with the definition of "Special Purpose Entity" (except for clause (j) of such definition);

(xiii)    Borrower failing to obtain Lender's prior written consent to any Indebtedness for borrowed money if required by the Loan Agreement or the Mortgage;

(xiv)    Borrower failing to obtain Lender's prior written consent to any Lien upon the Property other than the Liens created by the Loan Documents and Permitted Encumbrances; and/or

(xv)    Borrower failing to obtain Lender's prior written consent to any Transfer, as required by the Loan Agreement or the Mortgage.

Section 9.6    <u>Matters Concerning Manager and Franchisor</u>.

(a)    Lender shall have the right, exercisable in its sole and absolute discretion, to require pursuant to written request that Borrower terminate the Management Agreement and replace same with a Replacement Management Agreement if a Manager Termination Condition (defined below) exists. Upon Lender's written request, for so long as a Manager Termination Condition exists, Borrower shall terminate the Management Agreement and shall enter into a Replacement Management Agreement. As used herein, "**Manager Termination Condition**" means that (i) an Event of Default is continuing and (ii) Borrower has the right to terminate Manager pursuant to the terms of the Management Agreement.

(b)    If a Franchise Agreement shall be in effect with respect to the Property and (i) the Debt has been accelerated pursuant to the terms and conditions hereof and of the other Loan Documents, (ii) a Franchisor shall become bankrupt or insolvent or (iii) a default occurs under the Franchise Agreement, Borrower shall, at the request of Lender, terminate the Franchise Agreement and replace the Franchisor with a replacement Franchisor and Franchise Agreement entered into in accordance with the applicable terms and conditions hereof, it being understood and agreed that the fees and other sums payable under such replacement Franchise Agreement shall not exceed then prevailing market rates.

Section 9.7    <u>Servicer</u>.    At the option of Lender, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer.

87

Borrower shall not be responsible for payment of any cost or expenses of the set-up of any servicing or any monthly servicing fee due to the Servicer under the Servicing Agreement.

Section 9.8    Intentionally Omitted.

Section 9.9    Intentionally Omitted.

## ARTICLE 10

## MISCELLANEOUS

Section 10.1    Survival.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Obligations are outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 10.2    Lender's Discretion.    Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Whenever this Agreement expressly provides that Lender may not withhold its consent or its approval of an arrangement or term, such provisions shall also be deemed to prohibit Lender from delaying or conditioning such consent or approval.

Section 10.3    Governing Law.

(a)    **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE**

**UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES, EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE AND/OR THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW**.

**(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT**:

[Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention:  Bruce S. Cybul, Esq.
Facsimile No.:  (212) 593-5955]

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF**

89

**NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR**.

Section 10.4    <u>Modification, Waiver in Writing</u>.    No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 10.5    <u>Delay Not a Waiver</u>.    Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or under any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 10.6    <u>Notices</u>.    All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (each, a "**Notice**"), shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a Notice to the other parties hereto in the manner provided for in this <u>Section 10.6</u>):

|                   |                                           |
|-------------------|-------------------------------------------|
| If to Lender:     | DiamondRock Hospitality Company           |
|                   | 6903 Rockledge Drive, Suite 800           |
|                   | Bethesda, Maryland 20817                  |
|                   | Attention:  Chief Financial Officer       |
|                   | Facsimile No.:  (240) 744-1199            |