<u>EXHIBIT A</u>

Modified Second Amended Plan of Reorganization
<u>Under Chapter 11 of the Bankruptcy Code Proposed by the Debtor</u>

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ALT Hotel, LLC, | ) | Case No. 11-19401 (ABG) |
|  | ) |  |
| Debtor. | ) | **Hearing Date: October 29, 2012** |
|  | ) | **Hearing Time: 10:30 a.m.** |

**MODIFIED SECOND AMENDED PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR**

ALT HOTEL, LLC ("Debtor"), the debtor and debtor in possession in the above-captioned Chapter 11 case, files the following Modified Second Amended Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code:

**ARTICLE I**

**DISCLOSURE STATEMENT**

The Debtor has filed a Disclosure Statement pursuant to 11 U.S.C. § 1125 and Bankruptcy Rule 3016(c) (the "Disclosure Statement"). The Disclosure Statement was approved by the Bankruptcy Court on April 9, 2012. The Disclosure Statement provides information that the Bankruptcy Court has determined to be adequate to enable holders of claims and interests to make informed judgments about the Plan. PLEASE READ THE DISCLOSURE STATEMENT WITH CARE.

**ARTICLE II**

**DEFINITION OF TERMS**

**A.**     **Definitions**

A term or word that is used in this Plan and that is not defined below, but that is defined in the Bankruptcy Code, shall have the meaning that is ascribed to it in the Bankruptcy Code and shall be construed in accordance with section 102 of the Bankruptcy Code. When used in this Plan, the following terms, when they are capitalized as set forth below, shall have the meanings that are specified below, unless the Plan otherwise indicates or unless the context otherwise requires:

1. <u>Administrative Expense Claim</u>: a Claim that, if allowed, would be entitled to priority under section 503(b) of the Bankruptcy Code, including (a) a claim that is incurred by the Debtor on or after the Petition Date; (b) a Claim of a Professional Person under sections 330 and 331 of the Bankruptcy Code and

Bankruptcy Rule 2016; and (c) any and all fees and charges that are assessed against the Estate under 28 U.S.C. § 1930.

2. <u>Affiliate Claim</u>:  a claim held or asserted by an affiliate of the Debtor, as "affiliate" is defined in section 101(2) of the Bankruptcy Code.

3. <u>Allowed Claim</u>:  any Claim that

    (a)    has been listed in the Schedules and is not described as disputed, contingent, or unliquidated;

    (b)    has been listed and described in the Schedules as a disputed, contingent, or unliquidated Claim, but only to the extent that the validity and amount of the Claim has been approved by Final Order of the Bankruptcy Court; or

    (c)    is presently or later becomes subject to an objection, and is subsequently allowed, but only in such amount as is allowed by a Final Order of the Bankruptcy Court.

4. <u>Amended and Restated Cash Management Agreement</u>:  that certain Amended and Restated Cash Management Agreement, which shall be filed with the Court on or before the Effective Date, between the Debtor and the Secured Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

5. <u>Amended and Restated Guaranty</u>:  that certain Amended and Restated Guaranty between the Secured Lender and PS CDO Manager, LLC, attached hereto as Exhibit 1.

6. <u>Amended and Restated Loan Agreement</u>:  that certain Amended and Restated Loan Agreement between the Debtor and the Secured Lender attached hereto as <u>Exhibit 1</u>.

7. <u>Amended and Restated Loan Documents</u>:  to the extent appropriate to effectuate the terms of this Plan: the Amended and Restated Cash Management Agreement, the Amended and Restated LockBox Agreement, the Amended and Restated Guaranty, Amended and Restated Loan Agreement, Amended and Restated Mortgage, Amended and Restated Promissory Note, Amended and Restated Security Agreement, and any other agreement or instrument that must reasonably be drafted and executed to memorialize and give effect to the provisions of the Amended and Restated Loan Agreement and the Plan insofar as such provisions relate to the treatment of the Secured Lender under the Plan.

8. <u>Amended and Restated Lockbox Agreement</u>:  that certain Amended and Restated Lockbox Agreement, which shall be filed with the Court on or before the Effective Date, by and among the Debtor, an eligible bank and the Secured

Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

9. Amended and Restated Mortgage: that certain Amended and Restated Mortgage which shall be filed with the Court on or before the Effective Date, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

10. Amended and Restated Promissory Note: that certain Amended and Restated Promissory Note which shall be filed with the Court on or before the Effective Date, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

11. Amended and Restated Security Agreement: that certain Amended and Restated Security Agreement which shall be filed with the Court on or before the Effective Date, as the same may subsequently be amended or modified pursuant to the agreement of the Debtor and the Secured Lender.

12. Bankruptcy Code: Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as it is in effect upon the Petition Date, together with all amendments thereto that are applicable to this Chapter 11 Case.

13. Bankruptcy Court or Court: the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) or, if either the reference of this Chapter 11 Case is withdrawn by the United States District Court or venue of this Chapter 11 Case is transferred, the United States District Court for the Northern District of Illinois or such other court of competent jurisdiction that exercises jurisdiction over the Chapter 11 Case.

14. Bankruptcy Rules: the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court that are in effect on the Petition Date, together with all amendments thereto that are applicable to the Chapter 11 Case.

15. Business Day: any day, except a Saturday, a Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

16. Chapter 11 Case: the Chapter 11 case pending before the Bankruptcy Court that was commenced by the Debtor on the Petition Date and is designated Case No. 11-19401.

17. Claim: a claim, as defined in section 101(5) of the Bankruptcy Code.

18. Claims Bar Date: December 16, 2011.

19. Class: a class of Claims or Interests, as defined in Article III of this Plan.

20. Confirmation: the entry of the Confirmation Order by the Bankruptcy Court.

21. <u>Confirmation Order</u>: the order that is entered by the Bankruptcy Court confirming the Plan.

22. <u>Contract Litigation</u>: The adversary proceeding that is captioned *ALT Hotel, LLC, et al. v. DiamondRock Allerton Owner, LLC*, is designated Adv. No. 11-01469, and is currently pending in the Bankruptcy Court.

23. <u>Debtor</u>: ALT Hotel, LLC, whether acting as the debtor in possession or as the Reorganized Debtor.

24. <u>DIP Loan</u>: the Post-Petition loan that was to be made by the Secured Lender to the Debtor pursuant to section 364 of the Bankruptcy Code.

25. <u>Disputed Claim</u>: a Claim that is represented by a Proof of Claim as to which an objection has been filed by any party in interest, or a Claim that is described in the Debtor's schedules as disputed, unliquidated, or contingent.

26. <u>Effective Date</u>: the first Business Day following the satisfaction of the conditions described in Section VII(D) of the Plan, but no later than January 18, 2013, except as described in Section VII(D) of the Plan.

27. <u>Equity Holder</u>: Hotel Allerton Mezz, LLC, the sole member of, and sole holder of an Interest in, the Debtor.

28. <u>Estate</u>: the estate that was created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

29. <u>Existing Loan Documents</u>: the Senior Loan Agreement, Guaranty, and all other documents made and entered into by the Debtor, the lenders, and their successors and assigns to evidence, govern, or secure the Senior Loan.

30. <u>Final Order</u>: an order or judgment of the Bankruptcy Court (or any alteration, modification or amendment thereto), the implementation, operation, or effect of which has not been stayed and as to which the time to appeal or seek review, rehearing or issuance of a *writ of certiorari* has expired, and as to which no appeal or petition for review, reconsideration, rehearing or issuance of *writ of certiorari* has been taken or is still pending.

31. <u>Foreclosure Proceeding</u>: the foreclosure lawsuit that is captioned *DiamondRock Allerton Owner, LLC v. Alt Hotel, LLC*, is designated Case No. 10 CH 18859 (Atkins, J.), and is currently pending (although stayed under section 362 of the Bankruptcy Code) in the Circuit Court of Cook County, Illinois, Chancery Division.

32. <u>General Unsecured Claims</u>: all Unsecured Claims, other than any Unclassified Claims, any Administrative Expense Claims, any Priority Tax Claims, or any claims other than Administrative Expense Claims that are otherwise entitled to priority under section 507 of the Bankruptcy Code.

33. <u>Governmental Unit</u>:  any governmental unit, agency, or entity that is the holder of a Claim that is not a Secured Claim and that is otherwise entitled to treatment as a Priority Claim pursuant to section 507(a)(8) of the Bankruptcy Code.

34. <u>Guaranty</u>:  that certain Guaranty Agreement that was dated as of October 1, 2010, executed by PS CDO Manager, LLC, and given to the Secured Lender.

35. <u>Guaranty Litigation</u>:  the lawsuit that is captioned *DiamondRock Allerton Owner, LLC v. PS CDO Manager, LLC*, is designated Index No. 652224/2011, and is currently pending in the Supreme Court of the State of New York, County of New York.

36. <u>Hotel</u>:  the Allerton Hotel, an operating hotel that is owned by the Debtor and located at 701 North Michigan Avenue, Chicago, Illinois.

37. <u>Interest</u>:  the membership interest of the Equity Holder in the Debtor, which constitutes the sole membership interest in the Debtor.

38. <u>Lockbox Cash</u>: all cash held in the lockbox account and/or cash management account maintained by KeyBank as servicer pursuant to the Existing Loan Documents on the Effective Date.

39. <u>Management Agreement</u>:  that certain Hotel Management Agreement dated November 9, 2006 between the Debtor and Manager, or such other replacement agreement for the management of the business operations of the Hotel into which the Debtor shall enter in accordance with the Amended and Restated Loan Documents.

40. <u>Manager</u>:  Kokua Hospitality, LLC, the current manager of the Hotel pursuant to the Management Agreement or such other manager of the Hotel as shall be selected by the Debtor in accordance with the Amended and Restated Loan Documents.

41. <u>Notice and Hearing</u>:  legal proceedings in the Bankruptcy Court as described in section 102(1) of the Bankruptcy Code.

42. <u>Petition Date</u>: May 5, 2011, the date upon which the Debtor commenced this Chapter 11 Case.

43. <u>Plan</u>:  this Modified Second Amended Plan of Reorganization, as it may be amended or modified from time to time either by the filing of a further amended Plan by the Debtor or pursuant to an order of the Bankruptcy Court.

44. <u>Post-Petition</u>:  occurring after the Petition Date.

45. <u>Principal Paydown</u>:  $5,000,000 as partial payment of the Allowed Secured Claim of the Secured Lender.

46. <u>Priority Tax and Duty Claims</u>:  Allowed unsecured claims of governmental units which are entitled to priority under section 507(a)(8) of the Bankruptcy Code.

47. <u>Professional Persons</u>:  any and all Persons that have been employed and/or that are to be compensated or reimbursed pursuant to any of sections 326, 327, 328, 330 or 1103 of the Bankruptcy Code.

48. <u>Pro Rata</u>:  proportionally, so that the ratio of the amount that is distributed on account of a particular Allowed Claim to the amount of such Allowed Claim is the same as the ratio of the amount distributed on account of all Allowed Claims in the Class of which such particular Allowed Claim is a member to the aggregate amount of all Allowed Claims in such Class.

49. <u>Reorganized Debtor</u>:  following the Effective Date, the Debtor as reorganized pursuant to the Plan.

50. <u>Schedules</u>:  the schedules, statement of financial affairs, and lists filed by the Debtor on and after the Petition Date pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended.

51. <u>Secured Claim</u>:  a Claim that is a secured by a duly-perfected mortgage, security interest, or lien against property of the Debtor and that is quantified in accordance with section 506(a) of the Bankruptcy Code.

52. <u>Secured Lender</u>:  DiamondRock Allerton Owner, LLC.

53. <u>Senior Loan</u>:  $79,000,000 loan obtained by the Debtor in November 2006 pursuant to the Senior Loan Agreement.

54. <u>Senior Loan Agreement</u>:  the Loan Agreement dated as of November 9, 2006 by and between the Debtor and Column Financial, Inc. (as amended on March 21, 2007 by the First Amendment to Loan Agreement, and further amended on November 6, 2009 by the Second Amendment to Loan Agreement.

55. <u>Seasonality Reserve</u>: the reserve created on the Effective Date pursuant to the Amended and Restated Loan Agreement which shall be available to cover shortfalls in cash flow available to pay operating expenses, interest and certain reserves in any given month following the Effective Date.

**B.**        **Rules of Interpretation.**

The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan.

## ARTICLE III

### CLASSIFICATION OF CLAIMS AND INTERESTS

1. <u>Unclassified Claims</u>:  Administrative Expense Claims and Priority Tax and Duty Claims.

2. <u>Class 1</u>:  the Secured Claim of the Secured Lender, the amount of which is in dispute.

3. <u>Class 2</u>:  any Secured Claim other than the Class 1 Claim of the Secured Lender including, but not limited to, the claim of any "lessor" under a "financing lease" or "capital lease."

4. <u>Class 3</u>:  General Unsecured Claims.

5. <u>Class 4</u>:  the Interest of the Equity Holder.

### ARTICLE IV

### TREATMENT OF UNCLASSIFIED CLAIMS AND CLASSES OF CLAIMS AND INTERESTS UNDER THE PLAN

A.        **Unclassified Claims**

1. <u>Administrative Expense Claims</u>.  Pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, each Allowed Administrative Expense Claim, with the exception of each Administrative Expense Claim of a Professional Person, shall be paid in full on or before the Effective Date or pursuant to terms that are otherwise agreed to by the Debtor and the holder of such claim.  Each Administrative Expense Claim of a Professional Person shall be paid in full within fourteen (14) days after the entry of a Final Order by the Bankruptcy Court allowing the application for compensation and reimbursement of such Professional Person.  Professional Persons shall file their final fee and expense applications no later than ten (10) business days following the entry of the Confirmation Order.

2. <u>Priority Tax and Duty Claims</u>.  Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Allowed Priority Tax and Duty Claim shall be paid in full on or before the Effective Date or pursuant to terms that are otherwise agreed to by the Debtor and the holder of such Claim.

B.        **Classified Claims and Interests**

1. <u>Class 1</u>:  Secured Claim of Secured Lender.

The Class 1 Secured Claim of the Secured Lender, which is impaired under the Plan, shall be treated as follows:

(a) The Secured Lender will retain all of its liens and security interests in property of the Debtor, which liens and security interests will have the same priority and validity as the pre-petition liens and security interests of the Secured Lender

(b) The amount of the Allowed Secured Claim of the Secured Lender shall be $71,000,000. After the Principal Paydown to be made on the Effective Date, the principal balance of the Secured Claim of the Secured Lender shall be in the amount of $66,000,000 under the Amended and Restated Loan Agreement ("New Principal Balance"). All interest and/or adequate protection payments made to Secured Lender during the pendency of the Debtor's bankruptcy case shall be deemed valid interest payments and thus, shall not be applied to reduce the amount of the Allowed Secured Claim of the Secured Lender.

(c) The New Principal Balance will bear interest at the rate of 5.5% percent per annum ("New Interest Rate"), which interest will be payable to the Secured Lender monthly, for a period of forty-eight (48) months from the Effective Date. ("Secured Loan Payment Commencement Date") provided that the Borrower may elect to extend the term by one year if (i) Borrower pays an extension fee equal to one percent (1%) of the principal balance on the date of the extension, and (ii) the property shall have achieved a minimum Debt Service Coverage Ratio of 1.20x for the twelve (12) months preceding the extension date based solely upon interest only payments and no amortization.

(d) All other terms and conditions relating to the treatment of the Allowed Secured Claim of the Secured Lender shall be set forth in the Amended and Restated Loan Documents, which shall be executed, delivered, and (where appropriate) recorded in order to memorialize and give effect to the provisions of the Plan insofar as such provisions relate to the treatment of the Secured Lender under the Plan.

(e) Upon the entry of the Confirmation Order, the Contract Litigation, Foreclosure Proceeding and the Guaranty Litigation shall each either be dismissed with prejudice, or the Debtor and the Secured Lender will take such action as is necessary to dismiss with prejudice such litigation and proceedings. All claims asserted therein shall be released and deemed satisfied, provided, however, that upon the Effective Date, the Guaranty will be replaced and superseded by the Amended and Restated Guaranty.

2.  Class 2:  Other Secured Claims

These Claims, if any, are unimpaired under the Plan.  Each holder of an Allowed Other Secured Claim, if any, shall retain, unaltered, the legal, equitable and contractual rights (including any liens that secure such Claim) to which such Claim entitles each such holder and such Allowed Other Secured Claim, if any, shall be reinstated as of the Effective Date.

3.  Class 3:  General Unsecured Claims.

These Claims are impaired under the Plan.  Each holder of an Allowed General Unsecured Claim shall receive fifty percent (50%) of the amount of such holder's Allowed General Unsecured Claim on the Effective Date and fifty percent (50%) of the balance of such holder's Allowed General Unsecured Claim, together with interest computed at the rate of five percent (5%) per annum, one hundred eighty (180) days after the Effective Date.

4.  Class 4:  Interest of Equity Holder.

The Interest of the Equity Holder is unimpaired.

**C.**          **Impairment of Classes and Interest.**

The Claims and/or Interests comprising Classes 1 and 3 are impaired under the Plan (each, an "Impaired Class").  Pursuant to the provisions of section 1129(b) of the Bankruptcy Code, in the event an Impaired Class does not accept the Plan, the Debtor requests that the Court enter an order confirming the Plan without the acceptance of such Impaired Class pursuant to section 1129(b) of the Bankruptcy Code.  All holders of Claims in Class 2, if any, and the holder of the Class 4 Interest, are deemed to have accepted the Plan.

## ARTICLE V

## CLAIMS OBJECTIONS AND TREATMENT OF DISPUTED CLAIMS

**A.**          **Administration of Claims**

Each Claim shall be allowed or disallowed, as the case may be, in such amount as the Court shall determine, whether prior to or following Confirmation, and whether pursuant to this Plan or otherwise, upon such notice as the Bankruptcy Court or Bankruptcy Rules shall permit, except that (i) after the Effective Date, the Reorganized Debtor may settle or compromise any controversies regarding Claims without notice or further order of the Court and (ii) pursuant to section 502(d) of the Bankruptcy Code, any Claims held by any entities from which property is recoverable under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that are transferees of transfers that are avoidable under sections 544, 545, 547, 548 or 549 of the Bankruptcy Code, are deemed disallowed and the holders thereof may not vote to accept or to reject the Plan unless such entities or transferees have paid the amount, or turned over any such property, for which such entities or transferees are liable under section 542, 550 or 553 of the Bankruptcy Code.

**B.**          **Claims Assigned to Reorganized Debtor.**

On the Effective Date, the Debtor shall be deemed to have assigned to the Reorganized Debtor, and the Reorganized Debtor shall be deemed to have acquired and become the successor to, all causes of action, claims, lawsuits, defenses, counterclaims and setoffs, whether equitable or legal, available to the Debtor as of the Effective Date, including all claims of the Debtor for relief against any other person existing as of the Effective Date.  Any objection to Claims must be filed and served in accordance with Bankruptcy Rule 3007; provided, however, that the foregoing limitations do not apply to any Claims filed subsequent to Confirmation.

**C.**          **No Distribution on Disputed Claims.**

Notwithstanding any provision of the Plan specifying the time for payment of distributions to holders of claims, no payment, dividend, or distribution shall be made to the holder of any Disputed Claim until the time such Claim has been determined to be an Allowed Claim.  Notwithstanding the existence of a Disputed Claim in a Class to which a distribution under this Plan is due, such distribution to other creditors shall not be affected by any delay in the resolution of the Disputed Claim.  Upon the allowance of any Disputed Claim, the holder shall be paid the amount that such holder would have received had its Claim been an Allowed Claim on the Effective Date.

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**          **Assumption of Executory Contracts and Unexpired Leases.**

Except for any unexpired lease or executory contract that the Debtor rejects or designates as being subject to rejection on or before the Effective Date, all executory contracts and unexpired leases not previously assumed by the Debtor pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtor and the Plan shall constitute a motion to assume such executory contracts and unexpired leases to which the Debtor is a party.  Subject to (i) appropriate notice being provided to non-debtor counterparties to executory contracts and unexpired leases of the Debtor's assumption of their respective contracts or leases and any cure amounts in accordance with subsection C below and (ii) occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute provisional approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a preliminary finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtor, the Estate and all parties in interest in the Reorganization Case.  With respect to each such executory contract or unexpired lease assumed by the Debtor, unless otherwise determined by the Bankruptcy Court pursuant to Final Order or agreed to by the parties in accordance with the procedure described in subsection C below, any defaults of the Debtor with respect to such assumed executory contracts or unexpired leases existing as of the Effective Date shall be cured in the ordinary course of the business of the Reorganized Debtor promptly after any such default becomes known to the Debtor and, if disputed, established pursuant to applicable law by the Bankruptcy Court, and the assumed executory contracts and unexpired

leases shall be binding and enforceable upon the parties thereto, subject to the rights and defenses existing under each such executory contract and unexpired lease.

**B.**          **Reservation of Rejection Rights.**

Notwithstanding subpart A of this Article VI, the Debtor may reject any executory contract or unexpired lease listed on an exhibit to be provided to the Bankruptcy Court and served on all creditors and other parties in interest no later than five (5) business days prior to the Confirmation Hearing.  Any such exercise of the right to reject an unexpired lease of real property under which the Reorganized Debtor is a lessor shall entitle the lessee to all rights under section 365(h) of the Bankruptcy Code, unless otherwise agreed to in writing by the Reorganized Debtor and the particular lessee.

**C.**          **Notice of Assumption.**

No later than five (5) business days after entry of the Confirmation Order, the Debtor shall provide written notice (the "Assumption Notice") of Confirmation to all counterparties to any executory contract or unexpired lease with the Debtor of (i) the Debtor's provisional assumption of each such counterparty's executory contract or unexpired lease with the Debtor pursuant to the Confirmation Order, (ii) any cure amount necessary to be paid to any such counterparty pursuant to the provisions of section 365 of the Bankruptcy Code and (iii) any other rights such counterparty may have with respect to the Debtor's assumption of the particular executory contract or unexpired lease.  Not later than fourteen (14) days after service of the notice described in the first sentence of this subsection C (the "Assumption Objection Bar Date"), any counterparty to an executory contract or unexpired lease with the Debtor shall file any objection it may have to assumption of the particular counterparty's executory contract or unexpired lease, including any objection the counterparty may have to the cure amount set forth in the Assumption Notice or objection based on adequate assurance of future performance, and serve the objection on undersigned counsel for the Debtor, counsel for the Secured Lender and the Office of the United States .  To the extent that any such counterparty to any executory contract or unexpired lease with the Debtor fails to file an objection, each such executory contract or unexpired lease shall be deemed assumed as of the date of Confirmation in accordance with subsection A above.  To the extent that any such counterparty to any executory contract or unexpired lease with the Debtor files and serves an objection, the Bankruptcy Court shall determine the merits of the objection and any response of the Debtor and enter a Final Order regarding the assumption of that particular executory contract or unexpired lease.  The pendency of any dispute over assumption of a particular executory contract or unexpired lease shall not constitute a bar to the occurrence of the Effective Date.

# ARTICLE VII

## MEANS FOR EXECUTION OF THE PLAN

**A.**          **Dismissal of All Litigation**

Upon the entry of the Confirmation Order, the Contract Litigation, Foreclosure Proceeding and the Guaranty Litigation shall be dismissed with prejudice in accordance with Article IV.B.1.e.  All claims asserted therein shall be released and deemed satisfied, provided,

however, that the Guaranty will be replaced and superseded by the Amended and Restated Guaranty.

**B.**          **Amended and Restated Loan Documents**

All Amended and Restated Loan Documents that have not otherwise been filed with the Court as Exhibit 1 to the Plan, shall be on terms substantially in the same form as the Existing Loan Documents, with changes necessary to conform to the terms and conditions of the Amended and Restated Loan Agreement, and shall be filed with the Court no less than one (1) Business Day prior to the Effective Date with the consent of the Secured Lender, whose consent shall not be unreasonably withheld. Prior to and until the Effective Date, the Debtor and the Secured Lender agree that the material terms and conditions of the Existing Loan Documents will govern their relationship.

**C.**          **Effective Date**

The conditions to effectiveness of the Plan shall be:

1.   the payment of the Principal Paydown by the Equity Holder;

2.   the payment of the Lockbox Cash into the Seasonality Reserve and payment of $1,500,000 by the Equity Holder into the Seasonality Reserve;

3.   any default under the Modified Cash Collateral Order shall have been timely cured; and

4.   the filing of the Amended and Restated Loan Documents with the Court, as described in Section VII(C).

In the event that any of the conditions described in this Section are not satisfied by January 18, 2013, then the Effective Date of the Plan shall not occur and the Court shall enter such Final Orders as are necessary to facilitate the sale of the Hotel pursuant to section 363 of the Bankruptcy Code. Such Final Orders shall provide for, among other things, that (A) the auction for the sale of the Hotel shall occur no later than February 28, 2013; (B) the hearing to approve the sale of the Hotel shall occur no later than March 15, 2013; (C) the Secured Lender shall be permitted to "credit bid" the full amount of its Allowed Secured Claim ($71,000,000) pursuant to section 363(k) of the Bankruptcy Code; and (D) the Debtor shall not be permitted any further extensions of the exclusivity periods for the purpose of proposing or soliciting alternative chapter 11 plans. Notwithstanding the foregoing, in the event that (1), (2) and (3) above have been satisfied and the Court has not entered a Final Order pursuant to Section VII(C) of the Plan, then the Effective Date shall be one business day following the filing of the Amended and Restated Loan Documents.

**D.**          **Assumption of Executory Contracts and Unexpired Leases**

The Debtor shall proceed with the resolution of any disputes with respect to the assumption of executory contracts or unexpired leases in accordance with Article VI above. The Debtor may amend the terms and conditions of any executory contract or unexpired lease to

resolve any objection to the Debtor's assumption of the contract or lease and the Debtor may enter into other supplemental and ancillary documents necessary for implementation of the Plan without any additional approval of the Bankruptcy Court.

E.          **Amended and Restated Cash Management Agreement**

If, and to the extent that, the Debtor and Secured Lender deem it appropriate to enter into an Amended and Restated Cash Management Agreement, they may do so without the approval or execution of such Amended and Restated Cash Management Agreement by the Manager or any successor to the Manager.  Any such Amended and Restated Cash Management Agreement shall supersede and replace the existing Cash Management Agreement.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

A.          **Vesting of Assets.**

Upon the Effective Date, all assets of the Estate shall be vested in the Reorganized Debtor in accordance with section 1141 of the Bankruptcy Code, and no further order of the Court shall be necessary for the Reorganized Debtor to perform such acts as are within the ordinary scope of its business and/or necessary to carry out the purposes or intent of this Plan.

B.          **Unmarked Ballots.**

Executed ballots respecting the Plan returned by Creditors to the Debtor that do not indicate acceptance or rejection of the Plan shall be deemed and counted as acceptance of the Plan.

C.          **Negotiated Distribution Checks.**

Pursuant to section 347 of the Bankruptcy Code, ninety (90) days after any distribution to any creditor by the Reorganized Debtor provided for herein, the Reorganized Debtor shall stop payment on any check on such distribution remaining unpaid to a holder of an Allowed claim and funds shall be returned to the Reorganized Debtor.  From and after the date the Reorganized Debtor stops payment on any distribution check pursuant to this paragraph, the holder of the Allowed claim on account of which such check was issued shall be entitled to receive no further distributions on account of his/her/its claim and such holder's Allowed claim shall thereupon be deemed satisfied in full.

D.          **Mailing List; Returned Distribution Checks.**

The official listing of creditor identities and mailing addresses is maintained by the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Northern District of Illinois (the "Official Mailing List").  It shall be the obligation of each creditor and/or party in interest to assure that the Official Mailing List is current and accurate as to each such person or entity.  In the event that a distribution check, that has been properly posted to the creditor's address as set forth in the Official Mailing List, is returned as undeliverable by the United States Postal

Service, the Reorganized Debtor shall be authorized, but not required, to avoid such check with the applicable funds becoming subject to further distribution pursuant to this Plan, and the Claim of such creditor being deemed satisfied in full.

**E.        Administrative Claims Bar Date.**

The deadline for submission of all Claims entitled to administrative priority, with the exception of fees and costs of Professional Persons, shall be thirty (30) days following Confirmation.  Failure to file a Claim by this date shall conclusively bar the claimant from asserting his Claim, which Claim shall be forever discharged.

**F.        Employment of Professional Persons.**

The Reorganized Debtor shall be authorized to employ and compensate Professional Persons following Confirmation upon such terms as the Reorganized Debtor deems reasonable and appropriate without further notice or order of the Court.  All final applications for compensation for legal services rendered prior to Confirmation and reimbursement of actual and necessary expenses shall be filed and served on the Reorganized Debtor and Office of the United States Trustee within ten (10) Business Days following the entry of the Confirmation Order.

**G.        Treatment of Negotiable Instruments.**

Any negotiable instrument held by the holder of an Allowed Claim shall be deemed exchanged, canceled, or satisfied, as the case may be, on the Effective Date.

**H.        Timely Payments.**

The Reorganized Debtor shall make all payments required under the Plan and applicable law on a timely basis.

**I.        Stay of Confirmation Order Shall Not Apply.**

The stay of enforceability of Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall not apply, and the order of Confirmation shall be enforceable according to its terms absent further order of the Court.

## ARTICLE IX

### SATISFACTION OF INDEBTEDNESS, DISCHARGE OF CLAIMS AND RELATED PROVISIONS

**A.        Satisfaction of Indebtedness and Discharge of Claims.**

The distribution made to the various classes of creditors as provided for in this Plan shall be in full and complete satisfaction of their Allowed Claims.  Except to the extent provided for in this Plan, Confirmation shall operate, upon the Effective Date, as a discharge of any and all debts and claims as defined in section 101(5) of the Bankruptcy Code against the Debtor or Debtor in Possession that arose at any time prior to Confirmation.  The discharge of the Debtor and the

discharge of claims against the Debtor, whether asserted against the Debtor or the Debtor in Possession, shall be effective as to each claim, regardless of whether or not (a) the claim was scheduled, (b) a proof of claim was filed, (c) the claim is an Allowed Claim or (d) the holder thereof voted to accept the Plan.

**B.**         **Release of Liabilities under Guaranty and Related Injunction.**

**AS OF THE EFFECTIVE DATE, AND IN CONSIDERATION FOR PS CDO MANAGER, LLC'S AGREEMENT TO ACT AS GUARANTOR UNDER THE AMENDED AND RESTATED GUARANTY, THE SECURED LENDER SHALL BE DEEMED TO HAVE FOREVER RELEASED, WAIVED AND DISCHARGED ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DEMANDS, DEBTS, CAUSES OF ACTION AND LIABILITIES SECURED LENDER MAY HAVE AGAINST PS CDO MANAGER, LLC WITH RESPECT TO THE GUARANTY AND SHALL BE PERMANENTLY ENJOINED FROM ANY ACTION TO ENFORCE THE GUARANTY.**

**C.**         **Exculpation.**

As of the Effective Date, the Debtor, the Equity Holder, and their affiliates, and each of their respective present or former officers, members, employees, accountants, advisors, attorneys, consultants, experts or other agents, shall not have or incur any liability to any entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan or other related document, the pursuit of Confirmation, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan. The Debtor and Equity Holder shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and any related document. In no event shall any party exculpated from liability under this section be exculpated from liability in the case of gross negligence, fraud or willful misconduct.

**D.**         **No Liability for Solicitation or Participation.**

Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the persons who have solicited acceptances or rejections of the Plan (including the Debtor and Equity Holder, and each of their respective present or former officers, members, employees, accountants, advisors, attorneys, consultants, experts or other agents) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation or for violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan.

## ARTICLE X

## MODIFICATION OF THE PLAN

Pursuant to the provisions of section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor and Reorganized Debtor reserve the right to modify or alter the provisions of the Plan at any time prior to or subsequent to Confirmation, subject to the provisions of Bankruptcy Code and the Bankruptcy Rules and the consent of the Secured Lender.

## ARTICLE XI

## RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Notwithstanding the entry of the Confirmation Order, until notice of the Effective Date,, the Bankruptcy Court shall retain jurisdiction to ensure that the purposes and intent of the Plan are carried out. Without limiting the generality of the foregoing, the Court shall retain jurisdiction for the following purposes:

1. Fixing and allowing any Claim as a cost and expense of the administration of the Chapter 11 Case.

2. Reconsidering the allowance of any Claim that has been allowed.

3. Hearing and determining any objection to a Claim. The failure of the Debtor to object to, or to examine any claim for the purpose of voting, shall not be deemed to be a waiver of the Debtor's right to object to any claim in whole or in part.

4. Hearing and determining any action brought by the Debtor seeking to avoid any transfer of an interest of the Debtor in property, or any obligation incurred by Debtor, that is avoidable pursuant to applicable law.

5. Hearing and determining all causes of action, controversies, disputed, or conflicts between or among the Debtor and any other party, including those that were pending prior to entry of the Confirmation Order.

6. Correcting any defect, curing any omission, or reconciling any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan.

7. Hearing and determining any action brought by the Debtor to protect the Debtor and the Estate from actions of creditors, or other parties-in-interest.

8. Issuing any order that may be necessary to implement the Plan or Confirmation Order, including without limitation, such declaratory judgments and injunctive orders as are appropriate to protect the Debtor, the Estate and the Reorganized Debtor from actions of creditors, or other parties in interest.

9. Hearing and determining any dispute relating to the terms or implementation of the Plan or Confirmation Order, or the rights and obligations of any parties in interest with respect thereto.

10. Hearing and determining the merits of any objection to the Debtor's assumption of any executory contract or unexpired lease and entering Final Orders regarding same.

11. The modification of the Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code in accordance with Article X above.

## ARTICLE XII

### ENTRY OF CLOSING ORDER BY THE BANKRUPTCY COURT

The Bankruptcy Court shall enter an order concluding and terminating the Reorganization Case upon application of the Reorganized Debtor.

Dated this 29th day of October, 2012.

ALT Hotel, LLC

By:    Hotel Allerton Mezz, LLC, Sole Member of ALT Hotel, LLC

By:    _____ */s/ Joseph Iacono*_____
        Joseph Iacono, Authorized Signatory,
        Hotel Allerton Mezz, LLC, Sole Member

EXHIBIT 1

Amended and Restated Loan Agreement

## AMENDED AND RESTATED LOAN AGREEMENT

**By and between**


**ALT HOTEL, LLC,**
**as Borrower,**


**and**


**DIAMONDROCK ALLERTON OWNER, LLC,**
**as Lender**


**Dated as of [_____], 2012**

# TABLE OF CONTENTS

**Page**

ARTICLE 1     DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................2

    Section 1.1     Definitions........................................................................................2
    Section 1.2     Principles of Construction.............................................................27

ARTICLE 2     GENERAL TERMS..........................................................................27

    Section 2.1     Loan Commitment; Disbursement to Borrower .............................27
    Section 2.2     Interest Rate ..................................................................................28
    Section 2.3     Loan Payment ...............................................................................29
    Section 2.4     Prepayments..................................................................................30
    Section 2.5     Release of Property .......................................................................31
    Section 2.6     Cash Management..........................................................................31
    Section 2.7     Extension of the Initial Maturity Date ..........................................35

ARTICLE 3     CONDITIONS PRECEDENT ..........................................................36

    Section 3.1     Conditions Precedent to Closing....................................................36

ARTICLE 4     REPRESENTATIONS AND WARRANTIES..................................38

    Section 4.1     Borrower Representations..............................................................38
    Section 4.2     Survival of Representations ...........................................................46
    Section 4.3     Approval of Bankruptcy Court ......................................................46

ARTICLE 5     BORROWER COVENANTS...........................................................46

    Section 5.1     Affirmative Covenants...................................................................46
    Section 5.2     Negative Covenants ......................................................................60
    Section 5.3     Hotel.............................................................................................65

ARTICLE 6     INSURANCE; CASUALTY; CONDEMNATION; REQUIRED
                   REPAIRS .......................................................................................65

    Section 6.1     Insurance......................................................................................65
    Section 6.2     Intentionally Omitted ...................................................................68
    Section 6.3     Miscellaneous ...............................................................................68
    Section 6.4     Casualty........................................................................................70
    Section 6.5     Condemnation ...............................................................................70
    Section 6.6     Restoration ....................................................................................70

ARTICLE 7        RESERVE FUNDS .................................................................75

    Section 7.1    Intentionally Omitted ...................................................75
    Section 7.2    Escrow Funds ...............................................................75
    Section 7.3    FF&E Reserve Funds .....................................................76
    Section 7.4    Intentionally Omitted ...................................................77
    Section 7.5    Seasonality Reserve Funds ...........................................77
    Section 7.6    Operating Expense Account ..........................................78
    Section 7.7    Excess Cash Flow Account ...........................................78
    Section 7.8    Reserve Funds, Generally .............................................78
    Section 7.9    Letters of Credit ...........................................................80

ARTICLE 8        DEFAULTS ...........................................................................81

    Section 8.1    Event of Default ...........................................................81
    Section 8.2    Remedies ......................................................................83

ARTICLE 9        SPECIAL PROVISIONS .......................................................85

    Section 9.1    Sale of Note ..................................................................85
    Section 9.2    Intentionally Omitted ...................................................85
    Section 9.3    Intentionally Omitted ...................................................85
    Section 9.4    Exculpation ..................................................................85
    Section 9.5    Matters Concerning Manager and Franchisor ................87
    Section 9.6    Servicer ........................................................................87
    Section 9.7    Intentionally Omitted ...................................................88
    Section 9.8    Intentionally Omitted ...................................................88

ARTICLE 10       MISCELLANEOUS ...............................................................88

    Section 10.1    Survival .......................................................................88
    Section 10.2    Lender's Discretion .....................................................88
    Section 10.3    Governing Law ............................................................88
    Section 10.4    Modification, Waiver in Writing ..................................90
    Section 10.5    Delay Not a Waiver .....................................................90
    Section 10.6    Notices ........................................................................90
    Section 10.7    Trial by Jury ................................................................91
    Section 10.8    Headings .....................................................................91
    Section 10.9    Severability .................................................................91
    Section 10.10   Preferences ..................................................................92
    Section 10.11   Waiver of Notice .........................................................92
    Section 10.12   Intentionally Omitted ..................................................92
    Section 10.13   Expenses; Indemnity ...................................................92
    Section 10.14   Schedules Incorporated ...............................................93
    Section 10.15   Offsets, Counterclaims and Defenses ...........................93
    Section 10.16   No Joint Venture or Partnership; No Third Party Beneficiaries .....................93

Section 10.17  Publicity ......................................................................................94
Section 10.18  Waiver of Marshalling of Assets ..................................................94
Section 10.19  Waiver of Offsets/Defenses/Counterclaims...................................94
Section 10.20  Conflict; Construction of Documents; Reliance ............................94
Section 10.21  Brokers and Financial Advisors....................................................95
Section 10.22  Prior Agreements .........................................................................95
Section 10.23  Duplicate Originals, Counterparts ...............................................95

**SCHEDULES AND EXHIBITS**

| | |
|---|---|
| Schedule I | Leases |
| Schedule II | Intentionally Omitted |
| Schedule III | Organizational Structure |
| Schedule IV | Intentionally Omitted |
| Schedule V | Intentionally Omitted |
| Schedule VI | List of Approved Managers, Approved Cash Management Managers and Hotel Companies |
| Schedule VII | Intentionally Omitted |
| Schedule VIII | Intentionally Omitted |
| Schedule IX | Intentionally Omitted |
| Schedule X | Union Contracts |
| | |
| Exhibit A | Legal Description |
| Exhibit B | Form of Replacement Guaranty |

## AMENDED AND RESTATED LOAN AGREEMENT

THIS AMENDED AND RESTATED LOAN AGREEMENT, dated as of [_____], 2012 (as amended, restated, replaced, supplemented or otherwise Modified from time to time, this "**Agreement**"), is entered into by and among **DIAMONDROCK ALLERTON OWNER, LLC**, a Delaware limited liability company, having its principal place of business at 6903 Rockledge Drive, Suite 800, Bethesda, Maryland 20817 (together with its successors and assigns, "**Lender**") and **ALT HOTEL, LLC**, a Delaware limited liability company, having its principal place of business at c/o Petra Capital Management LLC, 1370 Avenue of the Americas, 23rd Floor, New York, New York 10019 ("**Borrower**").

### W I T N E S S E T H :

WHEREAS, Lender, as successor-in-interest to U.S. Bank National Association (successor-in-interest to Wells Fargo Bank, N.A.), as trustee for the beneficial holders of the Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-TLF1 ("**Second Original Lender**"), as successor-in-interest to Column Financial, Inc., as Tranche A Lender, and Column Financial, Inc., as Tranche B Lender (collectively, "**Original Lender**") made a loan to Borrower in the original principal amount of up to $79,000,000 (the "**Original Loan**"), pursuant to that certain Loan Agreement, dated as of November 9, 2006 (the "**Original Closing Date**"), by and between Original Lender and Borrower, as amended pursuant to that certain First Amendment to Loan Agreement, dated as of March 21, 2007, by and between Original Lender and Borrower, that certain Second Amendment to Loan Agreement, dated as of November 6, 2009, by and between Second Original Lender and Borrower (collectively, the "**Original Loan Agreement**");

WHEREAS, Borrower initiated a chapter 11 proceeding entitled In re: ALT Hotel LLC (Case No. 11-19401) (the "**Bankruptcy Proceeding**") in the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division) (the "**Bankruptcy Court**");

WHEREAS, the Bankruptcy Proceeding was resolved through an amended plan of reorganization (the "**Plan of Reorganization**") filed in the Bankruptcy Proceeding on October [__], 2012 and confirmed on October [__], 2012 by an order entered by the Bankruptcy Court (the "**Confirmation Order**");

WHEREAS, Lender initiated proceedings captioned DiamondRock Allerton Owner, LLC v PS CDO Manager, LLC, designated as Index No. 652224/2011 before the Supreme Court of the State of New York, County of New York (the "**New York Proceeding**");

WHEREAS, Borrower initiated proceedings captioned ALT Hotel, LLC, et al v. DiamondRock Allerton Owner, LLC, designated as Adv. No. 11-01469 filed before the Bankruptcy Court (the "**Equitable Subordination Litigation**");

WHEREAS, simultaneously with the execution of this Agreement, the Bankruptcy Proceeding, the New York Proceeding and the Equitable Subordination Litigation will be dismissed with prejudice;

1

WHEREAS, simultaneously with the execution of this Agreement, and as a condition to the effectiveness of this Agreement and the Plan of Reorganization, Borrower is making a payment to Lender in the amount of Five Million Dollars ($5,000,000) under the Original Loan (the "**Original Loan Paydown**"), reducing the Outstanding Principal Balance of the Loan to Sixty-Six Million Dollars ($66,000,000);

WHEREAS, simultaneously with the execution of this Agreement, Borrower is making a deposit into the Seasonality Reserve the amount of One Million Five Hundred Thousand Dollars ($1,500,000) pursuant to Section 7.5.1 hereof;

WHEREAS, Lender and Borrower are willing to amend and restate the terms of the Original Agreement in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the covenants, agreements, representations and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE 1

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions.    For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with, such Person.

"**Affiliated Manager**" shall mean any Manager in which Borrower, Principal or any Sponsor has, directly or indirectly, any legal, beneficial or economic interest.

"**Aggregate Outstanding Principal Balance**" shall mean, as of any date, the Outstanding Principal Balance.

"**ALTA**" shall mean the American Land Title Association, or any successor thereto.

"**Alterations**" shall mean physical alterations to the Property but shall exclude the addition, replacement and/or upgrading of FF&E.

"**Amortization Payment**" shall mean an amount equal to (A) prior to the first Permitted Transfer, one hundred percent (100%) of all funds on deposit in the Cash Management Account as of the applicable Payment Date after payment of items (i) through (v) of Section 2.6.3(a), provided, however, in no event shall the total Amortization Payment in any Fiscal Year under this subsection (A) exceed the principal payments that would be paid during such Fiscal Year if the Outstanding Principal Balance was repaid at the Applicable Interest Rate on a thirty (30) year amortization schedule and (B) after a Permitted Transfer, twenty-five percent (25%) of all funds on deposit in the Cash Management Account as of the applicable Payment Date after payment of

items (i) through (v) of Section 2.6.3(a), provided, however, in no event shall the total Amortization Payment in any Fiscal Year under this subsection (B) exceed the principal payments that would be paid during such Fiscal Year if the Outstanding Principal Balance was repaid at the Applicable Interest Rate on a thirty (30) year amortization schedule.

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures as well as costs of preparing the financial reports required under Section 5.1.11 hereof, for the Property prepared by Borrower or the Manager, as applicable, for the applicable Fiscal Year or other period.

"**Applicable Interest Rate**" shall mean a fixed rate of five and one-half percent (5.5%).

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.11(d) hereof.

"**Approved Cash Management Manager**" shall mean each of the Persons designated as an Approved Cash Management Manager on Schedule VI hereto as long as at the time of such Person's appointment there has been no material adverse change in the business or condition, financial or otherwise, of such Person.

"**Approved Extraordinary Expense**" shall mean an Extraordinary Expense reasonably approved by Lender in writing after the occurrence and continuance of an Event of Default as provided in Section 5.1.11(e).

"**Approved Franchise Agreement**" shall mean a Franchise Agreement with an Approved Franchisor which is on arm's length, market terms, and reasonably approved by Lender.

"**Approved Franchisor**" shall mean any franchisor, licensor or similar Person owned or controlled by any Approved Manager, and reasonably approved by Lender.

"**Approved Institutional Investor**" shall mean an Institutional Investor reasonably acceptable to Lender (as confirmed in writing by Lender).

"**Approved Manager**" shall mean each of the Persons designated as an Approved Manager on Schedule VI hereto as long as at the time of such Person's appointment there has been no material adverse change in the business or condition, financial or otherwise, of such Person.

"**Approved Operating Expense**" shall mean an operating expense of the Property (which shall include, without limitation, all fees required to be paid to a manager pursuant to the Management Agreement) which is either (i) set forth on the Approved Annual Budget or (ii) if such operating expense is not included on the Approved Annual Budget, otherwise approved in writing by Lender (with such approval not to be unreasonably withheld, conditioned or delayed).

"**Approved Op Ex Disbursements**" shall have the meaning set forth in Section 7.6 hereof.

3

"**Approved Projections**" shall mean, for any applicable period, such projections of Net Cash Flow approved by Lender in writing (which such approval shall not be unreasonably withheld, conditioned or delayed).

"**Approved Replacement Reservation System**" shall mean any of (i) Pegasus (including Unirez, UTELL and Travel Click), (ii) Lexington, (iii) SRZ, or (iv) SynXis.

"**Approved Reservation Contract**" shall mean, collectively, (a) a contract with an Approved Replacement Reservation System for reservation services for the Property, which contract shall be in form and substance reasonably acceptable to Lender and (b) a recognition agreement and comfort letter in form and substance reasonably satisfactory to Lender, executed and delivered to Lender by Borrower and such Approved Replacement Reservation System.

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents (as the same has been amended, modified or assigned), dated as of the Original Closing Date, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Amended and Restated Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Lender, Borrower, and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assumption Transfer**" shall have the meaning set forth in Section 5.2.10(e) hereof.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited, petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee or examiner for such Person or any portion of the Property; or (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Code**" shall mean 11 U.S.C. §101 *et seq.*, as the same may be amended from time to time.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals to this Agreement.

4

"**Bankruptcy Proceeding**" shall have the meaning set forth in the Recitals to this Agreement.

"**Base Management Fee**" shall mean a per annum fee payable to Manager pursuant to the Management Agreement equal to 3% of Gross Receipts (as defined in the Management Agreement).

"**Basic Carrying Costs**" shall mean, for any period, the sum of the following costs: (a)Taxes, (b) Other Charges and (c) Insurance Premiums.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its permitted successors and assigns.

"**Borrower Recourse Liabilities**" shall have the meaning set forth in Section 9.4 hereto.

"**Breakage Costs**" shall have the meaning set forth in Section 2.2.3(h) hereof.

"**Building**" shall mean the building located upon the Land.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Calculation Date**" shall mean the first Payment Date occurring in each calendar quarter.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP and the Uniform System of Accounts (including expenditures for building improvements or major repairs).

"**Cash Management Account**" shall have the meaning set forth in Section 2.6.2(a) hereof.

"**Cash Management Agreement**" shall mean that certain Amended and Restated Cash Management Agreement, dated as of the date hereof, by and among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Casualty**" shall have the meaning set forth in Section 6.4 hereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 6.6 hereof

"**Casualty Retainage**" shall have the meaning set forth in Section 6.6 hereof

"**Certified Amount**" shall have the meaning set forth in Section 2.6.2(b) hereof

"**Change of Control Transfer**" shall have the meaning set forth in Section 5.2.10(d) hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

5

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade materially and adversely affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in <u>Section 6.6(b)</u> hereof.

"**Confirmation Order**" shall have the meaning set forth in the Recitals to this Agreement.

"**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage and the other Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled interest payments and principal payments (if any) due under this Agreement and the Note.

"**Debt Service Coverage Ratio**" shall mean a ratio for the applicable period in which:

(a)     the numerator is the Net Cash Flow for such period as set forth in the financial statements required hereunder; and

(b)     the denominator is the aggregate amount of interest due and payable on the Note for such period.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default and of which Borrower has actual notice.

"**Default Rate**" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) five percent (5%) above the Applicable Interest Rate.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in

6

the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's or "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch or S&P or "Aa2" by Moody's).

"**Embargoed Person**" shall have the meaning set forth in Section 4.1.35 hereof.

"**Environmental Indemnity**" shall mean that certain Amended and Restated Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Equipment**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Equitable Subordination Litigation**" shall have the meaning set forth in the Recitals to this Agreement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 2.6.3(a)(vii) hereof.

"**Excess Cash Flow Account**" shall mean a sub-account of the Cash Management Account established to hold Excess Cash Flow.

"**Excess Cash Flow Funds**" shall mean such amounts as are held in the Excess Cash Flow Account.

"**Excusable Delay**" shall have the meaning set forth in Section 6.6(b)(i)(D) hereof.

"**Extended Maturity Date**" shall have the meaning set forth in Section 2.7 hereof.

"**Extension Fee**" shall mean one percent (1.0%) of the Outstanding Principal Balance.

"**Extension Option**" shall have the meaning set forth in Section 2.7 hereof.

"**Extension Term**" shall have the meaning set forth in Section 2.7 hereof.

7

"**Extraordinary Expense**" shall have the meaning set forth in Section 5.1.11(e) hereof

"**FF&E**" shall have the meaning set forth in Section 7.3.1 hereof.

"**FF&E Reserve Funds**" shall have the meaning set forth in Section 7.3.1 hereof.

"**FF&E Monthly Deposit**" shall have the meaning set forth in Section 7.3.1 hereof.

"**FF&E Reserve Account**" shall mean a sub-account of the Cash Management Account established to hold FF&E Reserve Funds.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Fixed Maturity Date**" shall mean either (a) the Initial Maturity Date, or (b) if Borrower shall have properly exercised the Extension Option, the Extended Maturity Date, as applicable.

"**Foreclosure Proceeding**" shall mean the foreclosure lawsuit that is captioned DiamondRock Allerton Owner, LLC v. Alt Hotel, LLC, designated as Case No. 10 CH 18859 (Atkins, J.), before the Circuit Court of Cook County, Illinois, Chancery Division, other than as removed to the Bankruptcy Court.

"**Franchise Agreement**" shall mean (i) any Approved Franchise Agreement or (ii) to the extent Lender has granted its prior written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed, any franchise, license or similar agreement entered into after the date hereof by Borrower or any of its respective Affiliates with respect to all or any portion of the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, in each case subject to the terms and conditions set forth herein.

"**Franchisor**" shall mean (i) any Approved Franchisor or (ii) to the extent Lender has granted its prior written consent thereto, such consent not to be unreasonably withheld, or as otherwise permitted hereunder any franchisor, licensor or similar Person under any Franchise Agreement entered into after the date hereof with respect to all or any portion of the Property, together with their respective successors and assigns in such capacity, in each case subject to the terms and conditions set forth herein.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean, for any period, all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source during such period, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-through or reimbursements paid by tenants under the Leases of any nature, but excluding Rents from month-to-month tenants or tenants that are the subject of any Bankruptcy Action (with the exception of any Rents paid until such time as (i) any such tenant or tenants file a motion to assume or reject the relevant Lease(s), (ii) the deadline under the Bankruptcy Code by which such tenant or tenants must assume or reject the relevant Lease(s) expires, or (iii) any such tenant or tenants fail to pay Rents with respect to such Lease(s) on a timely basis) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, proceeds from the sale of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income insurance) and Condemnation Proceeds, any disbursements to Borrower from any of the Reserve Funds, any proceeds resulting from the sale, exchange, transfer, financing or refinancing of all or part of the Property and any investment income on funds not related to the normal operation of the Property.

"**Guarantors**" shall mean the guarantor under the Guaranty, and its successors and permitted assigns and the term "**Guarantor**" shall mean each of such guarantors.

"**Guaranty**" shall mean that certain Amended and Restated Guaranty Agreement made by PS CDO Manager, LLC for the benefit of Lender and dated as of the date hereof, which supersedes and replaces that certain Guaranty Agreement, dated as of October 1, 2010, made by PS CDO Manager, LLC for the benefit of Lender, which is deemed null and void and of no further force and effect.

"**Historic District Regulations**" shall mean, collectively, (i) that certain Ordinance passed by the City Council of the City of Chicago at the regular meeting held on the 29th day of April, 1998, as recorded on June 18, 1998 as document number 98517095 by the County Recorder of Cook County, Illinois, (ii) that certain Certification of the Rehabilitation of the Allerton Hotel, 701 North Michigan Avenue, For the Class-L Real Estate Tax Reduction, executed on December 1, 1999, by David Mosena, Chairman, on behalf of the City of Chicago Commission on Chicago Landmarks and (iii) any amendment, restatement, supplement or other modification of any of the foregoing.

"**Hotel Company**" shall mean each of the Persons designated as a Hotel Company on Schedule VI hereto as long as at the time of such Person's appointment there has been no material adverse change in the business or condition, financial or otherwise, of such Person.

"**Hotel License**" shall mean, collectively, each license and/or permit required under applicable Legal Requirements for the operation of the Property as it is required to be operated pursuant to the terms hereof, including, without limitation, any required hotel operators license, food and beverage license and liquor license.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, on a particular date, the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations for which such Person is liable); (d) obligations under reimbursement agreements in connection with letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 10.13(b) hereof.

"**Indemnifying Person**" shall mean Borrower.

"**Independent Director**" or "**Independent Manager**" shall mean a Person selected by Borrower who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years: (a) a stockholder, director (with the exception of serving as the Independent Director or Independent Manager), officer, employee, partner, member, attorney or counsel of Principal, Borrower or any Affiliate of either of them; (b) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Principal, Borrower or any Affiliate of either of them; (c) a Person controlling or under common control with any such stockholder, director, officer, partner, member, customer, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, customer, supplier or other Person. Notwithstanding anything to the contrary contained herein, a natural Person who satisfies the foregoing definition other than subparagraph (b) shall not be disqualified from serving as an Independent Director of the applicable Person if such natural Person is an independent director provided by a nationally recognized company that provides professional independent directors in the ordinary course of its business. A natural Person who otherwise satisfies the foregoing definition except for being the independent director of a special purpose entity affiliated with the Borrower or Special Purpose Entity shall not be disqualified from serving as an Independent Director of the Special Purpose Entity if such special purpose entity does not own a direct or indirect interest in the Borrower or Special Purpose Entity and such person is an independent director provided by a nationally-recognized company that provides professional independent directors in the ordinary course of its business.

"**Initial Maturity Date**" shall mean the date that is 48 months from date hereof.

"**Initial Seasonality Deposit**" shall have the meaning set forth in Section 7.5.1.

"**Institutional Investor**" shall mean shall mean any one of the following Persons:

10

(i)    a pension fund, pension trust or pension account that (a) has total real estate assets of at least $1,000,000,000 and (b) is managed by a Person that controls at least $1,000,000,000 of real estate equity assets;

(ii)    a pension fund advisor who (a) immediately prior to such transfer, controls directly and/or indirectly at least $1,000,000,000 of real estate equity assets and (b) is acting on behalf of one or more pension funds that, in the aggregate, satisfy the requirements of clause (i) of this definition;

(iii)    an insurance company that is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia), which (a) has a net worth, as of a date no more than six (6) months prior to the date of the transfer, of at least $500,000,000 and (b) immediately prior to such transfer, controls real estate equity assets of at least $1,000,000,000;

(iv)    an insurance company which is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia) (a) with a net worth, as of a date no more than six (6) months prior to the date of the transfer, of at least $500,000,000 and (b) who, immediately prior to such transfer, controls directly and/or indirectly real estate equity assets of at least $1,000,000,000; or;

(v)    a corporation organized under the banking laws of the United States or any state or territory of the United States (including the District of Columbia) (a) with a combined capital and surplus of at least $500,000,000 and (b) who, immediately prior to such transfer, controls directly and/or indirectly real estate equity assets of at least $1,000,000,000;

(vi)    any Person with a long-term unsecured debt rating from the Rating Agencies of at least investment grade; or

(vi)    any Person which is 51% owned (directly or indirectly) and controlled by any of the Persons listed in clauses (i) through (vi) above.

Notwithstanding the foregoing, no Person shall be deemed to be an Institutional Investor if (y) such Person (or any other Person owned or controlled by such Person or affiliated with such Person) has been, within the last ten (10) years, (I) subject to any material, uncured event of default in connection with a loan financing which resulted in litigation or an acceleration of an indebtedness held by Lender or any other secondary market or institutional lender or (II) the subject of any Bankruptcy Action; or (z) any of the principals or Persons which control such Person or own a material direct or indirect equity interest in such Person have ever been convicted of a felony.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.3 hereof.

"**Insurance Proceeds**" shall have the meaning set forth in Section 6.6(b) hereof.

"**Interest Period**" shall mean, with respect to any Payment Date, the period commencing on and including the ninth (9th) day of the preceding calendar month and terminating on and including the eighth (8th) day of the calendar month in which such Payment Date occurs; provided, however, that no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate), and the initial Interest Period shall begin on and include the Closing Date and shall end on and include the immediately following eighth (8th) day of the calendar month.

"**Land**" shall mean the land more particularly described on Exhibit A attached hereto and all rights appurtenant thereto, including, without limitation, all air and development rights, if any, acquired by Borrower.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of any space in the Property, and (a) every modification, amendment or other agreement relating to such lease, sublease, subsublease or other agreement entered into in connection with such lease, sublease, subsublease or other agreement, and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean all Federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Prescribed Laws, the Americans with Disabilities Act of 1990, as amended, the Historic District Regulations and all permits, licenses and authorizations and regulations relating to each of the foregoing, and all covenants, agreements, restrictions and encumbrances contained in any instruments recorded against the Property in the real estate records (other than the Leases) at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Lender Controlled Funds**" shall have the meaning set forth in Section 2.6.1(d) hereof.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without payment of fee by Lender), clean sight draft letter of credit acceptable to Lender and the Rating Agencies (either an evergreen letter of credit or one which does not expire until at least thirty (30) Business Days after the Maturity Date) in favor of Lender and entitling Lender to draw thereon in New York, New York without payment of a fee, issued by a domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution.

12

"**Letter of Credit Amount**" shall mean ten percent (10%) of the then outstanding balance of the Loan.

"**Licenses**" shall have the meaning set forth in <u>Section 4.1.22</u> hereof.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create, any of the foregoing, on or affecting Borrower, the Property or any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the original principal amount of Sixty Six Million Dollars ($66,000,000) made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Environmental Indemnity, the Guaranty, the Manager Recognition Agreement, the Cash Management Agreement, Lockbox Account Agreement and all other documents executed and/or delivered in connection with the Loan.

"**Lockbox Account**" shall have the meaning set forth in <u>Section 2.6.1(a)</u> hereof.

"**Lockbox Account Agreement**" shall have the meaning set forth in <u>Section 2.6.1(a)</u> hereof.

"**Lockbox Bank**" shall have the meaning set forth in <u>Section 2.6.1</u> hereof.

"**Management Agreement**" shall mean (i) the Hotel Management Agreement entered into by and between Manager and Borrower, as same may be amended, modified or supplemented from time to time, pursuant to which Manager is to provide management and other services with respect to the Property or (ii) if the context requires, a Replacement Management Agreement.

"**Manager**" shall mean Kokua Hospitality, LLC, a Delaware limited liability company, or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement.

"**Manager Controlled Funds**" shall have the meaning set forth in <u>Section 2.6.1(d)</u> hereof.

"**Manager Recognition Agreement**" shall mean that certain Amended and Restated Subordination, Nondisturbance and Attornment Agreement made by and among Borrower, Lender and Manager as of the date hereof and any replacements thereof.

"**Management Termination Period**" shall mean a period commencing upon the earliest of (i) the occurrence of a default by Manager under the Management Agreement beyond any

applicable grace and cure periods which has a Material Adverse Effect, (ii) the failure of the income and revenue generated from the Property to be applied in accordance with the terms of the Management Agreement and the Loan Documents, or (iii) the expiration, cancellation or other termination of the Management Agreement, which such Management Termination Period shall expire upon the earlier of (y) Borrower entering into a Replacement Management Agreement in accordance with the applicable terms and conditions hereof or (z) the satisfaction and discharge of the Debt.

"**Manager Termination Condition**" shall have the meaning set forth in Section 9.5(a) hereof.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the Property, (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of Borrower or the Property, (iii) the enforceability, validity, perfection or priority of the lien of the Security Instrument or the other Loan Documents, or (iv) the ability of Borrower to perform its obligations under the Loan Documents.

"**Material Contract**" shall mean any of the following: (a) all material covenants, agreements, restrictions and encumbrances contained in any instruments, either recorded or otherwise a matter of public record, affecting the Property or any part thereof which if violated will result in a material adverse effect on the ownership or operation or materially diminish the value of the Property, (b) any lease or sublease that is entered into after the date hereof for greater than 2,500 rentable square feet at the Property, (c) the union contracts and employment agreements, together with all settlement agreements related thereto affecting the Property (collectively, the "**Union Contracts**") described on Schedule X, including, without limitation any existing or future settlement agreements pertaining to any disputes arising out of such Union Contract, (d) the Franchise Agreement, if any, and (e) any contract, license or other agreement pursuant to which goods or services are provided to, or in respect of, Borrower or the Property and which (i) is not terminable upon sixty (60) days notice or less or requires payment of a termination fee in excess of $25,000, (ii) requires the payment of an amount per year in excess of $250,000 or (iii) is with an Affiliate of Borrower, as any of the foregoing described in clauses (a) through (d) may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement; provided, that (A) advance booking arrangements and negotiated rate agreements entered into in the ordinary course of the management and operation of the Property, (B) the mere purchase of goods on a non-forward commitment basis (e.g., purchase of a good for cash) in the ordinary course of the management and operation of the Property and (C) any other agreement entered into with a Person that is not an Affiliate of Borrower pursuant to which good or services are provided to, or in respect of, the Property entered into in the ordinary course of the management and operation of the Property, as the same is managed and operated on the date hereof, and which requires the payment of an amount per year that is less than $500,000, shall not constitute a Material Contract. Notwithstanding the foregoing, so long as an Event of Default exists, all contracts, licenses and other agreements whether or not oral or in writing pursuant to which any goods or services are provided to or in respect of Borrower or the Property (other than advance booking arrangements and negotiated rate agreements entered into in the ordinary course of the management an operation of the Property) shall be deemed to be Material Contracts.

14

"**Maturity Date**" shall mean either (a) the Fixed Maturity Date, or (b) if applicable, the Extended Maturity Date or (c) such other date on which the final payment of principal of the Note becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Monthly Interest Payment**" shall have the meaning set forth in Section 2.3.1.

"**Monthly Payment Notification**" shall have the meaning set forth in Section 2.6.1(d) hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean that certain first priority Mortgage and Security Agreement, dated the Original Closing Date, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Net Cash Flow**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period (as reasonably determined by Lender using underwriting standards that are consistent with the standards used at the initial underwriting and closing of the Loan, which are normal and customary in the securitized loan industry for loans of a similar size as the Loan on properties of the same type as the Property in the same general geographic area as the Property); provided, that for purposes of calculating Net Cash Flow, the following shall be deducted from Gross Income from Operations for such period (but without duplication for amounts already deducted as Operating Expenses or as part of the FF&E Reserve Funds): (a) the management fees, sales and marketing fees and other fees and expenses payable to Manager under the Management Agreement, (b) minimum assumed FF&E Monthly Deposit contributions equal to four percent (4%) of Gross Income from Operations, and (c) the franchise fees, sales and marketing expenses and other fees and expenses payable to Franchisor under any Franchise Agreement.

"**Net Operating Income**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.

"**Net Proceeds**" shall have the meaning set forth in Section 6.6(b) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 6.6(b)(vi) hereof.

"**New York Proceeding**" shall have the meaning set forth in the Recitals to this Agreement.

15

"**Original Loan**" shall have the meaning set forth in the Recitals to this Agreement.

"**Original Loan Paydown**" shall have the meaning set forth in the Recitals to this Agreement.

"**Note**" shall mean that certain Amended and Restated Promissory Note, dated as of the date hereof and in the original principal amount of Sixty Six Million Dollars ($66,000,000), evidencing the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Notice**" shall have the meaning set forth in Section 10.6 hereof.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized officer of the general partner or managing member of Borrower, as applicable.

"**Operating Company**" shall mean a Person which, as of the date of the applicable transfer, is not a "shell" or "pass through" entity and which has material assets other than its direct and/or indirect equity ownership interest in Borrower. Notwithstanding the foregoing, a Person may still be considered an "Operating Company" for the purposes hereof if it is a "series" limited liability company and the aforesaid "material assets" are held in other series which are legally separate for liability purposes but legal title to such material assets remains held by such "series" limited liability company.

"**Operating Expenses**" shall mean, for any period, the total of all operating expenses, computed in accordance with GAAP, of whatever kind relating to the Property, which expenditures are incurred on a regular monthly or recurring or other periodic basis, including without limitation, utilities, cleaning, maintenance, ordinary repairs and maintenance, insurance, permits, license fees, franchise fees, royalties, property taxes and assessments, advertising and marketing expenses, management fees, payroll and related taxes, security systems, transportation, legal and accounting, computer processing charges, tenant improvements and leasing commissions (to the extent the same are not capitalized under GAAP), operational equipment or other lease payments as reasonably approved by Lender, and other similar costs, but excluding depreciation or amortization, income or estate taxes or other impositions in the nature of income or estate taxes, any expense (including legal, accounting and other professional fees, expenses and disbursements) incurred in connection with the making of the Loan or the sale, exchange, transfer, financing or refinancing of all or any portion of the Property or in connection with the recovery of proceeds which are applied to prepay the Note, any expenses which in accordance with GAAP should be capitalized, any item of expense which would otherwise be considered within Operating Expenses pursuant to the provisions above but is paid directly by any tenant or reimbursed by the tenant to Borrower, Debt Service and contributions to the FF&E Reserve Funds, the Tax and Insurance Escrow Funds, the Seasonality Funds, and any other reserves required under the Loan Documents.

16

"**Operating Expense Account**" shall mean a sub-account of the Cash Management Account established to hold Operating Expense Funds.

"**Operating Expense Funds**" shall have the meaning set forth in Section 7.6 hereof.

"**Original Closing Date**" shall have the meaning set forth in the Recitals to this Agreement.

"**Original Lender**" shall have the meaning set forth in the Recitals to this Agreement.

"**Original Loan Agreement**" shall have the meaning set forth in the Recitals to this Agreement.

"**Other Charges**" shall mean all ground rents, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof and which if not timely paid will result in a Lien on the Property.

"**Other Obligations**" shall mean (a) all obligations of Borrower contained herein; (b) each obligation of Borrower contained in any other Loan Document; and (c) each obligation of Borrower contained in any renewal, extension, amendment, modification, change of, or substitution or replacement for, all or any part of this Agreement, the Note or any other Loan Document.

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**Payment Date**" shall mean the ninth (9th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"**Payment Notice**" shall have the meaning set forth in Section 5.1.24 hereof.

"**Payment Shortfall**" shall have the meaning set forth in Section 7.5.2 hereof.

"**Permitted Encumbrances**" shall mean, collectively (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy or on the Survey or otherwise approved or created pursuant to the Bankruptcy Proceeding or approved by the Original Lender with respect to the Original Loan, (c) Liens, if any, for Taxes imposed by any Governmental Authority that are not yet due or delinquent or are being contested in accordance with Section 5.1.2 hereof, (d) statutory liens for labor or materials that (i) secure sums not yet due and payable, (ii) secure sums for which Borrower is not indebted, (iii) secure sums not in excess of $500,000.00 in the aggregate, or (iv) are bonded or insured over to Lender's reasonable satisfaction; provided, however, that with respect to the foregoing subclauses (ii) and (iii), such sums shall be deemed "Permitted Encumbrances" for purposes of this definition only if, after written notice to Lender, Borrower, at its own expense, is contesting the amount or validity of same by appropriate legal proceeding

in accordance with the Loan Documents, promptly initiated and conducted in good faith and with due diligence; and provided further that the conditions set forth in clauses (a) through (f) of Section 5.1.2 and/or Section 3.6(b) of the Mortgage, as applicable, shall also be satisfied in respect of such contest, (e) any attachment or judgment lien; provided that the judgment it secures shall have been discharged or execution thereof stayed pending appeal within the earlier of sixty (60) days after the entry thereof and the date that is ten (10) days prior to the earlier to occur of the Maturity Date or the date on which the Property is scheduled to be sold for non-payment, or shall have been discharged within the earlier of sixty (60) days after the expiration of any such stay and the date that is ten (10) days prior to the earlier to occur of the Maturity Date or the date on which the Property is scheduled to be sold for non-payment, (f) easements, rights-of-way, restrictions (including zoning restrictions), defects or irregularities in title to which like properties are commonly subject which have not been granted or created by Borrower in violation of any term of this Agreement prohibiting such grant or creation and which do not (i) interfere with the benefits to be provided by the Mortgage, (ii) adversely affect the operation, use, value, enjoyment or marketability of the Property in any material respect, or (iii) adversely affect Borrower's ability to repay the Loan in full, and (g) such other Liens as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Transfer**" shall have the meaning set forth in Section 5.2.10(e) hereof.

"**Permitted Transferee**" shall mean a corporation, partnership or limited liability company that (i) (A) has (or its affiliated entities have) total assets (in name or under management) in excess of $100,000,000 not including the Property and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $15,000,000, and (B) is (x) an entity that is (or is controlled and 15% (directly or indirectly) owned by) an experienced operator and/or owner regularly engaged in the business of owning or operating, full-service hotel properties in urban locations (as its main business or as part of a broader business of owing or operating commercial properties) and that engages an Approved Property Manager or (y) is an Approved Institutional Investor or (iii) is Sponsor or any entity controlled by Sponsor; provided, however, notwithstanding the foregoing in no event shall any Prohibited Transferee be a Permitted Transferee under this definition, even if such Prohibited Transferee otherwise satisfies the conditions set forth in subsections (i), (ii) or (iii) of this definition

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Plan of Reorganization**" shall have the meaning set forth in the Recitals to this Agreement.

"**Policies**" shall have the meaning specified in Section 6.3(a) hereof.

"**Prescribed Laws**" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. § 1701 *et seq.* and (d) all other Legal Requirements relating to money laundering or terrorism.

"**Principal**" shall mean any constituent owner of Borrower which, by the terms hereof, is required to be a Special Purpose Entity.

"**Proforma Net Cash Flow**" shall mean the Net Cash Flow that would be generated by the Property upon completion of a Restoration, as reasonably determined by Lender based upon the Net Cash Flow as of the date immediately prior to the occurrence of the Casualty or Condemnation and taking into account any reduction in the revenue-generating capacity of the Property due to reduced room count, size of Improvements, etc. that will exist following the Restoration.

"**Prohibited Transferee**" means (i) any person, or any entity which has a chief executive officer, president, chief financial officer, general counsel, chief operating officer or person holding an equivalent position to the foregoing (but with a different title) (each a "**Senior Executive**") who has been convicted of a felony involving theft, fraud, extortion, embezzlement or other similar criminal acts involving dishonesty (a "**Dishonest Convict**") or (ii) any entity that is controlled by a person, or an entity which has a Senior Executive, who is a Dishonest Convict; provided, however, that no such entity shall constitute a "Prohibited Transferee" if it is diligently taking commercially reasonable actions in furtherance of removing such Senior Executive from his or her capacity as such or (iii) any person or entity (or any Affiliate thereof) that would jeopardize the Property's liquor license if to be held by such transferee or (iv) any person or entity who is an Embargoed Person.

"**Property**" shall mean the Land, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property, Land, and Improvements, as more particularly described in the granting clause of the Mortgage and referred to therein as the "Property".

"**Provided Information**" shall mean any and all financial and other information provided at any time by, or on behalf of, any Indemnifying Person with respect to the Property, Borrower, Principal and/or Manager in connection with the Loan.

"**Qualified Manager**" shall mean any of (a) Manager, (b) any Approved Manager (including without limitation, any Hotel Company) or (c) in the reasonable judgment of Lender,

a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Property.

"**Rating Agencies**" shall mean each of S&P, Moody's and Fitch, or any other nationally recognized statistical rating agency which has been approved by Lender.

"**Removed Litigation**" shall mean the lawsuit captioned Hotel Allerton Mezz, LLC v. Wells Fargo Bank, N.A., *et al.*, designated as Adv. No. 11-01651, filed in the Bankruptcy Court.

"**Rents**" shall mean all rents (including, without limitation, percentage rents), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payments and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower from any and all sources arising from or attributable to the Property and the Improvements, including, without limitation, all revenues from telephone services, laundry, vending, television, and all hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, and all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager, or any of their respective agents or employees, and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance (it being understood and agreed that the management fee for such replacement manager shall not exceed then prevailing market rates); and (b) an agreement in substantially the same form as the Manager Recognition Agreement (or such other agreement in form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense; provided, however, if the Qualified Manager is a Hotel Company, then (i) such Hotel Company's standard form of management agreement shall constitute a Replacement Management Agreement which shall be deemed acceptable to Lender under this definition and (ii) the manager recognition agreement shall provide that Lender may not terminate such Qualified Manager as the manager unless such Qualified Manager has defaulted under such Replacement Management Agreement beyond all applicable notice and grace periods.

"**Reserve Funds**" shall mean, collectively, the Tax and Insurance Escrow Funds, the FF&E Reserve Funds, the Seasonality Funds, the Operating Expense Funds, the Excess Cash Flow Funds and any other escrow fund established pursuant to the Loan Documents.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation; provided, however, that Borrower may make other alterations in connection with such repair or restoration as may be reasonably approved by Lender.

"**Restoration Debt Service Coverage Ratio**" shall mean a ratio for the applicable period in which:

(a)     the numerator is the Proforma Net Cash Flow as of the date of determination; and

(b)     the denominator is the product obtained by multiplying the (x) Outstanding Principal Balance as of such date of determination by (y) a constant equal to the Applicable Interest Rate.

"**Restricted Party**" shall mean, collectively (a) Borrower, Principal and any Affiliated Manager, (b) any shareholder, partner, member, non-member manager or direct legal or beneficial owner of Borrower, and (c) Persons which hold indirect legal or beneficial interests in Borrower.

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies, Inc.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance or pledge of a legal or beneficial interest.

"**Seasonality Reserve Account**" shall mean a sub-account of the Cash Management Account established to hold Seasonality Reserve Funds.

"**Seasonality Reserve Amount**" shall mean the greater of (i) One Million Five Hundred Thousand Dollars ($1,500,000) and (ii) the Seasonality Shortfall Amount.

"**Seasonality Reserve Funds**" shall have the meaning set forth in Section 7.5.1 hereof.

"**Seasonality Shortfall Amount**" shall mean the greater of (i) One Million Five Hundred Thousand Dollars ($1,500,000) and (ii) if there shall be insufficient Gross Income From Operations to pay in full (a) all deposits into the Tax and Insurance Account for the payment of Taxes and Insurance Premiums, (b) Approved Operating Expenses and Approved Extraordinary Expenses for the Property and/or (c) all Monthly Interest Payments, each as due in the then preceding calendar months of December, January, February, March and April (collectively, the "**Seasonality Months**" and individually, a "**Seasonality Month**") and without reduction for any surplus funds in any such month. For the avoidance of doubt, the Seasonality Shortfall Amount shall in no event be reduced by the amount of any excess Gross Income From Operations available in any Seasonality Month after payments for deposits for the payment of Taxes and Insurance Premiums and payments of all Approved Operating Expenses, Approved Extraordinary Expenses and Monthly Interest Payments and without taking into account amounts utilized from the Seasonality Reserve Account.

21

"**Second Original Lender**" shall have the meaning set forth in the Recitals to this Agreement.

"**Security Documents**" shall have the meaning set forth in <u>Section 2.5.1</u> hereof

"**Servicer**" shall have the meaning set forth in <u>Section 9.6</u> hereof.

"**Servicing Agreement**" shall have the meaning set forth in <u>Section 9.6</u> hereof

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company which at all times prior to, on and after the date hereof:

(a)      was, is and will be organized solely for the purpose of (i) acquiring, financing, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; or (ii) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

(b)      has not been, is not, and will not be engaged in any business unrelated to (i) the acquisition, financing, development, ownership, management or operation of the Property, (ii) acting as general partner of the limited partnership that owns the Property, or (iii) acting as a member of the limited liability company that owns the Property, as applicable;

(c)      has not had, does not have, and will not have, any assets other than those related to the Property or its partnership interest in the limited partnership or the membership interest in the limited liability company that owns the Property or acts as the general partner or a member thereof, as applicable;

(d)      except as expressly permitted by this Agreement, the Bankruptcy Proceeding or the other Loan Documents or in connection with a repayment of the Debt or as required by law, has not engaged, sought or consented to, and will not engage in, seek or consent to, any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

(e)      if such entity is a limited partnership, has had, now has, and will have as its only general partners, Special Purpose Entities that are corporations, limited partnerships or limited liability companies;

(f)      if such entity is a corporation, has had, now has, and will have at least one (1) Independent Director, and has not caused or allowed, and will not cause or allow, the board of directors of such entity to take any action requiring the unanimous affirmative vote of one

22

hundred percent (100%) of the members of its board of directors unless one (1) Independent Director shall have participated in such vote;

(g)     if such entity is a limited liability company with more than one (1) economic member, has had, now has and will have at least one (1) member that is a Special Purpose Entity that is a corporation that has at least one (1) Independent Director and that owns at least one percent (1.0%) of the equity of the limited liability company;

(h)     if such entity is a limited liability company with only one (1) economic member, has been, now is, and will be a limited liability company organized in the State of Delaware or State of Maryland that (i) has at least one Independent Manager and has not caused or allowed, and will not cause or allow, the board of managers or managing member of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the managers, including, without limitation, filing a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, unless one Independent Manager shall have participated in such vote and (ii) has at least one springing member that will become the member of such entity upon the dissolution of the existing member;

(i)     if such entity is (i) a limited liability company, has had, now has, and will have articles of organization, a certificate of formation and/or an operating agreement, as applicable, (ii) a limited partnership, has had, now has, and will have a limited partnership agreement, or (iii) a corporation, has had, now has, and will have a certificate of incorporation, in each of the foregoing cases, provides that such entity will not: (A) dissolve, merge, liquidate or consolidate other than as permitted by the Bankruptcy Proceeding; (B) sell all or substantially all of its assets or the assets of Borrower (as applicable); (C) engage in any other business activity or amend its organizational documents with respect to the matters set forth in this definition without the consent of Lender; or (D) without the affirmative vote of one (1) Independent Director and of all other directors of the corporation (that is such entity or the general partner or managing or co-managing member of such entity), file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest;

(j)     has been, is and intends to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same have or shall become due, and has maintained, is maintaining and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(k)     has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

(l)     has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own tax returns, except to the extent that it is a disregarded entity for tax purposes or has been or is required to file consolidated tax returns by law, provided, however, that any entity may file tax returns consolidated with those of another

23

Person as long as such consolidated tax return shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(m)     has maintained and will maintain its own records, books, resolutions and agreements;

(n)     (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) other than as provided in the Cash Management Agreement, has not participated, and will not participate, in any cash management system with any other Person;

(o)     has held and will hold its assets in its own name;

(p)     has conducted and will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (dd) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(q)     has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person; provided, however, that any entity may have financial statements consolidated with those of another Person as long as such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(r)     has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets and has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations;

(s)     has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(t)     (i) if such entity owns the Property, it has had no and will have no Indebtedness other than (1) the Loan, (2) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed one percent (1%) of the original principal amount of the Loan, in the aggregate, which liabilities are not more than ninety (90) days past the date incurred and are not evidenced by a note, and (3) such other debt as may be specifically approved by Lender in its sole discretion; or (ii) if such entity acts as the general partner of a limited partnership that owns the Property or as the sole member or managing member of a limited liability company which owns the Property or of a limited liability company that is the sole equity member of such limited liability company, has and will have no Indebtedness other than (x) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of such entity or the Borrower, in amounts not to exceed one percent (1%) of the original principal amount of the

24

Loan, in the aggregate, which liabilities are not more than ninety (90) days past the date incurred and are not evidenced by a note, or (y) such other liabilities that are permitted pursuant to this Agreement;

(u)     has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Agreement;

(v)     has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate other than, with respect to Special Purpose Entities other than Borrower, the ownership of 100% of the outstanding equity ownership interests of another Special Purpose Entity;

(w)     has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(x)     has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name. The stationery, invoices, and checks utilized by the Special Purpose Entity or utilized to collect its funds or pay its expenses have borne and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(y)     except to Lender in connection with the Loan has not pledged and will not pledge its assets for the benefit of any other Person;

(z)     has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (dd) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(aa)     has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(bb)     has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(cc)     has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

(dd)    has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or other Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party, and (ii) in connection with this Agreement;

(ee)    has not had and will not have any obligation to indemnify, and has not indemnified and will not indemnify, its partners, officers, directors or members, as the case may be, unless such an obligation was and is fully subordinated to the Obligations and will not constitute a claim against the Obligations in the event that cash flow in excess of the amount required to pay the Obligations is insufficient to pay such obligation;

(ff)    if such entity is a corporation, to the extent such entity has become insolvent, it has considered and shall consider the interests of its creditors in connection with all corporate actions;

(gg)    except as expressly contemplated by the Loan Documents, does not and will not have any of its obligations guaranteed by any Affiliate; and

(hh)    has complied and will comply with all of the terms and provisions contained in its organizational documents.  The statement of facts contained in its organizational documents are true and correct and will remain true and correct.

"**Sponsor**" shall mean Petra Capital Management LLC and its Affiliates and related entities.

"**Sponsor Entities**" shall mean any one or more of Sponsor and any Approved Institutional Investor, in each case and as of the date of determination, owning all or any portion of the equity ownership interests described in Section 5.2.10(d)(ii)(A).

"**Springing Recourse Events**" shall have the meaning set forth in Section 9.4 hereto.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Substitute Guarantor**" shall mean a Person with total assets in excess of $50,000,000 (in name or under management) and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $10,000,000.

"**Survey**" shall mean a survey of the Property prepared pursuant to the requirements contained in Section 4.1.27 hereof.

"**Tax and Insurance Escrow Funds**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or any part thereof, together with all interest and penalties thereon, if any.

"**Threshold Amount**" shall have the meaning set forth in Section 5.1.21 hereof.

"**Title Company**" shall mean Lawyers Title Insurance Corporation, or any successor title companies acceptable to Lender and licensed to issue title insurance in the State in which the Property is located.

"**Title Insurance Policy**" shall mean the ALTA mortgagee title insurance policy provided to Original Lender (or, if the Property is in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the Lien of the Mortgage (as defined in the Original Loan Agreement) encumbering the Property.

"**Transfer**" shall have the meaning set forth in Section 5.2.10(b) hereof.

"**UCC**" or "**Uniform Commercial** Code" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"**Uniform System of Accounts**" shall mean the most recent edition of the Uniform System of Accounts for Hotels as adopted by the American Hotel and Motel Association.

"**U.S. Obligations**" shall mean non-redeemable securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged.

Section 1.2    Principles of Construction.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE 2

## GENERAL TERMS

Section 2.1    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to continue, and Borrower hereby agrees to borrow, the Loan on the Closing Date. Each of the parties hereto acknowledges and agrees that, as of the date hereof, the Loan is outstanding from Lender to Borrower in the outstanding

principal amount of Sixty-Six Million Dollars ($66,000,000).   Borrower acknowledges and agrees that all of such funds were advanced to, and received by, Borrower.

2.1.2   Amounts Repaid May Not Be Re-borrowed.  Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

2.1.3   The Note, Mortgage and Loan Documents.  The Loan shall be evidenced by the Note and secured by the Mortgage, the Assignment of Leases and the other Loan Documents.

2.1.4   Intentionally Omitted.

Section 2.2   Interest Rate.

2.2.1   Interest Generally.  Interest on the Outstanding Principal Balance shall accrue from the Closing Date to but excluding the Maturity Date at the Applicable Interest Rate.

2.2.2   Interest Calculation.  Interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate based on a three hundred sixty (360) day year by (c) the Outstanding Principal Balance.

2.2.3   Intentionally Omitted.

2.2.4   Intentionally Omitted.

2.2.5   Default Rate.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

2.2.6   Usury Savings.   This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Outstanding Principal Balance at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Outstanding Principal Balance at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

28

2.2.7    Intentionally Omitted.

Section 2.3    Loan Payment.

2.3.1    Interest Payments.  Borrower shall pay to Lender on each Payment Date the interest accrued on the Outstanding Principal Balance for the preceding Interest Period (the **"Monthly Interest Payment"**). The first Interest Period hereunder shall commence on and include the Closing Date and end on and include the eighth (8th) day of the next occurring calendar month. Each Interest Period thereafter shall commence on and include the ninth (9th) day of each calendar month during the term of the Loan and shall end on and include the eighth (8th) day of the next occurring calendar month. For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods, if the day on which such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day. With respect to payments of principal due on the Maturity Date, interest shall be payable at the Applicable Interest Rate or the Default Rate, as the case may be, through and including the day immediately preceding such Maturity Date. All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

2.3.2    Principal Payments.  In addition to the Monthly Interest Payment, Borrower shall pay to Lender principal payments in accordance with the terms of this Agreement, including, without limitation, the Amortization Payment and all amounts to be paid to Lender from Seasonality Reserve Funds**.**

2.3.3    Payment on Maturity Date.  Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

2.3.4    Late Payment Charge.  If any principal, interest or any other sums due under the Loan Documents, excluding the payment of principal due on the Maturity Date, is not paid by Borrower by the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5.0%) of such unpaid sum, and (b) the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.

2.3.5    Method and Place of Payment.   Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

29

Section 2.4     Prepayments.

2.4.1     Voluntary Prepayments.  On any Payment Date and so long as no Event of Default has occurred and is continuing, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Outstanding Principal Balance, in whole or in part; provided that such prepayment is accompanied all accrued and unpaid interest on the portion of the Outstanding Principal Balance then being prepaid.  Any partial prepayment shall be applied to the Loan in such order and priority as may be determined by Lender in its sole discretion.

2.4.2     Mandatory Prepayments.     On the next occurring Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender is not obligated or does not elect to make such Net Proceeds available to Borrower for Restoration, Borrower authorizes Lender to apply Net Proceeds as a prepayment of the Debt, in an amount equal to one hundred percent (100%) of such Net Proceeds.  Any prepayments under this Section 2.4.2 shall be applied as provided in Section 2.4.3.  Any Net Proceeds remaining after the prepayment of the Debt in full shall be transferred by Lender to Borrower. If the Lender does not make available to Borrower the Net Proceeds for Restoration as provided in this Section 2.4.2, then notwithstanding anything to the contrary herein, Borrower shall be permitted to repay the remaining Debt in whole.

2.4.3     Application of Payments of Principal.  Notwithstanding anything to the contrary contained in this Agreement, the following principal payments shall be allocated among the Loan, as follows:

(a)     any voluntary prepayment of the Loan shall be fully allocated only to the Loan;

(b)     all Net Proceeds not required to be made available for Restoration shall be applied first to the Debt, in any order, priority and proportions as Lender shall elect in its sole discretion from time to time, until the Debt is paid in full, and then the balance disbursed to Borrower;

(c)     subject to Lender's obligation to make the Approved Op Ex Disbursements (to the extent applicable), any Reserve Funds, Excess Cash Flow or other cash collateral held by or on behalf of Lender, whether in the Cash Management Account, the Tax and Insurance Escrow Account, the FF&E Reserve Account, or otherwise, including, without limitation, any Net Proceeds then being held by Lender, shall, upon the occurrence and during the continuance of an Event of Default, be applied by Lender as follows or may continue to be held by Lender as additional collateral for the Loan, all in Lender's sole discretion: first, to the Debt, in any order, priority and proportions as Lender shall elect in its sole discretion from time to time, until the Debt is paid in full, and then the balance disbursed to Borrower;

(d)     Intentionally Omitted; and

(e)     subject to Lender's obligation to make the Approved Op Ex Disbursements (to the extent applicable), all Rents received by Lender upon the occurrence and

30

during the continuance of an Event of Default pursuant to Section 3.1 of the Assignment of Leases shall be applied by Lender as follows or may continue to be held by Lender as additional collateral for the Loan, all in Lender's sole discretion: first, (i) to the expenses of managing and securing any of the Property, as contemplated by clause (a) of said Section 3.1 of the Assignment of Leases, and/or (ii) to the Debt, in any order, priority and proportions as Lender shall elect in its sole discretion from time to time, until the Debt is paid in full, and then the balance disbursed to Borrower.

        2.4.4     Intentionally Omitted.

        Section 2.5    Release of Property.  Except as set forth in this Section 2.5, no repayment or prepayment of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Mortgage.

        2.5.1     Release on Payment in Full.  Lender shall, upon the written request and at the expense of Borrower, (a) upon payment in full of all principal and interest due on the Loan and all of the other Debt due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Agreement, release (or reconvey) the Lien of the Mortgage and of this Agreement upon the Lockbox Account, the Cash Management Account, all Reserve Funds and all other security interests granted herein and under the Loan Documents (collectively, the **"Security Documents"**), or (b) in lieu of applying monies as a full repayment of the Debt, along with a release of the Lien of the Mortgage and the other Security Documents, Lender agrees that it shall, in consideration of an amount equal to that necessary for a full repayment of the Debt in accordance with the terms of the Security Documents, endorse the Note, and assign the Mortgage and the other Security Documents to a lender designated by Borrower, and Lender shall execute and deliver to Borrower or such lender such instruments and other documents as shall be necessary or appropriate in compliance with all applicable laws to evidence any such assignment of the Mortgage and the Loan, and Borrower shall reimburse Lender for all of its reasonable out-of-pocket costs, including, but not limited to, legal costs and expenses incurred in connection therewith.

        Section 2.6    Cash Management.

        2.6.1     Lockbox Account.

        (a)     Borrower shall establish and maintain a  segregated Eligible Account (the **"Lockbox Account"**) with an Eligible Institution (the **"Lockbox Bank"**) in trust for the benefit of Lender, which Lockbox Account is under the sole dominion and control of Lender in accordance with the terms of the Lockbox Account Agreement entered into on the Original Closing Date among such Eligible Institution, Borrower and Lender (as the same may be amended and restated on the date hereof, the **"Lockbox Account Agreement"**).  The Lockbox Account shall be entitled "DiamondRock Allerton Owner, LLC, as Lender to ALT Hotel, LLC-Lockbox Account."  Borrower hereby grants to Lender a first priority security interest in the Lockbox Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Lockbox Account, including, without limitation, filing UCC-1 Financing

Statements and continuations thereof. Borrower will not in any way alter or modify the Lockbox Account and will notify Lender of the account number thereof. Lender (and its agents, including Servicer) shall have the sole right to make withdrawals from the Lockbox Account and all costs and expenses for establishing and maintaining the Lockbox Account shall be paid by Borrower.

(b)     Borrower shall, or shall cause Manager to, deliver irrevocable written instructions to all tenants under Leases to deliver all Rents payable thereunder directly to the Lockbox Account. Borrower shall, and shall cause Manager to, deposit all amounts received by Borrower or Manager constituting Rents within two (2) Business Days after receipt by Borrower and Manager shall use reasonable efforts to deposit same within one (1) Business Day after receipt thereof; provided, however, notwithstanding anything to the contrary contained herein, in the event the Property is being managed by an Approved Cash Management Manager pursuant to a Replacement Management Agreement, all Rents from all sources including, without limitation, the American Express Card, Mastercard and Visa Card will be received and held by such Approved Cash Management Manager prior to and during the continuance of an Event of Default and such Approved Cash Management Manager shall have the sole right to pay the expenses of the Property pursuant to and in accordance with the terms of the applicable Replacement Management Agreement, and the parties hereto shall enter into such modifications to the Lockbox Agreement and Cash Management Agreement as such Approved Cash Management Manager reasonably requests and that are reasonably acceptable to the parties in order to effectuate the foregoing.

(c)     Borrower shall obtain from Lockbox Bank its agreement, in form and substance reasonably satisfactory to Lender to transfer to the Cash Management Account in immediately available funds by federal wire transfer all amounts of the opening available balance on deposit in the Lockbox Account once every Business Day throughout the term of the Loan.

(d)     Each of Borrower and Lender acknowledge that, as of the date hereof, all receipts payable with respect to the Property paid by (i) the American Express Card (with respect to receipts other than from Property's restaurant), together with all cash, wire transfer and check payments made with respect to the Property, are delivered directly to Manager (the "**Manager Controlled Funds**") and (ii) the Visa Card, Diner's Card, Discover Card, American Express (with respect to receipts from the Property's restaurant only), the Mastercard and all other credit cards are delivered directly to the Lockbox Account (the "**Lender Controlled Funds**"). On or prior to the fifth (5th) day of each month, Borrower shall cause Manager to notify Lender as to (A) the aggregate amount of Manager Controlled Funds actually received by Manager during the immediately preceding calendar month and (B) the amount of Approved Operating Expenses required for such month pursuant to the Approved Annual Budget and Approved Extraordinary Expenses (such notification, the "**Monthly Payment Notification**"). If the Monthly Payment Notification shall indicate that the amount of Approved Operating Expenses and Approved Extraordinary Expenses for such month (x) exceeds the amount of Manager Controlled Funds actually received by Manager during the immediately preceding month, then Lender shall promptly pay to Manager from the amount of Lender Controlled Funds actually received by Lender in such month, funds equal to the amount of such shortfall and (y) is less than the amount of Manager Controlled Funds actually received by Manager during the immediately preceding

32

month, then Borrower shall cause Manager to promptly deposit the excess amount of such Manager Controlled Funds into the Lockbox Account. During the continuance of an Event of Default, at Lender's direction Borrower shall cause Manager to direct all Manager Controlled Funds into the Lockbox Account.

(e)    Borrower shall, and shall cause Manager to, instruct all Persons that maintain open accounts with Borrower or Manager with respect to the Property or with whom Borrower or Manager does business on an "accounts receivable" basis with respect to the Property to, deliver all payments due under such accounts in accordance with Section 2.6.1(d), and neither Borrower nor Manager shall direct any such Person to make payments due under such accounts in any other manner.

(f)    Without the prior written consent of Lender, so long as any portion of the Debt remains outstanding, neither Borrower nor Manager shall direct or cause any Person to pay any amount in any manner other than as provided in this Agreement.

(g)    Neither Borrower, Manager nor any other Person shall open or maintain any accounts other than the Lockbox Account into which Rents from the ownership and operation of the Property are deposited (provided, that the foregoing shall not prohibit Borrower from utilizing one or more separate accounts for the disbursement or retention of funds that have been transferred to Borrower pursuant to the express terms of this Agreement).

(h)    If the Lockbox Bank fails to be an Eligible Institution, Lender may replace the Lockbox Bank with a substitute Lockbox Bank upon five (5) days' notice to Borrower. Borrower hereby agrees that it shall take all reasonable action necessary to facilitate the transfer of the respective obligations, duties and rights of the Lockbox Bank to the successor thereof selected by Lender in its sole discretion.

2.6.2    Cash Management Account. (a) Lender or Servicer has established and maintains a segregated Eligible Account, held by Lender or Servicer in trust for the benefit of Lender, which is under the sole dominion and control of Lender (the "**Cash Management Account**"). The Cash Management Account is currently held at KeyBank, N.A. (the "**Cash Management Bank**") and is entitled "Alt Hotel LLC Cash Management Account," account number 329681092568. Borrower hereby grants to Lender a first priority security interest in the Cash Management Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Cash Management Account, including, without limitation, filing UCC-1 Financing Statements and continuations thereof. Borrower will not in any way alter or modify the Cash Management Account and will notify Lender of the account number thereof. Lender and Servicer shall have the sole right to make withdrawals from the Cash Management Account and all costs and expenses for establishing and maintaining the Cash Management Account shall be paid by Borrower. Lender shall have the right, from time to time, to replace the Cash Management Bank with another Eligible Institution.

(b)    Intentionally Omitted.

33

(c)     Lender shall establish the following sub-accounts (which may be ledger-entry sub-accounts) of the Cash Management Account, each in the name of Lender, into which funds on deposit in, or other financial assets credited to, the Cash Management Account shall be deposited, credited or otherwise allocated in accordance with the provisions of Section 2.6.3:

(i)     the Tax and Insurance Escrow Account into which Tax and Insurance Escrow Funds shall be deposited under Section 7.2;

(ii)     the Seasonality Reserve Account into which Seasonality Reserve Funds shall be deposited under Section 7.5;

(iii)     the FF&E Reserve Account in which the FF&E Reserve Funds will be deposited under Section 7.3;

(iv)     Intentionally Omitted;

(v)     the Operating Expense Account into which Operating Expense Funds shall be deposited under Section 7.6; and

(vi)     the Excess Cash Flow Account into which Excess Cash Flow shall be deposited under Section 7.7.

2.6.3     Application of Funds in the Cash Management Account.

(a)     On each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day) all funds on deposit in the Cash Management Account shall be applied by Lender to the payment of the following items in the following order of priority:

(i)     First, payment to the Tax and Insurance Escrow Account in accordance with the terms and conditions of Section 7.1;

(ii)     Next, payments to the Operating Expense Account in accordance with the terms and conditions of Section 7.6 hereof;

(iii)     Next, payment to Lender of the Monthly Interest Payment due on such Payment Date;

(iv)     Next, payments to the FF&E Reserve Account in accordance with the terms and conditions of Section 7.3 hereof;

(v)     Next, payment to the Seasonality Reserve Account in accordance with the terms and conditions of Section 7.5 hereof;

(vi)     Next, payment to Lender of the Amortization Payment, if any, and any other amounts then due and payable to Lender under the Loan Documents; and

34

(vii)    Next, all remaining funds ("**Excess Cash Flow**") shall be paid to Borrower, unless an Event of Default exists, in which case all Excess Cash Flow shall be deposited in the Excess Cash Flow Account.

(b)    The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever. Notwithstanding the foregoing, upon the termination of an Event of Default, any amounts in the Excess Cash Flow Account shall be released to Borrower.

(c)    Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, subject to Lender's obligation to make the Approved Op Ex Disbursements and to make funds available for the payment of Taxes and Insurance Premiums (which Lender hereby agrees to do solely to the extent of receipts from the Property and funds in the Seasonality Reserve), all funds on deposit in the Cash Management Account following the occurrence of an Event of Default and its continuance may be applied by Lender in such order and priority as Lender shall determine in its sole discretion until the Debt is paid in full, and then the balance disbursed to Borrower. Borrower hereby agrees and acknowledges that if (x) all of the Obligations have been satisfied and (y) there are funds remaining in the Reserve Funds, Lender shall deliver any balance to Borrower.

Section 2.7    Reconciliations.  Upon a request by Borrower, Lender shall cooperate (at no out of pocket cost to Lender) with Borrower to cause Cash Management Bank, Lockbox Bank or Manager to prepare and deliver to Borrower monthly reconciliations of the funds contained in the Cash Management Account and bank account statements for the Cash Management Account and the Lockbox Account.

Section 2.8    Extension of the Initial Maturity Date.  Borrower shall have the option to extend the term of the Loan beyond the Initial Maturity Date for one (1) year each (the "**Extension Term**", and the Maturity Date following the exercise of the Extension Option is hereinafter the "**Extended Maturity Date**") upon satisfaction of the following terms and conditions:

(a)    no monetary Default under the Loan or Event of Default shall have occurred and be continuing at the time the Extension Option is exercised and on the date that the Extension Term commences;

(b)    Borrower shall notify Lender of its irrevocable election to extend the Maturity Date as aforesaid not earlier than six (6) months, and no later than one (1) month, prior to the Initial Maturity Date;

(c)    the Debt Service Coverage Ratio, at the time election was made pursuant to Section 2.7(b) above and at the Initial Maturity Date, based on the trailing 12 months, shall be equal to or greater than 1.20:1.00;

35

(d)     Intentionally Omitted;

(e)     Intentionally Omitted;

(f)     Intentionally Omitted; and

(g)     In connection with the Extension Option, Borrower shall have delivered to Lender, together with its notice pursuant to subsection (b) of this Section 2.7, the non-refundable Extension Fee based on the Outstanding Principal Balance on the date of such notice.

## ARTICLE 3

## CONDITIONS PRECEDENT

Section 3.1     Conditions Precedent to Closing.  The obligation of Lender to make the Loan hereunder is subject to the fulfillment by Borrower, or waiver by Lender, of the following conditions precedent no later than the Closing Date provided, however, that by entering into this Agreement, Lender shall be deemed to have waived any such condition not therefore fulfilled or satisfied (subject to any post-closing letter executed by Borrower contrary to such waiver).

3.1.1     Representations and Warranties; Compliance with Conditions.  The representations and warranties of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Default shall have occurred and be continuing; and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

3.1.2     Loan Documents.   Lender shall have received originals of this Agreement, the Note and all of the other Loan Documents, in each case, duly executed and delivered on behalf of Borrower.

3.1.3     Insurance; Encumbrances.

(a)     Intentionally Omitted.

(b)     Intentionally Omitted.

(c)     Intentionally Omitted.

(d)     Insurance.  Lender shall have received valid certificates of insurance for the Policies required hereunder, satisfactory to Lender in its sole discretion, and evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)     Intentionally Omitted.

(f)     Encumbrances.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first priority Lien as of the Closing Date with respect to the Mortgage, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents and the Bankruptcy Proceeding, and Lender shall have received satisfactory evidence thereof.

3.1.4     Related Documents.     Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance reasonably satisfactory to Lender, and shall have been duly authorized, executed and delivered by all parties thereto and Lender shall have received and approved certified copies thereof.

3.1.5     Delivery of Organizational Documents.  (a)  Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Borrower and/or its formation, structure, existence, good standing and/or qualification to do business, as Lender may reasonably request in its sole discretion, including, without limitation, good standing certificates, qualification to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender.

(b)     Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Principal, Guarantors, and other members and/or partners of Borrower, and/or the formation, structure, existence, good standing and/or qualification to do business of any of the foregoing, as Lender may request in its sole discretion, including, without limitation, good standing certificates, qualification to do business in the appropriate jurisdictions, authorizing resolutions and incumbency certificates as may be requested by Lender.

3.1.6     Opinions of Borrower's Counsel.  Lender shall have received opinions from Borrower's counsel with respect to the due execution, authority, enforceability under New York law of the Loan Documents (it being understood that such opinions shall not include enforceability of the Mortgage and Assignment of Leases or any other opinions under Illinois law), all such opinions in the form of the opinions delivered to Lender on the date hereof.

3.1.7     Intentionally Omitted.

3.1.8     Basic Carrying Costs.  Borrower shall have paid or cause to have been paid, or there shall be sufficient funds in the Lockbox Account to pay, all Basic Carrying Costs relating to the Property which are in arrears, including without limitation, (a) accrued but unpaid Insurance Premiums, (b) currently due Taxes (including any in arrears) and (c) currently due Other Charges, which amounts shall be funded with proceeds of the Loan.

3.1.9     Intentionally Omitted.

3.1.10   Payments.  All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or

before the Closing Date shall have been paid, including, without limitation, the Original Loan Paydown and the Initial Seasonality Deposit.

      3.1.11    <u>Intentionally Omitted.</u>

      3.1.12    <u>Intentionally Omitted.</u>

      3.1.13    <u>Intentionally Omitted.</u>

      3.1.14    <u>Pending Suits</u>.  The Bankruptcy Proceeding, the New York Proceeding and the New York Proceeding will be dismissed with prejudice prior to or simultaneously with the execution of this Agreement.

      3.1.15    <u>Intentionally Omitted</u>.

      3.1.16    <u>Intentionally Omitted</u>.

      3.1.17    <u>Management Agreement</u>.   Lender hereby approves the Management Agreement. The base management fee payable to the Manager shall not exceed three percent (3.0%) of Gross Receipts (as defined in the Management Agreement) per annum.

      3.1.18    <u>Intentionally Omitted</u>.

      3.1.19    <u>Intentionally Omitted</u>

      3.1.20    <u>Intentionally Omitted</u>.

      3.1.21    <u>Intentionally Omitted</u>.

## ARTICLE 4

## <u>REPRESENTATIONS AND WARRANTIES</u>

      Section 4.1    <u>Borrower Representations</u>.   Borrower represents and warrants as of the Closing Date that:

      4.1.1    <u>Organization</u>.  Borrower has been duly organized and is validly existing and in good standing pursuant to the laws of the State of Delaware and is in good standing as a authorized foreign entity pursuant to the laws of the State of Illinois, with all requisite power and authority to own its properties and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower will consist only of the ownership, management and operation of the Property. Immediately following the funding of the Loan, the ownership interests of Borrower will be as set forth on the organizational chart attached hereto as <u>Schedule III</u>.

4.1.2    _Proceedings_.  Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party.  This Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by or on behalf of Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.1.3    _No Conflicts_.   The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower, Principal and/or Guarantors, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any such Governmental Authority required for the execution, delivery and performance by Borrower, Principal and/or Guarantors, as applicable, of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

4.1.4    _Litigation_.  There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened (a) in writing against Borrower, Principal or the Property, which actions, suits or proceedings, if determined against Borrower, Principal or the Property, are reasonably likely to materially adversely affect the condition (financial or otherwise) or business of Borrower, Principal or the condition or ownership of the Property, or (b) that are not adequately covered by insurance, other than the Bankruptcy Proceeding, the Equitable Subordination Litigation, the Foreclosure Proceeding, the New York Proceeding, the Removed Litigation, any other action, suit or proceeding of which Lender is aware, any other advisory proceedings initiated in connection with the Bankruptcy Proceeding, the New York Litigation and other actions initiated by Lender, all of which Lender acknowledges.

4.1.5    _Agreements_.  Borrower is not a party to any agreement or instrument which is reasonably likely to materially and adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise (other than the Bankruptcy Proceeding). Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property are bound which is reasonably likely to have a material adverse effect on Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which

39

Borrower or the Property is otherwise bound, other than (a) any obligations incurred in the ordinary course of the operation of the Property as permitted pursuant to clause (t) of the definition of "Special Purpose Entity" set forth in <u>Section 1.1</u> hereof, and (b) the obligations under the Loan Documents.

      4.1.6    <u>Title</u>. Borrower has good, marketable and as to the items other than personality, insurable fee simple title to the Property, free and clear of all Liens whatsoever, except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. Borrower is the sole owner of the portion of the Property constituting personalty, holding same free and clear of all Liens whatsoever, except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. The Permitted Encumbrances in the aggregate do not materially and adversely affect the value, operation or use of the Property (as currently used) or Borrower's ability to repay the Loan. The Mortgage and the Assignment of Leases, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, create (a) a valid, perfected first priority lien in and to Borrower's right, title and interest to the Property, subject only to Permitted Encumbrances and the Liens created by the Loan Documents, and (b) perfected first priority security interests in and to, and perfected collateral assignments of, Borrower's right, title and interest in and to all personalty (including the Leases) constituting any part of the Property, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. To Borrower's knowledge, there are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.

      4.1.7    <u>Solvency</u>. Borrower has (a) not entered into the transaction contemplated by this Agreement or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under such Loan Documents. The fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's probable liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower). Other than the Bankruptcy Proceeding, no petition in bankruptcy has been filed against Borrower or any of its constituent Persons, and neither Borrower nor any of its constituent Persons has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under any state or

federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or any of its constituent Persons.

4.1.8    Full and Accurate Disclosure.    To Borrower's knowledge, no statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains (or in the case of written material, at the time supplied contained) any untrue statement of a material fact or omits (or in the case of such written material, at the time supplied omitted) to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.

4.1.9    No Plan Assets.

(a)    Borrower does not sponsor, is not obligated to contribute to, and is not itself an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (1) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (2) transactions by or with Borrower are not subject to any state or other statute, regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Loan Agreement including, but not limited to, the exercise by Lender of any of its rights under the Loan Documents.

(b)    Borrower further represents and warrants that one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

4.1.10    Compliance.    To Borrower's knowledge, Borrower and the Property (including the use thereof) comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes necessary to operate the Property and carry on its business. To Borrower's knowledge, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental

Authority. To Borrower's knowledge, there has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

4.1.11    Financial Information.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in connection with the Loan (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of the Property as of the date of such reports, and (iii) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any material contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof as a hotel, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no material adverse change in the financial condition, operation or business of Borrower from that set forth in said financial statements.

4.1.12    Condemnation.  To Borrower's knowledge, no Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of any roadway providing access to the Property.

4.1.13    Federal Reserve Regulations.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.1.14    Utilities and Public Access.  To Borrower's knowledge, the Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

4.1.15    Not a Foreign Person.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.

42

4.1.16    Separate Lots.   To Borrower's knowledge, the Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

4.1.17    Assessments.   To Borrower's knowledge, there are no pending or, to Borrower's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

4.1.18    Enforceability.   The Loan Documents are not currently subject to any right of rescission, set-off, counterclaim or defense by Borrower, Principal or any Guarantor, including the defense of usury, and Borrower, Principal and Guarantors have not asserted any right of rescission, set-off, counterclaim or defense with respect thereto except pursuant to the Equitable Subordination Litigation.

4.1.19    No Prior Assignment.   To Borrower's knowledge, there are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

4.1.20    Insurance.   Borrower has obtained and has delivered to Lender certificates of insurance (on ACORD Form 25), together with proof that all premiums have been paid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any such Policies, and Borrower has not done, by act or omission, anything which would impair the coverage of any such Policies.

4.1.21    Use of Property.   The Property is used exclusively for retail, restaurant and hotel purposes and other appurtenant and related uses.

4.1.22    Certificate of Occupancy; Licenses.   To Borrower's knowledge, all material certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits, if any, and any applicable liquor license required for the legal use, occupancy and/or operation of the Property for retail and hotel purposes (collectively, the **"Licenses"**), have been obtained and are in full force and effect. The use being made of the Property is in conformity with all zoning laws applicable to the Property.

4.1.23    Flood Zone.   To Borrower's knowledge, except as set forth on the Survey, none of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, the flood insurance required pursuant to Section 6.1(i) hereof is in full force and effect with respect to the Property.

4.1.24    Intentionally Omitted.

4.1.25    Boundaries.   To Borrower's knowledge except as set forth on the Survey, all of the Improvements, which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other

43

encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by the Title Insurance Policy or are Permitted Encumbrances.

4.1.26    Leases. To Borrower's knowledge, the Property is not subject to any Leases other than (i) hotel guest occupancy agreements and (ii) the Leases described in Schedule I attached hereto and made a part hereof. Borrower is the owner and lessor of landlord's interest in the Leases. No Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases and any subleases, licenses, assignments or occupancy agreements thereunder. The current Leases are in full force and effect and, to Borrower's knowledge, there are no monetary or other material defaults thereunder by either party and to Borrower's knowledge, there are no conditions that, with the passage of time or the giving of notice, or both, would constitute monetary or other material defaults thereunder. The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto. No Rent (including security deposits) has been paid more than one (1) month in advance of its due date. All work to be performed by Borrower prior to the date hereof under each Lease has been performed as required in such Lease and has been accepted by the applicable tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements, except as expressly set forth in such Leases, required to be given by Borrower to any tenant prior to the date hereof has already been received by such tenant. To Borrower's knowledge, no tenant listed on Schedule I has assigned its Lease or sublet all or any portion of the premises demised thereby. No tenant holds its leased premises under assignment, nor, to Borrower's knowledge, does anyone except such tenant and its employees occupy such leased premises. No tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the Property of which the leased premises are a part. No tenant under any Lease has any right or option for additional space in the Improvements.

4.1.27    Survey. To Borrower's knowledge, to the knowledge of Borrower, the Survey for the Property delivered to Lender in connection with this Original Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

4.1.28    Principal Place of Business; State of Organization. The Borrower is organized under the laws of the State of Delaware and has its principal place of business in the State of New York.

4.1.29    Filing and Recording Taxes. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid, and, under current legal requirements, the Mortgage is enforceable in accordance with its terms by Lender (or any subsequent holder thereof), subject to principles of equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations.

44

4.1.30   Special Purpose Entity/Separateness.

(a)   Borrower hereby represents, warrants and covenants that from and after the respective date of its formation through the date on which the Debt has been paid in full Borrower has been, is, shall be and shall continue to be a Special Purpose Entity.

(b)   The representations, warranties and covenants set forth in Section 4.1.30(a) shall survive for so long as any amount remains payable to Lender under this Agreement or any other Loan Document.

(c)   Intentionally Omitted.

4.1.31   Management Agreement.   As of the date hereof, the Management Agreement is in full force and effect and, to Borrower's knowledge, there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default by Borrower thereunder that is reasonably likely to have a material adverse effect on Borrower or the Property.

4.1.32   Illegal Activity.   No portion of the Property has been or will be purchased by Borrower with proceeds of any illegal activity.

4.1.33   Franchise Agreement.   As of the date hereof, there is no Franchise Agreement in effect.

4.1.34   Investment Company Act.   Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

4.1.35   Embargoed Person.   At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower or Principal shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under the Prescribed Laws (each such Person, an "**Embargoed Person**") with the result that the Loan made by Lender is or would be in violation of law; (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower or Principal, as applicable, with the result that the Loan is or would be in violation of law; and (c) none of the funds of Borrower or Principal, as applicable, shall be derived from any unlawful activity with the result that the Loan is or would be in violation of law.

4.1.36   Cash Management Account.

(a)   This Agreement, together with the other Loan Documents, creates a valid and continuing security interest (as defined in the Uniform Commercial Code of the State of Illinois) in the Lockbox Account and Cash Management Account in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is

45

enforceable as such against creditors of and purchasers from Borrower. Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold or otherwise conveyed the Lockbox Account or the Cash Management Account;

      (b)    Each of the Lockbox Account and Cash Management Account constitute "deposit accounts" within the meaning of the Uniform Commercial Code of the State of Illinois;

      (c)    Pursuant and subject to the terms hereof, the Lockbox Bank has agreed to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Lockbox Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities; and

      (d)    The Lockbox Account and Cash Management Account are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee.

      Section 4.2    <u>Survival of Representations</u>.    Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> hereof and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

      Section 4.3    <u>Approval of Bankruptcy Court</u>.    The transactions contemplated by this Agreement and the other Loan Documents are part of the Reorganization Plan.

## ARTICLE 5

## BORROWER COVENANTS

      Section 5.1    <u>Affirmative Covenants</u>.    From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

      5.1.1    <u>Existence; Compliance with Legal Requirements</u>.    (a) To the extent necessary to avoid a material adverse change in the financial condition, business condition, legal existence or qualification to do business of Borrower, Borrower shall do or cause to be done with reasonable promptness all things necessary to preserve, renew and keep in full force and effect Borrower's existence, rights, licenses, permits and franchises and comply with all material Legal Requirements applicable to Borrower and the Property, including, without limitation, the Franchise Agreement, if any. Borrower shall keep and maintain or cause Manager to keep and maintain all Licenses necessary for the operation of the Property as a hotel (with appurtenant

retail uses). There shall never be committed by Borrower, and Borrower shall use commercially reasonable efforts not to permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording the federal government or any state or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower shall at all times maintain, preserve and protect all franchises and trade names, preserve all the remainder of its property used in the conduct of its business, and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Mortgage. Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (a) no Event of Default has occurred and remains uncured; (b) Borrower is permitted to do so under the provisions of any mortgage or deed of trust superior in lien to the Mortgage; (c) such proceeding shall not result in a default under any material agreement to which Borrower is subject and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Borrower shall, upon final determination thereof, promptly comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (f) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower and the Property; and (g) Borrower shall furnish such security as may be required in the proceeding (or, if none required, as may be reasonably requested by Lender), to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

      (b)    <u>Intentionally Omitted</u>.

      5.1.2    <u>Taxes and Other Charges</u>. Borrower shall pay or cause to be paid all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, or any part thereof, as the same become due and payable; provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of <u>Section 7.2</u> hereof. Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges no later than ten (10) days prior to the date the same shall become delinquent provided, however, Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to <u>Section 7.2</u> hereof. Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property and that is prohibited in accordance with <u>Section 5.2.2</u> hereof, and shall promptly pay for all utility services provided to the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other

Charges, provided that (a) no Default or Event of Default has occurred and remains uncured; (b) Borrower is permitted to contest same under the provisions of any mortgage or deed of trust superior in lien to the Mortgage; (c) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (d) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (e) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (f) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (g) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien.

      5.1.3    Litigation. Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower or Principal which are reasonably likely to materially adversely affect Borrower's or Principal's condition (financial or otherwise) or business or the Property.

      5.1.4    Access to Property. Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice (which may be given verbally); provided such inspections do not materially interfere with the use and operation of the Property.

      5.1.5    Notice of Default. Borrower shall promptly advise Lender of any material adverse change in Borrower's or Principal's condition, financial or otherwise, or of the occurrence of any Event of Default of which Borrower has actual knowledge.

      5.1.6    Cooperate in Legal Proceedings. Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way materially and adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

      5.1.7    Perform Loan Documents. Borrower shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower. Payment of the costs and expenses associated with any of the foregoing shall be in accordance with the terms and provisions of this Agreement, including, without limitation, the provisions of Section 10.13 hereof.

      5.1.8    Award and Insurance Benefits. Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably

payable in connection with the Property to the extent Lender is entitled to same under the terms of this Agreement or the Mortgage, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

       5.1.9    Further Assurances.    Borrower shall, at Borrower's sole cost and expense:

       (a)    furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

       (b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts reasonably necessary, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require, including, without limitation, the execution and delivery of all documents necessary to transfer any liquor licenses with respect to the Property; and

       (c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

       5.1.10    Mortgage Taxes.    Borrower represents that it has paid all state, county and municipal recording and all other taxes imposed upon the execution and recordation of the Mortgage.

       5.1.11    Financial Reporting.

       (a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis reasonably acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property. Lender shall have the right from time to time at reasonable times during normal business hours upon reasonable prior notice (which may be verbal) to examine such books, records and accounts where same are ordinarily maintained, which shall be at the office of Borrower or any other Person maintaining such books, records and accounts or its managing agent, and to make such copies or extracts thereof as Lender may reasonably require. After the occurrence and during the continuance of an Event of Default, Borrower shall pay any out-of-pocket costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)     Borrower will furnish to Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements audited by an independent certified public accountant acceptable to Lender (which shall be deemed to include Price Waterhouse) in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year. Borrower's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses and the actual income and expenses for the prior Fiscal Year, (ii) occupancy statistics for the Property and (iii) an Officer's Certificate or an officer's certificate delivered by Manager certifying that, to such Person's knowledge, each annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and that such financial statements have been prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP or such other accounting basis as Lender shall reasonably accept and as of the date thereof whether, to such Person's knowledge, there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower or Guarantors, and if such Default or an Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)     Borrower will furnish, or cause to be furnished, to Lender on or before twenty five (25) days after the end of each calendar month during the first year of the term of the Loan and on or before forty five (45) days after the end of each calendar quarter thereafter, the following items, accompanied (with respect to quarterly reports only) by an Officer's Certificate or an officer's certificate delivered by Manager stating that, to such Person's knowledge, such items are true, correct, accurate in all material respects and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) a rent roll for the subject month (or quarter, as applicable); (ii) monthly (or quarterly, as applicable) and year-to-date operating statements (including Capital Expenditures) prepared for each calendar month (or quarter, as applicable), noting Net Operating Income, Gross Income from Operations, and Operating Expenses (not including any contributions to the FF&E Reserve Funds), and, upon Lender's reasonable request, other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such period, and containing a comparison of budgeted income and expenses and the actual income and expenses, all in form satisfactory to Lender; (iii) a reasonably detailed explanation of any material expenses incurred which were not provided in the applicable Annual Budget. On or before twenty five (25) calendar days after the end of each calendar month during the first year of the term of the Loan and on or before forty-five (45) calendar days after the end of each calendar quarter thereafter (or as soon after such 45th day as such reports become available to Borrower) Borrower also will furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

(d)     Each Fiscal Year, Borrower shall submit or shall cause Manager to submit to Lender an Annual Budget not later than thirty (30) days prior to the commencement of such

period or Fiscal Year in substantially the form delivered to Lender in connection with the closing of the Loan (or such other form as may be reasonably acceptable to Lender), except that the Annual Budget for the current Fiscal Year shall be delivered on or prior to the Closing Date. At all times, the Annual Budget shall be subject to Lender's approval, which shall not be unreasonably withheld, conditioned or delayed (each such Annual Budget, an "**Approved Annual Budget**"). Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's proposed Annual Budget. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request for approval of such Annual Budget containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST FOR APPROVAL OF ANNUAL BUDGET PURSUANT TO SECTION 5.1.11(d) OF THE LOAN AGREEMENT THIS REQUEST SHALL BE DEEMED APPROVED IF NOT OBJECTED TO WITHIN 5 BUSINESS DAYS**", Lender's approval shall be deemed given if no objection is made by Lender within five (5) Business Days after receipt thereof. In the event that Lender objects to a proposed Annual Budget submitted by Borrower which requires the approval of Lender hereunder, Lender shall advise Borrower of such objections within five (5) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within five (5) Business Days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves or is deemed to have approved the Annual Budget. Until such time that Lender approves or is deemed to have approved a proposed Annual Budget which requires the approval of Lender hereunder, the most recently Approved Annual Budget shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums, utilities expenses, union labor and fixed increases under previously executed agreements; provided, further, that the Approved Annual Budget shall be adjusted to reflect increased variable expenses as a result of increased occupancy levels from the prior year.

(e)    In the event that Borrower must incur an extraordinary Operating Expense or Capital Expenditure not set forth in the Approved Annual Budget (each, an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for approval, which approval shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything to the contrary contained herein, no approval from Lender shall be required if (i) a single Extraordinary Expense is equal to or less than five percent (5%) of the amount set forth in the Approved Annual Budget for such expense, or (ii) if no sum was budgeted for such expense in the Approved Annual Budget and the Extraordinary Expense is less than or equal to five percent (5%) of the Approved Annual Budget; provided that all Extraordinary Expenses in any Fiscal Year do not exceed five percent (5%) of the Approved Annual Budget, (iii) an emergency exists which require the immediate expenditure of an Extraordinary Expense to preserve the value of the Property or to protect the health and safety of Persons located on the Property or adjacent to the Property or (iv) such expense is an expense required to be made to cause the Property to comply with the terms of this Agreement or the other Loan Documents.

51

(f)     Any reports, statements or other information required to be delivered under this Agreement shall be delivered in paper form.

5.1.12   <u>Business and Operations</u>.   Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property. Borrower will qualify to do business and will remain in good standing under the laws of Illinois as and to the extent the same are required for the ownership, maintenance, management and operation of the Property. Borrower shall keep and maintain all Licenses necessary for the operation of the Property for hotel and retail purposes, except to the extent that the failure to do so would not have a material adverse effect on Borrower or the Property.

5.1.13   <u>Title to the Property</u>.   Borrower will warrant and defend (a) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), and (b) the validity and priority of the Lien of the Mortgage and the Assignment of Leases, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

5.1.14   <u>Costs of Enforcement</u>.   In the event (a) that the Mortgage is foreclosed in whole or in part or that the Mortgage is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, or (c) of any future bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors (other than the Bankruptcy Proceeding), Borrower, on behalf of itself and its successors and assigns, agrees that it/they shall be chargeable with and shall pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

5.1.15   <u>Estoppel Statement</u>.

(a)     Lender and Borrower each shall, within thirty (30) days of written request from the other or a third party, furnish such other party or such third party with a statement, duly acknowledged and certified, setting forth (i) the Outstanding Principal Balance, (ii) the Applicable Interest Rate, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the performance of the Obligations, if any, and (v) that the Note, this Agreement, the Mortgage and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

(b)     At Lender's request (which may be made no more than one (1) time in any calendar year), Borrower shall request tenant estoppel certificates from each commercial tenant

leasing space at the Property in the form required by such tenant's lease or, at Borrower's election, in the form previously accepted by Lender.

        5.1.16    <u>Intentionally Omitted</u>.

        5.1.17    <u>Performance by Borrower</u>.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, subject to all applicable notice, grace and cure periods therein.

        5.1.18    <u>Intentionally Omitted</u>.

        5.1.19    <u>No Joint Assessment</u>.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

        5.1.20    <u>Leasing Matters</u>.

        (a)      Any Leases with respect to the Property executed after the date hereof which Leases both (x) cover more than 2,500 square feet and (y) are for a term of greater than a one year shall be submitted to Lender for approval, which approval shall not be unreasonably withheld, conditioned or delayed. Upon request, Borrower shall furnish Lender with executed copies of all Leases. Any Leases for which Lender's approval is not required in accordance with the preceding sentences of this <u>Section 5.1.20(a)</u> and all renewals of Leases (except for renewals of Leases pursuant to renewal rights in existence as of the date hereof) shall provide for rental rates comparable to existing market rates for comparable space in comparable buildings in Chicago, Illinois and shall otherwise contain commercially reasonable terms. Any Leases for which Lender's approval is not required in accordance with the preceding sentences of this <u>Section 5.1.20(a)</u> shall not contain any terms which would materially and adversely affect Lender's rights under the Loan Documents. All proposed Leases executed after the date hereof shall provide that they are subordinate to the Mortgage and that the lessee agrees to attorn to Lender or any purchaser at a sale by foreclosure or power of sale. Lender shall enter into a subordination, non-disturbance and attornment agreement on Lender's then-current standard form with any tenant subject to modifications requested by tenants, provided such modifications are reasonably acceptable to Lender (other than an Affiliate of Borrower) entering into a new lease for which Lender's approval is required by this <u>Section 5.1.20</u> and has been obtained, within ten (10) Business Days after written request therefore by Borrower. Borrower (i) shall use commercially reasonable efforts to observe and perform, or cause to be performed in all material respects, the obligations imposed upon the lessor under the Leases; (ii) shall use commercially reasonable efforts to enforce and may, in a commercially reasonable manner and in a manner not to impair the value of the Property involved, amend the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, or terminate or accept a surrender of such Lease, except that no termination or acceptance of

surrender of any Leases shall be permitted unless by reason of a tenant default and except as expressly provided in the Leases; provided, however, that no such acceptance of surrender of any Lease covering more than 2,500 square feet will be permitted without the consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, provided a new Lease for the applicable portion of the Property is entered into contemporaneously with such cancellation on substantially the same (or more favorable) terms as the cancelled lease with a tenant of substantially similar quality; (iii) shall not collect any of the rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change the terms of the Leases in a manner inconsistent with the provisions of the Loan Documents; and (vi) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require. Notwithstanding anything to the contrary contained herein, Borrower shall not enter into a lease of all or substantially all of the Property, without Lender's prior consent.

        (b)     Notwithstanding anything to the contrary contained in this Section 5.1.20:

        (i)     whenever Lender's approval or consent is required pursuant to the provisions of this Section 5.1.20, Borrower shall have the right to submit a term sheet of such transaction to Lender for Lender's approval, such approval not to be unreasonably withheld, conditioned or delayed. Any such term sheet submitted to Lender shall set forth all material terms of the proposed transaction, including identity of tenant, square footage, term, rent, rent credits, abatements, work allowances and tenant improvements to be constructed by Borrower. Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's written request for approval or consent of such term sheet. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters **"REQUEST FOR APPROVAL OF LEASING TERM SHEET - REQUEST WILL BE DEEMED APPROVED PURSUANT TO SECTION 5.1.20 OF THE LOAN AGREEMENT IF NO OBJECTION IS MADE WITHIN 5 BUSINESS DAYS"**, Lender shall be deemed to have approved or consented to such term sheet if Lender fails to respond to such second written request before the expiration of such five (5) Business Day period;

        (ii)     whenever Lender's approval or consent is required pursuant to the provisions of this Section 5.1.20 for any matter with respect to which Lender has not previously approved a term sheet pursuant to Section 5.1.20(b)(i) above, Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's written request for such approval or consent. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters **"REQUEST FOR APPROVAL OF LEASING MATTER - REQUEST WILL BE DEEMED APPROVED PURSUANT TO SECTION 5.1.20 OF THE LOAN AGREEMENT IF NO OBJECTION IS MADE**

54

**WITHIN 5 BUSINESS DAYS**", Lender shall be deemed to have approved or consented to such matter if Lender fails to respond to such second written request before the expiration of such five (5) Business Day period;

(iii)     whenever Lender's approval or consent is required pursuant to the provisions of this Section 5.1.20 for any matter that Lender has previously approved or is deemed to have approved a term sheet pursuant to Section 5.1.20(b)(i) above, Lender shall use good faith efforts to respond within five (5) Business Days after Lender's receipt of Borrower's written request for such approval or consent. If Lender fails to respond to such request within five (5) Business Days, and Borrower sends a second request containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "**REQUEST FOR APPROVAL OF LEASING MATTER FOR WHICH TERM SHEET HAS BEEN APPROVED - REQUEST WILL BE DEEMED APPROVED PURSUANT TO SECTION 5.1.20 OF THE LOAN AGREEMENT IF NO OBJECTION IS MADE WITHIN 5 BUSINESS DAYS**", Lender shall be deemed to have approved or consented to such matter if Lender fails to respond to such second written request before the expiration of such five (5) Business Day period; provided that there have been no material deviations from the term sheet and that the aggregate economics of the transaction are no less favorable to Borrower than as set forth in the term sheet; and

(iv)     in the event that Lender shall have approved (or be deemed to have approved) a term sheet submitted by Borrower with respect to a certain Lease, Lender shall not withhold its approval or consent with respect to such Lease on the basis of any provisions of such Lease dealing with the items contained in the approved term sheet.

5.1.21     Alterations.  Except for the addition, upgrade or replacement of FF&E (which shall not be deemed Alterations), provided, however, FF&E shall in all events be subject to the terms and conditions of Section 7.3 herein, and reimbursable pursuant to the terms and conditions of Section 7.3; Lender's prior written approval shall be required in connection with any Alterations to any Improvements, not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Lender's consent shall not be required in connection with any Alterations that will not have a material adverse effect on Borrower's financial condition or the value of the Property, provided that such Alterations are either (a) performed in connection with Restoration after the occurrence of a Casualty in accordance with the terms and provisions of this Agreement or (b) do not materially adversely affect any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements, and do not have an aggregate cost in excess of $1,000,000 (the "**Threshold Amount**"). If the total unpaid amounts due and payable with respect to the Alterations (other than such amounts to be paid or reimbursed by tenants under the Leases), after deducting any Reserve Funds which may be utilized for such Alterations in accordance with the terms of this Loan Agreement which amounts are not the subject of an unrelated request for disbursement from such Reserve Funds, (excluding alterations described in the first sentence of this Section 5.1.21 above) shall at any time exceed the Threshold Amount, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following:

55

(i) cash, (ii) U.S. Obligations, (iii) Intentionally Omitted, (iv) a completion and performance bond or an irrevocable letter of credit (payable on sight draft only) issued by a financial institution (A) having a rating by S&P of not less than "A-1+" if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is reasonably acceptable to Lender, (B) Intentionally Omitted and (C) in form reasonably acceptable to Lender, or (v) such other security reasonably satisfactory to Lender. Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to Alterations to the Improvements on the Property (other than such amounts to be paid or reimbursed by tenants under the Leases) over the Threshold Amount and Lender may apply such security from time to time at the option of Lender to pay for such Alterations.

      5.1.22   Operation of Property.

          (a)   Borrower shall cause the Property to be operated, in all material respects, in accordance with the Management Agreement or Replacement Management Agreement, as applicable; provided, however, that Borrower shall not be deemed to be in default hereunder if Manager, and not Borrower, is in default under the terms of the Management or Replacement Management Agreement and Borrower is otherwise complying with the provisions of this Section 5.1.22. In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly, after obtaining Lender's consent, if Lenders consent is expressly required in accordance with the terms of this Agreement, which consent should not be unreasonably withheld, conditioned or delayed, enter into a Replacement Management Agreement with Manager or another Qualified Manager, as applicable and in accordance with the terms of this Agreement. Any breach of the covenants contained in this Section 5.1.22(a) with respect to the Management Agreement shall not result in an Event of Default as long as Borrower is actively seeking Lender's consent, if Lenders consent is expressly required in accordance with the terms of this Agreement, to enter into a Replacement Management Agreement with Manager or another Qualified Manager or, in the case of a termination, the Manager is replaced within thirty (30) days by a Qualified Manager pursuant to Section 9.5.

          (b)   Borrower shall: (i) use commercially reasonable efforts to perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Management Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, material report and estimate required to be delivered to Borrower under the Management Agreement; and (iv) use commercially reasonable efforts to enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner.

      5.1.23   Performance of Material Contracts. Borrower shall observe and perform in all material respects, the terms of all Material Contracts to be observed and performed by

Borrower pursuant to the terms of such Material Contracts, and Borrower shall exercise all commercially reasonable efforts to preserve and enforce all of Borrower's rights and remedies under such Material Contracts.

     5.1.24  <u>Franchise Agreement</u>. Solely if a Franchise Agreement shall be in place with respect to the Property:

     (a)   Borrower shall cause Manager to operate the Property pursuant to, and in accordance with, the terms of the Franchise Agreement and the Management Agreement in all material respects.

     (b)   Subject to the terms and conditions of <u>Section 5.1.25</u>, Borrower shall (or shall cause. Manager to) do the following:

     (i)   obtain, keep and maintain all certifications, permits, licenses, authorizations and approvals required for the continued legal use and operation of the Property as a hotel in the manner operated on the date hereof in all material respects;

     (ii)   promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under the Franchise Agreement in all material respects and use commercially reasonable efforts to preserve and to keep unimpaired its material rights thereunder,

     (iii)   promptly notify Lender of any (A) material default under the Franchise Agreement (or any successor franchise agreement or membership agreement), or (B) event or condition which, with the giving of notice or the passage of time, or both, would be a material default by Manager under the Franchise. Agreement (or any successor franchise agreement or membership agreement), or (C) notice or information received which indicates that Franchisor is terminating the Franchise Agreement or otherwise terminating any license or other right of Borrower or Manager under the Franchise Agreement, in each case promptly after Borrower or Manager receives such notice or otherwise is aware of such default, event or condition, which notice to Lender shall be accompanied by a written statement of the actions Borrower intends to take to cure such default or remedy such event, condition or circumstance, and, thereafter, keep Lender fully informed on a regular basis as to the progress of such actions; and, in the event that such actions have not successfully cured such default or remedied such event, condition or circumstance within thirty (30) days of the date of the original notice to Lender or if at any time before or after such thirty (30) day period Lender determines, in its reasonable discretion, that Borrower or Manager will not be reasonably able to complete the required cure within the time period for such cure in the Franchise Agreement or the notice sent pursuant thereto, then Lender shall immediately, without the requirement of notice to Borrower or Manager but subject to the terms of the Franchise Agreement, be entitled to take such action as it deems necessary, as Borrower's sole cost and expense, in order to effect a cure of such default (including all rights and remedies Lender may have under this Agreement).   Borrower shall, and shall cause

Manager to, cooperate fully with Lender if Lender determines, in its reasonable discretion, to take any action it reasonably deems necessary in order to cure such default and Borrower shall immediately reimburse Lender for any and all reasonable costs and expenses resulting, either directly or indirectly, from such action;

(iv)    deliver copies to Lender of all notices of default which Borrower or Manager shall receive under the Franchise Agreement within ten (10) days after receipt thereof;

(v)    promptly deliver to Lender a copy of any financial statements, material business plan or capital expenditures plan, received by it under the Franchise Agreement;

(vi)    to the extent entitled to so request under the Franchise Agreement and not more frequently than one (1) time per calendar year, request from Franchisor an estoppel certificate from the Franchisor in form and substance satisfactory to Lender in its reasonable discretion and Borrower shall use its commercially reasonable efforts to obtain such estoppel certificate from Franchisor;

(vii)    to the extent not prohibited under the Franchise Agreement and to the extent available to Borrower, provide to Lender any additional information with respect to the Franchise Agreement which may be reasonably required by Lender and its successor and/or assigns in connection with a Secondary Market Transaction, and Borrower shall, and shall cause Manager to, reasonably cooperate with Lender and its successors and/or assigns in connection with any such Secondary Market Transaction; and

(viii)    within fifteen (15) days after request by Lender (but not more frequently than twice in any calendar year), furnish Lender with a statement, duly acknowledged and certified, setting forth (A) the amounts then payable under the Franchise Agreement; (B) the date payments were last made under the Franchise Agreement (including annual dues and all monthly fees); (C) any offsets or defenses to the payment of amounts due under the Franchise Agreement known to Borrower; and (D) a statement that the Franchise Agreement is a valid, legal and binding obligation of Borrower and has not been modified or if modified, giving particulars of such modification.

(ix)    (A) Borrower shall deliver to Lender copies of schedules of annual dues and any amendment or revision to the Franchise Agreement and evidence reasonably satisfactory to Lender that all annual membership dues and fees have been paid no later than fifteen (15) days prior to the due date (the "**Payment Notice**") in accordance with the Franchise Agreement for each year during the term of the Loan and Extension Term, (B) Borrower acknowledges and agrees that in the event that Lender shall fail to receive the Payment Notice as provided herein, Lender shall have the right, without obligation to inquire or notify Borrower, to pay such amounts then due and owing to Franchisor, and Borrower shall be required to reimburse Lender within two (2)

58

Business Days after receipt of request thereof. Borrower further acknowledges and agrees that if it shall fail to deliver the Payment Notice to Lender in accordance with this Section 5.1.24(b)(ix), it shall be required to reimburse Lender for any amounts paid regardless of whether Borrower has already made such payment to Franchisor.

(c)    Without Lender's prior written consent, not to be unreasonably withheld and subject to the terms and conditions of Section 5.1.25 herein Borrower shall not, nor shall Borrower permit Manager to:

(i)    surrender, terminate or cancel the Franchise Agreement;

(ii)    reduce or consent to the reduction of the term of the Franchise Agreement;

(iii)    increase or consent to the increase of the amount of any charges under the Franchise Agreement (other than any increase provided for in the Franchise Agreement or any increase with respect to which Borrower's consent or approval is not required under the Franchise Agreement or any system-wide modification under the Franchise Agreement); or

(iv)    otherwise materially modify, change, supplement, alter or amend, or, except to the extent consistent with commercially sound business practices, waive or release any of its rights and remedies under, the Franchise Agreement in any material respect.

5.1.25 _Termination of Franchise Agreement_. Notwithstanding anything contained herein to the contrary, if a Franchise Agreement shall be in place with respect to the Property, Borrower shall be permitted to terminate the Franchise Agreement and all of its obligations thereunder, subject to Borrower satisfying (and, to the extent applicable, continuing to satisfy) the following conditions:

(a)    Borrower delivers a written notice to Lender at least thirty (30) days prior to the proposed termination date;

(b)    Borrower shall provide Lender evidence that all amounts due and owing under the Franchise Agreement have been paid in full and will be paid in full as of the date of termination (including, without limitation, any termination or similar fees payable under the Franchise Agreement);

(c)    From and after such termination, Borrower shall maintain the Property in the quality and condition which is equal to or better than the standard required under the Franchise Agreement (as if it were still in effect) or the standard required under any Approved Reservation Contract, whichever is higher);

(d)    Prior to such termination, Borrower shall enter into an Approved Reservation Contract and deliver the same to Lender;

59

(e)     Following such termination, (1) Borrower shall (i) comply with the terms and conditions of the Approved Reservation Contract, (ii) not, without Lender's prior written consent (which such consent shall not be unreasonably withheld, conditioned or delayed), amend, supplement, restate, replace or otherwise modify the Approved Reservation Contract, (iii) cause the Property to be operated at all times under an Approved Reservation Contract and (iv) not enter into a replacement Approved Reservation Contract except in accordance with the applicable terms and conditions hereof and (2) the terms and conditions contained herein relating to the Franchise Agreement shall be deemed to relate and apply to the Approved Reservation Contract;

(f)     No Event of Default for which Lender has elected to accelerate the Loan shall have occurred and be continuing as of the date of the termination of the Franchise Agreement; and

(g)     Borrower shall pay all of Lender's out of pocket expenses in connection with this Section 5.1.25, including the reasonable legal fees and expenses of Lender; provided, that, such expenses to be borne by Borrower shall be capped at $10,000;

provided, however, that if Manager is replaced by an Approved Manager, then Borrower shall be entitled to terminate the Franchise Agreement and replace it with a Management Agreement (that may include concepts that generally appear in a franchise agreement) with such Approved Manager and/or a Franchise Agreement with such Approved Manager or an Affiliate of such Approved Manager.

5.1.26   Compliance with Plan of Reorganization.   Lender and Borrower each shall comply with all of the provisions of the Plan of Reorganization that relate to this Agreement and the Loan.

Section 5.2   Negative Covenants.   From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not, without Lender's prior written consent, do, directly or indirectly, any of the following:

5.2.1   Operation of Property.   Borrower shall not, without Lender's prior consent (which consent shall not be unreasonably withheld, conditioned or delayed): (i) subject to Section 9.5 hereof, surrender, terminate or cancel the Management Agreement; provided, that Borrower may, without Lender's consent, replace the Manager so long as the replacement manager is a Qualified Manager pursuant to a Replacement Management Agreement; (ii) reduce or consent to the reduction of the term of the Management Agreement other than as a result of a termination permitted hereunder or consented to by Lender; (iii) increase or consent to the increase of the amount of any charges or fees under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.

5.2.2    Liens.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except:

(i)    Permitted Encumbrances;

(ii)    Liens created by or permitted pursuant to the Loan Documents; and

(iii)    Liens for Taxes or Other Charges not yet due.

5.2.3    Dissolution.  Other than as permitted by the Plan of Reorganization, Borrower shall not (a) engage in any dissolution, liquidation, consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership and operation of the Property, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower except to the extent permitted by the Loan Documents, (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction where such qualification is required for Borrower to own its assets or conduct its business or enforce its contracts or agreements, or (e) cause Principal to (i) dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which Principal would be dissolved, wound up or liquidated in whole or in part, or (ii) amend, modify, waive or terminate the certificate of incorporation or bylaws of Principal, in each case, without obtaining the prior consent of Lender, other than in connection with any Transfer permitted pursuant to Section 5.2.10 hereof.

5.2.4    Change in Business.  Borrower shall not enter into any line of business other than the ownership and operation of the Property as a hotel.

5.2.5    Debt Cancellation.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than in connection with termination of Leases in accordance herewith or with Transfers permitted hereunder) owed to Borrower by any Person, except in the ordinary course of Borrower's business.

5.2.6    Zoning.  Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case, without the prior consent of Lender.

5.2.7    No Joint Assessment.  Borrower shall not suffer, permit or initiate the joint assessment of all or any portion of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

5.2.8    Principal Place of Business and Organization.  Borrower shall not change its principal place of business set forth in the introductory paragraph of this Agreement without first giving Lender at least thirty (30) days prior notice. Borrower shall not change the

61

place of its organization as set forth in <u>Section 4.1.28</u> without the consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

      5.2.9    <u>ERISA</u>.

      (a)    Borrower shall not engage in any transaction which would cause any obligation or action to be taken hereunder or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

      (b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one or more of the following circumstances is true:

      (A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

      (B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

      (C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

      5.2.10    <u>Transfers</u>.

      (a)    Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members and (if Borrower is a trust) beneficial owners, as applicable, in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

      (b)    Without the prior consent of Lender and except to the extent otherwise set forth in this <u>Section 5.2.10</u>, Borrower shall not, and shall not permit any Restricted Party to, (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or

otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein, or (ii) permit a Sale or Pledge of an interest in the Property or in any Restricted Party (collectively, a **"Transfer"**), other than (1) pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of Section 5.1.20 hereof, (2) the disposition of Equipment and other Personal Property pursuant to the replacement thereof or otherwise in the ordinary course of the operation of the Property and (3) as permitted in the Plan of Reorganization.

(c)    A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property, or any part thereof, for a price to be paid in installments; (ii) an agreement by Borrower leasing or subleasing all or substantially all of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; or (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests.

(d)    Notwithstanding the provisions of this Section 5.2.10, any equity ownership transfer (but not any pledge) of a direct and/or indirect interest in Borrower shall be permitted without Lender's consent provided, that, if any such transfer of a direct and/or indirect interest in Borrower is in excess of fifty percent (50%) or would result in a change of control of Borrower (a **"Change of Control Transfer"**), then (i) Lender shall receive thirty (30) days prior written notice of such Transfer; (ii) the Transfer shall be to a Permitted Transferee, (iii) after giving effect to such Transfer, the Property shall continue to be managed by an Approved Manager, (iv) Borrower shall continue to be a Special Purpose Entity and shall continue to comply with the covenants contained herein related to ERISA matters, (v) a Substitute Guarantor shall have executed and delivered to Lender a replacement guaranty substantially in the form attached hereto as Exhibit B (and upon such execution and delivery, Lender shall release Guarantor under the then-existing Guaranty or any Substitute Guarantor under any prior replacement guaranty) and    (vi) Lender shall have received a payment (the **"Transfer Payment"**) equal to (i) with respect to the first Permitted Transfer, Six Million Dollars ($6,000,000) less the Amortization Payments paid to Lender since the Effective Date, and (ii)

63

with respect to the second Permitted Transfer, Three Million Dollars ($3,000,000), such amounts to be applied to the Outstanding Principal Balance.

(e)     Lender shall not withhold its consent to up to two (2) Transfers of the Property in its entirety, directly or indirectly, to a Permitted Transferee (including, without limitation, an Affiliate of Borrower that is a Permitted Transferee) (an "**Assumption Transfer**" and together with a "**Change of Control Transfer**", a "**Permitted Transfer**"); provided that (i) no Event of Default shall have occurred and remain uncured; (ii) the Permitted Transferee shall have executed and delivered to Lender a modification of the terms hereof, the Note, the Mortgage or the other Loan Documents in form and substance reasonably acceptable to Lender; (iii) the Permitted Transferee shall have executed and delivered to Lender an assumption of this Agreement, the Note, the Mortgage and the other Loan Documents as so modified by the Permitted Transferee in form and substance reasonably acceptable to Lender, evidencing such Permitted Transferee's agreement to abide and be bound by the terms of the Note, this Agreement and the other Loan Documents, subject to the provisions of Section 10.4 hereof; (iv) Lender shall have received payment of all of fees and expenses incurred in connection with such Transfer including, without limitation, all of Lender's out-of-pocket expenses in connection with the approval of such Transfer, the cost of any third party reports, reasonable legal fees and expenses; (v) Lender shall have received payment of a non-refundable $5,000 application fee; (vi) Intentionally Omitted; (vii) Lender shall have received reasonably satisfactory evidence of the Permitted Transferee's continued compliance with the representations and covenants set forth in Section 4.1.30 and Section 5.2.9 hereof; (viii) Lender shall have received satisfactory evidence that the single purpose nature and bankruptcy remoteness of Borrower, its shareholders, partners or members, as the case may be, following such transfers are in accordance with the then current standards of Lender; (ix) a Substitute Guarantor shall have executed and delivered to Lender a replacement guaranty substantially in the form attached hereto as Exhibit B (and upon such execution and delivery, Lender shall release Guarantor under the then-existing Guaranty or any Substitute Guarantor under any prior replacement guaranty); (x) Lender shall have received the applicable Transfer Payment; and (xi) such other conditions as Lender shall determine in its reasonable discretion to be in the interest of Lender with respect to the Loan and the Property.

(f)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Obligations immediately due and payable upon a Transfer not in accordance with this Agreement. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer of the Property.

5.2.11     Distributions to Affiliates.  Borrower shall not make any distributions to, or otherwise pay any dividends or make any payments to, any Restricted Party or any Guarantor, including, without limitation, any Principal, during any month while the Obligations are outstanding unless and until the payments specified in Section 2.6.3(a)(i)-(vi) with respect to such month (whether due or payable in the ordinary course of business during such month) have been made with sufficient funds on deposit in the Cash Management Account.

5.2.12     No Amendments.  Borrower shall not, without Lender's prior written consent (which consent Lender shall not unreasonably withhold, delay or condition), materially