amend, modify or terminate, or permit the amendment, modification or termination of (i) the organizational, governing or other corporate documents of Borrower in violation of the terms of this Agreement and the other Loan Documents or (ii) any Material Contracts.

Section 5.3   Hotel.   Without limiting the provisions of Section 5.1.22 and/or 5.2.1 above, Borrower hereby makes the following affirmative and negative covenants and Borrower hereby makes the following representations and warranties as if same were contained in Section 4.1 hereof (and such representations and warranties are hereby incorporated into Section 4.1):

(a)   Borrower shall promptly provide Lender with full and complete copies of all notices of default received by Borrower pursuant to the Management Agreement. In addition to the foregoing, Borrower shall (i) promptly deliver to Lender a copy of an annual business plan, if any, and annual capital expenditures budget received by it under the Management Agreement and not otherwise delivered to Lender, and (ii) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the Manager under the Management Agreement and the Manager Recognition Agreement.

(b)   As of the Closing Date, to the best of Borrower's knowledge (1) the Management Agreement is in full force and effect, (2) all sums currently due and payable under the Management Agreement have been paid, (3) Borrower is not in default under the Management Agreement beyond any applicable notice and/or cure periods and (4) Manager is not in default under the Management Agreement beyond any applicable notice and/or cure periods.

## ARTICLE 6

## INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS

Section 6.1   Insurance.   Borrower shall or shall cause Manager to obtain and maintain insurance for Borrower and the Property providing at least the following coverages:

(i)   Special Form Perils insurance including ordinance and law coverage as required in this paragraph on the Improvements and the Personal Property located therein, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case, (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) without deduction for depreciation, but the amount shall in no event be less than the Aggregate Outstanding Principal Balance; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property located therein waiving all co-insurance provisions; (C) providing for no deductible in excess of the lesser of (1) five percent (5%) of the "Full Replacement Cost" (as such term is defined in clause (A) above), (2) five percent (5%) of the Net Operating Income for the calendar year in which such insurance is

65

obtained, or (3) Fifty Thousand and No/Dollars ($50,000.00) for all such insurance coverage; and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use thereof shall at any time constitute legal non-conforming structures or uses due to a loss by a covered peril which coverage shall comprise three types: (1) Coverage A – the value of the undamaged portion of the Improvements, which shall be included in the building limit; (2) Coverage B – the cost of demolition/debris removal in an amount equal to ten percent (10%) of the value of the Improvements; and (3) Coverage C – the increased costs of construction to restore the Improvements in an amount equal to ten percent (10%) of the value of the Improvements. In addition, Borrower shall obtain or cause to be obtained: (x) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the lesser of (1) the Aggregate Outstanding Principal Balance or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall reasonably require; and (y) coastal windstorm insurance in amounts and in form and substance satisfactory to Lender in the event the Building is located in any coastal region, provided that the insurance pursuant to clauses (x), and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i);

(ii)    commercial general liability insurance, including an endorsement and coverages against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than Two Million and No/Dollars ($2,000,000) in the aggregate and One Million and No/Dollars ($1,000,000) per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Article 8 of the Mortgage to the extent the same is available;

(iii)    rental loss and/or business income interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property have been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Improvements are repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected Gross Income from Operations for a period of not less than

66

twelve (12) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire prior to the end of such period. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the Gross Income from Operations for the succeeding twelve (12) month period. Notwithstanding anything to the contrary in Section 2.6 hereof, all proceeds payable jointly to Borrower and Lender pursuant to this subsection shall be held by Lender and shall be applied by Lender (I) first, to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note and (II) second, provided no Event of Default has occurred and is continuing, Operating Expenses approved by Lender in its sole discretion; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Improvements coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Improvements, and (4) with an agreed amount endorsement or confirmation that coinsurance does not apply to this coverage;

(v)    if the Improvements includes commercial property, worker's compensation insurance with respect to any employees of Borrower, as required by any Governmental Authority or Legal Requirement;

(vi)    comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)    umbrella liability insurance in an amount not less than Twenty Five Million and No/Dollars ($25,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(viii)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing minimum limits per occurrence of One Million and No/Dollars ($1,000,000.00);

(ix)    if the Building is or becomes a legal "non-conforming" use by a covered peril, ordinance or law coverage and insurance coverage to compensate for the cost of demolition and/or rebuilding of the undamaged portion of the Building along with

any reduced value and the increased cost of construction in amounts as requested by Lender;

(x)     the commercial property and business income insurance required under Sections 6.1(i) and (iii) above shall cover perils of terrorism and acts of terrorism (whether caused by a foreign or domestic source) and Borrower shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism (whether caused by a foreign or domestic source) on terms (including amounts) consistent with those required under Sections 6.1(i) and (iii) above at all times during the term of the Loan; provided, however, that coverage purchased by Borrower of the types provided for under the Terrorism Risk Insurance Act of 2002 ("**TRIA**") as of the date hereof (even if TRIA is modified, repealed or expires after the date hereof) shall satisfy Borrower's obligations under this subsection (x); provided, further, that Borrower shall not be required to incur a cost for terrorism insurance that is in excess of $226,000 per year (the "**Terrorism Coverage Cost Cap**") and in the event the annual premium for terrorism coverage satisfying the requirements of this Section 6.1(a) shall exceed the Terrorism Coverage Cost Cap, Borrower shall only be required to obtain and maintain terrorism coverage for as much of the coverage as is available for a premium equal to the Terrorism Coverage Cost Cap;

(xi)     the Required Environmental Insurance Policy; and

(xii)     upon not less than sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Building located in or around the region in which the Building is located.

Section 6.2     Intentionally Omitted.

Section 6.3     Miscellaneous. All insurance provided for in Section 6.1 shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies may be issued by a syndicate of not less than five (5) financially sound and responsible insurance companies authorized to do business in the State, of which either (i) one hundred percent (100%) shall have a claims paying ability rating of "A" or better (and the equivalent thereof) by at least two (2) Rating Agencies, or (ii) sixty percent (60%) shall have a claims paying ability rating of "A" or better (and the equivalent thereof) by at least two (2) Rating Agencies and the first layers of the coverages required hereunder shall be provided by such companies, and the remaining forty percent (40%) of which shall have a claims paying ability rating of "BBB-" or better (and the equivalent thereof) by at least two (2) of the Rating Agencies, or (iii) the claims paying ability rating by at least two (2) Rating Agencies rating the Securities, shall be equivalent to or better than the claims paying ability rating of such insurance companies on the Closing Date. The Policies described in Section 6.1 (other than those strictly limited to liability protection) shall designate Lender as mortgagee and loss payee. Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to

Lender (each such date, as applicable, the "**Policy Expiration Date**"), Borrower will make its best efforts to provide (each of the following, collectively, the "**Renewal Evidence**") certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**").  In all events, Borrower shall (i) until delivery of the Renewal Evidence, keep Lender appraised during said fifteen (15) day period of its efforts to furnish to Lender the Renewal Evidence and (ii) by no later than two (2) Business Days prior to the Policy Expiration Date (such date, the "**Policy Renewal Deadline**"), furnish to Lender the Renewal Evidence.  Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1.

(a)    All Policies provided for or contemplated by Sections 6.1(ii) and (vii) shall name Borrower as the insured and Lender (and its affiliates) as the additional insured, as its interests may appear, and in the case of the Policies required under Section 6.1 relating to property damage, boiler and machinery and flood insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(b)    All Policies provided for in Section 6.1 shall contain clauses or endorsements to the effect that:

(i)    no act or negligence of Borrower, or anyone acting for Borrower, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    the Policies shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' notice to Lender and any other party named therein as an additional insured;

(iii)    the issuers thereof shall give notice to Lender if the Policies have not been renewed at least fifteen (15) days prior to its expiration; and

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(c)    If, as of any Policy Renewal Deadline, Lender is not in receipt of written evidence that all Policies are in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate. All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the Default Rate.

69

(d)     Section 16.9 of the Mortgage is hereby incorporated by reference as if fully set forth herein.

Section 6.4     Casualty.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a **"Casualty"**), Borrower shall give prompt notice of such damage to Lender, and shall, at Borrower's option, either (a) promptly commence and diligently prosecute the completion of the Restoration so that the Property resembles, as nearly as possible, the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.6, or (b) prepay the Loan in whole. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In addition, Lender may participate in any settlement discussions with any insurance companies with respect to any Casualty in which the Net Proceeds or the costs of completing the Restoration are equal to or greater than One Million and No/Dollars ($1,000,000) and Borrower shall deliver to Lender all instruments required by Lender to permit such participation.

Section 6.5     Condemnation.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding in respect of Condemnation and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by Lender to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to perform the Obligations at the time and in the manner provided in this Agreement and the other Loan Documents and the Outstanding Principal Balance shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Obligations. Lender shall not be limited to the interest paid on the Award by the applicable Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a Governmental Authority, Borrower shall promptly commence and diligently prosecute Restoration and otherwise comply with the provisions of Section 6.6. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 6.6     Restoration.  The following provisions shall apply in connection with the Restoration:

(a)     If the Net Proceeds shall be less than One Million and No/Dollars ($1,000,000.00) and the costs of completing the Restoration shall be less than One Million and No/Dollars ($1,000,000.00), the Net Proceeds will be disbursed by Lender to Borrower upon receipt; provided that all of the conditions set forth in Section 6.6(b)(i) are met and Borrower

70

delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)     If the Net Proceeds are equal to or greater than One Million and No/Dollars ($1,000,000.00) or the costs of completing the Restoration is equal to or greater than One Million and No/Dollars ($1,000,000.00), the Net Proceeds will be held by Lender and Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.6. The term "**Net Proceeds**" for purposes of this Section 6.6 shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(i), (iv), (vi), (ix), (x), (xi) and, to the extent applicable, (xii) as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel costs and fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)     The Net Proceeds shall be made available to Borrower for Restoration upon the approval of Lender in its reasonable discretion that the following conditions are met:

(A)     no Event of Default shall have occurred and be continuing;

(B)     (1) in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty, or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no material portion of the Improvements is located on such land;

(C)     the Management Agreement and Franchise Agreement, if any, will remain in full force and effect following completion of the Restoration or a Replacement Management Agreement or a replacement Franchise Agreement (entered into in accordance with the terms and conditions hereof) shall be executed and set to be in full force and effect following completion of the Restoration;

(D)     subject to delays due to acts of god, governmental restrictions, stays, judgments, orders, decrees, enemy actions, civil commotion, fire, casualty, strikes, work stoppages, shortages of labor or materials or other cases beyond the reasonable control of Borrower (each, an "**Excusable Delay**"), Borrower shall commence Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(E)    any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1, if applicable, or (3) by other funds of Borrower;

(F)    Lender shall be satisfied that Restoration will be completed on or before the earliest to occur of (1) the Maturity Date, (2) such time as may be required under applicable Legal Requirements, or (3) the expiration of the insurance coverage referred to in Section 6.1(iii);

(G)    the Property and the use thereof after Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(H)    Restoration shall be done and completed by Borrower in a diligent manner and in material compliance with all applicable Legal Requirements;

(I)    such Casualty or Condemnation, as applicable, does not result in the permanent loss of access to the Property or the related Improvements;

(J)    after giving effect to Restoration, the Restoration Debt Service Coverage Ratio shall be at least equal to the Debt Service Coverage Ratio for the twelve (12) month period immediately prior to the Casualty which gave rise to such Restoration;

(K)    Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire estimated cost of completing the Restoration, which budget shall be subject to Lender's reasonable approval;

(L)    to the extent that any Licenses are affected by the applicable Casualty or Condemnation, Lender shall have received reasonably satisfactory evidence that all licenses and permits necessary for the operation of the hotel and any restaurant functions on the Property and any liquor license shall be in full force and effect upon completion of the Restoration; and

(M)    the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are in an amount sufficient in Lender's reasonable discretion to cover the estimated cost of Restoration, taking into account the budget delivered to Lender in accordance with clause (K) above.

(ii)    The Net Proceeds shall be paid directly to Lender for deposit in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 6.6(b), shall constitute additional security for the Debt and the Other Obligations. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time

72

to time during the course of Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with Restoration have been paid for in full or for deposits for FF&E ordered and placed or to be placed in storage or delivered to the Property, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Company which shall cause such liens to be omitted.

(iii)     In the event that the estimated cost of Restoration exceeds One Million and No/Dollars ($1,000,000.00), all plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**").  Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which shall not be unreasonably withheld, conditioned or delayed. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, including amounts for FF&E ordered and placed or to be placed in storage or delivered to the property, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "**Casualty Retainage**" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.6(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that Restoration has been completed substantially in accordance with the provisions of this Section 6.6(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has

satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the Title Company, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the Lien of the related Mortgage and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.6(b) shall constitute additional security for the Debt and the Other Obligations.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that Restoration has been completed substantially in accordance with the provisions of this Section 6.6(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower; provided no Event of Default shall have occurred and shall be continuing.

(c)     All Net Proceeds not required (i) to be made available for Restoration, or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 6.6(b)(vii) may be retained and applied by Lender in accordance with Section 2.4.2 hereof toward the payment of the Outstanding Principal Balance whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, in the sole discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its sole discretion, so long as Lender either commences to apply such Net Proceeds to Restoration in accordance with the terms and conditions of this Agreement or applies such Net Proceeds toward the payment of the Outstanding Principal Balance, in each case within thirty (30) days of receipt thereof.

(d)     In the event of foreclosure of the Mortgage, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of

Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

## ARTICLE 7

### RESERVE FUNDS

Section 7.1     Intentionally Omitted.

Section 7.2     Escrow Funds. Borrower shall pay to Lender on the Payment Date occurring in May 2013 and each Payment Date thereafter (a) one-twelfth of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates (such deposits, the "**Tax Deposits**"), and (b) one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (the foregoing amounts required to be so deposited pursuant to this Section 7.2, are hereinafter called the "**Tax and Insurance Escrow Funds**"). The Tax and Insurance Escrow Funds and the payment of the monthly Debt Service, shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will promptly and timely apply the Tax and Insurance Escrow Funds to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.1.2 hereof and under the Mortgage, subject to Borrower's right to contest Taxes in accordance with Section 5.1.2 hereof. In making any payment relating to the Tax and Insurance Escrow Funds, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Escrow Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Section 5.1.2 hereof, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Funds. Any amount remaining in the Tax and Insurance Escrow Funds after the Debt has been paid in full shall be returned to Borrower. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. If at any time Lender reasonably determines that the Tax and Insurance Escrow Funds are not or will not be sufficient to pay Taxes and Insurance Premiums by the dates set forth in (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be. Upon payment of the Taxes and Insurance Premiums, Lender shall reassess the amount necessary to be deposited in the Tax and Insurance Escrow Funds for the succeeding period, which calculation shall take into account any excess amounts remaining in the Tax and Insurance Escrow Funds.

Section 7.3    FF&E Reserve Funds.

7.3.1    Deposit to FF&E Reserve Account.  Borrower shall deposit with Lender on each Payment Date an amount equal to four percent (4%) of the Gross Income from Operations for the prior calendar month (the "**FF&E Monthly Deposit**"), which is the amount reasonably estimated by Lender in its sole discretion to be due for replacements and repairs of the furniture, fixtures and equipment used in connection with the Property (collectively, the "**FF&E**"). Amounts so deposited shall hereinafter be referred to as Borrower's "**FF&E Reserve Funds**".

7.3.2    Disbursements from FF&E Reserve Account.  Lender shall make disbursements from the FF&E Reserve Account as requested by Borrower, no more frequently than once in any thirty (30) day period and of no less than $5,000.00 per disbursement, within ten (10) days after satisfaction by Borrower of each of the following conditions with respect to each such disbursement: (i) Borrower shall submit Lender's standard form of draw request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made, which request shall specify the expense for FF&E to be paid and shall be accompanied by copies of paid invoices for the amounts requested; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; and (iii) Lender shall have received (1) an Officer's Certificate from Borrower (A) stating a description of the FF&E for which the disbursement is being requested, (B) stating that all FF&E to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements or is necessary as a deposit for the ordering of FF&E, (C) identifying each Person that supplied materials or labor or deposits for goods and materials in connection with the FF&E to be funded by the requested disbursement, (D) stating that each such Person has been paid in full or will be paid in full (including amounts paid for deposits made for such FF&E items) upon such disbursement, (E) stating that the FF&E to be funded have not been the subject of a previous disbursement, and (F) stating that all previous disbursements of FF&E Reserve Funds have been used to pay the previously identified expenses for FF&E, (2) a copy of any license, permit or other approval by any Governmental Authority required in connection with the FF&E and not previously delivered to Lender, (3) if required by Lender for requests in excess $50,000.00 for a single item, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment (which lien waivers may be conditioned solely upon receipt of payment) or other evidence of payment satisfactory to Lender, and (4) such other evidence as Lender shall reasonably request to demonstrate that the expenses for FF&E to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender may require an inspection of the Property at Borrower's expense prior to making a monthly disbursement in order to verify completion of replacements and/or repairs of FF&E in excess of $250,000.00 for which reimbursement is sought, provided that such inspection shall not extend the time within which Lender must disburse the funds from the FF&E Reserve Account as provided above.

7.3.3    Balance in the FF&E Reserve Account.  The insufficiency of any balance in the FF&E Reserve Account shall not relieve Borrower from its obligation to fulfill all preservation and maintenance covenants in the Loan Documents.

       7.3.4     Intentionally Omitted.

Section 7.4     Intentionally Omitted.

Section 7.5     Seasonality Reserve Funds.

       7.5.1     Deposits to Seasonality Reserve Account.  On the Closing Date (i) Borrower shall deposit into the Seasonality Reserve Account the amount of One Million Five Hundred Thousand Dollars ($1,500,000) to be held by Lender as additional collateral for the Loan, and (ii) Lender and Borrower will instruct Lockbox Bank and Cash Management Bank (and Lender will instruct Servicer to instruct Lockbox Bank and Cash Management Bank) to deposit into the Seasonality Reserve Account all amounts currently held by Lockbox Bank and/or Cash Management Bank in the Lockbox Account and/or Cash Management Account (or any sub-accounts thereof) (collectively, the "**Initial Seasonality Deposit**") to be held by Lender as additional collateral for the Loan.  Commencing on the Payment Date in June, 2013 and continuing for each Payment Date thereafter, one hundred percent (100%) of all funds on deposit in the Cash Management Account (after the payments pursuant to Sections 2.6.3(i)-(iv) of this Agreement) shall be deposited into the Seasonality Reserve Account until the total amount on deposit in the Seasonality Reserve Account is equal to Seasonality Reserve Amount.  Amounts so deposited shall hereinafter be referred to as Borrower's "**Seasonality Reserve Funds**".

       7.5.2     Withdrawal from Seasonality Reserve Account.  If, on any Payment Date, there are insufficient funds (a) in the Tax and Insurance Escrow Account for payment of Taxes and Insurance Premiums, (b) in the Operating Expense Account for payment of Approved Operating Expenses and Approved Extraordinary Expenses (and for purposes of this subsection (b), any Manager Held Funds shall be deemed to be funds in the Operating Expense Account) and/or (c) in the Cash Management Account for payment of the Monthly Interest Payment due on such Payment Date (any such shortfall the "**Payment Shortfall**"), provided that no Event of Default shall exist and remain uncured, Lender shall apply Seasonality Reserve Funds then on deposit to the payment of such Payment Shortfall (first to payment of Taxes and Insurance Premium, then to payment of Approved Operating Expenses and Approved Extraordinary Expenses and then to payment of the Monthly Interest Payment, but in no event to exceed the Payment Shortfall) and in each case the Seasonality Reserve Funds shall be reduced by an equal amount.  Notwithstanding the foregoing, Borrower expressly acknowledges and agrees that in the event that on any day on which the Payment Shortfall is due and payable the amount of such Payment Shortfall exceeds the Seasonality Reserve Funds then on deposit, Borrower shall remain liable for the difference between such Payment Shortfall and the Seasonality Funds then on deposit, such difference to be due and payable at the time the Payment Shortfall is due and payable. Lender acknowledges that if Lender is obligated to apply Seasonality Reserve Funds to the payment of any Payment Shortfall pursuant to this Section 7.5.2, then the failure of Borrower to pay such Payment Shortfall in the amount of such Seasonality Reserve Funds so applied shall not be deemed an Event of Default.  Notwithstanding anything to the contrary contained herein, following an Event of Default, Lender agrees to apply amounts in the Seasonality Reserve  to Payment Shortfalls solely with respect to the payment of Taxes and Insurance Premiums and payment of Approved Operating Expenses and Approved Extraordinary Expenses (it being

understood that Lender shall have no obligation to deposit funds into the Seasonality Reserve other than in accordance with Section 2.6.3).

   7.5.3 Distribution of Proceeds from Seasonality Reserve Account. On the Payment Date occurring in May 2013, after taking into account all payments required to be made pursuant to Sections 2.6.3(i)-(iv) of this Agreement on or before that Payment Date, the lesser amount of (i) One Million Five Hundred Thousand Dollars ($1,500,000) and (ii) the sum of (a) total amount then on deposit in the Seasonality Reserve Account plus (b) any Manager Controlled Funds actually received by Manager that were required to have been deposited by Manager in the Lockbox Account in accordance with the terms of Section 2.6.1(d) on or before such Payment Date (after taking into account all payments that would have been made with such Manager Controlled Funds pursuant to Sections 2.6.3(i)-(iv) of this Agreement) but which were not timely deposited in accordance with such Section 2.6.1(d), shall be paid to Lender to reduce the Outstanding Principal Balance.

  Section 7.6 Operating Expense Account. On each Payment Date, Borrower shall deposit (or shall cause there to be deposited) into the Operating Expense Account (or Lender shall cause to be deposited from the Cash Management Account in accordance with Section 2.6.3 herein) an amount equal to the aggregate amount of Approved Operating Expenses and Approved Extraordinary Expenses to be incurred by Borrower for the next succeeding Interest Period. Amounts deposited pursuant to this Section 7.6 are referred to herein as the "**Operating Expense Funds**". Lender shall disburse available Operating Expense Funds to Borrower to pay Approved Operating Expenses and/or Approved Extraordinary Expenses upon Borrower's request (which such disbursement shall include, to the extent of available Operating Expense Funds, the portion of the Base Management Fee then due and payable provided a Management Termination Period does not exist) (any such disbursement, an "**Approved Op Ex Disbursement**"). The foregoing request shall be accompanied by an Officer's Certificate detailing the applicable expenses to which the requested disbursement relates and attesting that such expense shall be paid with the requested disbursement.

  Section 7.7 Excess Cash Flow Account. In the event that a sweep of Excess Cash Flow is instituted during the continuance of an Event of Default, all Excess Cash Flow shall be deposited into the Excess Cash Flow Account. All such deposit amounts in the Excess Cash Flow Account shall be treated as a "Reserve Fund" for purposes of Section 7.8. All additional amounts deposited under this section shall be additional security for the repayment of the Debt and may be withdrawn by Lender upon the occurrence and continuance of an Event of Default and applied by Lender in such order and priority as Lender may determine. All calculations of the Debt Service Coverage Ratio shall be subject to verification by Lender.

  Section 7.8 Reserve Funds, Generally.

   (a) Borrower grants to Lender a first-priority perfected security interest in all of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for the Obligations. Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for payment of the Obligations. Upon the occurrence and during the continuance of an Event of Default, subject to Lender's obligation to

78

make any available Approved Op Ex Disbursements (but only from available receipts from the Property, in the Operating Expense Account or the Seasonality Reserve) and payments of Tax and Insurance Premiums (but only from available receipts from the Property, in the Tax and Insurance Escrow Account or the Seasonality Reserve Account) Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the reduction of the Debt (in such order, proportion and priority as Lender may determine in its sole discretion), until the Debt is paid in full. Borrower and Lender hereby agree and acknowledge that if all of the Obligations have been satisfied and there is any amount remaining in the Reserve Funds, the balance shall be disbursed to Borrower.

(b)    Borrower shall not, without obtaining the prior consent of Lender, pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(c)    The Reserve Funds shall be held in an Eligible Account and shall be invested in Permitted Investments pursuant to the Cash Management Agreement. Provided that no Event of Default has occurred and is continuing, all interest or other earnings on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund, except that all interest or other earnings on the portions of the Tax and Insurance Escrow Funds representing Tax Deposits shall be retained by Lender. Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest or income earned on the Reserve Funds, except for any such taxes applicable to the interest or income earned on the portions of the Tax and Insurance Escrow Funds representing Tax Deposits which is retained by Lender. No other investments of the sums on deposit in the Reserve Funds shall be permitted except as set forth in this Section 7.8. Borrower shall bear all reasonable costs associated with the investment of the sums in the account in Permitted Investments. Such costs shall be deducted from the income or earnings on such investment, if any, and to the extent such income or earnings shall not be sufficient to pay such costs, such costs shall be paid by Borrower promptly on demand by Lender. Lender shall have no liability for the rate of return earned or losses incurred on the investment of the sums in Permitted Investments.

(d)    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established. Borrower shall, effective upon an Event of Default, assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(e)     Upon request by Borrower, Lender agrees to use reasonable efforts to provide Borrower access to or copies of statements reflecting the current balance of the Reserve Funds.

Section 7.9     Letters of Credit.

7.9.1     Delivery of Letters of Credit.  With respect to any Letter of Credit which Borrower may furnish or cause to be furnished to Lender for any purpose hereunder or under any of the other Loan Documents, Lender will be entitled, among other things, to make one or more draws by presentment thereof to the issuing bank accompanied only by Lender's draft and a certification acceptable to Lender and required to be given under said Letter of Credit, it being intended that the issuing bank shall have no right to inquire as to Lender's right to draw upon said Letter of Credit. Lender shall be the beneficiary of any Letter of Credit delivered to it pursuant to the terms of the Loan Documents and none of Borrower, Principal nor Guarantor shall be entitled to draw down any such Letter of Credit for any reason whatsoever. Notwithstanding the foregoing, Borrower shall not deliver to Lender a Letter of Credit, or Letters of Credit which, in the aggregate, would exceed the Letter of Credit Amount.

7.9.2     Security for Debt.  Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine.

7.9.3     Additional Rights of Lender.  In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit: (a) with respect to any evergreen Letter of Credit, if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date (other than the Additional Collateral Letter of Credit), if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (c) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); (d) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Eligible Institution and Borrower has not substituted a Letter of Credit from an Eligible Institution within ten (10) Business Days after notice or (e) if the bank issuing the Letter of Credit shall not consent to the assignment of the Letter of Credit to such party as Lender shall request and Borrower has not substituted a Letter of Credit from an Eligible Institution within ten (10) Business Days after receiving notice from Lender of such failure to consent by the issuing bank. If Lender draws upon a Letter of Credit pursuant to the terms and conditions of this Agreement, provided no Event of Default exists, Lender shall apply all or any

part thereof for the purposes for which such Letter of Credit was established. Notwithstanding anything to the contrary contained in the above, Lender is not obligated to draw any Letter of Credit upon the happening of an event specified in (a), (b), (c), (d) or (e) above and shall not be liable for any losses sustained by Borrower due to the insolvency of the bank issuing the Letter of Credit if Lender has not drawn the Letter of Credit.

## ARTICLE 8

## DEFAULTS

Section 8.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if any portion of the Debt is not paid when due;

(ii)    Intentionally Omitted;

(iii)    subject to Borrower's right to contest as set forth in Section 5.1.2, if any of the Taxes or Other Charges are not paid when the same would be considered delinquent (provided that it shall not be an Event of Default if there are sufficient Tax and Insurance Escrow Funds on deposit with Lender to pay such amounts when due, no other Event of Default is then continuing and Servicer fails to make such payment in violation of this Agreement);

(iv)    if the Policies are not kept in full force and effect or if a default shall occur under Section 6.2 hereof;

(v)    if a Transfer in violation of this Agreement occurs or Borrower otherwise encumbers any portion of the Property without Lender's prior consent in violation of the provisions of this Agreement or Article 6 of the Mortgage;

(vi)    if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false in any material respect as of the date the representation or warranty was made; provided, however, that if (1) such misrepresentation was not intentional, and (2) the condition causing the representation or warranty to be false is susceptible of being cured, the same shall be an Event of Default hereunder only if the same is not cured within thirty (30) days after written notice to Borrower from Lender; and provided, further, if the condition causing the representation or warranty to be false is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such condition within such thirty (30) day period and thereafter diligently proceeds to cure the same, then such thirty (30) day period shall be extended for such an additional period of time as is reasonably necessary for Borrower in the

81

exercise of due diligence to cure such condition, such additional period not to exceed one hundred fifty (150) days;

(vii)    if Borrower or Principal shall make an assignment for the benefit of creditors in contravention of the Loan Documents;

(viii)   if a receiver, liquidator or trustee shall be appointed for Borrower or Principal, or if Borrower or Principal shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Principal (other than the Bankruptcy Proceeding), or if any proceeding for the dissolution or liquidation of Borrower or Principal shall be instituted (other than the Bankruptcy Proceeding); provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Principal, upon the same not being discharged, stayed or dismissed within sixty (60) days;

(ix)    Intentionally Omitted;

(x)     subject to force majeure, if Borrower ceases to do business as a hotel at the Property or terminates such business for any reason whatsoever (other than temporary cessation in connection with any continuous and diligent renovation or restoration of the Property following a Casualty or Condemnation);

(xi)    if Borrower breaches any of its respective negative covenants contained in Section 5.2 or any covenant contained in Section 4.1.30 or Section 5.1.11 hereof, and any such breach is not cured within fifteen (15) Business Days after written notice to Borrower from Lender;

(xii)   with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xiii)  Intentionally Omitted;

(xiv)   if a monetary default by Borrower under the Management Agreement has occurred and continues beyond the date that is three (3) Business Days prior to the expiration of the applicable cure period under the Management Agreement;

(xv)    if a non-monetary default by Borrower under the Management Agreement has occurred and continues beyond the date that is five (5) days prior to the expiration of the applicable cure period under the Management Agreement;

(xvi)   if Borrower commences a cure of a non-monetary default by Borrower under the Management Agreement and then abandons such cure or fails to diligently prosecute such cure for a period of ten (10) consecutive days;

82

(xvii)  if the Management Agreement is terminated and a Qualified Manager is not in place under a Replacement Management Agreement within forty five (45) days after such termination;

(xviii)  if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(xix)   Intentionally Omitted;

(xx)    Intentionally Omitted;

(xxi)   Intentionally Omitted; or

(xxii)  if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xxi) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default involving a payment by Borrower to Lender, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed one hundred fifty (150) days.

(b)     Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vii) or (viii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Obligations to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vii) or (viii) above, the Debt and all Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2   Remedies.

(a)     Unless waived by Lender in writing (Lender being under no obligation to do so), upon the occurrence of an Event of Default, all or any one or more of the rights, powers,

83

privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Obligations have been paid in full.

(b)     <u>Intentionally Omitted</u>.

(c)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose the Mortgage to recover so much of the Debt as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(d)     Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

(e)     <u>Remedies Cumulative; Waivers</u>.   The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of

Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## ARTICLE 9

## **SPECIAL PROVISIONS**

Section 9.1    Sale of Note.  Borrower acknowledges and agrees that Lender may, at no cost to Borrower, sell all or any portion of the Loan and the Loan Documents and the Note. At the request of Lender, and to the extent not already required to be provided by Borrower under this Agreement, Borrower shall, at no cost to Borrower, use reasonable efforts to provide information not in the possession of Lender or which may be reasonably required by Lender in order to satisfy market standards or which may be reasonably required by prospective investors.

All reasonable third party costs and expenses (other than legal expenses) incurred by Borrower or Lender in connection with Borrower's complying with requests made under this Section 9.1 shall be paid by Lender.

Section 9.2    Intentionally Omitted.

Section 9.3    Intentionally Omitted.

Section 9.4    Exculpation.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees for itself and its successors and assigns that it and its successors and assigns shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under, or by reason of, or in connection with, the Note, this Agreement, the Mortgage or the other Loan Documents. The provisions of this Section shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of or any of the Guaranties made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against

the Property; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower under the terms of this Agreement, by money judgment or otherwise, to the extent of any actual out of pocket loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

       (i)      fraud or intentional misrepresentation by Borrower, Guarantor or any of their respective principals, officers, agents or employees in connection with the Loan;

       (ii)     the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity Agreement or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

       (iii)    the wrongful removal or destruction of any material portion of the Property after an Event of Default; provided that Borrower has received notice of such wrongful removal or destruction;

       (iv)    the knowing misapplication or conversion by or on behalf of Borrower of (A) any Insurance Proceeds paid by reason of any Casualty, (B) any Awards received in connection with a Condemnation or (C) any Rents paid more than one (1) month in advance, in each case only to the extent of the amounts received by Borrower;

       (v)     any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to such foreclosure or action in lieu thereof;

       (vi)    Rents received or applicable to a period during the existence of any Event of Default which are not either (x) applied to the ordinary and necessary expenses of owning and operating the Property or (y) paid to Lender;

       (vii)    Borrower filing a voluntary petition under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law (other than the Bankruptcy Proceeding);

       (viii)   the filing of an involuntary petition against Borrower under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law if and only if (x) such filing was by an Affiliate of Borrower or (y) such filing was not by an Affiliate, but Borrower has acted in concert with, colluded or conspired with the petitioning creditors in connection with such involuntary petition;

       (ix)    Borrower filing an answer consenting to, or otherwise acquiescing or joining in any involuntary petition filed by any Person against Borrower under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law;

(x)    Borrower consenting to or otherwise acquiescing or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property (other than as requested by Lender);

(xi)    Borrower making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due;

(xii)    Borrower failing to maintain its status as a Special Purpose Entity in compliance with the definition of "Special Purpose Entity" (except for clause (j) of such definition);

(xiii)    Borrower failing to obtain Lender's prior written consent to any Indebtedness for borrowed money if required by the Loan Agreement or the Mortgage;

(xiv)    Borrower failing to obtain Lender's prior written consent to any Lien upon the Property other than the Liens created by the Loan Documents and Permitted Encumbrances; and/or

(xv)    Borrower failing to obtain Lender's prior written consent to any Transfer, as required by the Loan Agreement or the Mortgage.

Section 9.6    Matters Concerning Manager and Franchisor.

(a)    Lender shall have the right, exercisable in its sole and absolute discretion, to require pursuant to written request that Borrower terminate the Management Agreement and replace same with a Replacement Management Agreement if a Manager Termination Condition (defined below) exists. Upon Lender's written request, for so long as a Manager Termination Condition exists, Borrower shall terminate the Management Agreement and shall enter into a Replacement Management Agreement. As used herein, "**Manager Termination Condition**" means that (i) an Event of Default is continuing and (ii) Borrower has the right to terminate Manager pursuant to the terms of the Management Agreement.

(b)    If a Franchise Agreement shall be in effect with respect to the Property and (i) the Debt has been accelerated pursuant to the terms and conditions hereof and of the other Loan Documents, (ii) a Franchisor shall become bankrupt or insolvent or (iii) a default occurs under the Franchise Agreement, Borrower shall, at the request of Lender, terminate the Franchise Agreement and replace the Franchisor with a replacement Franchisor and Franchise Agreement entered into in accordance with the applicable terms and conditions hereof, it being understood and agreed that the fees and other sums payable under such replacement Franchise Agreement shall not exceed then prevailing market rates.

Section 9.7    Servicer.    At the option of Lender, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer.

Borrower shall not be responsible for payment of any cost or expenses of the set-up of any servicing or any monthly servicing fee due to the Servicer under the Servicing Agreement.

      Section 9.8      Intentionally Omitted.

      Section 9.9      Intentionally Omitted.

## ARTICLE 10

## MISCELLANEOUS

      Section 10.1      Survival.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Obligations are outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

      Section 10.2      Lender's Discretion.   Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Whenever this Agreement expressly provides that Lender may not withhold its consent or its approval of an arrangement or term, such provisions shall also be deemed to prohibit Lender from delaying or conditioning such consent or approval.

      Section 10.3      Governing Law.

      (a)      **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE**

UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES, EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE AND/OR THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

[Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention:  Bruce S. Cybul, Esq.
Facsimile No.:  (212) 593-5955]

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF

**NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY
CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT
ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE
AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH
SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON
AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY
DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO
HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT
LEAVING A SUCCESSOR.**

Section 10.4   <u>Modification, Waiver in Writing</u>.   No modification, amendment,
extension, discharge, termination or waiver of any provision of this Agreement, or of the Note,
or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in
any event be effective unless the same shall be in a writing signed by the party against whom
enforcement is sought, and then such waiver or consent shall be effective only in the specific
instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no
notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand
in the same, similar or other circumstances.

Section 10.5   <u>Delay Not a Waiver</u>.   Neither any failure nor any delay on the part of
Lender in insisting upon strict performance of any term, condition, covenant or agreement, or
exercising any right, power, remedy or privilege hereunder, or under the Note or under any other
Loan Document, or under any other instrument given as security therefor, shall operate as or
constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future
exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by
way of limitation, by accepting payment after the due date of any amount payable under this
Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived
any right either to require prompt payment when due of all other amounts due under this
Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect
prompt payment of any such other amount.

Section 10.6   <u>Notices</u>.   All notices, consents, approvals and requests required or
permitted hereunder or under any other Loan Document (each, a **"Notice"**), shall be given in
writing and shall be effective for all purposes if hand delivered or sent by (a) certified or
registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid
delivery service, either commercial or United States Postal Service, with proof of attempted
delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such
other address and Person as shall be designated from time to time by any party hereto, as the case
may be, in a Notice to the other parties hereto in the manner provided for in this <u>Section 10.6</u>):

> If to Lender:   DiamondRock Hospitality Company
> 6903 Rockledge Drive, Suite 800
> Bethesda, Maryland 20817
> Attention: Chief Financial Officer
> Facsimile No.: (240) 744-1199

| with a copy to: | Willkie Farr & Gallagher LLP |
| | 787 Seventh Avenue |
| | New York, New York 10019 |
| | Attention: Steven D. Klein, Esq. |
| | Facsimile No.: 212-728-9221 |

| If to Borrower: | c/o Petra Capital Management LLC |
| | 1370 Avenue of the Americas, 23rd Floor |
| | New York, New York 10019 |
| | Attention: Mr. Joseph Iacono |
| | Facsimile No.: (212) 489-1.629 |

| with copies to: | Schulte Roth & Zabel LLP |
| | 919 Third Avenue |
| | New York, New York 10022 |
| | Attention: Bruce S. Cybul, Esq. |
| | Facsimile No.: (212) 593-5955 |

A Notice shall be deemed to have been given: in the case of hand delivery or delivery by a reputable overnight courier, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery and telecopy, upon the first attempted delivery on a Business Day; or in the case of telecopy, upon sender's receipt of a machine-generated confirmation of successful transmission after advice by telephone to recipient that a telecopy Notice is forthcoming.

Section 10.7  Trial by Jury.  LENDER, BORROWER AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER SUCH PARTY EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF BORROWER AND LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER OR LENDER, AS THE CASE MAY BE.

Section 10.8  Headings.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9  Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such

provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10  Preferences.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11  Waiver of Notice.  Borrower hereby expressly waives, and shall not be entitled to, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

Section 10.12  Intentionally Omitted.

Section 10.13  Expenses; Indemnity.

(a)   Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender after the Closing Date in connection with (i) intentionally omitted; (ii) except as otherwise provided in this Agreement, Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) intentionally omitted; (iv) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement and the other Loan Documents; (v) intentionally omitted; (vi) enforcing or preserving any rights, either in response to third party claims or in prosecuting or defending any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (vii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender, under Section 9.7 or as otherwise set forth herein. Any cost and expenses due and payable to Lender may be paid, at Lender's option, from any amounts in the Lockbox Account or Cash Management Account.

92

(b)     Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, bad faith, fraud or willful misconduct of Lender. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lender.

Section 10.14 Schedules Incorporated.   The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 10.15 Offsets, Counterclaims and Defenses. Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower unless such offset, counterclaim or defense would otherwise be forfeited.

Section 10.16 No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)     Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan (or any disbursement of Reserve Funds) in the absence of

93

strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 10.17 _Publicity._  All news releases, publicity or advertising by either party or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, Borrower, or any of their Affiliates shall be subject to the prior approval of the other party hereto.

Section 10.18 _Waiver of Marshalling of Assets._  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of the Mortgage, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 10.19 _Waiver of Offsets/Defenses/Counterclaims._  Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any Obligations under the Loan Documents. No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

Section 10.20 _Conflict; Construction of Documents; Reliance._  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21 <u>Brokers and Financial Advisors</u>.

(a)     Intentionally Omitted.

(b)     Borrower and Lender each hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower and Lender hereby agree to indemnify, defend and hold the other harmless from and against any and all claims, liabilities, costs and expenses of any kind (including reasonable attorneys' fees and expenses) in any way relating to or arising from a claim that any person or entity acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this section shall survive any release or termination of this Agreement whether occasioned by a repayment of the indebtedness secured hereby or otherwise.

Section 10.22 <u>Prior Agreements</u>.   This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 10.23 <u>Duplicate Originals, Counterparts</u>.   This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**ALT HOTEL, LLC**, a Delaware limited liability company

By:_____
             Name:
             Title:

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**LENDER**:

[_____]

By:_____
    Name:
    Title:

## SCHEDULE I

### LEASES

1. Space Lease executed by Chicago Gifts and Novelties, Inc., as lessee, and Bristol Management L.P., as the manager of Bristol Hotel Tenant Company, as lessor, dated January 15, 1999.

2. **[TO BE UPDATED AS NECESSARY]**

## **SCHEDULE II**

<u>Intentionally Omitted</u>

## **SCHEDULE III**

Organizational Structure

(See attached)

## SCHEDULE IV

Intentionally Omitted

## **SCHEDULE V**

Intentionally Omitted

## SCHEDULE VI

## LIST OF APPROVED MANAGERS, APPROVED CASH MANAGEMENT MANAGERS AND HOTEL COMPANIES

## SCHEDULE VII

Intentionally Omitted

1

## **SCHEDULE VIII**

Intentionally Omitted

## **SCHEDULE IX**

Intentionally Omitted

**SCHEDULE X**
**UNION CONTRACTS**

1.    Contract dated September 1, 2002 (as amended) with the Hotel Employees and
      Restaurant Employees Union Local No. 1 AFL-CIO and Hotel, Motel, Club, Cafeteria
      Restaurant Employees and Bartenders Union Local No. 450 AFL-CIO

2.    Collective Bargaining Agreement dated July 1, 2000 (as amended) with the International
      Union of Operating Engineers AFL-CIO — Local 399

3.    Contract dated April 24, 2003 (as amended) with the Painters District Counsel No. 14 and
      the Painting and Decorating Painters Contractors Association, Chicago Council.

4.    **[TO BE UPDATED AS NECESSARY]**

## EXHIBIT A

### LEGAL DESCRIPTION

PARCEL 1:

LOT 1 IN ALLERTON'S SUBDIVISION, BEING A RESUBDIVISION OF THE WEST 1/2
OF THE SOUTH 1/2 OF BLOCK 45 AND THE WEST 1 50/100 FEET OF THE SOUTHEAST
1/4 OF SAID BLOCK 45 IN KINZIE'S ADDITION TO CHICAGO IN THE NORTH
FRACTION OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD
PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PARCEL 2:

EASEMENT FOR THE BENEFIT OF PARCEL 1 FOR USE AND MAINTENANCE OF
SIGNAGE ATTACHED TO THE FACADE, INGRESS AND EGRESS, STRUCTURAL
SUPPORT AND SUCH OTHER APPURTENANT EASEMENTS AS SET FORTH IN
ARTICLE 2 AND SUCH OTHER SECTIONS THEREIN AS CREATED BY THE
DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND
EASEMENTS RECORDED JUNE 10, 2002 AS DOCUMENT NUMBER 0020643764, AND
RERECORDED AUGUST 23, 2002 AS DOCUMENT NUMBER 0020927679, MADE BY
FELCOR HOTEL ASSET COMPANY, LLC OVER THE FOLLOWING LAND:

LOT 2 IN THE PLAT OF ALLERTON'S SUBDIVISION, BEING A RESUBDIVISION OF
THE WEST 1/2 OF THE SOUTH 1/2 OF BLOCK 45 AND THE WEST 1 50/100 FEET OF
THE SOUTHEAST 1/4 OF SAID BLOCK 45 IN KINZIE'S ADDITION TO CHICAGO IN
THE NORTH FRACTION OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF
THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Property Address:     701 N. Michigan Avenue, Chicago, Illinois 60611

Tax Parcel ID No.:     17-10-106-009

## EXHIBIT B

### FORM OF REPLACEMENT GUARANTY

### GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "**Guaranty**") is effective as of [_____], by [_____], a [_____], having an address at [_____] ("**Guarantor**"), for the benefit of DIAMONDROCK ALLERTON OWNER, LLC, a Delaware limited liability company, having an address at 6903 Rockledge Drive, Suite 800, Bethesda, MD 20817 ("**Lender**").

### RECITALS:

A. [_____] ("**Borrower**") is indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") made pursuant to that certain Amended and Restated Loan Agreement, originally dated as of [_____], between Borrower (successor in interest to [_____]) and Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is evidenced by the Note (as defined in the Loan Agreement), and is secured by that certain Mortgage and Security Agreement of even date herewith (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Mortgage**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (together with the Note, the Loan Agreement and Mortgage, collectively, the "**Loan Documents**").

B. As of the date hereof (the "**Transfer Date**"), the Property has been Transferred to Borrower, and Borrower has assumed the Loan and the Loan Documents.

C. Lender requires that Guarantor, from and after the hereof provide this unconditional guarantee of payment and performance to Lender of the Guaranteed Obligations (as herein defined) on the terms and conditions contained herein.

D. As of the Transfer Date, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

E. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

3

## ARTICLE 11

NATURE AND SCOPE OF GUARANTY

Section 11.1 **Guaranty of Obligation**. Subject to the terms of this Guaranty, Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise but only to the extent same first arise and are due and payable from and after the Transfer Date. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor from and after the Transfer Date in accordance with this Guaranty.

Section 11.2 **Definition of Guaranteed Obligations**.

11.2.1 Subject to subparagraph (b) hereof as used herein, the term **"Guaranteed Obligations"** means (a) the obligations and liabilities of Borrower to Lender for which Borrower shall be personally liable to Lender pursuant to items (i), (ii), (iii), (iv), (v), (vi), (xii) (xiii) and (xiv) of Section 9.4 of the Loan Agreement and (b) payment of all the Debt from and after the occurrence of one or more of items (vii), (viii), (ix), (x), (xi) and (xii) of Section 9.4 of the Loan Agreement (provided, that, this subsection (b) shall only apply to occurrences of item (xii) that result in a substantive consolidation involving Borrower), in each case only to the extent the same first arise and are due and payable from and after the Transfer Date. Guarantor acknowledges that it shall be liable for payment of all of the Debt from and after the occurrence of the items set forth in subsection (b) above notwithstanding that the Debt is not fully recourse to Borrower under the terms of the Loan Agreement as a result of the items set forth in subsection (b).

11.2.2 Notwithstanding anything to the contrary contained herein or in any other Loan Document, with respect to Guarantor's obligations and liabilities for the Guaranteed Obligations, Guarantor agrees (and by accepting this Guaranty, Lender hereby agrees) that to the extent any of the following first arise and are due and payable from and after the Transfer Date, all of the Guaranteed Obligations of Guarantor under this Guaranty are recourse obligations of Guarantor, but not of any direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor (other than Borrower) and none of such direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor (other than Borrower) shall have any liability in its personal or individual capacity, but instead, all parties shall look solely to the property and the assets of Guarantor for satisfaction of any Guaranteed Obligations of any nature required to be paid by Guarantor to Lender under this Guaranty;

Section 11.3 **Nature of Guaranty**. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor. The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced

4

shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

Section 11.4  **Guaranteed Obligations Not Reduced by Offset**.  The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset or claim of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset or claim arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 11.5  **Payment By Guarantor**.  If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time payment of all or part of the Guaranteed Obligations is due, and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

Section 11.6  **No Duty To Pursue Others**.  It shall not be necessary for Lender (and Guarantor hereby waive any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (a) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (b) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (c) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (d) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (e) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (f) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Section 11.7  **Waivers**.  Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (a) any loans or advances made by Lender to Borrower, (b) acceptance of this Guaranty, (c) any amendment or extension of the Note, the Loan Agreement or of any other Loan Documents, (d) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (e) the occurrence of any breach by Borrower or an Event of Default, (f) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (g) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (h) protest, proof of non-payment or default by Borrower, and (i) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in

5

connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed except as specifically provided for herein.

Section 11.8   **Payment of Expenses**.  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, promptly after demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.  The covenant contained in this <u>Section 1.8</u> shall survive the payment and performance of the Guaranteed Obligations.

Section 11.9   **Effect of Bankruptcy**.  In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain in full force and effect.  It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 11.10   **Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

Section 11.11   **Borrower**.  The term "Borrower" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

## ARTICLE 12

### EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

To the extent permitted by law, Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights which Guarantor might otherwise have as a result of or in connection with any of the following:

6

Section 12.1 **Modifications**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the Loan Agreement, the other Loan Documents, or any other document, instrument, contract or understanding between Borrower and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

Section 12.2 **Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Guarantor.

Section 12.3 **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor, or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor, or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

Section 12.4 **Invalidity of Guaranteed Obligations**. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (a) the Guaranteed Obligations, or any part thereof, exceed the amount permitted by law, (b) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (c) the officers or representatives executing the Note, the Mortgage, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (d) the Guaranteed Obligations violate applicable usury laws, (e) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (f) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (g) the Note, the Mortgage, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

Section 12.5 **Release of Obligors**. Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor have not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

7

Section 12.6 **Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

Section 12.7 **Release of Collateral**. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 12.8 **Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

Section 12.9 **Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor are not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

Section 12.10 **Offset**. The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other Person, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 12.11 **Merger**. The reorganization, merger or consolidation of Borrower into or with any Person.

Section 12.12 **Preference**. Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

Section 12.13 **Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that

8

Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE 13

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

Section 13.1 **Benefit**. Guarantor is an Affiliate and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 13.2 **Familiarity and Reliance**. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

Section 13.3 **No Representation By Lender**. Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

Section 13.4 **Guarantor's Financial Condition**. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

Section 13.5 **Legality**. The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any applicable law, statute or regulation of any court or governmental agency or body having jurisdiction over Guarantor (except for such violations that would not reasonably be expected to result in a material adverse effect on the financial condition of Guarantor, Borrower or the Property), or constitute a default under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor (except for such violations that would not reasonably be expected to result in a material adverse effect on the financial condition of Guarantor, Borrower or the Property). This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other rights and to general equity principles.

9

Section 13.6   **Survival**.  All representations and warranties made by Guarantor herein shall survive the execution hereof.

**ARTICLE 14**

SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 14.1   **Subordination of All Guarantor Claims**.  As used herein, the term "Guarantor Claims" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  Upon the occurrence of an Event of Default and its continuance, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon Guarantor Claims.

Section 14.2   **Claims in Bankruptcy**.  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application against the Guaranteed Obligations, any such dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit against Guarantor Claims, then upon indefeasible payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon Guarantor Claims.

Section 14.3   **Payments Held in Trust**.  Notwithstanding anything to the contrary in this Guaranty, in the event that Guarantor shall receive any funds, payments, claims or distributions which are prohibited by this Guaranty, Guarantor agrees that the receiving Guarantor shall hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenant that the receiving Guarantor shall promptly pay the same to Lender.

10

Section 14.4  **Liens Subordinate**.  Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach.  Without the prior written consent of Lender, Guarantor shall not (a) exercise or enforce any creditor's right it may have against Borrower, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE 15

### MISCELLANEOUS

Section 15.1  **Waiver**.  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of Lender hereunder shall be in addition to all other rights provided by law.  Subject to the further provisions of Section 5.5, no consent to departure from or waiver of any provision of this Guaranty shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

Section 15.2  **Notices**.  Any notice, demand, statement, request or consent made hereunder shall be in writing and shall be deemed to be received by the addressee on the third day following the day such notice is deposited with the United States Postal Service first class certified mail, return receipt requested, addressed to the address, as set forth below, of the party to whom such notice is to be given, or to such other address as either party shall in like manner designate in writing.  The addresses of the parties hereto are as follows:

Guarantor:              [_____]
                        [_____]
                        [_____]
                        [_____]
                        [_____]


with a copy to:         [_____]
                        [_____]
                        [_____]
                        [_____]

[_____]

Lender:                    DiamondRock Allerton Owner, LLC

c/o DiamondRock Hospitality Company

6903 Rockledge Drive, Suite 800

Bethesda, Maryland  20817

Attention:  Chief Financial Officer

Facsimile No.: (240) 744-1199


with a copy to:            DiamondRock Allerton Owner, LLC

c/o DiamondRock Hospitality Company

6903 Rockledge Drive, Suite 800

Bethesda, Maryland  20817

Attention:  General Counsel

Facsimile No.: (240) 744-1199


Section 15.3   **Governing Law**.  This Guaranty shall be governed in accordance with the State of New York and the applicable law of the United States of America.

Section 15.4   **Invalid Provisions**.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 15.5   **Amendments**.  This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

12

Section 15.6 **Parties Bound; Assignment; Joint and Several**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. The obligations and liabilities of Guarantor hereunder shall, except as expressly set forth herein, be joint and several.

Section 15.7 **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

Section 15.8 **Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

Section 15.9 **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

Section 15.10 **Rights and Remedies**. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 15.11 **ENTIRETY**. THIS GUARANTY EMBODIES THE FINAL AND ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTORS' GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS

13

GUARANTY AGREEMENT.   THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

Section 15.12 **WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY HERETO AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER SUCH PARTY EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE LOAN AGREEMENT, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY LENDER OR GUARANTOR, AS THE CASE MAY BE.**

Section 15.13 **Guarantor's Assets**.  Guarantor covenants and agrees that, except for normal and customary loan payments and distributions of capital and profits and the payment of employee salaries and benefits and dividends in the ordinary course of business, Guarantor shall not voluntarily dispose of its assets other than on an arms-length basis in exchange for fair consideration.  Until all of the Guaranteed Obligations have been paid in full, Guarantor shall maintain total assets of $50,000,000.00 (in name or under management) and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $10,000,000.00.

Section 15.14 **Reinstatement in Certain Circumstances**.   If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise and such payment satisfied any Guaranteed Obligations, Guarantor's obligations hereunder with respect to such Guaranteed Obligations shall be reinstated as though such payment has been due but not made at such time.

**[NO FURTHER TEXT ON THIS PAGE]**

14

IN WITNESS WHEREOF, Guarantor has executed this Guaranty Agreement as of the day and year first above written,

### GUARANTOR:

[_____]


By: _____

      Name:

      Title:

*Signature Page to Guaranty Agreement*

Amended and Restated Guaranty Agreement

## AMENDED AND RESTATED GUARANTY AGREEMENT

THIS AMENDED AND RESTATED GUARANTY AGREEMENT (this "**Guaranty**") is effective as of [_____], by PS CDO MANAGER, LLC, a Delaware limited liability company, having an address at c/o Petra Capital Management LLC, 1370 Avenue of the Americas, 23rd Floor, New York, New York 10019 ("**Guarantor**"), for the benefit of DIAMONDROCK ALLERTON OWNER, LLC, a Delaware limited liability company, having an address at 6903 Rockledge Drive, Suite 800, Bethesda, MD 20817 ("**Lender**").

### RECITALS:

A.    Borrower is indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") made pursuant to that certain Amended and Restated Loan Agreement, of even date herewith, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is evidenced by the Note (as defined in the Loan Agreement), and is secured by that certain Mortgage and Security Agreement of even date herewith (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Mortgage**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (together with the Note, the Loan Agreement and Mortgage, collectively, the "**Loan Documents**").

B.    Guarantor entered into that certain Guaranty Agreement (the "**Original Guaranty**"), dated as of October 1, 2010, pursuant to which Guarantor provided the unconditional guarantee of payment and performance to Lender of the Guaranteed Obligations (as defined therein) from and after the date of the Original Guaranty (the "**Original Transfer Date**");

C.    Lender requires that, in accordance with the Plan of Reorganization, Guarantor from and after the hereof (the "**A&R Transfer Date**") provide this unconditional guarantee of payment and performance to Lender of the Guaranteed Obligations (as herein defined) on the terms and conditions contained herein.

D.    As of the Original Transfer Date, Guarantor has been the owner of a direct or indirect interest in Borrower.

E.    Guarantor is willing to amend and restate the terms of the Original Guaranty in accordance with the terms and conditions of this Guaranty.

F.    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**Section 1.1** <u>**Guaranty of Obligation**</u>.  Subject to the terms of this Guaranty, Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise but only to the extent same first arise and are due and payable from and after the A&R Transfer Date. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor from and after the A&R Transfer Date in accordance with this Guaranty.

**Section 1.2** <u>**Definition of Guaranteed Obligations**</u>.

(a)    Subject to subparagraph (b) hereof as used herein, the term **"Guaranteed Obligations"** means the obligations and liabilities of Borrower to Lender but only to the extent same first arise and are due and payable from and after the A&R Transfer Date for which Borrower shall be personally liable to Lender pursuant to items (vii), (viii), (ix), (x), (xi), (xii), (xiii), (xiv) and (xv) of Section 9.4 of the Loan Agreement.

(b)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, with respect to Guarantor's obligations and liabilities for the Guaranteed Obligations, Guarantor agrees (and by accepting this Guaranty, Lender hereby agrees) that to the extent any of the following first arise and are due and payable from and after the A&R Transfer Date:

(i)    all of the Guaranteed Obligations of Guarantor under this Guaranty are recourse obligations of Guarantor, but not of any direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor (other than Borrower) and none of such direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor (other than Borrower) shall have any liability in its personal or individual capacity, but instead, all parties shall look solely to the property and the assets of Guarantor for satisfaction of any Guaranteed Obligations of any nature required to be paid by Guarantor to Lender under this Guaranty;

(ii)    with respect to those certain of the Guaranteed Obligations incorporated by reference herein through items (vii), (viii), (ix), (x) and (xi) of Section 9.4 of the Loan Agreement, the maximum aggregate liability of Guarantor hereunder with respect thereto shall be limited to $15,800,000.00;

(iii)    with respect to those certain of the Guaranteed Obligations incorporated by reference herein though items (xii), (xiii), (xiv) and (xv) of Section 9.4 of the Loan Agreement, the maximum aggregate liability of Guarantor hereunder with respect thereto shall be limited to $11,850,000.00.

2

**Section 1.3**   **Nature of Guaranty**.  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor.  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**Section 1.4**   **Guaranteed Obligations Not Reduced by Offset**.  The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset or claim of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset or claim arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**Section 1.5**   **Payment By Guarantor**.  If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time payment of all or part of the Guaranteed Obligations is due, and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**Section 1.6**   **No Duty To Pursue Others**.  It shall not be necessary for Lender (and Guarantor hereby waive any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (a) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (b) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (c) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (d) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (e) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (f) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**Section 1.7**   **Waivers**.  Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (a) any loans or advances made by Lender to Borrower, (b) acceptance of this Guaranty, (c) any amendment or extension of the Note, the Loan Agreement or of any other Loan Documents, (d) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (e) the occurrence of any breach by Borrower or an Event of Default, (f) Lender's

3

transfer or disposition of the Guaranteed Obligations, or any part thereof, (g) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (h) protest, proof of non-payment or default by Borrower, and (i) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed except as specifically provided for herein.

> **Section 1.8** **Payment of Expenses**. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, promptly after demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section 1.8 shall survive the payment and performance of the Guaranteed Obligations.

> **Section 1.9** **Effect of Bankruptcy**. In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

> **Section 1.10** **Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

> **Section 1.11** **Borrower**. The term "Borrower" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

## ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

> To the extent permitted by law, Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any

4

common law, equitable, statutory or other rights which Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1 **Modifications**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the Loan Agreement, the other Loan Documents, or any other document, instrument, contract or understanding between Borrower and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

Section 2.2 **Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Guarantor.

Section 2.3 **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor, or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor, or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

Section 2.4 **Invalidity of Guaranteed Obligations**. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (a) the Guaranteed Obligations, or any part thereof, exceed the amount permitted by law, (b) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (c) the officers or representatives executing the Note, the Mortgage, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (d) the Guaranteed Obligations violate applicable usury laws, (e) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (f) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (g) the Note, the Mortgage, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

Section 2.5 **Release of Obligors**. Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor have not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the

Guaranteed Obligations, or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

**Section 2.6     Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**Section 2.7     Release of Collateral**.    Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**Section 2.8     Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**Section 2.9     Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor are not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

**Section 2.10    Offset**. The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other Person, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**Section 2.11    Merger**. The reorganization, merger or consolidation of Borrower into or with any Person.

**Section 2.12    Preference**.    Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**Section 2.13   Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations

6

pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**Section 3.1** **Benefit**.  Guarantor is an Affiliate and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**Section 3.2** **Familiarity and Reliance**.  Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**Section 3.3** **No Representation By Lender**.  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**Section 3.4** **Guarantor's Financial Condition**.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**Section 3.5** **Legality**.  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any applicable law, statute or regulation of any court or governmental agency or body having jurisdiction over Guarantor (except for such violations that would not reasonably be expected to result in a material adverse effect on the financial condition of Guarantor, Borrower or the Property), or constitute a default under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor (except for such violations that would not reasonably be expected to result in a material adverse effect on the financial condition of Guarantor, Borrower or the Property).  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other rights and to general equity principles.

Section 3.6    <u>Survival</u>.  All representations and warranties made by Guarantor herein shall survive the execution hereof.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1    <u>Subordination of All Guarantor Claims</u>.  As used herein, the term "Guarantor Claims" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  Upon the occurrence of an Event of Default and its continuance, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon Guarantor Claims.

Section 4.2    <u>Claims in Bankruptcy</u>.  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application against the Guaranteed Obligations, any such dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit against Guarantor Claims, then upon indefeasible payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon Guarantor Claims.

Section 4.3    <u>Payments Held in Trust</u>.  Notwithstanding anything to the contrary in this Guaranty, in the event that Guarantor shall receive any funds, payments, claims or distributions which are prohibited by this Guaranty, Guarantor agrees that the receiving Guarantor shall hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenant that the receiving Guarantor shall promptly pay the same to Lender.

Section 4.4    <u>Liens Subordinate</u>.  Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing

8

payment of Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (a) exercise or enforce any creditor's right it may have against Borrower, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V

## MISCELLANEOUS

**Section 5.1** **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. Subject to the further provisions of Section 5.5, no consent to departure from or waiver of any provision of this Guaranty shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**Section 5.2** **Notices**. Any notice, demand, statement, request or consent made hereunder shall be in writing and shall be deemed to be received by the addressee on the third day following the day such notice is deposited with the United States Postal Service first class certified mail, return receipt requested, addressed to the address, as set forth below, of the party to whom such notice is to be given, or to such other address as either party shall in like manner designate in writing. The addresses of the parties hereto are as follows:

| | |
|---|---|
| Guarantor: | PS CDO Manager, LLC |
| | c/o Petra Capital Management LLC |
| | 1370 Avenue of the Americas, 23rd Floor |
| | New York, New York 10019 |
| | Attention: Mr. Mark Mortensen |
| | Facsimile No.: (212) 489-1629 |
| | |
| with a copy to: | Schulte Roth & Zabel LLP |
| | 919 Third Avenue |
| | New York, New York 10022 |
| | Attention: Bruce S. Cybul, Esq. |
| | Facsimile No.: (212) 593-5955 |

| Lender: | DiamondRock Allerton Owner, LLC |
| | c/o DiamondRock Hospitality Company |
| | 6903 Rockledge Drive, Suite 800 |
| | Bethesda, Maryland 20817 |
| | Attention: Chief Financial Officer |
| | Facsimile No.: (240) 744-1199 |
| | |
| with a copy to: | DiamondRock Allerton Owner, LLC |
| | c/o DiamondRock Hospitality Company |
| | 6903 Rockledge Drive, Suite 800 |
| | Bethesda, Maryland 20817 |
| | Attention: General Counsel |
| | Facsimile No.: (240) 744-1199 |

**Section 5.3     Governing Law**. This Guaranty shall be governed in accordance with the State of New York and the applicable law of the United States of America.

**Section 5.4     Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**Section 5.5     Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**Section 5.6     Parties Bound; Assignment; Joint and Several**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. The obligations and liabilities of Guarantor hereunder shall, except as expressly set forth herein, be joint and several.

**Section 5.7     Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**Section 5.8     Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**Section 5.9     Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind

10

any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

Section 5.10 **Rights and Remedies**. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 5.11 **ENTIRETY**. **THIS GUARANTY EMBODIES THE FINAL AND ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTORS' GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

Section 5.12 **WAIVER OF RIGHT TO TRIAL BY JURY**. **EACH PARTY HERETO AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER SUCH PARTY EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE LOAN AGREEMENT, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY LENDER OR GUARANTOR, AS THE CASE MAY BE.**

11

**Section 5.13   Guarantor's Assets**.  Guarantor covenants and agrees that, except for normal and customary loan payments and distributions of capital and profits and the payment of employee salaries and benefits and dividends in the ordinary course of business, Guarantor shall not voluntarily dispose of its assets other than on an arms-length basis in exchange for fair consideration.

**Section 5.14   Reinstatement in Certain Circumstances**.  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise and such payment satisfied any Guaranteed Obligations, Guarantor's obligations hereunder with respect to such Guaranteed Obligations shall be reinstated as though such payment has been due but not made at such time.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, Guarantor has executed this Guaranty Agreement as of the day and year first above written,

**GUARANTOR:**

**PS CDO MANAGER, LLC**
a Delaware limited liability company

By: _____
       Name:  Joseph Iacono
       Title:   Authorized Signatory

*Signature Page to Guaranty Agreement*

Schedule 1